```
              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA

         CASE NO.: 18-CV-24100-COOKE/GOODMAN


DIGNA VINAS,

     Plaintiff,

vs.

THE INDEPENDENT ORDER OF
FORESTERS,

     Defendant.

-------------------------/


              Video deposition of
                 LISA BUCKLAND,
          taken at Toronto Court Reporters
           65 Queen Street W., Suite 1410
           Toronto, Ontario, Canada M5H 2M5
                on March 4, 2020
```

TORONTO COURT REPORTERS

EXHIBIT "A"

```
APPEARANCES:

FOR PLAINTIFF:

CRAIG M. GREENE, Esq.
Kramer, Green, Zuckerman,
Greene & Buchsbaum, P.A.
Co-Counsel for Plaintiff
4000 Hollywood Blvd.,
Suite 485-S
Hollywood, FL. 33021
(954)966-2112
cgreene@kramergreen.com


FOR DEFENDANT:

KRISTINA B. PETT, Esq.
McDowell Hetherington LLP
2385 Executive Center Drive
Suite 400
Boca Raton's, FL 33431
(561)430-3021
kristina.pett@mhllp.com

and

IAN COLLINS, Esq.
In-house counsel for Foresters
Foresters
789 Don Mills Road
Toronto, On M3C 1T9
416-467-2982
icollins@foresters.com
```

**LISA BUCKLAND**    3

1                          TABLE OF CONTENTS
2                                                     Page No.
3          LISA BUCKLAND, sworn                       6
4          EXAMINATION BY MR. GREENE                  6
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**TORONTO COURT REPORTERS**

LISA BUCKLAND     4

```
1                      EXHIBITS

2                                          Page No.

3    EXHIBIT NO. 12: Email from Liz Folk to Eli Whabi and

4    Valerie Bourbonnais.

5                                            38

6    EXHIBIT NO. 13: Contestable Claim Underwriting

7    Review-Life, Bates document 000227.

8                                            39

9    EXHIBIT NO. 14: Email from Liz Folk to Lisa Buckland

10   Dated February 28, 2017 at 9:30:12 a.m.

11                                           44

12   EXHIBIT NO. 15: Email from Liz Folk to Lisa Buckland

13   Dated February 28, 2017 at 9:30:12 a.m.

14                                           44

15   EXHIBIT NO. 16:  The printout from a CRM program.

16                                           50

17

18

19    Objections are found on the following pages:

20         14, 18, 19, 20, 21, 24, 29, 55

21

22

23

24

25
```

TORONTO COURT REPORTERS

1    -- Upon commencing at 8:28 a.m.

2              VIDEOGRAPHER:  This is Peter Goodale,

3    certified legal videographer from Toronto Court

4    Reporters.  We are going on the record on Thursday,

5    March 5, 2020, at the time indicated on the video,

6    which is 8:28 a.m.

7              Here begins Media number 1 in the

8    deposition of Lisa Buckland, taken by plaintiff, in

9    the matter of Digna Vinas versus The Independent

10   Order of Foresters, case number 18-CV-22100, filed

11   in the United States District Court for the Southern

12   District of Florida, and being held at Toronto Court

13   Reporters, 65 Queen Street West, Suite 1410,

14   Toronto, Ontario, Canada.

15             The certified court reporter is Marc

16   Beebe from the firm Toronto Court Reporters.

17             Counsel, please introduce yourselves

18   and state whom you represent, and the court reporter

19   will swear in or affirm the witness.

20             MR. GREENE:  Good morning.  This is

21   Craig Greene, on behalf of the plaintiff Digna

22   Vinas.

23             MS. PETT:  Good morning.  Kristina

24   Pett, on behalf of the defendant The Independent

25   Order of Foresters.

TORONTO COURT REPORTERS

LISA BUCKLAND     6

```
1                    MR. GREENE:  Please swear the witness.
2    LISA BUCKLAND, sworn.
3    EXAMINATION BY MR. GREENE:
4    BY MR. GREENE:
5                    Q - Please give us your name and
6    address?
7                    A - Lisa Buckland.  Home address?
8                    Q - That's fine.
9                    A - Is 512 Drew Street, Oshawa,
10   Ontario, L1H 5B7.
11                   Q - Initially I notice you talk very
12   softly; that's fine for you and I chatting, our court
13   reporter, though, is going to need you to speak up
14   just little bit so that he can hear everything you
15   say.  Okay?
16                   A - Okay.
17                   Q - Okay.  Ms. Buckland, my name is
18   Craig Greene, and I represent the plaintiff, and over
19   the next hopefully not too long, I'm going to be
20   taking your deposition; that means that I'm going to
21   be asking you questions and looking to you for
22   answers.  If at any time you don't understand any of
23   my questions, please let me know; I'll be glad to
24   re-ask the question or rephrase the question or do
25   whatever it takes so you understand the question I'm
```

1     asking and you're giving me an answer accordingly.

2                   I need you to answer all questions out

3     loud with a "yes", a "no", an "I don't know", or any

4     other verbal response, because "uh-huhs", "hm-hmms",

5     shakes of the head, of other non-verbal responses,

6     while it may come across clear on the video, doesn't

7     come across clearly for our court reporter, and

8     that's our official record.

9                   Experience has shown that the most

10    difficult instruction to follow is this:  I need you

11    to please allow me to finish asking all of my

12    questions before you begin answering it.  The reason

13    that that is so hard is because in normal

14    conversation you know what the last two, three, four

15    words of my question are going to be just by the

16    context of our conversation, but in a deposition we

17    need to have a clean question, followed by a clean

18    answer, just because it reads better for our jury.

19    So it may happen; if it doesn't, if you're able

20    remember all the time to let me finish, then you'll

21    be the first in years, but I'm keeping my fingers

22    crossed.

23                   We do take a break about every hour.

24    I'm hoping not to have to take too many breaks with

25    you, if any.

LISA BUCKLAND    8

```
1                     Do you understand all these
2      instructions?
3                     A - Yes.
4                     Q - Okay.  By whom are you employed?
5                     A - Foresters.
6                     Q - Foresters what?
7                     A - Foresters Financial.
8                     Q - Okay.  What do you do for Foresters
9      Financial?
10                    A - I'm a claims adjudicator.
11                    Q - What does a claims adjudicator do?
12                    A - We review claims that come in.
13                    Q - For what kind of, what kind of
14     claim?
15                    A - Death claim, disability claims.
16                    Q - So you work for an insurance
17     company?
18                    A - Yes, sir.
19                    Q - Okay.  And you're part of the team
20     that reviews the claims that are made by policy
21     holders under their policies?
22                    A - Yes.
23                    Q - I have the benefit of having spoken
24     with David yesterday, Sullivan, Mr. Sullivan, and he
25     kind of let me in on some of the things you do.  Do I
```

```
 1    understand that right now you're, a hundred percent
 2    of your professional time is devoted to contestable
 3    life claims?
 4                   A - Yes, sir.
 5                   Q - Okay.  As I understand, a
 6    contestable life claim, basically a insured has the
 7    misfortune of having passed away shorter than the
 8    contestable period, usually two years from the time
 9    that the policy was issued, and under those
10    circumstances the insurance company goes back, looks
11    at the application and determines if there were any
12    mistakes in the application that were material to
13    underwriting the risk, and if the policy would have
14    been written in any other way, any other material
15    form, you all attempt to rescind the policy; is that
16    a pretty good summary?
17                   A - Yes.
18                   Q - Okay.  And that's what you do five
19    days a week, you know, eight hours a day, whatever,
20    whatever your schedule is?
21                   A - Yes.
22                   Q - Okay.  How long have you been doing
23    that?
24                   A - I've been working in the claims
25    department for -- sorry.
```

TORONTO COURT REPORTERS

1           Q - Take your time.  Don't be nervous.

2    I am the single least offensive lawyer you will meet

3    that will be questioning you, I promise.

4           A - Okay.

5           Q - Okay?

6           A - For over six years.

7           Q - Okay.  Have you reviewed anything

8    in preparation for your depo today?

9           A - Just the information that was

10   shown to me.

11          Q - Without telling me what you

12   discussed, tell me what you reviewed?

13          A - I reviewed the documents that Tina

14   had --

15          Q - Okay?

16          A - -- shown me.

17          Q - Can you give me an idea of, after

18   having reviewed them, what they were?

19          A - They were the medical records, my

20   review from going through the file.

21          Q - Okay.  Before reviewing the records

22   that Ms. Pett showed you, if someone had said:  "Did

23   you do a contestable claim for a Rigoberto Vinas?",

24   what would you have told them?

25          A - I don't recall.

**TORONTO COURT REPORTERS**

1          Q - Okay.  That's what I figured.

2          We were told yesterday that you do

3     approximately, there was a range, but there was, you

4     do approximately, you get 300 new files a year; does

5     that sound about right?

6          A - I don't know the number, but it's

7     a lot.

8          Q - Okay.  And you know from reviewing

9     this that you would have reviewed this claim at

10    approximately the beginning of 2017; correct?

11         A - Correct.  Yes.

12         Q - After reviewing the materials that

13    Ms. Pett showed you, do you recognize the file?  Do

14    you remember it?

15         A - No.

16         Q - Okay.  It was just, it's just, that

17    could have been you, it could have been someone else,

18    you have no recollection of working on this file

19    whatsoever?

20         A - I don't, sorry.

21         Q - Okay.  Did you, was there anything

22    in reviewing the file that made you think the steps

23    that were taken were not yours, in other words, you

24    say:  "Well, no, I wouldn't have done that", or:

25    "That seems kind of weird that that was my file.  Are

LISA BUCKLAND    12

1    you telling me that's my file?"  Anything like that?

2                    A - No, sir.

3                    Q - So the steps that were taken that

4    you saw were consistent with what you would have

5    taken anyway?

6                    A - Yes.

7                    Q - Even though you don't remember

8    taken them?

9                    A - Correct.

10                   Q - Okay.  When you undertake a

11   contestable claim, does your inquiry change depending

12   upon the state in which you're doing that claim or

13   making that inquiry?

14                   A - Can you say that again?

15                   Q - Sure.  Are all the policies that

16   you investigate, or all the applications you

17   investigate, are those from the United States?

18                   A - Yes, sir.

19                   Q - Okay.  Does your inquiry, do the

20   questions you ask, or the scope of your inquiry, or

21   any other aspect of your investigation, change

22   depending upon the state where the policy was issued?

23                   A - Not at, not for the beginning

24   process of it; at the end it could.

25                   Q - Okay.  What changes at the end?

TORONTO COURT REPORTERS

LISA BUCKLAND    13

```
1                  A - If it was a causal connection
2      state, we would have to make a direct link between a
3      mis -- if there was a misrep found and the cause of
4      death.
5                  Q - Causal connection meaning that if
6      the insured left off the 16 diagnoses of cancer that
7      he had, which would have caused you not to have
8      issued the policy but he dies by getting hit by a
9      bus, then there would be no causal connection?
10                 A - Correct.
11                 Q - Okay.  And the policy would still
12     then be in effect, in a causal connection state?
13                 A - I would have to look at the whole
14     file for that.
15                 Q - Fair enough.  But that's what you
16     meant by causal connection?
17                 A - Correct, if there's a direct link.
18                 Q - Understood.  When you're making
19     your inquiries -- well, strike that.
20                 Have you ever read the policy
21     representation, or the application representation
22     that the insured makes when he's promising to do
23     whatever he's promising to do in the application?
24                 A - You mean the piece on the actual
25     application itself?
```

TORONTO COURT REPORTERS

LISA BUCKLAND    14

```
 1                    Q - Yes.
 2                    A - Yes.
 3                    Q - I'll paraphrase; if you're
 4       uncomfortable with my paraphrase, you tell me, okay?
 5                    In essence, the proposed insured
 6       promises to provide information that is true and
 7       correct to the best of his or her knowledge or
 8       belief?  Is that accurate?
 9                    A - Yes.
10                    Q - Okay.  When you make your
11       inquiries, do you make your inquiries trying to
12       determine what the proposed insured's best knowledge
13       and belief was at the time that they filled out the
14       application, or do you make your inquiry to determine
15       if the insured left out, for example, a diagnosis
16       that he may or may not have known about?
17                    MS. PETT:  Objection to the form.
18       OBJECTION
19       BY MR. GREENE:
20                    Q - You can answer.
21                    A - I look to see if there was
22       anything that was not disclosed on the application.
23                    Q - Okay.  So your focus is not whether
24       the insured knew about the thing that was not
25       disclosed, your inquiry is to determine whether or
```

TORONTO COURT REPORTERS

1   not there was a diagnosis, or a test, or something

2   like that that was not disclosed?

3              A - I want to see if there was any

4   medical information that was not disclosed on the

5   application.

6              Q - Okay.  Do you ever take the inquiry

7   to the point where you say, okay, there was a blood

8   test -- let's say, for example -- that made its way

9   into the diabetic category -- I'm using one that's a

10  little closer to home for this case -- that now the

11  blood test made its -- let's say in order to be

12  diabetes, it has to have a reading of 7.0 or higher;

13  you with me?

14             A - Yes.

15             Q - Okay.  And you look at a couple of

16  tests, and in fact there was a blood test reading of

17  7.0 or higher on two or three tests; you still with

18  me?

19             A - Yes.

20             Q - Okay.  And the insured did not

21  disclose that he had diabetes; would that be,

22  something that was left off, from your perspective, a

23  misrepresentation?

24             A - I'm looking at what the doctors

25  have documented in the file.

LISA BUCKLAND    16

```
1                    Q - Okay?

2                    A - And I'm, I would look to see if

3         there was a diagnosis of diabetes.

4                    Q - And when you look at diagnosis,

5         what do you look at in the doctor's records?

6                    A - I'm looking to see -- I'm looking

7         to see what the doctor had documented, based on the

8         visits that were that, that he had gone in for.

9                    Q - Right.  But the doctor has

10        different areas in his report; he says "discussed

11        with the patient", there are billing codes; you're

12        familiar with those, right?  CPT codes?

13                   A - Hm-hmm.

14                   Q - Yes?

15                   A - Yes.

16                   Q - Okay.  There are other places where

17        it says "subjective complaints, objective findings",

18        you're familiar with those categories?

19                   A - I am.

20                   Q - Okay.  When you are looking through

21        the records, do you make any attempt to determine

22        what the insured's knowledge and belief was as to his

23        or her condition, or just what the doctor documented?

24                   A - I'm looking at the documentation.

25                   Q - Okay.  So let me follow that up
```

TORONTO COURT REPORTERS

LISA BUCKLAND     17

1    with, so then you do not make any attempt to

2    determine whether the insured provided his best

3    knowledge and belief about what was documented; is

4    that fair?

5                   A - With this file, it was documented

6    so many times that I would think that he was aware

7    of his condition.

8                   Q - I understand that you're making

9    that assumption.  That was an assumption on your

10   part, fair enough?  You would think, you said?

11                  A - Based on the repetitive notes.

12                  Q - Yes.  The CPT codes or the IG

13   whatever codes were, right?  That's what you're

14   referring to?

15                  A - I'm referring to the actual notes

16   in the medical records.

17                  Q - The CPT codes, the ones that say --

18   I forget what the code number is, ant then it says

19   diabetes mellitus, those different notes; right?

20                  A - Yes, all the different notes.

21                  Q - Okay.  Let's get back to my

22   original question though:  Do you make any

23   determination -- this is a general question, not with

24   regards to this file -- when you do your

25   investigations, do you make any attempt to determine

TORONTO COURT REPORTERS

LISA BUCKLAND    18

```
 1    not what's just in the records but whether the

 2    insured knew of his condition so that he could

 3    provide his best knowledge and belief to you?

 4                 A - I look, if it was documented, that

 5    it was discussed directly with him, I would document

 6    that as well.

 7                 Q - Fantastic.  What if it's not?

 8    Other than it saying "I talked to him about it"?

 9                 MS. PETT:  Objection to the form.

10    OBJECTION

11    BY MR. GREENE:

12                 Q - You can answer.

13                 A - If it's not --

14                 Q - Documented?

15                 A - -- specifically documented that

16    they discussed it with him, I'm still going to list

17    what had happened in that visit.

18                 Q - Okay.  And do you make any

19    determination, if there's no documentation of the

20    insured having been provided the information, do you

21    still rescind the policy, even though you don't know

22    if the insured knew of the condition?

23                 MS. PETT:  Object to the form.  Go

24    ahead.

25    OBJECTION
```

TORONTO COURT REPORTERS

LISA BUCKLAND    19

```
 1    BY MR. GREENE:
 2              Q - You can answer.
 3              A - Again, I would document everything
 4    I've seen in the visits, and then I send it off for
 5    another, to underwriting for review.
 6              Q - Right.  And assume underwriting
 7    comes back and said:  "If I knew the guy had
 8    diabetes, I would not have issued the policy."
 9              A - Correct.
10              Q - But you still haven't determined
11    that the insured knew of the condition in my
12    hypothetical; right?
13              MS. PETT:  Objection to the form.  Go
14    ahead.
15    OBJECTION
16              A - Yes, I don't want to do
17    hypotheticals.
18    BY MR. GREENE:
19              Q - Well, we -- that's what you do
20    every day when you send off things back to your
21    underwriter and say:  "What would you have done if?"
22    So no disrespect, but follow along with me.
23              In this case that I'm asking you
24    about, you go ahead, you look at the insured's
25    medical records; there's nothing to indicate that
```

**TORONTO COURT REPORTERS**

LISA BUCKLAND    20

1    the doctor talked to the insured about any of his

2    diagnosis; you with me so far?

3                A - Yes, I am.

4                Q - Okay.  And yet you find something

5    that looks like it was omitted from the application;

6    still with me?

7                A - Yes.

8                Q - Okay.  Now, you send it off to

9    underwriting, underwriting said:  "We would have

10   issued a different policy."  You still with me?

11               A - Yes.

12               Q - "Or we wouldn't have issued the

13   policy."  Anyone of those?

14               A - Yes.

15               Q - You still with me?

16               A - Yes.

17               Q - Do you rescind the policy, even

18   though you have not made a determination whether the

19   insured knew of the condition?

20               MS. PETT:  Objection to form.  Go

21   ahead.

22   OBJECTION

23               A - At that point I would do up a

24   rescission letter and send it to management for

25   review.

TORONTO COURT REPORTERS

LISA BUCKLAND    21

```
1    BY MR. GREENE:
2              Q - So your recommendation would be to
3    do a rescission?
4              A - Correct.
5              Q - Why would you do that if you have
6    never at that point made a determination whether the
7    insured provided his best knowledge and belief?
8              MS. PETT:  Objection to the form.
9    OBJECTION
10             A - Again, I would do it based on the
11   amount of times it was noted in the medical records,
12   I would, I would have to believe that he was aware
13   of his medical conditions.
14   BY MR. GREENE:
15             Q - Is there a reason you wouldn't call
16   or make a written inquiry of the doctor to find out
17   if he, if the patient was aware of his medical
18   condition?
19             A - There's no reason.
20             Q - Okay.  You could do it?
21             A - I could go back to the doctors;
22   correct.
23             Q - You agree with me that in terms of
24   getting to the actual answer of whether the insured
25   provided his best knowledge and belief, that would be
```

TORONTO COURT REPORTERS

```
1    more accurate, a better way to do it, than -- and I'm
2    not being disrespectful, but assuming that he must
3    have known by the number of times the doctor made an
4    entry; would that be fair?
5              MS. PETT:  Objection to the form.
6              WITNESS:  Can you read it to me?
7              MR. GREENE:  Sure.  Can you read that
8    back, please.  Listen to it carefully.
9              COURT REPORTER:  "You agree with me
10   that in terms of getting to the actual answer of
11   whether the insured provided his best knowledge and
12   belief, that would be more accurate, a better way to
13   do it, than -- and I'm not being disrespectful, but
14   assuming that he must have known by the number of
15   times the doctor made an entry; would that be fair?"
16   BY MR. GREENE:
17             Q - In other words, actually calling
18   the doctor and saying:  "Did you tell him?", as
19   opposed to assuming he must have told him because
20   there were a bunch of entries on there?  That's all.
21             MS. PETT:  Objection. Okay.
22   BY MR. GREENE:
23             Q - You can answer.
24             A - Sorry, I'm not sure how to answer
25   this one.  Yeah, I don't think it's a better way.  I
```

```
1     think it's another way that I could have gotten,
2     found out if he was aware.
3     BY MR. GREENE:
4                 Q - Well, one would tell you the actual
5     answer; right?
6                 A - Yes.
7                 Q - Your way doesn't tell you the
8     actual answer; does it?
9                 A - No.
10                Q - Okay.  In reviewing the records
11    that Ms. Pett showed you -- first of all, when did
12    you do that?
13                A - The, this actual file?
14                Q - Yes.
15                A - I believe it was early 2017.
16                Q - I'm sorry, no, when did you
17    review --
18                A - Oh.
19                Q - -- the file with Ms. Pett?
20                A - Just -- was it Tuesday?  Tuesday.
21                Q - Okay.  The documents that you were
22    referring to were the documents contained within the
23    claim file; correct?
24                A - Correct.
25                Q - And if I understand correctly, they
```

**TORONTO COURT REPORTERS**

```
 1   were just Dr. Hershman's records; would that be
 2   right?
 3             A - I believe so.
 4             Q - Okay.  Was there any other document
 5   that you relied upon to make your recommendation to
 6   deny the claim and rescind the policy other than the
 7   CPT code entries that Dr. Hershman made?
 8             MS. PETT:  Objection to the form.
 9   OBJECTION
10             A - You keep referring to CPT codes
11   that --
12   BY MR. GREENE:
13             Q - Let's get to what they are, because
14   they may be, I may be using the wrong term.
15             A - Yes.
16             Q - I'm talking about the billing
17   codes; do you know what I'm talking about when I say
18   that?
19             A - Yeah, ICDs.
20             Q - ICD codes?
21             A - Yeah.
22             Q - Okay.  Here's the claim file.  This
23   should be a copy of -- I'm showing the witness
24   plaintiff's Exhibit 8 from yesterday.  That should be
25   a complete copy of what Ms. Pett showed you.
```

**TORONTO COURT REPORTERS**

LISA BUCKLAND    25

1           A - Okay.

2           Q - Can you tell me what you were

3    referring to when you said that you relied upon

4    "blank" to recommend rescission?

5           A - Well, I would, I would look at it

6    as a whole, not just codes.  I'm looking at it as a

7    whole.  I'm looking at the reason for the visits.

8    I'm looking at everything that's documented, just,

9    not just the ICD codes listing a diagnosis.

10          Q - I understand you're getting all the

11   medical records.

12          A - Hm-hmm.

13          Q - But I'm asking you what are you

14   looking at as the basis for the misrepresentation?

15          A - I'm looking to see if the doctor,

16   what the doctor documented.  Again, not just codes,

17   I'm looking at the reason for the appointments; I'm

18   looking at current medications.

19          Q - Okay?

20          A - Past medical history, and --

21          A - Okay.  Let's talk about a few of

22   those.  Was this patient on any diabetes medication?

23          A - I would have to go through the

24   file again.

25          Q - Okay.  Let's do this -- David's not

TORONTO COURT REPORTERS

```
 1    here yet, but --
 2                 MR. COLLINS:  Not to my knowledge.
 3    BY MR. GREENE:
 4                 Q - Okay.  I'm going to let you --
 5    we're going to go off the record because nobody likes
 6    to read while a camera's --
 7                 A - Thank you.
 8                 Q - No problem.  Go off the record.
 9    I'm going to ask you these questions: I'm going to
10    ask you what you looked at; I'm going to ask you
11    whether there was any history of diabetes, other than
12    those IG -- what are they?
13                 A - ICD.
14                 Q - IC --
15                 A - -- D.
16                 Q - ICD codes, cause I won't mess that
17    up again, I promise.  ICD codes.  I'm going to ask
18    you if there's any indication of blood.  Do you --
19    well, let me ask you:  Do you look at blood test
20    results?
21                 A - Not necessarily.
22                 Q - Well, I need an answer.  Do you
23    look at blood test results when determining whether
24    someone has or has not allegedly made a
25    misrepresentation in the application?
```

TORONTO COURT REPORTERS

LISA BUCKLAND    27

1              A - I look at test results, yes.

2              Q - Okay.  And that would include blood

3        test results?

4              A - It would look at, yes, all test

5        results.

6              Q - Okay.  So you do look at them?

7              A - I look at those.

8              Q - Okay.  When looking at them, do you

9        measure whether, do you determine whether they are

10       normal or abnormal for an indication of a diagnosis

11       for whatever condition you're suspecting?

12             A - That would be underwriting that

13       would do that.

14             Q - Okay.  But when you're making the

15       decision as to whether somebody misrepresented or

16       not, do you look at the blood test result to

17       determine whether or not, "Hey, given he had this

18       blood test result, he must have known that he had

19       disease A, B or C"?

20             A - Again, I'm going to look at what

21       the doctor documented.  They, they generally, they

22       would typically mention the test results and --

23             Q - That's answering your question

24       about whether you'd look at what the doctor

25       documented, that wasn't my question.  Can you read

**TORONTO COURT REPORTERS**

LISA BUCKLAND     28

```
1    back my question, please?
2                    COURT REPORTER:  "But when you're
3    making the decision as to whether somebody
4    misrepresented or not, do you look at the blood test
5    result to determine whether or not, 'Hey, given he
6    had this blood test result, he must have known that
7    he had disease A, B or C'?"
8                    A - I do look at the blood test
9    results, but I would not base a rescission strictly
10   on them.
11                   Q - Okay.  So if hypothetically there
12   was some blood test result that would indicate the
13   presence, God forbid, of cancer, and that blood test
14   result came back positive, that would be something
15   you would consider?
16                   A - Correct.
17                   Q - On the other hand, if the doctor
18   sent out a blood test result that in order to have a
19   diagnosis of cancer it had to have a reading of 3 or
20   over, and this guy was 2.9, you would indicate that
21   he didn't have cancer; right?
22                   A - I would, again I would take it as
23   a whole; I would look at everything.
24                   Q - You would consider that?
25                   A - I would consider it.
```

LISA BUCKLAND    29

```
 1              Q - Okay.  And you would actually look

 2     at the reading, the number, versus what it took to be

 3     diagnosed with that condition, that would be part of

 4     your factoring; right?

 5              Do you understand the question?

 6              A - I do understand what you're

 7     saying, I just am not sure how to answer you.

 8              I would, I would run it by

 9     underwriting for their opinion on it.

10              Q - You're asking underwriting whether

11     they would have issued the policy or not had they

12     known A, B and C, that's your question to

13     underwriting; right?

14              A - Yes.

15              Q - Okay.  What I'm asking you is, from

16     the claims perspective of whether or not the insured

17     misrepresented something or not; do you take into

18     consideration the reading, the blood test reading,

19     what number it is and what it takes in order to have

20     a positive diagnosis that you claim the, a proposed

21     insured left off, or a negative diagnosis?

22              MS. PETT:  Objection to the form.

23     OBJECTION

24     BY MR. GREENE:

25              Q - Do you look at that number and what
```

TORONTO COURT REPORTERS

1    it takes for it to be positive?

2              A - I look at the, I look at the test

3    results, and not being a doctor, I am not --

4              Q - Qualified?

5              A - -- yes, I'm not qual -- like, I

6    don't know --

7              Q - I'll help where I can.

8              A - -- what the reading should exactly

9    be, so I would discuss it with underwriting.

10             Q - So then, what's the point of you

11   looking at a blood test result if you don't know what

12   the meaning of the blood test result was?

13             A - I would, I would include it, I

14   could include it when I sent it to underwriting.

15             Q - What if the blood test result comes

16   back and says 1,567, do you know what 1,567 means on

17   any particular reading?

18             A - Some of them I do.

19             Q - Okay.  So you do take your

20   knowledge and experience about what a positive or

21   negative result is into consideration when deciding

22   whether to rescind a policy?

23             A - Yes.

24             Q - Okay.  Are you familiar with what

25   positive, negative or other similar readings are for

```
 1    diabetes?

 2                    A - No.

 3                    Q - So if I were to tell you that a

 4    particular insured had a 4.0, a 5.0, 6.0, 7.0 or an

 5    8.0 on an A1c reading, you would have no idea what

 6    that meant?

 7                    A - No.

 8                    Q - Okay.  At the time that you made

 9    your decision to recommend, the time you made your

10    decision whether to recommend -- or to recommend

11    rescission and deny Ms. Vinas' claim, did you have

12    available to you the diabetes questionnaire?

13                    A - Yes, sir.

14                    Q - Okay.  And has that been marked as

15    Exhibit 6?  Is that the diabetes questionnaire that

16    I'm handing you?

17                    A - Yes.

18                    Q - Okay.  I have another -- that's

19    okay.

20                    Now this, if I understand correctly,

21    was a document that was signed by the insured as

22    well; correct?

23                    A - Yes.

24                    Q - And it was done because apparently

25    the Medical Information Bureau had a 2012 hit that
```

TORONTO COURT REPORTERS

LISA BUCKLAND    32

1    reflected diabetes with regard to Mr. Vinas; does

2    that sound familiar?

3                    A - Yes.

4                    Q - And in order to clarify the issue,

5    Foresters asked for this document to be sent out;

6    does that sound familiar?

7                    A - Yes.

8                    Q - Okay.  And this is all information

9    that you gathered and reviewed and went over before

10   you made your recommendation; correct?

11                   A - Yes.

12                   Q - Read along with me, if you would,

13   on number 11.  It says:  "Please provide any

14   additional information you feel you would -"- you"

15   means Mr. Vinas; right?

16                   A - Yes.

17                   Q - Okay. "-- is important in relation

18   to this condition", and "this condition" would be

19   regarding diabetes; correct?

20                   A - Yes.

21                   Q - Okay.  Read what the insured wrote,

22   please.

23                   A - "Proposed insured had a medical

24   exam done for an insurance policy --"

25                   Q - Let me just warn you -- I didn't do

TORONTO COURT REPORTERS

1   this, my bad.  When you read, you tend to speak much

2   more quickly, we all do.

3                   A - Okay.

4                   Q - So consciously read slowly because

5   our court reporter will, we don't want him to get to

6   upset with us.

7                   A - Okay.

8                   Q - Yeah.

9                   A - "Proposed insured had a medical

10   exam done for an insurance policy in 2012.  The

11   medical examiner told him that he had diabetes."

12                   Q - Okay.  Let me stop you there.  That

13   would be the medical examiner for the, for the

14   insurance policy from 2012; is that how you read it?

15                   A - Yes.

16                   Q - Okay.  Go on.

17                   A - "After following up with his

18   primary doctor and doing additional testing, he

19   concluded that the primary insured did not have

20   diabetes."

21                   Q - Let me stop you there.  So

22   apparently Mr. Vinas went to his doctor; correct?

23                   A - Correct.

24                   Q - And that would be Dr. Hershman, the

25   primary doctor; right?  If It says it up here?

```
 1                    A - Yes.

 2                    Q - Okay.  And Dr. Hershman told him he

 3          did not have diabetes; that's what that form says;

 4          right?

 5                    A - That's what it says.

 6                    Q - Okay.  So you had in front of you,

 7          when you evaluated this claim to determine what

 8          Mr. Vinas' best knowledge and belief was about

 9          whether he had diabetes or not, information that his

10          doctor told him he did not have diabetes; would that

11          be fair?

12                    A - That's what he said.

13                    Q - Okay.  And after being told that,

14          with that information, the policy was issued; right?

15                    A - Yes.

16                    Q - So Foresters relied upon, among

17          other things, the accuracy of that information in

18          issuing the policy; fair?

19                    A - Yes.

20                    Q - Okay.  I just brought up to your

21          attention here -- and if you want to read the rest, I

22          don't want to be accused of stopping you; if you

23          think that I've stopped you and there's something

24          more you want to read for fairness, please do.  Is

25          there anything more you want to read there?
```

TORONTO COURT REPORTERS

1           A - No, I'm okay with it.

2           Q - Okay.  I've just pointed out to you

3   in this deposition that there was affirmative

4   documentation in the file that specifically addressed

5   what Mr. Vinas was told by his doctor; right?

6           A - Yes.

7           Q - Okay.  Other than that, other than

8   the fact that Mr. Vinas was specifically told by his

9   doctor that he did not have diabetes, according to

10  this document, are you aware of any other evidence in

11  your entire claim file that you've reviewed that

12  addresses what Mr. Vinas was actually told by his

13  doctor?

14          A - No, sir.

15          Q - Okay.  So then, it's fair to say

16  the only evidence in your claim file about what

17  Mr. Vinas was told by his doctor indicates he was

18  told that he did not have diabetes; fair?

19          A - Can you repeat that?  Sorry.

20          Q - Sure.  The only evidence in your

21  claim file which addresses what Mr. Vinas was told by

22  his doctor relating to diabetes was that he was told

23  by his doctor that he did not have diabetes; is that

24  a fair statement?

25          A - Yes.

LISA BUCKLAND    36

1              Q - Let me have a couple of -- dot a
2    couple "i"s and cross a couple "t"s here.
3              Do you have any recollection of the
4    handling of this file whatsoever?
5              A - No, sir.
6              Q - Do you have any recollection of
7    ever talking to Mrs. Vinas?
8              A - No, sir.
9              MR. GREENE:  Let's go off the record
10   and let me look at that screenshot that we haven't
11   been able to print out yet, make sure there's
12   nothing in there I need you to go over.  I think I'm
13   done with this young lady.
14             VIDEOGRAPHER:  Off the record at 9:02
15   a.m.
16   (OFF RECORD)
17             VIDEOGRAPHER:  We're back on the
18   record at 9:10 a.m.
19   BY MR. GREENE:
20             Q - Okay.  Ms. Buckland, I have a
21   couple of things before we move on to the document.
22             The material was sent by Mrs. Vinas,
23   the medical records specifically, to the insurance
24   company on what's dated as February 1st, 2017.  If
25   we assume it got to you the 2nd, 3rd, 4th, something

```
1    like that, your documentation for having reviewed
2    the material and gotten the recommendation off to --
3    or the summary, I should say, off to underwriting
4    wasn't till the 24th, three weeks later; is that
5    about the turnaround time for files in your office
6    that you're working on?
7                   A - Turnaround times can vary.
8                   Q - I'm just trying to figure out what,
9    what was going on during this three weeks, and I know
10   you have no independent recollection of it, and I
11   understand that 100 percent, but I'm trying to figure
12   out why it took three weeks after Mrs. Vinas sent the
13   documents in for you to even first then send a
14   summary to --
15                  A - It would be based on my workload.
16                  Q - Okay.  Let me ask you to take a
17   look at Exhibit 12.  Actually, it's probably --
18                  MS. PETT:  Didn't we mark that
19   yesterday?
20                  MR. GREENE:  I don't think these
21   individual ones were.  If they were, then I'll
22   certainly have to use the other one.  Let's see.
23                  I don't think so.  I know we looked at
24   them.
25                  MS. PETT:  Okay.
```

TORONTO COURT REPORTERS

```
 1                    MR. GREENE:  I know there were two of
 2       them; there was 245 and 246, and -- so I think there
 3       was 227.
 4       EXHIBIT NO. 12: Email from Liz Folk to Eli Whabi and
 5       Valerie Bourbonnais.
 6       BY MR. GREENE:
 7                    Q - Take a look at what's been marked
 8       as Exhibit 12, if you would.
 9                    Is -- I know that the header on that
10       says it's from Liz Folk, but I think that's because
11       that's the return version of it.
12                    A - Yes.
13                    Q - Is that a summary that you prepared
14       to send to underwriting of what you found to be the
15       relevant factors from the claim file?
16                    A - Yes.
17                    Q - I have something here.  What's the
18       Bates stamp number on that if you would, please?
19                    A - This number?  The IOF-000245?
20                    Q - 245.  Okay.  You've indicated --
21       strike that.
22                    Is it your job, if I understand
23       correctly, to provide underwriting with all of the
24       information from the entire file that you think is
25       relevant to the determination of whether or not A,
```

LISA BUCKLAND   39

1    the proposed insured answered something incorrectly,
2    and B, whether it was material?
3              A - Yes.
4              Q - Okay.  What part of this did you
5    fill out, including just filling in blanks?  You
6    know, I assume there's a place for age at issue, you
7    probably had to fill that in or maybe that came in
8    prefilled?
9              A - Do you have the one I sent to Liz,
10   just because Liz also adds stuff in on this?
11             MS. PETT:  I have it.
12             MR. GREENE:  Okay.  Let's go ahead,
13   we'll mark that as Exhibit 13, if that's okay?  Here
14   you go.
15   EXHIBIT NO. 13: Contestable Claim Underwriting
16   Review-Life, Bates document 000227.
17   BY MR. GREENE:
18             Q - Okay.  And for the record, that's
19   Bates stamp what?
20             A - 000227.
21             Q - Okay.  Hold on one second, I'll get
22   to that.
23             And my question is the same:  What did
24   you fill in?
25             A - Everything that is completed on it

TORONTO COURT REPORTERS

LISA BUCKLAND    40

1    I had written in.

2                    Q - Okay.

3                    A - Everything that's not in bold.

4                    Q - Okay, 'cause the bold is what's

5    pre-filled for, for the question?

6                    A - Correct.

7                    Q - Okay.

8                    A - Except for where it says "Report

9    from Hershman Medical Center", I would have put that

10   in.

11                   Q - Okay.  So then you filled in that

12   this was a male, 73 years old, non-tobacco user.  The

13   issue date and the date of death, that was all

14   information you filled in?

15                   A - Yes.

16                   Q - And the questionnaires, indicates

17   diabetes questionnaire, that's that extra

18   questionnaire you all sent out, right?

19                   A - Yes.

20                   Q - Then you gave a summary of the

21   things you thought were relevant from the medical

22   records; right?

23                   A - Correct.

24                   Q - Do you also attach the medical

25   records for the underwriter's review as well?

TORONTO COURT REPORTERS

LISA BUCKLAND    41

1              A - No, sir.

2              Q - So the only thing that the

3      underwriter has available to him, or her, is this

4      sheet?

5              A - No, sir.  When -- I don't attach

6      the medical records but they do have access to them

7      in our system.

8              Q - Understood.  So they can get to

9      them, they're just not physically attached?

10             A - Correct.

11             Q - Understood.  Okay.

12             You indicated what you thought were

13     the bases for the, what you call misrepresentation

14     or inaccuracies in the questionnaire; correct?

15             A - Yes, sir.

16             Q - Okay.  And you told me that you do

17     understand that the question that is to be answered

18     in order to determine whether there's a

19     misrepresentations is whether or not the insured

20     answered the questions not accurately but rather to

21     his best knowledge and belief; true?

22             A - Yes.

23             Q - Okay.  Is there any reason you

24     didn't include in the information to be provided to

25     the underwriter the fact that this insured, in

TORONTO COURT REPORTERS

1   addition to these, what you thought were
2   inconsistencies or discrepancies, the fact that the
3   insured was specifically told by his doctor that he
4   did not have diabetes, is there a reason you didn't
5   include that as a question?
6           A - No.
7           Q - Why would you not have included
8   that if the ultimate question to be determined is
9   what the insured knew?
10          A - I include what's in the medical
11  records.
12          Q - Don't you also include what's in
13  the other material that you had available to you?
14          A - No, this is, what you see here is
15  what I send off.
16          Q - Right?
17          A - Underwriting has access to the
18  whole file, and they would --
19          Q - Okay?
20          A - -- they would do what they do.
21          Q - Okay.  So you, you pointed out the
22  stuff that you felt was inconsistent, but you didn't
23  point out any of the information that showed that
24  Mr. -- in this case you pointed out things that you
25  thought were inconsistent, but you did not point out

```
1     the single area in the entire file that said that

2     Mr. Vinas didn't know that he had --

3                    A - I didn't point that out, no.

4                    Q - Diabetes was my last word but,

5     that's fine.  Okay.  We're done with that exhibit;

6     we're going to leave that here.

7                    I'll mark these.  We have the same

8     agreement, all these are business records?

9                    MS. PETT:  Yes.

10                    MR. GREENE:  I don't even have the

11    video on you.

12    BY MR. GREENE:

13                    Q - Take a look at Exhibit number 14

14    and Exhibit -- I don't know why I have a separate

15    one -- and Exhibit 15.

16                    MS. PETT:  We have a 15 already.

17                    MR. GREENE:  No, remember we

18    substituted 11 --

19                    MS. PETT:  Oh, that's right.

20                    MR. GREENE:  -- at the end by

21    stipulation.

22                    MS. PETT:  Yes.

23    BY MR. GREENE:

24                    Q - Those two seem to be identical, but

25    they were two different Bates stamp numbers, so I'm
```

TORONTO COURT REPORTERS

LISA BUCKLAND    44

```
 1    showing them both to you, and I've marked them as 14
 2    and 15.  Can you tell us what those are?
 3    EXHIBIT NO. 14: Email from Liz Folk to Lisa Buckland
 4    Dated February 28, 2017 at 9:30:12 a.m.
 5    EXHIBIT NO. 15: Email from Liz Folk to Lisa Buckland
 6    Dated February 28, 2017 at 9:30:12 a.m.
 7              A - This is when Liz sends the
 8    underwriting, sent the underwriting opinion back to
 9    me.
10    BY MR. GREENE:
11              Q - Okay.  So there's the, if I
12    understand correctly, there's the, your request:
13    "Please review and advise"?
14              A - Hm-hmm.
15              Q - And that's, you're sending the
16    underwriter the request to review a contestable
17    claim; correct?
18              A - Yes.
19              Q - And that was this contestable
20    claim; right?
21              A - Yes.
22              Q - And she knows what you're talking
23    about because you do this all day long; right?
24              A - Correct.
25              Q - It's not like you have to say:
```

TORONTO COURT REPORTERS

1    "Please review and advise.  This is an insured

2    were -- yadda-yadda yadda"; right?

3                    A - That's correct.

4                    Q - Okay.  Does underwriting have a

5    dedicated group of folks that just review contestable

6    claims?

7                    A - Yes.

8                    Q - Okay.  So claims has a dedicated

9    group of folks that just adjust contestable claims,

10   you know, see if there's a misrepresentation,

11   underwriting has a group of folks that just review it

12   from the underwriting perspective?

13                   A - Correct.

14                   Q - So you work with Liz all the time?

15                   A - I used to.

16                   Q - Or did before she left?

17                   A - Correct.

18                   Q - Okay.  And then the other part of

19   the email is her response back to you where she says:

20   "Hi Lisa.  The opinion is archived.  Regards"?

21                   A - Yes.

22                   Q - On average, just on average, how

23   many of these requests do you send to underwriting on

24   a daily basis, or a weekly basis?  I don't need an

25   exact number, I just want a ballpark?

LISA BUCKLAND    46

```
1                    A - It varies.
2                    Q - I'm sure it does.  Is it ten?
3       Three?  Seven?  Twenty?
4                    A - It could be one; it could be none;
5       it could be five.
6                    Q - Okay.  So somewhere between one and
7       five a day?
8                    A - It could be.
9                    Q - That's what --
10                   A - Yeah.
11                   Q - I'm looking for a range that you
12      feel comfortable with; you're under oath so obviously
13      I want you to tell the truth.  It's somewhere between
14      one and five?
15                   A - Yes.
16                   Q - Six, six would be really unusual,
17      and zero would be really unusual?
18                   A - Yeah.
19                   Q - Okay.  Fair enough.
20                   And do you usually get back about the
21      same?  Does underwriting usually get them back to
22      somewhere between one and five results per day?  On
23      average again?
24                   A - Yes.
25                   Q - Okay.  I need you to think back,
```

1    and I want you to look at your experience, you've

2    been doing this five years, okay?  About what

3    percentage of the opinions that come back from

4    underwriting say that "The policy would not have been

5    issued the way it was originally issued" versus, say,

6    "Yes, we would have issued it the same"?

7                    A - I don't know.

8                    Q - You have no idea?

9                    A - I don't know.

10                   Q - You literally have -- you can't

11   tell me if it's, if it's above 50 percent, below

12   50 percent, 20 percent, 10 percent?  You have zero

13   idea?

14                   A - I don't know the percentage.

15                   Q - Are there more that come back that

16   are found to be rescindable, that is that it was a

17   material misrepresentation?

18                   A - Honestly, I don't know.  I don't

19   know.

20                   Q - Who would keep track of that kind

21   of thing?

22                   A - Management would.

23                   Q - Okay.  Did you work yesterday?

24                   A - Yes, sir.

25                   Q - Okay.  Did you get back any, any

**TORONTO COURT REPORTERS**

```
 1     reports yesterday from underwriting?
 2                    A - I -- my --
 3                    Q - I won't ask you names, I promise.
 4                    A - Okay.
 5                    Q - Social security numbers or diseases
 6     or anything like that, just very generically, did you
 7     get back any?
 8                    A - Honestly, I don't know, because I
 9     did a system upgrade yesterday morning and my
10     Outlook was down until this morning.
11                    Q - Fair enough.  Did you work the day
12     before?
13                    A - Yes.
14                    Q - Okay.
15                    A - Only for a couple of hours.
16                    Q - Okay.  When is the last full day
17     that you put in at Foresters?
18                    A - It was on Monday.
19                    Q - Okay.  On Monday, about how many of
20     these did you get back from underwriting?
21                    A - I don't know exactly.
22                    Q - I know.
23                    A - I believe one or two.
24                    Q - Okay.  Were the one or two that you
25     got back, did they find that the policy should be
```

TORONTO COURT REPORTERS

LISA BUCKLAND    49

```
 1      rescinded, or did they find that the policy would
 2      have been issued as-is?
 3                  A - I don't know, I haven't got to
 4      them yet.
 5                  Q - Okay.  What's the last one you
 6      remember?
 7                  I'm trying to make it easy, you keep
 8      pushing me back.
 9                  A - You noticed.
10                  Q - And that's important.  What's the
11      last one you remember?
12                  A - The last one I remembered --
13      remember, we are not going -- we are -- I'm going to
14      prepare a rescission letter on it.
15                  Q - Okay.  And that was last --
16                  A - That would have been on Friday.
17                  Q - Last week?
18                  A - Yes, sir.
19                  Q - Okay.  Did you only do one that
20      day, I think?
21                  A - I believe it was just the one that
22      day.
23                  Q - Okay.  Do you remember any from
24      Thursday?
25                  A - No.
```

```
 1                    Q - Okay.  All right.  Let's go through
 2     this document really quick.  We're going to mark it
 3     as Exhibit 16.
 4                    MR. GREENE:  All right.  For the
 5     record, last night at, right in between the salad
 6     and the escargot, I received an email from
 7     counsel -- I received an email from counsel
 8     indicating that her client had in fact found some
 9     additional documents that would have been responses
10     to the request for production; was this the CRN, is
11     that what it was called?
12                    MS. PETT:  CRM.
13                    MR. GREENE:  CRM.  From the CRM file,
14     and we are doing our best to make our way through
15     that stuff today.
16     BY MR. GREENE:
17                    Q - Have I marked as Exhibit number 16,
18     Ms. Buckland, the printout from a CRM program?
19                    A - Yes, sir.
20     EXHIBIT NO. 16:  The printout from a CRM program.
21     BY MR. GREENE:
22                    Q - Is it a program?  Is that what it
23     is?
24                    A - Yes.
25                    Q - Okay.  I'm going to walk
```

LISA BUCKLAND     51

```
 1        Mr. Sullivan through the majority of this, but I am
 2        asking you, take a look at the very top.  It says:
 3        "Created on January 12th, 2017, at 11:46 in the
 4        morning.  Death claim."  Who would have put that
 5        information in there?
 6                    A - It was created by.
 7        Natasha who was a phone representative.
 8                    Q - Okay.  And it says you were the
 9        owner?
10                    A - Yes.
11                    Q - What does "owner" mean?
12                    A - It means it's going to be one of
13        the files I'll handle.
14                    Q - Okay.  Are these on a wheel?  Do
15        they just get assigned next one, next one, next one,
16        next one?
17                    A - Yes.
18                    Q - Okay.  And apparently, according to
19        this, the -- on January 12th, the agent called to
20        report that the insured had passed away, and
21        requested the claims forms be sent via email.  Did I
22        read that accurately?
23                    A - Yes.
24                    Q - Okay.  And it says:  "Letter
25        emailed and imaged to FN --"
```

LISA BUCKLAND   52

```
1                    A - FileNexus.
2                    Q - "-- FileNexus on January 16th,
3         17th, by someone named E.H."?
4                    A - Yes.
5                    Q - We don't know -- oh, do we know who
6         E.H. is?
7                    A - I am -- Elizabeth Harris is who I
8         would think that is.
9                    Q - Is that a clerical type person?
10                   A - Yes.
11                   Q - Okay.  And the status is:  Problem
12        solved, meaning she went ahead and sent the stuff?
13                   A - Sent the forms.
14                   Q - Did you undertake to input any of
15        the information on the one, two, three, four pages
16        that make up Exhibit -- I think it was 16?
17                   A - Yes.
18                   Q - Okay.
19                   A - And no, I did not.
20                   Q - Okay.  Did you have available for
21        your review any of the information on Exhibit 16?
22                   A - Yes.
23                   Q - What was available for your review?
24                   A - All of it.
25                   Q - Can you tell me -- all right, let's
```

TORONTO COURT REPORTERS

LISA BUCKLAND     53

```
 1    backup.
 2                    There are two areas of inquiry that I
 3    would normally ask about now; one is what your
 4    normal process would be, one is what you know you
 5    did in this case.  So I just want you to know that
 6    both of those are coming, okay?
 7                    A - Okay.
 8                    Q - I assume you have no -- since you
 9    told me you have no recollection dealing with this
10    claim, you can't tell me if you did any particular
11    step with regard to the handling of this case?
12                    A - Correct.
13                    Q - Okay.  So if I ask you to look at
14    page 1, the entry on January 14th, 2015, at 11:44,
15    and then the entry on January 15th, 2015 at 9:14, and
16    if I ask you did you review those prior to making
17    your decision, you would have to tell me you don't
18    know one way or the other; correct?
19                    A - Correct, I don't recall.
20                    Q - Fair enough.  If I asked you would
21    it have been your normal process or your normal
22    course of events in what you do, did you review this,
23    what would you tell me?
24                    A - No.
25                    Q - Okay.  You would tell me you would
```

TORONTO COURT REPORTERS

1   not normally have reviewed this?

2                   A - No, sir.

3                   Q - What I said is correct?

4                   A - Correct.

5                   Q - It could be a double negative.

6                   A - Yes.

7                   Q - Okay.  In addition, then, to the

8   diabetes questionnaire form, there is an indication

9   on January 14th, 2015, that apparently was -- was it

10  input by Megan Lehman?

11                  A - Yes.

12                  Q - Okay.  L-E-H-M-A-N.  Megan is

13  M-E-G-A-N.

14                  That says that the agent called to

15  advise that Mr. Vinas does not have diabetes.  I

16  substituted the names, but is that accurate?

17                  A - Yes.

18                  Q - Okay.  Mr. Vinas completed an exam

19  for insurance in 2012, when the examiner advised the

20  client, specifically Mr. Vinas, that he had diabetes.

21  Mr. Vinas went to see the doctor and was advised that

22  he does not suffer from diabetes.  All of that was in

23  the system; correct?

24                  A - Yes.

25                  Q - If you would have looked at that

**TORONTO COURT REPORTERS**

1    beforehand, would that have at least raised some

2    question in your mind, in light of what you -- in

3    light of your burden to determine what Mr. Vinas'

4    best knowledge and belief was as opposed to whether

5    he met some diagnostic criteria --

6              MS. PETT:  Objection to the form.

7    Sorry, I thought you were done.

8              MR. GREENE:  I promise, I'll let you

9    know.

10             Okay, let me restart.

11   BY MR. GREENE:

12             Q - If you had looked at this prior to

13   making your decision, indicating that Mr. Vinas was

14   specifically told he didn't have diabetes, can you

15   tell me one way or the other if it would have

16   affected your decision?

17             MS. PETT:  Objection to the form.  Go

18   ahead.

19   OBJECTION

20             A - It would not have.

21   BY MR. GREENE:

22             Q - Okay.

23             A - The same information was provided

24   on the questionnaire.

25             Q - So you would have recommended

```
1    rescinding this policy even though the last
2    information you have about what Mr. Vinas actually
3    knew was that he was told he didn't have diabetes; is
4    that true?
5                A - He stated he didn't know.  The
6    information I had in the medical records showed that
7    he did have it, so I would have still recommended
8    rescission.
9                Q - So for you, it wasn't a question of
10   what he knew or not, it was what the diagnosis was?
11               A - Correct.
12               Q - Okay.  Last thing I need you to
13   look at is the actual medical records.  I did have
14   you look through them while we were off the record
15   before.  Did you have a chance to do that?
16               A - I -- no, I didn't go through them.
17               Q - You didn't.  Okay.
18               What I'd like you to do, and maybe
19   we'll let you take a minute, we'll start David, and
20   then come back to you and finish.
21               Remember I told you I was going to ask
22   you those four categories of questions:  Who, what
23   documents did you review; where were they located?
24   That doesn't ring a bell?
25               Okay.  Let me tell you what I want you
```

TORONTO COURT REPORTERS

LISA BUCKLAND    57

1    to do.  I want you to look through the claim file.

2                   A - Okay.

3                   Q - And I, specifically with regard to

4    the medical records.

5                   A - Hm-hmm.

6                   Q - I want to know is there anything

7    else other than the ICD codes that led you to believe

8    that Mr. Vinas had diabetes?

9                   A - Okay.

10                  Q - Okay?

11                  Let's go ahead and start David, you go

12   ahead look through that, and we'll just do

13   switchies.

14                  A - Okay.

15                  Q - Okay?  And that will be the last

16   area of inquiry I have for you, okay?

17                  A - Okay.

18                  VIDEOGRAPHER:  Off the record at

19   9:36 a.m.

20   (OFF RECORD)

21                  VIDEOGRAPHER:  We're back on the

22   record at 9:39 a.m.

23   BY MR. GREENE:

24                  Q - Okay.  With representation from

25   counsel that Ms. Buckland will not have to be making

TORONTO COURT REPORTERS

```
1    a trip to South Florida to appear live, I have no
2    other questions.
3                    A - Thank you.
4                    MS. PETT:  No questions.  We'll waive.
5                    WITNESS:  Okay.
6                    VIDEOGRAPHER:  This marks the end of
7    Media 1 in today's proceedings in the deposition of
8    Lisa Buckland.  Going off the record at 9:39 a.m.
9    -- Adjourned at 9:39 a.m.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**TORONTO COURT REPORTERS**

```
1              C E R T I F I C A T I O N

2

3         I HEREBY CERTIFY THE FOREGOING to be a true and

4    accurate transcription of my shorthand notes to the

5    best of my skill and ability.

6

7         I FURTHER CERTIFY that I am neither attorney nor

8    counsel for, nor related to or employed by, any of

9    parties to the action in which this deposition was

10   taken, and further that I am not a relative or

11   employee of any attorney or counsel employed in this

12   action, nor am I financially interested in this

13   case.

14

15            --------------------

16            MARC BEEBE, O.C.R.

17         Computer-Aided Transcription

18

19

20

21

22

23

24

25
```

**TORONTO COURT REPORTERS**