**EXHIBIT N**

Page 1

1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA

2
                 CASE NO. 18-CV-24100-COOKE/GOODMAN

3

4    DIGNA VINAS,

5         Plaintiff,

6    vs.

7    THE INDEPENDENT ORDER
     OF FORESTERS,

8

          Defendant.

9    _____/

10

11
                              Zoom Meeting

12                            Friday, 10:00 a.m.-4:00 p.m.
                              October 16, 2020

13

14
                 DEPOSITION OF DIGNA VINAS

15

16

17        Taken on Behalf of the Defendant before

18   Lisa Gerlach, Court Reporter, Notary Public

19   in and for the State of Florida at Large,

20   pursuant to Defendant's Notice of Taking

21   Deposition in the above cause.

22

23

24

25

Page 2

1        Appearances by Zoom:
2           Counsel for the Plaintiff:
3           CRAIG M. GREENE, ESQUIRE
            Kramer Green Zuckerman Greene & Buchsbau
4           4000 Hollywood Boulevard
            Suite 485
5           Hollywood, FL 33021-6786
            954-966-2112
6           cgreene@kramergreen.com
7
            Counsel for the Defendant:
8
            KRISTINA PETT, ESQUIRE
9           McDowell Hetherington, LLP
            2385 NW Executive Center Drive
10          Suite 400
            Boca Raton, FL 33431-7371
11          561-994-4311
            kristina.pett@mhllp.com
12
13          Also Present:
14          Brenda Kronzek, Ms. Pett's paralegal
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                       INDEX

2    WITNESS          EXAMINATION                PAGE

3    Digna Vinas

4          Direct by Ms. Pett                      4

5    Certificate of Oath                          147

6    Certificate of Reporter                      148

7    Witness Review Letter                        149

8    Errata Sheet                                 150

9                  PLAINTIFF'S EXHIBITS

10                       None

11                 DEFENDANT'S EXHIBITS

12   Exhibit 1     Application                     44

13   Exhibit 2     Foresters Letter, 1/16/15       68

14   Exhibit 3     Dr. Hershman Letter, 1/22/15    85

15   Exhibit 4     Foresters Letter, 1/16/17       94

16   Exhibit 5     Statement of Claim for Death
                   Benefits                        95

17

     Exhibit 6     Foresters Letter, 1/27/17       98

18

     Exhibit 7     Mrs. Vinas Letter, 2/1/17      103

19

     Exhibit 8     Foresters Letter, 4/5/17       105

20

     Exhibit 9     Civil Remedy Notice of Insurer

21                 Violations                     129

22   Exhibit 10    Stipulation For Payment        122

23   Exhibit 11    Foresters Letter, 4/8/20       139

24

25

```
                                               Page 4
 1    THEREUPON,
 2                        DIGNA VINAS,
 3    a witness herein, acknowledged after having been duly
 4    sworn, testified upon her oath as follows:
 5              THE WITNESS:  I do.
 6                     DIRECT EXAMINATION
 7    BY MS. PETT:
 8         Q.  Good morning, Mrs. Vinas.
 9              Could you, please, state your full name for
10    the record?
11         A.  Digna Vinas.
12         Q.  Mrs. Vinas, have you ever been deposed
13    before?
14         A.  No.
15         Q.  Just so we can do this smoothly, I'd like to
16    tell you about a few rules of the deposition.
17              If you wait until I finish my question before
18    you answer, that will help, because the court reporter
19    can't take down two people speaking at the same time.
20              Also, if you'll verbalize your answers
21    instead of nodding your head or shrugging your
22    shoulders, that's not going to read on the transcript;
23    so, the court reporter is going to need to hear a
24    verbal "yes" or "no" or whatever your answer is going
25    to be.
```

```
 1          If you don't understand my question, please
 2    let me know and I'll try to rephrase it.
 3          If at any time you want to take a break, let
 4    me know and I can accommodate that.  The only time you
 5    can't take a break is in the middle of a question.
 6    You have to wait until we finish the question and
 7    answer and then you may take a break.  Okay?
 8        A.  Okay.
 9        Q.  What is your address?
10        A.            REDACTED                   .
11        Q.  How long have you lived at that address?
12        A.  Seven years -- no -- ten years.
13        MR. GREENE:  It looks like there's a
14        little delay between Ms. Vinas's verbal
15        speech and what we're getting.
16          Digna, I'm going to ask you, if it's okay
17        with Tina and Lisa, to log off and log back
18        on, because it's really -- there's at least a
19        second or two delay, and our court reporter
20        relies on watching your lips in order to be
21        able to take your testimony down accurately.
22          So, Digna, will you sign off and log back
23        in, please?
24          (Off record.)
25    BY MS. PETT:
```

Page 6

```
 1        Q.  Do you rent or own your home?

 2        A.  I own.

 3        Q.  Do you have a mortgage?

 4        A.  I just finished paying the mortgage.

 5        Q.  What is your date of birth?

 6        A.       REDACTED

 7        Q.  Have you ever used any other name other than

 8   Digna Vinas?

 9        A.  I was Perez -- Digna Perez -- P-E-R-E-Z.

10        Q.  Are you currently single?

11        A.  Yes.  I'm a widow.

12        Q.  How long were you married?

13        A.  Eight years.

14        Q.  Was your husband's name?

15        A.  Rigoberto, R-I-G-O-B-E-R-T-O, Vinas.

16        Q.  When did you marry Mr. Vinas?

17        A.  The date?

18        Q.  Yes.

19        A.  Can I check?  Can I get some paperwork?

20        Q.  You can estimate.  You don't need to give me

21   the exact date.

22        A.  Right now, with all the questions and

23   everything -- and thinking -- I just want to answer

24   correctly.  And I don't -- I'm a little bit confused

25   right now.
```

Page 7

1          MR. GREENE:  Digna, look at me.  Take a

2      deep breath.  Relax.  Ms. Pett is a nice

3      lady.  She wants to ruin our case, but she's

4      a nice lady.

5          THE WITNESS:  It's okay.  Just, right

6      now, I have problems with dates like that,

7      like the wedding.  The wedding is just a

8      date.  I don't know why every time I need to

9      get my wedding date, I just have a problem

10     with that date.  Not many others.  I don't

11     know why.  It's just my wedding date.

12 BY MS. PETT:

13     Q.  How about --

14     A.  I was married eight years.

15     Q.  Do you remember what year you were married

16 in?

17     A.  I think it was the 13th.  I think it was the

18 -- sorry -- not the 13th.  Like I told you -- I am so

19 sorry.

20     Q.  That's okay.

21     A.  My wedding date is just a problem with my --

22 you know.  That's the only date I have a problem with.

23 Can I get my -- I know exactly where my certificate is

24 because I go to it all the time.

25     Q.  It's not necessary.  Unless you want to.

Page 8

1      A.  It's just that date -- I don't know why.  It

2   was -- I'm so sorry.

3      Q.  It's okay.  Were you married prior to being

4   married to Rigoberto?

5      A.  I was a widow.  I was married to David Perez.

6   He died as a police officer.

7      Q.  Do you have any children?

8      A.  I have three.

9      Q.  Are they all adults?

10     A.  Yes.

11     Q.  Are any of them financially dependent upon

12  you?

13     A.  No.  I became dependent upon them, which was

14  the embarrassing point in my life.

15     Q.  With respect to your mortgage, you said that

16  you just paid it off.

17         Which bank was your mortgage with?

18     A.  My mortgage was with Rushmore.

19     Q.  Do you recall how much your mortgage was?

20     A.  Yes.  When I first made it or when I paid it?

21     Q.  When you first made it.

22     A.  It was $42,000.

23     Q.  Is it for the home that you're in currently?

24     A.  Yes.

25     Q.  Did you ever default on your mortgage?

```
1         A.  No.
2         Q.  So you've never been involved in a
3    foreclosure action?
4         A.  No.
5         Q.  How long was your mortgage for?  What was the
6    term of your mortgage?
7         A.  I think my -- my husband was the one that
8    made the mortgage.  I think it was for 30 years.
9         Q.  When did you pay it off?
10        A.  I paid it off when I received -- about two
11   months ago, when I received the money from Foresters.
12        Q.  Are you on any medication today that --
13        A.  No.
14        Q.  -- that would impact -- let me finish my
15   question -- that would impact your ability to
16   remember?
17        A.  No.
18        Q.  Are you on any medication that would impact
19   your ability to testify truthfully?
20        A.  No.  I'm under no medication whatsoever.
21        Q.  Do you live alone?
22        A.  Yes.
23        Q.  Where did you live prior to your current
24   address?
25        A.  Yonkers.
```

Page 10

1      Q.   Yonkers, New York?

2      A.   Yes.

3      Q.   When did you move to Florida?

4      A.   I moved to Florida eight years ago.

5      Q.   Did you meet Mr. Vinas in Florida or in

6   New York?

7      A.   He lived in Florida.  I lived in New York.

8      Q.   So you met him when you moved here?

9      A.   No.  He went to New York every year, so I met

10   him a long time ago.  It was many, many years before I

11   married him.

12      Q.   When did your prior husband pass away?

13      A.   1983, March 15th.  I don't have a problem

14   with his dates.

15      Q.   So how long did you know Mr. Vinas?

16      A.   I knew Mr. Vinas, before I married him, about

17   six years.

18      Q.   Are you currently employed?

19      A.   No.

20      Q.   When was the last time you were employed?

21      A.   Before I came to Miami, I was employed in New

22   York City.

23      Q.   What was your job?

24      A.   I was office manager of Extra TV programming.

25      Q.   How long did you have that job?

Page 11

1      A.  14 years.

2      Q.  Did you retire?

3      A.  I did.

4      Q.  What are your current sources of income?

5      A.  Only Social Security.

6      Q.  When you met Mr. Vinas, what was his

7  occupation?

8      A.  He was retired.

9      Q.  What was he retired from?

10      A.  He had -- he was working as a construction

11  worker.

12      Q.  Construction worker?

13      A.  Yes.

14      Q.  Was he a construction worker in Miami?

15      A.  Yes.

16      Q.  Do you know how long he was a construction

17  worker?

18      A.  All his life, like, about 40 years.

19      Q.  Did you receive any pension --

20      A.  No.

21      Q.  -- from your job?

22      A.  From my job, no.

23      Q.  What about from your first husband's job, did

24  you receive a pension?

25      A.  He was a police officer and I received his

Page 12

```
1    pay until I got married.
2         Q.  What were Mr. Vinas's sources of income once
3    he retired?
4         A.  He had Social Security and he had a
5    carpenter's pension.
6         Q.  What type of Social Security was he
7    receiving?  Was it Social Security retirement or some
8    other form of Social Security?
9         A.  Social Security retirement.
10        Q.  Was he ever on Social Security Disability to
11   your knowledge?
12        A.  No.
13        Q.  Have you ever testified in a trial?
14        A.  No.
15        Q.  Have you ever been a party to a lawsuit other
16   than this lawsuit?
17        A.  No.
18        Q.  Did the Bank of America sue you?
19        A.  Oh, Bank of America did sue me.  I got a
20   lawyer and she is the one negotiating with them.
21   She's still negotiating with them.
22        Q.  How much did they sue you for?
23        A.  I have the number with me.  $10,400.
24        Q.  What was the reason they sued you?
25        A.  We had taken one of those checks that you pay
```

Page 13

1    within a year, because we always were able to.  But

2    due to the fact that he died, and I didn't get the

3    insurance from Foresters, I couldn't pay it.  I only

4    had Social Security.  I could not pay that, and all

5    the interest went in.

6         Q.  Once you were paid the benefits from

7    Foresters, did you pay off that debt?

8         A.  I paid everything except Bank of America,

9    because the lawyer is still negotiating with them.

10        Q.  But the lawsuit has been dismissed?

11        A.  Yes.  The lawyer is dealing with it.  I don't

12   know what the lawyer is doing right now.  I can't -- I

13   shouldn't have said no, because --

14             MR. GREENE:  Do you want that information

15        or do you just want to continue to question

16        the witness without me saying anything?

17             MS. PETT:  I'll keep asking her.

18             THE WITNESS:  I'm so sorry.  I don't know

19        what the lawyer is doing.  I know she's

20        negotiating.  I don't know what the outcome

21        will be.

22   BY MS. PETT:

23        Q.  Do you know how much you currently owe?

24        A.  I owe that company $10,400.

25        Q.  Do you have any other debts?

Page 14

1          A.  I paid everybody else off.  I had many debts.

2     I paid everybody off with the money that Foresters

3     sent to me.

4          Q.  Who did you pay?

5          A.  I paid American Express, I paid Chase Bank,

6     and I paid the mortgage.

7          Q.  You were current on your mortgage, though?

8          A.  I was -- on the mortgage when he passed, yes.

9          Q.  So you didn't miss -- once he passed, you

10    didn't miss any mortgage payments?

11         A.  No.  I sold my own insurance -- my own life

12    insurance.  I turned it in.  I sold jewelry, his

13    wedding bands, my bracelets.  I sold my jewelry, but I

14    never missed a payment.

15         Q.  How much was your monthly payment for the

16    mortgage?

17         A.  $298.

18         Q.  How much do you receive from Social Security?

19         A.  $1,600.

20         Q.  Did that change at all when your husband

21    passed, the amount you received from Social Security?

22         A.  I wasn't receiving Social Security before he

23    passed.  They gave me the Social Security.  He was

24    supporting me.  He wanted me to retire.

25         Q.  Before he passed, what was his Social

1   Security benefit?

2        A.   1,600.

3        Q.   What was his carpenters pension?

4        A.   He was getting 1,500, I believe.

5        Q.   So your monthly income prior to his death was

6   probably $3,100?

7        A.   Yes.

8        Q.   Did you have any other sources of income?

9        A.   No.

10        Q.   When you moved from New York to Florida, did

11   you own any property in New York?

12        A.   No.

13        Q.   Where did you live when you were living in

14   New York?

15        A.   I rented an apartment.

16        Q.   When you were married to David, did you have

17   a home?

18        A.   No.

19        Q.   Did you ever own a home prior to your current

20   home?

21        A.   I did in Puerto Rico.

22        Q.   When did you live in Puerto Rico?

23        A.   I lived in Puerto Rico, 1983 -- let me make

24   sure.  I was in Puerto Rico, 1983, when my husband

25   died.  We had gone two years before, 1981.

Page 16

1      Q.  How long did you live in Puerto Rico?

2      A.  14 years.

3      Q.  From when to when, approximately?

4      A.  1981 until 14 years after that.  Because my

5  son was one, and we came when he was 14.  So, he

6  turned one in Puerto Rico; and, 14 years later, we

7  came to New York.  That's why I know it was 14 years.

8      Q.  Maybe I misunderstood you.  I thought you

9  said that your first husband had died in 1983.

10     A.  He died in 1983.  That's why I said that we

11  went in 1981, two years prior to his death.  He was a

12  police officer.  He died in Puerto Rico.

13     Q.  So when you moved to New York, you were a

14  widow?

15     A.  I was a widow.

16     Q.  What are your children's names?

17     A.  David, Jimmy, Frances.

18     Q.  What year was David born?

19     A.  David was born, 1971.

20     Q.  What about Jimmy?

21     A.  1977.

22     Q.  And you said Frances?

23     A.  1970.

24     Q.  Do you have any grandchildren?

25     A.  Yes.

```
 1        Q.  How many grandchildren do you have?
 2        A.  12 grandchildren.
 3        Q.  Are you financially responsible for any of
 4   those grandchildren?
 5        A.  No.
 6        Q.  Did you do anything to prepare for your
 7   deposition today?
 8        A.  I organized my books.
 9        Q.  Did you meet with your attorney?  I don't
10   want to know what you talked about, but did you meet
11   with your attorney?
12        A.  Yes.
13        Q.  When did you do that?
14        A.  Last week.
15        Q.  Was it Mr. Greene?
16        A.  Yes.
17        Q.  How long did you speak with him?
18        A.  About 20 minutes.
19        Q.  Did you look at any documents?
20        A.  Documents?
21        Q.  Yes.
22        A.  What documents?
23        Q.  Did you look at any documents to prepare for
24   your deposition?
25        A.  No.  I organized my books.  I wrote some
```

1    things I thought maybe you would ask me.
2         Q.  Can you give me a brief summary of your
3    educational background?
4         A.  I have a high school diploma.
5         Q.  Did you have any other formal training beyond
6    high school?
7         A.  I studied stenography for a secretary.
8         Q.  Did you obtain a certificate?
9         A.  I did, but it was, like, from something -- I
10   didn't pay.  It was just, like, a course.
11        Q.  Do you have any student loans?
12        A.  No.
13        Q.  What was Mr. Vinas's educational background?
14        A.  He graduated high school in Cuba, and then he
15   came here and became a carpenter.
16        Q.  Did he have any formal education other than
17   high school?
18        A.  No.
19        Q.  Generally speaking, how would you describe
20   your lifestyle with Mr. Vinas?
21            MR. GREENE:  Object to the form.
22            THE WITNESS:  Excuse me?
23            MR. GREENE:  Don't worry about me, Digna.
24        You'll hear me say, rarely, I think -- but,
25        on occasion, I'll say, "Object to the form."

```
 1        That is just something that I have to do to

 2        preserve an objection.  But unless I tell you

 3        not to answer, listen to my objection.  When

 4        I'm finished speaking, go ahead and answer

 5        Ms. Pett's question.  Okay?

 6             THE WITNESS:  Okay.

 7   BY MS. PETT:

 8        Q.  The question was, how would you describe your

 9   lifestyle with Mr. Vinas?

10             MR. GREENE:  Same objection.  Go ahead.

11        A.  Fantastic.  He was, like, the most amazing --

12   he treated me like a princess.  He treated me with so

13   much kindness, and he always -- always -- just wanted

14   to be the best for me.  He was the most amazing man

15   ever.

16   BY MS. PETT:

17        Q.  How would you characterize your financial

18   situation when you were married?

19        A.  When I married him?

20        Q.  Yes.

21        A.  It was good.  It was good.

22        Q.  Was money tight?

23        A.  I became ill --

24             MR. GREENE:  Let me object to the form of

25        the last question.  Keep going.
```

Page 20

1      A.   I became ill, and we had to pay a lot of

2    medical bills for me.  I had chronic rheumatoid

3    arthritis.  And, because of that, we had to spend

4    everything he had saved, everything I had saved.  So

5    we were living now on his salary only and it was

6    pretty tight.

7           That's why we did the mortgage, which, he

8    never did a mortgage.  We did a mortgage to pay our

9    bills.  Right after he did the mortgage, he took the

10   insurance with Foresters.  That was the only reason

11   why he did get the insurance.  It was because of

12   Foresters.  It was because they told us Foresters was

13   a good company.

14           He wanted to make sure that the mortgage was

15   covered in case anything ever happened, like he always

16   said.  He was in perfect health; he was great.  And

17   the proof is that we had to change my insurance that

18   we had.

19           When we first got married -- I'm so sorry --

20   when we first got married, we did a life insurance.

21   Because, we got married, and they told us, "You should

22   get a life insurance in case anything happens to your

23   husband."  And I already had a life insurance, so he

24   got a life insurance.

25           MR. GREENE:  Digna -- Digna, you're doing

Page 21

1          really well following my earlier instructions
2          to answer the questions she's asking.  Ms.
3          Pett will get through, I promise, all this.
4          She's really good at what she does.  Answer
5          her question and then let her ask the next
6          question.  Okay?
7                THE WITNESS:  Sorry.
8                MR. GREENE:  Okay.
9    BY MS. PETT:
10         Q.  So, there was a lot there.  You earlier
11   mentioned that you sold your life insurance.
12              When did you do that?
13         A.  I sold my life insurance after he died.
14         Q.  Which company was your life insurance with?
15         A.  It was with BrightStar.
16         Q.  When did you obtain that insurance?
17         A.  Many years before I met my husband.  Many
18   years.
19         Q.  How much was the policy's face value?
20         A.  $100,000.
21         Q.  What was the monthly premium?
22         A.  Of my policy?
23         Q.  Yes.
24         A.  $89.
25         Q.  When you say you sold it, what do you mean?

Page 22

1          A.   I turned it in.   They gave me -- I have the

2     number here.   They gave me $8,106.40.   They said

3     that's what I have paid, and they gave it to me so I

4     could get the tombstone.

5          Q.   Was that the cash value of the policy?

6          A.   Yes.

7          Q.   And you recall that you did this sometime

8     after Mr. Vinas passed away?

9          A.   Yes.

10          Q.   Then you said that you spent all your savings

11     and his savings on medical bills.

12               When were you sick?

13          A.   I was sick -- one moment.   I want to remember

14     exactly.   It was 2015 and 2016.

15          Q.   You said rheumatoid arthritis?

16          A.   Chronic rheumatoid arthritis.

17          Q.   Did you have health insurance?

18          A.   I did.

19          Q.   With what company?

20          A.   So many.   They change it every year.

21               MR. GREENE:   Tina, I assume you mean at

22          the time.

23               MS. PETT:   Yes.

24               THE WITNESS:   Sorry.   I don't remember

25          the name.   I don't remember it.   There were

Page 23

1        so many different companies.

2   BY MS. PETT:

3        Q.  Were you and Mr. Vinas covered on the same

4   health insurance policy --

5        A.  No.

6        Q.  -- back when you were sick?

7        A.  No.

8        Q.  Did he have health insurance?

9        A.  He had Humana.

10        Q.  Why were you on different health insurances

11   at the time?

12        A.  Because I had -- when I came from New York, I

13   had a very good insurance with my company.  And then

14   he tried to get me a very good insurance, because I

15   had had cancer before, and he wanted me to be covered

16   better.

17        Q.  Do you remember what your health insurance

18   premiums were in 2015, 2016?

19        A.  It was, like, almost $500, or $500.

20        Q.  Did he have health insurance through his

21   union?

22        A.  He had health insurance, Humana, and they

23   would take it out of his Social Security.

24        Q.  So in 2015 and 2016, when you were diagnosed

25   with chronic rheumatoid arthritis, what types of bills

Page 24

1    did you have that the health insurance didn't pay for?

2         A.   First of all, Humira injections, they did not

3    pay for that.  The majority of the medicines, I had to

4    pay part of it.  And also, to go to the doctor, I had

5    to pay for the specialists.  We had at least $10,000

6    out of pocket, at least, a year.

7         Q.   How long did that go on?

8         A.   For two years.

9         Q.   Prior to the 2015-2016 diagnosis, how much

10   did you have in savings?

11        A.   I brought, like, $10,000.

12        Q.   Then you said Mr. Vinas used up his savings

13   too.  How much did he have?

14        A.   He had, like, $20,000, but we fixed the

15   house, too, when I first got here.

16        Q.   When did you buy the house?

17        A.   He bought this house in 1964, I believe it

18   was.  And it was really bad when I got here, so he

19   figured it could be better.

20        Q.   What is the current value of your home?

21        A.   I believe it's 200,000.

22        Q.   So when Mr. Vinas purchased the Foresters

23   policy, what were your monthly expenses?

24        A.   He was paying for the mortgage.   He was

25   paying for insurance, which that was the most -- the

1  biggest thing -- because we had to get house

2  insurance.  We had to get a house insurance which was

3  $4,000 a year.  If we didn't have the mortgage, we

4  didn't have to have house insurance.  So I had house

5  insurance, also, when he died.

6        We were paying all the small bills, all the

7  credit card bills, but they were small.

8        Q.  You said you had a credit card with Bank of

9  America and American Express.

10       Did you have any other cards?

11       A.  I had Chase.

12       Q.  Chase.  That's right.

13       A.  And he had a few.

14       Q.  To your knowledge, had Mr. Vinas ever been a

15  party to a lawsuit prior to his death?

16       A.  Not to my knowledge.

17       Q.  Do you know if Mr. Vinas had ever had any

18  issues with his credit card company where he didn't

19  pay the bill?

20       A.  Never, that I know of.

21            MR. GREENE:  Tina, let me just interject

22       at this point.  I've let you go really deep

23       into a lot of these, even considering the

24       consequential damage issue.

25            Have you got a lot more of this?

Page 26

1     Especially if you're going to get into

2     Mr. Vinas's stuff.

3          MS. PETT:  No, I don't have that much

4     more.

5          MR. GREENE:  Okay.  Then, rather than

6     fight the battle, go ahead.  I'll let you

7     finish up.

8  BY MS. PETT:

9     Q.  Where did you bank with Mr. Vinas?

10    A.  Bank of America.

11    Q.  So, at Bank of America, did you have a

12  checking account and did you have a savings account?

13    A.  We did.

14    Q.  Anything else?

15    A.  No.

16    Q.  Do you recall, when he passed away, how much

17  you had in those accounts?

18    A.  I would say a couple of hundred dollars.

19    Q.  When Mr. Vinas was alive, did you travel?

20    A.  We did.

21    Q.  How often would you travel?

22    A.  In the eight years, we went to Japan, Israel,

23  and Italy.

24    Q.  Have you traveled at all since he passed

25  away?

Page 27

 1        A.   No.

 2        Q.   Did he have any children?

 3        A.   Yes.

 4        Q.   How many children did he have?

 5        A.   Four.

 6        Q.   What are their ages?

 7        A.   Their ages?

 8        Q.   Uh-huh.

 9        A.   Close to 50.  I don't know their ages.

10        Q.   Did he provide financial support for any of

11   those children while you were married?

12        A.   No.

13        Q.   When you said you had 12 grandchildren, were

14   you counting the children on his side of the family as

15   well?

16        A.   No.  I have, also, 12 great-grandchildren.

17        Q.   Okay.  When Mr. Vinas applied for the

18   Foresters policy, do you know whether he had any other

19   life insurance?

20        A.   He did not.  He had a life insurance with --

21   yes, he did -- sorry -- with -- I'll tell you -- one

22   second -- with American General life insurance.

23        Q.   Do you know when he obtained that coverage?

24        A.   The minute we got married.

25        Q.   Did you get married in 2012?

Page 28

```
 1        A.   I believe so, yes.
 2        Q.   Did you also get life insurance when you got
 3   married to Mr. Vinas?
 4        A.   I had life insurance.
 5        Q.   That was the BrightStar policy?
 6        A.   Yes.
 7        Q.   You had had that before you married
 8   Mr. Vinas?
 9        A.   Yes.  Many years before.
10        Q.   From whom did he obtain the American General
11   insurance?
12             MR. GREENE:  Object to form.
13        A.   It was in New York and he obtained it from
14   that company.
15   BY MS. PETT:
16        Q.   Did he utilize an agent?
17             MR. GREENE:  Object to the form.
18        A.   No.
19   BY MS. PETT:
20        Q.   Do you know whether it was a term policy or
21   some other type of policy?
22        A.   Because when Jazmin came, she wanted to see
23   that policy.  She saw the policy.  She explained to me
24   that that company was not like Foresters.  Foresters
25   will not increase our premium.  And she said that, at
```

1    80 years old, that premium -- we weren't intending on

2    getting life insurance -- that that premium would

3    sky-rise really high and we were not going to be able

4    to afford it.

5            She said, on the contrary, Foresters would

6    not raise our premium.  So, that is why we

7    discontinued that policy at that moment, and it was

8    for $100,000.  We discontinued it and got Foresters.

9        Q.  So Mr. Vinas obtained the American General

10   policy in 2012; correct?

11       A.  Yes.

12       Q.  When did he obtain the Foresters policy?

13       A.  He obtained the Foresters policy in 2015.

14       Q.  Who is Jazmin?

15       A.  Jazmin is the representative of Foresters.

16       Q.  How did you meet Jazmin?

17       A.  Well, when I did the mortgage, they gave me a

18   few names of companies to do the insurance for the

19   mortgage.  We called Foresters because that was one of

20   the names.  They said, "Okay, we'll contact you."

21           The next person that contacted me was Jazmin,

22   saying that she was from Foresters, if she could come

23   over.  She came over.  And that's why I say it's

24   Foresters, because Foresters was the person that my

25   husband called to get this insurance.  Then Jazmin

Page 30

1    called.

2        Q.  Let's walk through that.  When you obtained

3    the mortgage -- in what year did you obtain the

4    mortgage?

5        A.  In 2015.

6        Q.  Okay.  So prior to 2015, you didn't have a

7    mortgage on the home?

8        A.  No, absolutely not.

9        Q.  And the mortgage was with -- what was the

10   name of that company again?

11       A.  Rushmore.

12       Q.  Did you have a mortgage broker?

13       A.  No.

14       Q.  How did you find Rushmore to issue the

15   mortgage?

16       A.  I believe he went to the bank.

17       Q.  And the bank --

18       A.  I'm not sure how he obtained the mortgage.  I

19   know it's Rushmore.  I don't know how he obtained it.

20       Q.  Were you involved in obtaining the mortgage?

21       A.  In obtaining the mortgage, no.  In obtaining

22   the mortgage insurance, yes.

23       Q.  Okay.  How much was the initial mortgage?

24       A.  42,000.

25       Q.  Were you on the mortgage?

Page 31

1       A.   No.

2       Q.   So the mortgage was just in Mr. Vinas's name?

3       A.   Yes.

4       Q.   Was the house just in Mr. Vinas's name or was

5   it --

6       A.   Yes.

7       Q.   It was just in his name?

8       A.   Yes.

9            MR. GREENE:   I assume you mean before his

10       death, Tina?

11           MS. PETT:   Correct, at the time this

12       mortgage was --

13           MR. GREENE:   Understood.

14   BY MS. PETT:

15       Q.   So Mr. Vinas obtained a mortgage from

16   Rushmore, and Rushmore advised Mr. Vinas that he

17   needed to have homeowners insurance; is that right?

18       A.   Yes.

19           MR. GREENE:   Object to the form.

20       A.   If homeowners insurance means the insurance

21   to cover the mortgage.   That's what you mean?

22   BY MS. PETT:

23       Q.   I'm trying to find out what you meant.

24       A.   Yes, it was.   I'm sorry.

25            We were going to get insurance to cover the

Page 32

```
1    mortgage, so they told us to get insurance, in case
2    anything happens, so the mortgage could be paid.
3    Because my husband did not want me to be with a
4    mortgage.  He never had a mortgage before.  So he
5    wanted to make sure he had the mortgage covered.
6        Q.  Okay.  But at the time that he applied for
7    the mortgage, did he not have the American General
8    policy?
9        A.  That was a life insurance.
10       Q.  So you're saying that, when he obtained the
11   mortgage, he wanted to get mortgage life insurance?
12       A.  Insurance for the mortgage.
13       Q.  Right.  So, if he passed, that mortgage would
14   be paid off?
15       A.  Absolutely.
16       Q.  Okay.  You said Rushmore gave him a list of
17   names to call --
18       A.  Yes.
19       Q.  -- for mortgage insurance?
20       A.  Yes.
21       Q.  Were you involved in that process?
22       A.  Yes.
23       Q.  What was your involvement in the process?
24       A.  I was there all the time.  He made the phone
25   call to Foresters.  That was one of the names.  And
```

Page 33

1    then, when Jazmin came over, we were together at the
2    table at all times.
3        Q.  Okay, but I'm trying to understand how you
4    got to Foresters.
5            What happened to the list of names that you
6    were given?
7        A.  What do you mean, what happened?
8        Q.  Do you still have the list of names with the
9    company --
10       A.  No, because we knew to make a phone call.
11   And, when Jazmin came over -- I don't know what we did
12   with that -- we didn't need it anymore.
13       Q.  Did you ever end up obtaining mortgage
14   insurance?
15           MR. GREENE:  Object to the form.
16       A.  That's what we did.  We were only going to
17   get $42,000 with Jazmin.  The reason why we got more
18   is because we cancelled our American General life
19   insurance because Jazmin said that Foresters would not
20   raise our premium when he became 80.
21           Due to the fact that she said that was going
22   to happen with the American General, and he was
23   healthy, we thought that, 80 years old, that's crazy.
24   So, of course, we went to Foresters and that was never
25   going to raise our premium, as far as Jazmin was

Page 34

1    concerned.

2    BY MS. PETT:

3        Q.  Do you recall how much the American General

4    monthly premium was?

5        A.  It was, like, 229.

6        Q.  How much was the Foresters monthly premium?

7        A.  I don't remember right now, but it was a lot

8    more.  That's why we couldn't do $100,000.  We just

9    had to do the mortgage and do 50,000 for life

10   insurance, because it was more, but they weren't going

11   to raise the premium when he was 80 years old, so we

12   were still going to have a life insurance by that

13   time.

14       Q.  When did you cancel the American General

15   coverage?

16       A.  Right after we did the insurance with you in

17   2015.  We cancelled it right away.

18       Q.  The American General policy, was that a term

19   policy?

20       A.  I don't understand what a term policy is, but

21   Jazmin said that it was different from Foresters life

22   insurance.

23       Q.  Okay.  You know how your BrightStar policy

24   built up cash value, so, when you sold it, they paid

25   you money?

1      A.   Uh-huh.

2           MR. GREENE:   Object to the form.

3   BY MS. PETT:

4      Q.   Was the American General policy like that or

5   was it just cancelled when it was cancelled?

6           MR. GREENE:   Object to the form.

7      A.   When we cancelled it, they didn't give us

8   money back, if that's what you're saying.

9   BY MS. PETT:

10     Q.   That's what I was asking.   Okay.

11          What's Jazmin's last name?

12     A.   Lightbourn.

13     Q.   When did you meet Jazmin?

14     A.   After we called Foresters, Jazmin gave us a

15  call, in 2015, and then she came over.

16     Q.   Did you know Jazmin before she called you?

17     A.   No.

18     Q.   When is the last time you spoke to Jazmin?

19     A.   When my husband died.

20     Q.   You haven't spoken to her since your husband

21  passed away?

22     A.   No.

23     Q.   Do you recall when it was in 2015 that Jazmin

24  came over to your house?

25     A.   Exact date?

Page 36

1       Q.   Approximate.

2       A.   It had to be close to when we got the

3  doctor's letter in January, because she told us to get

4  a doctor's letter.

5       Q.   How many times did Jazmin come to your house?

6       A.   Twice.

7       Q.   So one time was in approximately January of

8  2015.  When was the other?

9       A.   Right after, to sign the papers.

10           MR. GREENE:  Right after what?

11           THE WITNESS:  Right after she filled out

12       the application.

13           MR. GREENE:  Thank you.

14  BY MS. PETT:

15       Q.   You haven't seen Jazmin since 2015?

16       A.   She came when my husband died.

17       Q.   She came to your house?

18       A.   She came to my house to fill out the papers.

19  When I called Foresters to say -- she said she'll take

20  care of it, and she came to fill out papers.

21       Q.   And since that time, you haven't spoken to

22  her?

23       A.   No.

24       Q.   Or seen her?

25       A.   No.

Page 37

1      Q.  Prior to obtaining the policy with Foresters,
2   to your knowledge, did Mr. Vinas apply for any other
3   life insurance?
4      A.  No.
5      Q.  Did Mr. Vinas have any life insurance with
6   Humana?
7      A.  No.
8      Q.  When Mr. Vinas applied for his insurance with
9   American General, were you involved in that process?
10      A.  Yes.
11      Q.  What was your involvement with the American
12   General process?
13      A.  He filled out the application.  As far as we
14   were concerned, it was a good company, but we didn't
15   know -- we didn't know it was going to be -- they were
16   going to raise the premium at 80.
17      Q.  Were you present when he filled out the
18   American General application?
19      A.  I can't say for sure.
20      Q.  Did you ever live together in New York?
21      A.  Yes.  We got married in New York.
22      Q.  How long did you live with Mr. Vinas in
23   New York?
24      A.  Two years.
25      Q.  Two years?

1      A.   Uh-huh.

2      Q.   And you moved to Florida in 2013?

3      A.   More or less.

4      Q.   When Mr. Vinas obtained the American General

5   policy in 2012, do you know whether he underwent a

6   medical examination?

7      A.   He did.

8      Q.   Where did that medical examination take

9   place?

10      A.   At the house.

11      Q.   Do you know who conducted it?

12      A.   No.

13      Q.   Was there an American General representative

14   who came to your house in New York when he was going

15   through that process?

16      A.   I don't remember.

17      Q.   Do you recall when Mr. -- were you present

18   when the medical examiner came to the house in 2012?

19      A.   No.

20      Q.   Do you know where you were?

21      A.   Working.

22      Q.   Okay.  Did Mr. Vinas work in New York?

23      A.   No.

24      Q.   How do you know a medical examiner came to

25   your house in 2012?

1       A.  He told me.

2       Q.  Okay.

3           MR. GREENE:  Object to the form of the

4       last question.

5    BY MS. PETT:

6       Q.  Did he tell you anything else about the

7    medical examination in 2012?

8           MR. GREENE:  Same objection.

9       A.  I don't remember.

10   BY MS. PETT:

11      Q.  Excuse me?

12      A.  I don't remember too much about that.  I

13   wasn't there.

14      Q.  Do you recall Mr. Vinas ever telling you that

15   the medical examiner told him he had diabetes?

16          MR. GREENE:  Object to the form.

17      A.  I'm trying to remember.  Perhaps.  I'm not

18   sure.  I don't remember.

19   BY MS. PETT:

20      Q.  Did Mr. Vinas, in 2012, have an attending

21   physician, to your knowledge?

22      A.  Yes.

23      Q.  Who was that?

24      A.  Kenneth -- he's my doctor too.

25      Q.  Hershman?

Page 40

```
 1       A.  He's always been his doctor, for many, many
 2  years.
 3            MR. GREENE:  Ms. Pett, we've been going
 4       about an hour.  Can we take a quick restroom
 5       break?
 6            MS. PETT:  Sure.
 7            MR. GREENE:  Ten minutes?
 8            MS. PETT:  That's fine.
 9            (Brief recess.)
10  BY MS. PETT:
11       Q.  I think, when we took a break, we were
12  talking about Dr. Hershman.
13            You said that Dr. Hershman had been
14  Mr. Vinas's physician for a long time; is that right?
15       A.  Yes.
16       Q.  You also said he was your treating physician?
17       A.  Now.
18       Q.  When did he first become your treating
19  physician?
20       A.  About a year ago.
21       Q.  Did you ever accompany Mr. Vinas to any of
22  his appointments with Dr. Hershman?
23       A.  No.
24       Q.  Do you ever recall discussing with Mr. Vinas
25  whether any insurance-related examiner had told him he
```

Page 41

1    had diabetes?

2         A.  I remember he went to the doctor -- he was

3    upset.  I don't remember exactly who told him, but he

4    was upset because somebody told him that he had

5    diabetes.  So, he went to his doctor and he was upset

6    because he knew he didn't.

7              The doctor told him that, no, he was fine.

8    He didn't have diabetes; absolutely not.  That's what

9    I remember.  He came back and said, "No, I don't have

10   anything."  And I even spoke to the doctor now, and he

11   told me that he never had diabetes, no.

12        Q.  When did you speak to the doctor?

13        A.  Now, when I -- I'm his patient.  So, I

14   mentioned that now, and he said, "No, no."  I said, "I

15   remember" -- because they said they didn't want to

16   give me -- because he asked me if they gave me my

17   insurance, and I said, "No.  Actually, they say he had

18   diabetes and I know he didn't."  And he said, "He

19   didn't."

20        Q.  Do you know when that conversation occurred?

21        A.  (No audible response.)

22        Q.  Do you remember a date?

23        A.  No, I don't remember a date of this

24   conversation.

25        Q.  Did you ask Dr. Hershman to write Foresters a

Page 42

```
 1    letter, telling Foresters that Mr. Vinas did not have
 2    diabetes?
 3            MR. GREENE:  Object to the form.
 4        A.  If I -- excuse me?
 5    BY MS. PETT:
 6        Q.  Did you ask Dr. Hershman to write a letter to
 7    Foresters telling them that Mr. Vinas did not have
 8    diabetes?
 9        A.  No, I didn't.  He had written a letter for
10    Jazmin, for Foresters.  Jazmin said, "Foresters
11    requires a letter," but that was in 2015, when we did
12    the insurance.  I have a copy of that letter.
13    Foresters requested a letter that said he was in good
14    health.  That's the letter that we have.
15        Q.  Do you recall when Mr. Vinas told you that he
16    was upset that someone told him he had diabetes?
17        A.  I don't remember exactly when it was.
18        Q.  Do you know whether it was before or after
19    you purchased the Foresters policy?
20        A.  He needed to get a letter from Foresters
21    saying that he was healthy.  He needed to get a
22    letter.  Maybe it was then.
23        Q.  You don't know, though?  You're speculating?
24            MR. GREENE:  Object to the form.
25        A.  I don't know.  I know I have a letter there.
```

1           MR. GREENE:  Mrs. Vinas, concentrate on

2       her question.  Don't bother looking for

3       documentation.  Mrs. Pett has all of the

4       documentation.

5           THE WITNESS:  Okay.

6    BY MS. PETT:

7       Q.  Going back to the American General life

8    policy, do you know whether Mr. Vinas had any

9    difficulty getting that policy?

10          MR. GREENE:  Object to the form.

11      A.  I don't think so.

12   BY MS. PETT:

13      Q.  Do you recall when it was that you terminated

14   the American General policy?

15      A.  The same time that we did the policy for your

16   company, for Foresters.

17      Q.  Was there ever a time when you had both

18   policies in effect?

19      A.  Maybe a day or two.

20      Q.  I'm going to ask my paralegal to pull up the

21   application for the Foresters policy.  We're going to

22   put it on the screen.  After you've had a chance to

23   look at it, I'm going to ask you a few questions about

24   it.

25          MS. PETT:  We'll mark this as Exhibit 1.

Page 44

1          (Defendant's Exhibit 1 was marked.)

2     BY MS. PETT:

3          Q.  Mr. Vinas, can you see that?

4          A.  Yes.

5          Q.  Have you ever seen this document before?

6               MR. GREENE:  You need to let her see the

7          whole thing.  Can you scroll through it?

8               MS. PETT:  We will.

9               MR. GREENE:  Thanks.

10    BY MS. PETT:

11         Q.  Let's stay at this page.  Mrs. Vinas, is that

12    Mr. Vinas's signature at the bottom of the page?

13         A.  Yes, it is.

14              MR. GREENE:  Just for the record, the

15         document that's on the screen is

16         Exhibit 00012015-01-12, application with

17         diabetes questionnaire.pdf.

18    BY MS. PETT:

19         Q.  Mrs. Vinas, have you ever seen this document

20    before?

21         A.  I must have seen it.  I imagine I saw the

22    application he signed.

23         Q.  Okay.  When Jazmin came to your house, is

24    this the document that was completed in your presence?

25              MR. GREENE:  Object to the form.

1      A.  Actually, I would say yes, because the

2  writing had to be Jazmin's because it's not mine and

3  it's not my husband's.

4  BY MS. PETT:

5      Q.  This first page of Exhibit 1, that's typed;

6  correct?

7      A.  Yes.

8      Q.  Do you recall whether Jazmin had a computer

9  with her or did she bring hard papers?

10     A.  She had a computer with her, but I saw that

11 writing at the bottom, and that's not our handwriting.

12     Q.  Okay, but I'm not asking -- we can get to

13 that.  I'm not asking you about that.

14         What I want to know is, when Jazmin came to

15 your house, did she complete part of the application

16 on her computer?

17     A.  I can't recall.

18     Q.  Where did this meeting take place?  Was it at

19 your kitchen table?

20     A.  At our table.

21     Q.  You were sitting there the whole time?

22     A.  Yes.

23     Q.  Do you see where it says, "Income, past

24 12 months, $46,000?"

25     A.  Yes.

Page 46

1      Q.  Do you recall whether Jazmin asked your

2   husband what your income was for the past 12 months

3   and she wrote down what he indicated?

4      A.  I would imagine, yes.

5          MR. GREENE:  Tina, let's go off this for

6       a second.  Let me call you to discuss the

7       scope of this.  Let's put ourselves on mute

8       and stop the video for a moment.

9          MS. PETT:  Okay.

10         (Off record.)

11         MR. GREENE:  Ms. Pett and I have

12      discussed this.  With some limitations that

13      she and I discussed -- an understanding --

14      I'm going to go ahead and allow some limited

15      line of questioning on this without seeking a

16      protective order.

17         Mrs. Vinas, please feel free to answer

18      these questions until I tell you otherwise.

19   BY MS. PETT:

20      Q.  Mrs. Vinas, do you recall Jazmin asking your

21   husband what your income was for the past 12 months

22   and him responding $46,000?

23      A.  I would imagine so.

24      Q.  I don't want you to imagine.  I want you

25   to -- we're trying to see if you actually remember

Page 47

```
 1    this.  If you don't remember, there's nothing wrong
 2    with saying, "I don't remember."
 3              MR. GREENE:  Objection to form.
 4         A.  I don't remember exactly that question
 5    regarding income.
 6    BY MS. PETT:
 7         Q.  Okay.  How about for net worth?  Same answer;
 8    you don't remember?
 9         A.  Yes.
10         Q.  Do you see the address on there?  Is that
11    your e-mail address?
12         A.  Yes.
13         Q.  Do you recall whether Jazmin sent you any
14    e-mails concerning Mr. Vinas's life insurance
15    application?
16         A.  I can't recall.
17         Q.  Did Mr. Vinas have his own e-mail?
18         A.  No.  We had one together.
19         Q.  Is your e-mail address still the same today?
20         A.  Yes.
21         Q.  Let's scroll down to the next page.
22              Mrs. Vinas, you mentioned earlier that you
23    were going to replace the American General policy with
24    the Foresters policy; correct?
25         A.  Yes.
```

Page 48

1          Q.  Do you recall whether Jazmin asked your

2     husband whether he had any other insurance in effect

3     when she was going over the application with him?

4          A.  Yes.

5          Q.  Do you see the other insurance question where

6     it says, "Does the proposed insured currently have any

7     annuity or life, accidental death, critical illness,

8     or disability income insurance pending or in force?"

9     Do you see that question?

10         A.  Uh-huh, yes.

11         Q.  The answer is "no," correct?

12         A.  Correct.

13         Q.  Is that what your husband told Jazmin?

14             MR. GREENE:  Object to the form.

15         A.  No.

16    BY MS. PETT:

17         Q.  Do you recall whether your husband read over

18    the questions and answers after the application was

19    completed?

20         A.  Like I said, when she got to that

21    insurance -- if we had another insurance -- she

22    automatically said, "Let me see the insurance."  We

23    had the discussion regarding the insurance that he

24    had, and we got to the decision that Foresters would

25    be better than our American General one, and that we

1    were going to cancel. Maybe that's why she put "no,"

2    because we were going to cancel. But we did tell her

3    we had another insurance and we did cancel.

4        So, probably -- since we cancelled right

5    away -- probably when this got back here for him to

6    sign it, it was already "no," and she had already put

7    "no."

8        Q.  Next page. Question four also states, "Will

9    coverage be discontinued, reduced, or replaced or

10   premium payments stopped on existing life insurance

11   coverage or an annuity if the insurance applied for in

12   this application is issued?" And that also states,

13   "No."

14        Right?

15        MR. GREENE: Object to the form.

16        A.  Let me read it. Coverage of what?

17  BY MS. PETT:

18        Q.  "Will coverage be discontinued, reduced, or

19   replaced or premium payments stopped on existing life

20   insurance coverage or an annuity?"

21        A.  Due to the fact that it said we didn't have

22   insurance, that would be --

23        MR. GREENE: Tina, I just want to see if

24        you're looking at the same thing I am. I'm

25        concerned about something. Hold on a second.

1          I can't pull up the same page as you, or I

2          can't look at yours at the same time.

3              Are you looking at the page --

4              MS. PETT:  2 of 8, Bates number 4.

5              MR. GREENE:  Okay.  Can you -- I've got a

6          different 2 of 8.

7              MS. PETT:  Are you on Exhibit Share?

8              MR. GREENE:  No.  This is what I'm doing.

9          I'm looking at the document that you sent to

10         me, part of your claim file.

11             I don't know if you want to do this in

12         front of the witness or not.  I don't think

13         it's going to matter with Mrs. Vinas.  But,

14         if you'd like -- I'm a big believer in not

15         coaching witnesses -- I'll be happy to talk

16         to you about this on the side -- but I'm

17         looking at a different 2 of 8.

18             MS. PETT:  I don't know what you're

19         looking at.

20             MR. GREENE:  Let me tell you -- let's get

21         off this for a moment so that -- because I

22         don't think this is right.  Let's get off

23         this for a second and I'll call you.

24             (Off record.)

25             MR. GREENE:  You can put this on the

1      record.

2          Mrs. Vinas, Ms. Pett is going to run a

3      couple other things by you before she

4      continues with this line of questioning.

5          MS. PETT:  I'm going to skip that for now

6      while Brenda tries to pull it up.  I'm going

7      to move on to something else.  We'll come

8      back to it.

9          MR. GREENE:  Fantastic, great.

10   BY MS. PETT:

11     Q.  Did you ever have an account, Mrs. Vinas, at

12   TD Bank?

13     A.  We did.

14     Q.  In 2015?

15     A.  We did, yeah.

16     Q.  Do you recall, sitting here today, whether,

17   when Jazmin took this application from your husband,

18   whether you had any conversations about any specific

19   parts of the application?

20     A.  When we were going to do -- the main

21   conversation we had regarding the life insurance was

22   the extra $50,000, which was for our life insurance,

23   we had a long conversation regarding that to cancel

24   our American General for Foresters.

25     Q.  Do you recall Mr. Vinas being asked to

1   complete another part, a follow-up to this

2   application?

3       A.   Regarding?

4       Q.   Diabetes.

5       A.   That's when he had to give the letter.

6       Q.   That was the second time that you said that

7   Jazmin came to your house twice in connection with the

8   application for the policy.

9            Was that the second time that she came to

10  your house to go over the diabetes questionnaire?

11      A.   Yes.

12      Q.   Were you present during that meeting?

13      A.   Yes.

14      Q.   How did Mr. Vinas go about getting the letter

15  from Dr. Hershman?

16      A.   He went to the doctor.  He was upset, so he

17  went to the doctor and said that they told him that he

18  had diabetes regarding an insurance, and the doctor

19  said he didn't.

20           So, he requested a letter because Foresters

21  had requested a letter from the doctor to say that he

22  was healthy, that he didn't have diabetes, and the

23  doctor gave him the letter.

24      Q.   Did Mr. Vinas, to your knowledge, ever end up

25  being diagnosed with diabetes?

Page 53

1         A.   No.   To my knowledge, no.

2         Q.   What was his cause of death?

3         A.   It was the heart, and it said "diabetes,"

4    but, if it was diabetes, it wasn't -- it was then at

5    that moment, but he wasn't sick before then.  He

6    wasn't taking medication.  He wasn't being treated for

7    it.  He wasn't diabetic.

8         Q.   When did he first get sick?

9              MR. GREENE:  Object to the form.

10        A.   He didn't get sick.  He went outside and he

11   died right outside, throwing out the garbage, right

12   there, right in front of my house.

13   BY MS. PETT:

14        Q.   So, he had a heart attack; is that what

15   you're saying?

16        A.   Yes.

17             MS. PETT:  Brenda, can you put the

18        application back up on the screen?  Go down

19        to Bates page 9.  Scroll to where it says

20        declarations and agreements.

21   BY MS. PETT:

22        Q.   Sitting here today, Mrs. Vinas, do you recall

23   your husband and Jazmin having any conversation about

24   any of the terminology in this portion of the

25   application?

```
1            MR. GREENE:  For the record, the document
2       that counsel has put in front of the witness
3       is 31 single-space lines of probably about 8
4       or 9 font.
5            What I'd like the witness to do, if
6       counsel really would like an answer to that
7       question, I'm going to say, let's take a few
8       minutes and I would like the witness to read
9       every line here.  If you'd like to direct her
10      to the part that you're actually asking
11      about, that would obviously make the process
12      quicker.  But, other than that, I'm going to
13      ask the witness to read everything to
14      herself.
15           Which would you like to do?  I don't want
16      her to answer that question without reading
17      every line.
18           MS. PETT:  She can read every line.
19           MR. GREENE:  Okay.  Let's take a few
20      minutes, Mrs. Vinas.  What I'd like you to
21      do, please -- the question was whether or not
22      you recall Ms. Lightbourn and Mr. Vinas
23      discussing any portions of the things written
24      here.  Something like that.
25           If not, I'll let Tina re-ask the
```

```
 1          question.  Regardless, please read through
 2          every line here and let us know when you're
 3          done.
 4               (Off record.)
 5     BY MS. PETT:
 6          Q.  I have just one question about this.  Do you
 7     recall whether Jazmin and your husband went over any
 8     of the items set forth in this portion of Exhibit 1,
 9     which is page 7 of 8?
10          A.  Yes, I do, because it's talking about the
11     truth, and that we had to answer all the questions --
12     in order to be paid by Foresters, that we had to
13     answer all the questions truthfully -- all the time,
14     truthfully.  And she made sure she told us, "Say the
15     truth.  As long as you answer all the questions
16     truthfully, you will be paid."  And that is exactly
17     what did not happen.
18          Q.  You're saying, when you were sitting there on
19     the date the application was completed, which,
20     according to the document, is January 12, 2015, that
21     Ms. Lightbourn told your husband that a claim would be
22     paid if he told the truth?
23          A.  That everything would be paid.  Because, the
24     whole thing was, they were talking about -- like, I
25     bring it up again because it was very -- the only
```

Page 56

1  reason why we took Foresters was because we were

2  cancelling our -- the $50,000.  We were cancelling

3  American.  We already had life insurance.  So, she was

4  assuring us that we could cancel that one and we will

5  be paid if anything happens, as long as we tell the

6  truth, and we did.

7       Q.  Do you recall any other conversation with

8  respect to any of the items set forth on page 7 of the

9  application?

10      A.  It was always --

11          MR. GREENE:  Object to the form.

12      A.  -- this one?  The one that I read?

13  BY MS. PETT:

14      Q.  Yes.

15      A.  Yeah.  It's all about the truth.

16      Q.  Did you go over where it states in the last

17  paragraph, "I further understand and agree" -- under

18  two, it says, "no agent, producer, medical examiner,

19  or other person, except Foresters' executive secretary

20  or successor position, has power on behalf of

21  Foresters to make, modify, or discharge an insurance

22  contract"?

23      A.  She assured us that, as long as we told the

24  truth, it would be paid by Foresters.

25      Q.  Did she give you any business cards?

Page 57

1        A.   I don't recall.

2        Q.   Did she give you an e-mail address?

3        A.   Excuse me?  An e-mail address?  I don't think

4    so.

5        Q.   Did she let you know there were other

6    insurance companies she could sell coverage for?

7        A.   No.  As far as we were concerned, she

8    belonged to Foresters.  That's it.

9             MS. PETT:  Brenda, can you go to Bates

10            stamp 16 on Exhibit 1?

11   BY MS. PETT:

12       Q.   I think you previously testified -- I just

13   want to clarify -- that the handwriting on this page

14   of Exhibit 1 is not yours or not Mr. Vinas's.

15            Is that right?

16       A.   Yes, yes.  That is not ours.

17       Q.   Do you recall how it came about that

18   Mr. Vinas was asked to complete the diabetes

19   questionnaire?

20       A.   Excuse me?

21       Q.   When did you find out, after Ms. Lightbourn

22   was present to complete the application on

23   January 12th, that Foresters had additional questions

24   and was requiring your husband to answer additional

25   questions?

1       A.   I don't understand the question.

2       Q.   How did you find out that she needed to come

3    back to have the diabetes questionnaire completed?

4       A.   She called.

5       Q.   Did she speak to you or did she speak to

6    Mr. Vinas?

7       A.   To my husband.

8            MR. GREENE:   Tina, you mean in the phone

9       call or when she got to --

10           MS. PETT:   In the phone call.

11   BY MS. PETT:

12      Q.   Who did she call?

13      A.   I don't remember who she spoke to exactly.  I

14   know I was here when she came.

15      Q.   When she came the second time, do you know

16   why she was there?

17           MR. GREENE:   Object to the form.

18      A.   I'm not sure.

19   BY MS. PETT:

20      Q.   Do you recall whether Mr. Vinas told you that

21   Ms. Lightbourn was coming back to complete additional

22   information concerning the application?

23      A.   I'm not sure.  She came to pick up the letter

24   that she requested for Foresters.  I'm not sure.  I

25   don't recall.

Page 59

1      Q.   Do you recall whether, when she came back to
2  have the diabetes questionnaire completed, you still
3  had the American General coverage in effect?
4      A.   If it was a couple of days -- I don't
5  remember.  I know that we took the insurance, so we
6  automatically thought -- we automatically cancelled --
7  to us, she said, "Cancel American and do that."
8          I don't remember exactly.  I know I did it
9  right away.  I don't remember if we had it when she
10  came for this paper or not, but we cancelled it as
11  soon as we knew we were going to get this insurance.
12  We didn't want both.
13      Q.   Do you know if you waited until the Foresters
14  was issued before you cancelled the American General
15  policy?
16      A.   I can't recall, but I know we cancelled it
17  right away.  So, I'm not exactly -- one day -- I don't
18  remember.
19      Q.   Going back to the diabetes questionnaire
20  portion of Exhibit 1, do you recall whether
21  Ms. Lightbourn read these questions out loud to your
22  husband and he provided responses, or did it happen in
23  some other way?
24      A.   I can't recall.
25      Q.   What do you recall about the meeting

```
 1   concerning the diabetes questionnaire, if anything?
 2           MR. GREENE:  Object to the form of the
 3       question.
 4       A.   The second time she came, I'm not exactly --
 5   I don't remember exactly the details.  I don't.  I
 6   imagine she asked him the questions and he answered.
 7   You can tell she wrote it down.
 8   BY MS. PETT:
 9       Q.   Before she came to have the diabetes
10   questionnaire completed, did you have any
11   conversations with Mr. Vinas about the diabetes
12   question or why she had to come back for a second
13   time?
14           MR. GREENE:  I'm going to object, Tina.
15       At this point, you're going way beyond the
16       issues in the fraud claim, and actually the
17       areas that the judge precluded me from.  I'm
18       willing to talk to you about that again if
19       there's something beyond what you were
20       saying.  But this is not just testing the
21       witness's recollection about the issue.  Now
22       you're talking about conversations with her
23       and her husband.
24           So, if you'd like, we can talk about it.
25       You know that I've been very open to any
```

```
 1        thoughts you had, but I'd like to at least
 2        chat with you before I move for a protective
 3        order.
 4             MS. PETT:  Are you instructing her not to
 5        answer the question?
 6             MR. GREENE:  No.  I'm saying I think you
 7        and I should chat some more, because we
 8        chatted last time.  If you have another
 9        reason for asking this beyond what we
10        discussed, where you're no longer testing her
11        memory, as you told me you were going to be
12        doing, I'm happy to engage in that
13        conversation.
14             I have an idea.  Since I'm starving
15        anyway, let's do this.  Let's break for
16        lunch.
17             MS. PETT:  You want to take a break and
18        then --
19             MR. GREENE:  Let's take a break.  During
20        that break, you and I will talk further about
21        this and then we can figure it out.
22             Just for my own -- what are you looking
23        at -- another couple hours?
24             MS. PETT:  I have no idea.  I guess it
25        depends on how quickly we can get these
```

Page 62

1      questions answered or not.

2           MR. GREENE:  Okay.  Well, like I said,

3      we've been doing good.  Up to now, we've just

4      been flying through.  I'm trying to get an

5      idea.  Are you looking at an hour, four

6      hours?  That's all I'm trying to understand.

7           MS. PETT:  I really can't tell you.  I

8      was thinking this whole thing would take,

9      like, a couple of hours.  It's taking a lot

10     longer than I thought.  Probably a couple

11     more hours.

12          MR. GREENE:  Let's do this.  We'll break

13     for lunch.  It's 12:11 right now.  Lisa, is

14     1:00 good for you?

15          THE REPORTER:  That's fine.

16          MR. GREENE:  Tina, is 1:00 good for you?

17          MS. PETT:  Yes.

18          MR. GREENE:  Digna, is 1:00 good for you?

19          THE WITNESS:  Yes.

20          MR. GREENE:  Let's break.  Tina, I'll

21     call you in about five minutes.

22          (Lunch recess.)

23   BY MS. PETT:

24     Q.  I think where we left off, I was asking you

25   whether you had any conversations with Mr. Vinas prior

Page 63

1    to Jazmin's second visit to your home to complete the

2    diabetes questionnaire for the application process.

3              MR. GREENE:   Object to the form.

4         A.   Yes.

5    BY MS. PETT:

6         Q.   What did you discuss?

7         A.   When he was told that he had diabetes -- he

8    was told by Foresters that he had diabetes and he had

9    to fill out a form.   They wanted a medical -- he told

10   them that he didn't have it, and they wanted medical

11   proof.

12             So, he went to the doctor and got his medical

13   proof, because he knew he didn't have diabetes and he

14   wasn't being treated for diabetes of any kind.   So,

15   then he got the letter and he filled out the

16   questionnaire.   Whenever she came to talk about the

17   diabetes, he told her the truth.   He did not have

18   diabetes.   He was not being treated for diabetes.

19   They had that conversation there.

20        Q.   Who told Mr. Vinas that he had diabetes?

21        A.   Jazmin said Foresters needed -- because

22   Foresters found out that the other company had said

23   that he had diabetes and he had proven, no.   That's

24   why we got the insurance.

25             And then, I guess, they looked at that other

Page 64

1    insurance.  And because of that -- because of that
2    information that they had -- she said that they needed
3    a paper from his doctor stating that he did not --
4    that he was healthy, that he didn't have diabetes.
5    That's what he did.
6         Q.  How did he find out this information from
7    Jazmin?
8              MR. GREENE:  Objection to form.  What
9         information?
10        A.  I believe Jazmin called him to say that he
11   needed a paper from the doctor, for Foresters to
12   complete the application, saying that he did not have
13   diabetes.  And he did.  He went and got the paperwork.
14   BY MS. PETT:
15        Q.  So other than Jazmin, did your husband have
16   any communications with anyone about the application
17   for life insurance with Foresters?
18        A.  No.  As far as he was concerned, and me, she
19   was Foresters.  But, when I speak to you, it's, like,
20   she wasn't, but she was Foresters.  That's the only
21   one we ever talked to.
22        Q.  Did you speak to anyone from Foresters about
23   Mr. Vinas's application for life insurance?
24              MR. GREENE:  Objection to form; asked and
25         answered.

1        A.   After he passed?

2   BY MS. PETT:

3        Q.   At any time during the application process,

4   did you speak to anyone other than Jazmin and

5   Mr. Vinas about the application for life insurance?

6        A.   No.

7        Q.   Did your husband speak to anyone other than

8   Jazmin and you about the application for life

9   insurance with Foresters?

10       A.   I don't believe that he had any reason to.

11       Q.   Do you have any recollection of anyone from

12   Foresters calling your husband about the application

13   for life insurance?

14       A.   No.

15       Q.   Were you present when your husband talked to

16   Jazmin on the telephone about the application?

17       A.   No.

18       Q.   So, the only knowledge that you have

19   concerning any conversation that Jazmin had with your

20   husband would be from your husband telling you what

21   was discussed?

22            MR. GREENE:   Object to the form.

23       A.   He actually said -- she just requested him to

24   go to the doctor and get a letter, and that's what he

25   did.

1    BY MS. PETT:

2         Q.   That's not what I'm asking you.

3              The source of your knowledge of what was

4    discussed between Ms. Lightbourn and your husband was

5    your husband telling you what was discussed; correct?

6              MR. GREENE:   You're talking about on the

7         phone?

8              MS. PETT:   On the phone.

9         A.   On the phone?   It was my husband that told

10   me.

11   BY MS. PETT:

12        Q.   Looking back on Exhibit 1, on the page that

13   we're on where it's signed by your husband, I think it

14   states 1/15/2014, but that was 2015; correct?

15        A.   Yes.

16        Q.   The handwriting in response to question 11,

17   is that your handwriting?

18        A.   No.

19        Q.   Is that your husband's handwriting?

20        A.   No.

21        Q.   Did you see Jazmin complete the answer to

22   number 11?

23        A.   Yes.   She was writing everything.

24        Q.   Other than Dr. Hershman, did your husband

25   have any doctors during this timeframe?

1      A.  No.

2      Q.  Do you recall, when Jazmin went over the

3  diabetes questionnaire with your husband and you were

4  present, whether she read any of the questions on the

5  questionnaire out loud?

6      A.  She did.

7          MS. PETT:  Can you scroll up, Brenda, to

8      the top of the second page of the diabetes

9      questionnaire?

10 BY MS. PETT:

11     Q.  Do you recall whether Jazmin read the

12 questions in number seven out loud?

13         MR. GREENE:  Let the record reflect that

14     the witness is reading number seven.

15     A.  I am sure she read it out loud, because she

16 read all the questions out loud.  I don't remember her

17 reading every word, but I know she read every question

18 out loud because she wanted me to hear too.

19 BY MS. PETT:

20     Q.  Did you assist your husband with answering

21 any of the questions in number seven?

22     A.  No.

23     Q.  Do you know whether your husband actually had

24 an appointment with Dr. Hershman on December 5, 2014?

25     A.  If I remember if he had an appointment?

Page 68

1       Q.   Uh-huh.

2       A.   I know that he went to the doctor.  He would

3   take physicals.  I don't remember the date exactly,

4   but he would take his regular physicals.  He was very

5   good at that.

6       Q.   Do you know why he went to the doctor every

7   three months?

8       A.   He always liked to take his physicals.  He

9   wasn't a teenager.  He was in his 70s.  His wife had

10   died.

11       Q.   Did you ever go with Mr. Vinas to any of his

12   lab appointments where he would go and get his blood

13   tested?

14       A.   No.

15       Q.   Just to be clear, because I think we can get

16   through this record quickly, is it fair to say that

17   you never went to see Dr. Hershman with your husband

18   when he had an appointment?

19       A.   Exactly.

20       Q.   Did you ever have any conversations with

21   Dr. Hershman, say, between 2014 and the time your

22   husband passed away?

23       A.   No.

24            MS. PETT:  Can you pull up Exhibit 2,

25       Brenda?

1          (Defendant's Exhibit 2 was marked.)

2     BY MS. PETT:

3          Q.   While she's doing that -- when Mr. Vinas

4     would go to his appointments with Dr. Hershman, would

5     he come home and tell you what he discussed with

6     Dr. Hershman?

7          A.   Detailed.  I was very curious and I would ask

8     him every single thing, because I always wanted to

9     make sure that he was good.

10         Q.   What type of things would he tell you about

11    his appointments with Dr. Hershman?

12         A.   It was very, very routine.  It was always

13    very routine.  He would take his test and everything

14    would come out perfect, and that was it.  He always

15    felt good.  He may have been his age, but he was very

16    strong and very healthy -- always in good, tip-top

17    shape.  Even my children were, like, proud of him

18    because he was so strong and so healthy.

19         Q.   Did Dr. Hershman ever tell him to lose

20    weight?

21         A.   No.

22         Q.   You said that, when Mr. Vinas was told he had

23    diabetes, he was very upset about that.

24              Why was he upset?

25         A.   He was upset because he takes all these

Page 70

```
1    physicals and he's always tip-top -- on top of every
2    -- you know -- of his health.  He was very concerned
3    that he's healthy, he's good.
4            And because of that, he said, "How come my
5    doctor never said it?"  He was upset, because he went
6    to get his physical, he was updated.  And for somebody
7    else to come and tell him he had diabetes, and his own
8    doctor not tell him that, that's what made him upset.
9            But then he was calm when he came back.  He
10   said, "No, that is not true.  My doctor said that I
11   don't have diabetes.  I'm good."
12       Q.  Was there a family history of diabetes?
13       A.  No, but his wife had died of a heart attack
14   in her sleep.  I guess, because of that, you would
15   tend to really take care of yourself a little bit more
16   because of the age.
17       Q.  You've been paid the life insurance benefit
18   in this case; correct?
19       A.  We just did, yeah.
20       Q.  So what damages are you still seeking in this
21   matter?
22           MR. GREENE:  Objection to form.
23       A.  You can't fix a lot of the stuff that I had
24   to, because I can't get my insurance back to the price
25   that I was paying.  Back at the time that I got it, it
```

1    was $89.  You don't get that anymore.

2          You can't get his rings back.  You can't get

3    the bracelet that he bought me back.  That was so

4    expensive and he searched everywhere, because it

5    represented his Cuban heritage.  We can't get that

6    back.

7          So, there's a lot of stuff.  I have a very

8    bad -- all my life, I'm good -- what do you call it --

9    my credit.  I can't -- I have to wait a long time

10   before -- even though I paid all my bills, I still

11   have to wait a long time to build up that credit

12   again.  You know, at this age -- you know, I'm this

13   age.

14         A lot of the stuff that my children -- the

15   damage -- my children -- that, you can't fix either,

16   because I had to borrow from them, which I never did

17   in my life, even though I was a widow before.  This

18   was an embarrassment to my life.

19         To live -- to live a better life.  Because,

20   everything that you did send me, and you did send with

21   interest, I owed it.  Because I didn't have any money,

22   I owed everything, so everything went.

23         Q.  So with respect to the rings and the bracelet

24   that you sold, do you have receipts for the sale?

25         A.  No.  I didn't have the thought of getting

1   receipts that moment, when I had to go through

2   something so bad, and then -- I'll tell you the honest

3   truth -- I never thought of getting receipts.

4        Q.   Do you know how much they were worth?

5        A.   The bracelet cost him, in a pawn shop --

6   because they didn't make it anymore -- in a pawn shop,

7   he spent $2,500, and they gave me a thousand dollars.

8   And I had to do it because -- his rings -- one of his

9   rings that had my name inside of it, it was 800.  They

10  only gave me four.  And the other ring was, like -- it

11  was very antique -- very, very old.  I don't know what

12  the price was, but I only got $200 for it.

13       Q.   And then you said that you had to borrow

14  money from your children.

15            Who did you borrow the money from?

16       A.   My son is military -- he has six children.

17  So, I had to borrow from him.  Well, I didn't borrow.

18  I had to ask him for money.  I didn't borrow.  I

19  didn't have no money to pay it back.

20            I had to -- every time I had to pay any of my

21  bills, I couldn't afford it because of that.  I had

22  $4,000 of house insurance because of the mortgage.

23  That was more than the mortgage, you know.  So I had

24  to borrow that money -- $5,000 to pay for the taxes

25  of -- the house taxes.  I had to get it from my

1   children.  There was no way I was going to have $5,000

2   out of nowhere.

3       Q.  How much money did you get from your children

4   in total?

5       A.  I didn't add up my children's money.  It was

6   three years, almost four years, of getting money.  To

7   tell you the honest truth -- I'm going to be very

8   honest with you.

9           In order to be better, I used to go to stay

10  at my children's house just, like, "I want to spend

11  time with you."  But, sincerely, I'd just cry at

12  night, because it was just to be able to eat.  And

13  that's embarrassing.  I couldn't tell my children, "I

14  visit you because I want to eat."  That's

15  embarrassing.  That's how bad it was.

16          MR. GREENE:  Digna, take a minute.

17      Listen to me.  It is important that you tell

18      Ms. Pett, as best you can recall, the amount

19      of money that your children loaned you or

20      gave you, whatever you want to call it.

21          So, even though you didn't total it up,

22      take a deep breath, and, in your own mind,

23      say, "Child A gave me this, Child B gave me

24      that."  It is important that she knows that.

25      We can give it to her in another form, but,

Page 74

1          as long as we're here, this would be a good

2          time to do it.

3               THE WITNESS:  Okay.  I know that they

4          paid the taxes.  It was $5,000 every time I

5          had to pay the taxes.  They were also

6          responsible for -- responsible to pay the

7          $500 of the $4,000 a year for the house

8          insurance.  I couldn't afford that.

9               I would say -- I would say close to 30,

10         35,000 that they had to pay, because -- they

11         did also help me bury him.  I had nobody else

12         to give me money for that.

13    BY MS. PETT:

14         Q.  Did you pay them back?

15         A.  No.  I didn't have enough to pay them back.

16    I paid all my bills.  I paid everything I had.

17    Everything that I had, I paid friends back.  I paid

18    friends back.  They didn't want it back, but even a

19    thousand, 800.

20              For my hearing aids, my children paid for

21    that.  I became deaf.  I didn't know I was deaf.  I

22    was having a lot of trouble hearing, and the doctor

23    said that I needed hearing aids.  Probably the

24    medication, the Humira, affected my hearing.  That's

25    what he said.

1      Q.  How much were your monthly expenses prior to

2   your husband passing away?

3      A.  He was the one that would pay everything, so

4   he had enough to pay.

5      Q.  So you don't know how much your monthly

6   expenses --

7      A.  Exactly?  No, not right now.  He had a lot of

8   cards that -- I began to pay his cards, because I

9   didn't know -- I didn't know I wasn't obligated to pay

10   his credit cards.  So, in the very beginning, I

11   also -- I paid J.C. Penney.  That was under his name.

12   I started making payments on his credit cards until

13   somebody told me, "Deal with your credit cards.  You

14   don't have to finish paying his credit cards."  Then,

15   I stopped.

16      Q.  How much in credit card debt did you have

17   when he passed away?

18      A.  Me?  I'll tell you.  When he passed away --

19         MR. GREENE:  Tina, just so we're clear,

20      are you talking about her or his cards?

21         MS. PETT:  I said, "you."

22         THE WITNESS:  Me.

23         MR. GREENE:  Okay.

24         THE WITNESS:  To show an example, I only

25      owed American Express.  I owed $873.32 when

Page 76

```
1        he died.  I ended up paying $8,832.76 when I
2        got my money.  One, because I had to use it;
3        and, two, because the interest -- because I
4        couldn't pay the small payment -- the payment
5        that they said -- $210 -- I couldn't pay
6        that.  So, they put interest on top of
7        interest on top of interest.  I ended up
8        paying that -- 8,832 -- and I paid American
9        Express off.
10           Everything went like that.  I didn't know
11       -- $6,000 at Chase -- but all the interest
12       that they did, I had to pay it.
13   BY MS. PETT:
14       Q.  So what I'm trying to understand is, what
15   your credit card debt was when your husband passed
16   away.  Not after.  What debt did you have when he
17   passed away?  Then we'll talk about after.
18       A.  All together with all the credit cards, it
19   was, like, $20,000.
20       Q.  Before he passed away?
21       A.  Before he passed away.  We were doing the --
22   we were paying all the other stuff -- all the medical
23   bills.  It was really medical bills, because we didn't
24   expect me to get sick like that.  I was always a super
25   healthy person.  It was a snap of the fingers.
```

```
 1           I'll be honest with you.  Because I didn't
 2    have money to pay for the Humira after he died --
 3    because I didn't have money to pay for all that
 4    medication or that medical plan, I had to, on my own,
 5    stop taking all the pills I was taking, all the
 6    things.
 7           But I couldn't eat neither, so I couldn't buy
 8    meat and I couldn't buy hardly anything.  I was eating
 9    vegetables.  And, you know, I don't have chronic
10    rheumatoid arthritis.  And I realized on my own that I
11    was super, chronically allergic to dairy.  It's a
12    blessing, but I couldn't pay.
13       Q.  When Mr. Vinas obtained the life insurance
14    policy, how much debt did you have?
15       A.  When he obtained that -- I don't think we had
16    much debt.
17       Q.  Okay.  Because I thought you obtained it
18    around the time you had all those medical expenses.
19       A.  We had medical expenses.  You're saying
20    "debt."  The debt was on my credit cards.  We were
21    talking about my credit cards.
22       Q.  Okay.
23       A.  I didn't owe it on my credit cards.
24       Q.  So, let's break it down.  So when Mr. Vinas
25    obtained the life insurance policy, how much debt did
```

1   you have on your credit cards?

2          MR. GREENE:  You're just talking about

3      her personally?

4          MS. PETT:  For now.

5          MR. GREENE:  Okay.  This is just you,

6      Mrs. Vinas.

7      A.  I had, like, on my credit cards, maybe 1,200,

8   but we paid that monthly and we were doing those

9   monthly payments, so that was good.  We weren't behind

10  on anything.

11  BY MS. PETT:

12     Q.  So you had 1,200.  How much did he have at

13  the time he applied for the policy?

14     A.  I don't exactly remember, but I know that he

15  did the $40,000 to pay -- so that we could have money,

16  because we didn't have any savings.  We lost all our

17  savings.

18     Q.  When he passed away, how much was your credit

19  card debt?

20     A.  I had, like, 12,000, but then it went to a

21  lot.

22     Q.  How much did he have at the time he passed

23  away in credit card debt?

24     A.  I wouldn't know.  I did not write that down

25  anywhere.  I didn't look back on that year.  I didn't

1    look back.  I didn't know I was going to be asked how

2    much credit he had.  I didn't write it down.  I was

3    concerned with my credit.

4         Q.  Did you or Mr. Vinas discuss any of your

5    debts with Ms. Lightbourn when you were applying for

6    the policy?

7         A.  Any of our debt?

8         Q.  Uh-huh.

9         A.  If there was a question, I imagine that he

10   answered it.  But I don't think I -- maybe she did

11   ask.  Of course, she had to have asked it, because --

12   in order to give us the insurance.

13        Q.  No.  She asked you the questions on the

14   application.  I'm asking you if she asked any

15   questions about your personal financial situation,

16   other than what was on the application.

17        A.  No.

18        Q.  And you didn't tell her anything about your

19   personal financial situation other than what was on

20   the application?

21        A.  No.

22        Q.  I asked you at the beginning of this how much

23   in damages you were seeking and you haven't given me

24   an answer.

25             Is there a monetary amount that you are

1    seeking?

2            MR. GREENE:  Object to the form of the

3        question.  I disagree with that, but go on.

4        I won't lead the witness.

5        A.  I don't know how to answer that question.

6    BY MS. PETT:

7        Q.  What are you going to tell the jury when

8    you're asked, if we go to a trial, how much are you

9    seeking for Foresters to pay you for, quote,

10   consequential damages?

11           MR. GREENE:  Object to the form.

12       A.  I would have to sit down and -- I am so

13   sorry -- I did not add it up.  I did not look at what

14   I was owed.  I don't have a number for you right now,

15   but I will have a number for the judge.

16   BY MS. PETT:

17       Q.  You said you borrowed money from friends.

18           Do you have any written agreements with any

19   of the friends --

20       A.  No.  Like I said, when I got my money, I gave

21   some of my friends that had given me money -- because

22   they didn't put it -- they know my condition.  They

23   didn't put it as borrowed.  I paid them as a gift,

24   because they wouldn't want to put me in straits.  They

25   know I didn't receive that much and I owed so much.

Page 81

1   They knew my condition.  But I did give them money,

2   because I wanted to be sure that I was appreciative of

3   what they did for me when I didn't have anything.

4           MR. GREENE:  She's asking if you know how

5       much they gave you.

6           THE WITNESS:  Yes, I do.

7   BY MS. PETT:

8       Q.  How much?

9       A.  I could -- actually, $13,180 is what I gave

10  them back.  So, more or less, that's...

11      Q.  How many different people did you borrow

12  money from?

13      A.  Like I said, I didn't borrow.  They gave it

14  to me, but I had to pay it back.  I would say it's 13

15  people.  It was almost four years.

16      Q.  Did they each give you the same amount?

17      A.  No.  They gave me different amounts, but it

18  would add up.

19      Q.  Do you have a list of people who gave you

20  money?

21      A.  No, but I could make a list for you.

22      Q.  Okay.  Do you recall their names sitting

23  here?

24      A.  I could.  Do you want me to tell you their

25  names?

Page 82

1        Q.   Yes.

2        A.   I have Quique.

3             MR. GREENE:   How do you spell that?

4             THE WITNESS:   Q-U-I-Q-U-E.

5             MR. GREENE:   Glad I asked.

6             THE WITNESS:   And, whenever she's ready,

7        I'll give her the next.

8    BY MS. PETT:

9        Q.   Go ahead.   Do you have last names?

10       A.   Okay.   I could give you some last names.   I

11   don't know all my friends by last name.

12            Tharsey, T-H-A-R-S-E-Y; Quinones,

13   Q-U-I-N-O-N-E-S.

14       Q.   Keep going.

15       A.   Paula.   Paula gave me 3,000.   That was only

16   once.   She gave me 3,000.   I'm counting my children,

17   so there's David, Jimmy, Frances, with an E.

18   Anthony -- that's a couple, but I'm just going to give

19   you Anthony.   Doris, Christina, Deanna, my rabbi --

20   Rabbi Wolf.   Hold on a second.   I'm trying to

21   remember.   You can write "Baby."   That's what we call

22   him.   Pablo, P-A-B-L-O.   Those are the ones that I

23   remember exactly that I paid back.

24            The other people that gave me -- you know --

25   it wasn't much, so I didn't want to make them feel bad

Page 83

1    by paying the money back.

2        Q.  Did you pay any of them interest?

3        A.  No, I didn't pay interest.  It was hard

4    enough to get them to take the money they had given

5    me.

6        Q.  Now, when your husband applied for the

7    policy, how much in medical bills did you owe?

8        A.  Did I owe?  Every month, it was a different

9    amount, so we were paying as it went by.  We had a lot

10   of different doctors.  I was taking about eight

11   medications, plus the injection, and we had to go to

12   many different doctors, different places.

13           I had to do my blood test every time -- at

14   least every other week, I had to do my blood test.

15   That was money, because we had an insurance that

16   didn't cover all these things.

17       Q.  When your husband passed away, did you still

18   owe medical expenses?

19       A.  I surely did.

20       Q.  How much?

21       A.  I didn't pay that.  I haven't paid that.  I

22   haven't been able to pay that.  I would say close to

23   $10,000 in about 40 different places.

24       Q.  When you were paid the life insurance

25   benefits, you didn't pay that?

Page 84

1     A.  I didn't have enough for that.

2     Q.  You paid all of your credit card --

3     A.  Yes.

4     Q.  -- for Bank of America?

5     A.  Bank of America is the only one that's --

6  it's with the lawyer still, so I don't know what

7  they're going to come up with.  I don't know exactly

8  the amount that I have to pay the lawyer, because I

9  did have to hire a lawyer.  She's working with Bank of

10 America.

11    Q.  You said you paid Chase?

12    A.  I did.

13    Q.  Did you have any other credit cards other

14 than American Express, Bank of America, and Chase?

15    A.  No.

16        MS. PETT:  Can you pull that document

17        back up, Brenda, Exhibit Number 2, the 1/16

18        letter?

19 BY MS. PETT:

20    Q.  Take a look at what I marked as Exhibit 2 and

21 tell me if you've ever seen this document before.  For

22 purposes of the record, it's a January 16, 2015 letter

23 to Mr. Vinas from Foresters.

24        MR. GREENE:  Again, I want my client to

25        read the entire letter.  Let's just take no

Page 85

1         more than five minutes.  It's 1:48.  We'll
2         get back on at 1:53 or something like that.
3              (Brief recess.)
4    BY MS. PETT:
5         Q.  Mrs. Vinas, have you ever seen this letter
6    before?
7         A.  No.
8         Q.  Are you familiar with the term "MIB?"
9         A.  I am now.
10        Q.  Do you have any recollection of ever
11   discussing the contents of this letter with anyone?
12        A.  I do not have a recollection of my husband
13   receiving that letter.  I would very much know that he
14   would discuss it with me.  He discussed everything
15   with me -- something so important.
16        Q.  Do you know Julie Brooks?  Have you ever
17   spoken to a Julie Brooks?
18        A.  No.
19        Q.  Do you know if your husband ever requested
20   his MIB consumer file?
21        A.  I honestly don't.  That's why I say that I
22   don't remember him receiving this letter.  It's
23   something for the first time that I see, and something
24   that he would discuss with me because he would have to
25   request that file.

1           (Defendant's Exhibit 3 was marked.)

2    BY MS. PETT:

3        Q.  Let's go to the letter which is the 1/22/15

4    letter.

5           Tell me if this is the letter you've been

6    referring to today from Dr. Hershman.

7        A.  Yes, ma'am.

8        Q.  Have you seen Exhibit 3 before?

9        A.  This letter?

10       Q.  Yes.

11       A.  Yes.

12       Q.  When was the first time you saw it?

13       A.  When was the first time I saw it?

14       Q.  Yes.

15       A.  When he received it.

16       Q.  When he -- meaning Mr. Vinas?

17       A.  Yes.

18       Q.  So back in January of 2015?

19       A.  Yes.

20       Q.  After Dr. Hershman sent this letter to your

21   husband?

22           MR. GREENE:  Objection to form.

23       A.  Gave it to him.  Personally gave it to him.

24   BY MS. PETT:

25       Q.  Mr. Vinas went to the office and picked it

Page 87

1   up?

2       A.  Yes.

3       Q.  What did Mr. Vinas do with the letter?

4       A.  He gave it to Jazmin, when she came, so it

5   could be put in our record.  She said it was for

6   Foresters, so she could put it with the application.

7       Q.  Do you know if Jazmin had any conversations

8   with Dr. Hershman about this letter back in 2015?

9       A.  No.

10      Q.  You don't know or --

11      A.  I don't know.

12      Q.  What was your understanding of the purpose of

13  this letter?

14      A.  In order for us to get the insurance, we

15  needed a letter stating that he didn't have diabetes,

16  that he was in good health, that the questions that we

17  answered were all correct.

18      Q.  But he was advised to diet and exercise on a

19  regular basis?

20      A.  Not necessarily diet.  I don't consider that

21  we thought he was heavy.  He was okay.  He was

22  healthy.  There was no problem.  He was always taking

23  care of himself, eating the right things and

24  everything, but that's what I do now at our age.

25      Q.  The letter states, "He has been advised to

Page 88

1    diet and exercise on a regular basis."

2          Have I read that correctly?

3    A.   Okay.  So he was told.

4    Q.   But the second sentence too -- just for

5    clarification -- is it your testimony that Mr. Vinas

6    never was diagnosed with diabetes or is it your

7    testimony that he did not believe he had diabetes?

8          MR. GREENE:  Object to the form.

9    A.   He was never diagnosed with diabetes.  He was

10   never told he had diabetes.

11   BY MS. PETT:

12   Q.   Then he was never treated for any

13   complications of diabetes?

14   A.   But if he didn't have diabetes --

15         MR. GREENE:  Answer her question, Digna.

16   A.   Oh, no.  He never got treated for diabetes.

17   BY MS. PETT:

18   Q.   Did you ever ask Dr. Hershman why he included

19   in all of his medical records that your husband had

20   diabetes?

21         MR. GREENE:  Object to the form of the

22         question.  At this point, unless you are

23         going to tell me how this in any way relates

24         to the fraud claim, I'm going to seek a

25         protective order.

1           As you said to me, I let you go a little

2       bit on this, Ms. Pett, but, unless you can

3       tell me how this in any way relates to the

4       remaining claim, I'm going to seek a

5       protective order on this.

6           MS. PETT:  I would think a defense for

7       fraud is also unclean hands, so I would like

8       to know if she ever asked Dr. Hershman why he

9       put diabetes in her husband's records.

10          MR. GREENE:  Well, if you're going to do

11      that -- again, I'll do this outside the

12      witness's hearing, but I want it on the

13      record.  Why don't I do this?

14          Digna, why don't you step out of the room

15      for a moment so you can't hear what we're

16      talking about?

17          THE WITNESS:  Okay.

18          MR. GREENE:  The issue is, number one,

19      you're mischaracterizing.  He didn't diagnose

20      him with diabetes.  I think the thing that

21      you're referring to is the word "assessment"

22      with respect to a medical billing code.  I

23      went over that with your client whether it

24      was a MIB code or whatever the code -- the

25      three-letter word was or the three-letter

1       acronym was.  But there's nothing where he

2       was diagnosed with diabetes.  So, the

3       objection would normally be, assumes facts

4       not evidence.

5           In addition to that, the unclean hands

6       relates to the procurement or fraud with

7       regard to the contract.  This has nothing to

8       do with that.  This is simply whether or not

9       she went ahead and knew this or talked to the

10      doctor about whether he had diabetes.

11          You all went ahead and you paid the

12      claim, so, obviously, you guys didn't think

13      he either had diabetes or he didn't know that

14      he had diabetes; otherwise, you wouldn't have

15      paid the claim.

16          So, unless you can give me another

17      reason, I will seek a protective order based

18      upon this, and the record should be clear

19      that I've asked the witness to step out of

20      room so she can't hear what we're talking

21      about.

22          MS. PETT:  So, you will not let the

23      witness answer the question whether she ever

24      talked with Dr. Hershman about why he has

25      "diabetes" written throughout the medical

1    records?

2        MR. GREENE:  If you phrase it accurately

3    and say why he has written in a medical -- a

4    billing record assessment -- then, in order

5    to get through this, so that we don't have to

6    fight about it and waste more time, I would

7    let her -- because I'm pretty comfortable

8    she's going to say that she never did.

9    Regardless, all I would ask is that you

10   phrase it correctly so that I don't have to

11   object and have some other speaking

12   objection.

13       How's this?  Now that my objection is on

14   the record, you can phrase it any way you

15   want.  I'll object to the form.  If you're

16   going to limit it to that, I'd rather just

17   get done with the deposition.  Go ahead and

18   let me call her and tell her she can come

19   back.  I have my speaking objection on the

20   record without the witness being present.

21       MS. PETT:  Just because she has it on

22   mute doesn't mean she can't hear us.

23       MR. GREENE:  I told her to leave the room

24   so she couldn't hear us.  I'm assuming she

25   listened to my instructions.

Page 92

1           (The witness returned.)

2           MR. GREENE:  With the objection, I'll go

3       ahead and let Ms. Pett ask the question one

4       more time and allow the witness to answer

5       this question.

6           MS. PETT:  I'm going to lay more of a

7       foundation.

8  BY MS. PETT:

9       Q.  Mrs. Vinas, have you ever reviewed

10  Dr. Hershman's treatment records for your husband?

11      A.  I requested them and I sent them to

12  Foresters.

13      Q.  Right.  But did you ever read them?

14      A.  Not all of them.

15      Q.  Did you read some of them?

16      A.  I looked at the beginning, just to look

17  and...

18      Q.  Did you remove any of them?

19      A.  No.  Well, I sent it to Foresters in a sealed

20  envelope.  They gave me another copy.

21      Q.  So you had two copies of it?

22      A.  Yeah.  I have my copy, which I don't anymore.

23  I gave it to the first lawyer, and then the lawyer

24  never gave it back.

25      Q.  When you said you looked through the records,

Page 93

1    at least the top part of the records, did you see

2    "diabetes" written in any of those records?

3         A.  Not really.  I don't think I did.

4         Q.  Did you ever ask Dr. Hershman why he had

5    included the word "diabetes" in your husband's medical

6    records?

7         A.  No.  I commented to him that Foresters did

8    not want to pay my life insurance because they said he

9    had diabetes.

10        Q.  But you never specifically called him up and

11   asked him that question?

12        A.  No.

13             MR. GREENE:  Object to the form for all

14        the reasons I set forth outside of the

15        hearing of the witness.

16   BY MS. PETT:

17        Q.  And when you said that you talked to him

18   about the claim not being paid because he had

19   diabetes -- that Foresters said he had diabetes -- is

20   that the conversation you had mentioned earlier when

21   you said you told Dr. Hershman that and he said your

22   husband did not have diabetes?

23        A.  Yes.

24        Q.  And you don't recall when that conversation

25   was?

Page 94

1          A.  It was last year when I became his patient.

2              MS. PETT:  Can you pull up the next

3          exhibit, Brenda?

4              (Defendant's Exhibit 4 was marked.)

5     BY MS. PETT:

6          Q.  Take a look at Exhibit 4 and just tell me if

7     you've ever seen it before.

8              MR. GREENE:  Read through it, Mrs. Vinas.

9          A.  Yes, I remember this.

10    BY MS. PETT:

11         Q.  Have you seen this letter before?

12         A.  Yes.

13         Q.  Did Ms. Lightbourn give you a copy of the

14    letter?

15         A.  This letter?

16         Q.  Yes.

17         A.  I've seen it before.  I believe it was sent

18    to me.

19         Q.  What was the date your husband passed away?

20         A.  It was...

21         Q.  Is it January 11, 2017?

22         A.  Yes, 11th.

23         Q.  Do you recall when the first time, after he

24    passed away, was when you spoke to Ms. Lightbourn?

25         A.  That week.

1      Q.  To your knowledge, was she the one who

2   notified Foresters that your husband had passed away

3   and you would be submitting a claim?

4      A.  Yes.  She said she'll take care of it.

5   She'll get me the application; she'll get me

6   everything from Foresters.

7          MS. PETT:  Can you pull up the statement

8      of claim for death benefits?

9          (Defendant's Exhibit 5 was marked.)

10  BY MS. PETT:

11     Q.  Can you take a look through Exhibit 5?

12         MR. GREENE:  Ms. Pett, rather than me

13     taking some time out here to have her read

14     the whole thing, are you going to focus on a

15     particular section?

16         MS. PETT:  First, I want to know if she

17     recognizes it and then I want to know if any

18     of it is her handwriting.  I'm going to ask

19     her a couple things.

20         THE WITNESS:  That is not my handwriting,

21     number one.

22  BY MS. PETT:

23     Q.  When this claim form was completed, did

24  Ms. Lightbourn complete it?

25     A.  Yes.

Page 96

1      Q.  Did she complete it in your presence?

2      A.  Yes.

3      Q.  So she came to your house on January 12th and

4   she completed it and you signed it?

5      A.  That's my signature, yes.

6      Q.  Did you write the date there or did she write

7   the date?

8      A.  She wrote the date.

9          MR. GREENE:  For the record, the

10         signature being referred to is on page 2 of

11         3, I believe, of the PDF.

12  BY MS. PETT:

13     Q.  Actually, there's a signature on page 3 too.

14  If you could go down to page 3?

15         Is that your signature as well, Mrs. Vinas?

16     A.  Yes.

17     Q.  How did Ms. Lightbourn find out that your

18  husband had passed away?

19     A.  I called her because she was the person that

20  we had the contact for for Foresters.

21     Q.  Was anyone else present when the form was

22  completed?

23     A.  No.

24     Q.  Do you recall, when you completed the form,

25  whether she explained to you what a contestable

```
 1    investigation was?
 2              MR. GREENE:  Object to the form.  Are you
 3         talking about -- completed this document that
 4         we're looking at here?
 5              MS. PETT:  Yes.
 6              MR. GREENE:  Object to the form anyway.
 7         Go ahead.
 8         A.  Contestable?
 9    BY MS. PETT:
10         Q.  Are you familiar with the phrase,
11    "contestable investigation?"
12         A.  Actually, no, not with those words.  I don't
13    know what you're meaning with that.
14         Q.  Tell me what she explained to you, if
15    anything, about the claim process when she came to
16    your house and completed the form on your behalf.
17         A.  She expressly said, "I'll take care of this.
18    No problem."  She filled it out, I signed it, and she
19    said, "I'll send it out to Foresters and it will be
20    taken care of."  There was actually no problem with
21    it.  There was no question.
22         Q.  When did you learn that you needed to provide
23    your husband's medical records to Foresters?
24         A.  From Foresters.
25         Q.  How did you learn that you needed --
```

1          A.   There was a young lady.   They called me.

2     They called me from Foresters, actually.   That's when

3     I started talking to -- I'll tell you in a second --

4          Q.   Are you looking at notes?

5          A.   Just my little papers that I wrote little

6     notes on.   I had the name because I had it on my old

7     phone, the lady that I spoke to.   She was a very kind

8     lady, but she told me that I would need to send the

9     paperwork from the doctor.

10         Q.   Was it Lisa Buckland?

11         A.   Actually, yes -- Lisa.

12              MS. PETT:   Can you pull up the next

13         letter, Brenda?

14              (Defendant's Exhibit 6 was marked.)

15    BY MS. PETT:

16         Q.   How did you go about obtaining the records

17    from Dr. Hershman's office?   Did you go there

18    personally and ask for them or did you call?

19         A.   I called and I spoke to a young lady, and she

20    said she would notify the doctor and they would notify

21    me when they're ready.   Then she gave me a sealed

22    envelope, and she said, "These are the papers."   And

23    then, that's what I did -- sent it to them.

24         Q.   When you learned from Lisa that Foresters

25    wanted your husband's medical records, did you reach

Page 99

1    out to Ms. Lightbourn at all and ask her any

2    questions?

3        A.  No.

4        Q.  Did Ms. Buckland explain to you why Foresters

5    needed the records?

6        A.  I believe she started to -- yes, I'm going to

7    say.  I asked why.  I wanted to know why, because --

8    but then I remembered that we had spoken about it --

9    Jazmin and my husband and I -- because that was when

10   we were going to cancel the other insurance.

11           He wanted to make sure that if anything, God

12   forbid, happened -- and it did, so it was God's will

13   -- before the two years were up, what would happen.

14   And she said -- that's where we conversed -- and

15   that's why I remembered, because that was really big

16   to us.  She said, "As long as you put everything the

17   truth -- as long as you put the truth, it will be

18   paid.  The only thing, you might have to give more

19   documents or they might investigate you deeper."

20           So, it wasn't a big deal when they asked me,

21   because I knew that she said, if anything -- and it

22   just so happened, it was before the two years -- but

23   it would be paid.

24           At all times, we knew that it would be paid,

25   because it only was going to be a little bit more

1   documents that they would go through.  But, as long as

2   we say the truth, it would be paid, and we did say the

3   truth.

4       Q.  So when your husband purchased the policy,

5   you had an understanding that, if he died within the

6   first two years, that Foresters would investigate the

7   accuracy of his responses on the application?

8       A.  Absolutely.  Before we cancelled the other

9   one, we wanted to make sure that it was said that --

10  yes -- of course.  As long as we said the truth,

11  because they would check some of the doctors, that's

12  why it wasn't a big deal to me, because we did go with

13  the truth.

14      Q.  Take a look at Exhibit 6 and tell me if

15  you've ever seen Exhibit 6 before.

16      A.  This that I'm seeing now?

17      Q.  Yes.

18          MR. GREENE:  Go ahead and take a look at

19      it and read through it.  Then you can answer

20      Ms. Pett's question.

21      A.  Yes, I do remember this, because they said to

22  send the doctor's -- but they didn't express that I

23  had to send the death certificate.  I said, "I'm

24  sorry," and sent it.

25  BY MS. PETT:

1     Q.  This is around the time that you spoke to

2  Lisa and she told you that Foresters needed your

3  husband's medical records?

4     A.  Yes.

5     Q.  When was the next time -- after you met with

6  Ms. Lightbourn at your home to complete the claim

7  form, when was the next time you spoke to her?

8     A.  Actually, no other time; because, once they

9  called -- once Lisa called me and told me that they

10  weren't going to pay it, I called her various times

11  and never got an answer.  I left messages saying,

12  "What do you mean?  You said they were a reputable

13  company and that they would pay me, and now they're

14  saying they're not."  And she never -- to this day --

15  I never got an answer back.

16     Q.  So you called her -- just to summarize --

17  make sure I'm summarizing you accurately -- you called

18  her after the claim was denied to ask her what

19  happened?

20     A.  Yes.

21     Q.  And she didn't get back to you?

22     A.  Never.

23     Q.  Do you recall having any other conversations

24  with Lisa Buckland during the claim process?

25     A.  I spoke to her various times.  Because, now

Page 102

1    that I had her number and she was picking up the
2    phone, yes, I called her various times because I was
3    in shock when I was told that I wasn't going to get
4    paid.
5        Q.  What did Lisa tell you, if anything?
6        A.  We're sorry -- she was sorry, and that was
7    it.  That she was sorry and there was nothing she
8    could do.
9        Q.  Did you ask her to explain -- did you tell
10   her anything that Ms. Lightbourn had told you during
11   the application --
12       A.  Absolutely, I did.
13       Q.  -- to explain --
14       A.  Sorry.  I talked over you.  I'm sorry.
15       Q.  Did you talk to Lisa about any of the
16   conversations that you had with Ms. Lightbourn during
17   the application process?
18       A.  I did.  I said, "I don't understand.
19   Foresters always said I would get paid as long as we
20   told the truth, and we told the truth."
21       Q.  Did you ever speak to anyone, other than
22   Lisa, at Foresters about the claim decision?
23       A.  No --
24           MR. GREENE:  Object to the form, the way
25       it's phrased.

1        A.   -- to my knowledge, I didn't speak to anyone.

2   But then, again, remember, I was -- that was an

3   important call when I spoke to Lisa, and that I

4   remember.  But, at that moment, being so hurt, being

5   so sick, losing my husband, I focused on the important

6   people that I spoke to, which was Lisa.  I don't

7   forget that I spoke to her.

8            But, to my recollection, I don't think I

9   spoke to anybody else.  But then, again, you know, at

10  that time, you know, I can't say a strict no.

11           (Defendant's Exhibit 7 was marked.)

12  BY MS. PETT:

13       Q.   Can you take a look at what I just marked as

14  Exhibit 7 and tell me if you recognize it?

15       A.   Yes.  This looks like what I sent.

16       Q.   For purposes of the record, it's a

17  February 21st, 2017 letter from you to Foresters?

18       A.   Yes.

19       Q.   That's your signature on Exhibit 7?

20       A.   Yes.

21       Q.   Did you prepare this letter?

22       A.   Yes.

23       Q.   This was the cover letter where you were

24  sending the medical records from Dr. Hershman?

25       A.   Yes.

1      Q.  Other than the need for the records from

2   Dr. Hershman's office, did you discuss these records

3   with anyone at Dr. Hershman's office, including

4   Dr. Hershman, around the time you sent them to

5   Foresters?

6      A.  No.

7      Q.  Along with the February 1st letter, you

8   enclosed the death certificate and Dr. Hershman's

9   records?

10      A.  I enclosed the records, and I believe I

11   forgot to enclose the death certificate, even though I

12   wrote that I did.  That's when they requested the

13   death certificate because I didn't enclose it.

14      Q.  It looks like it was enclosed with this

15   record.

16          MR. GREENE:  Object to the form.

17   BY MS. PETT:

18      Q.  Can you go to the last page of the records?

19   Did you send the records by Priority Mail?

20      A.  Yes.

21      Q.  And just to be clear, you did not remove any

22   records from the records that Dr. Hershman's office

23   gave you before you sent them to Foresters?

24      A.  Absolutely not.  I didn't touch them.

25      Q.  When Mr. Vinas applied for the policy, was he

1   on any medications?

2        A.  No.

3        Q.  At some point after the policy was issued,

4   did Mr. Vinas start to take any medications?

5        A.  He took medications the week that he died.

6        Q.  That was the first time he had been taking

7   medications between the application and him passing

8   away?

9        A.  Yes.  He had an appointment on Thursday.  He

10  died Wednesday.

11       Q.  He had an appointment with Dr. Hershman?

12       A.  Yes.

13       Q.  Just a check-up or was there --

14       A.  No.  Because he wasn't feeling well that

15  week, he made an appointment.  Because that was the

16  first time he wasn't feeling well, he made the

17  appointment a week before.  Dr. Hershman gave him some

18  medication.  He brought it home.  We talked about it.

19            And then I was very concerned why this

20  medication -- he said, "Thursday, I have another

21  appointment.  Go with me."  He died Wednesday.

22            MS. PETT:  Can you pull up the April 5th

23       letter?

24            (Defendant's Exhibit 8 was marked.)

25  BY MS. PETT:

1      Q.  Take a look at what's been marked as

2    Exhibit 8 and tell me if you recognize it.

3          MR. GREENE:  The record should reflect

4        the witness is reading through Exhibit 8.

5        When you get to the point, Digna, that you've

6        reached the bottom, let Brenda know that you

7        would like her to scroll down.

8          THE WITNESS:  Okay.  I got to the bottom.

9          MR. GREENE:  Tina, are you going to ask

10       her something specific?  Again, I'm trying to

11       move it along.

12         Do you need her to focus on the whole

13       letter?

14         MS. PETT:  No.  I have a few questions,

15       but nothing specific about the letter.  I

16       don't think she needs to -- of course, if she

17       wants to look at the letter before she

18       answers, but it has nothing to with the

19       contents of the letter.

20         MR. GREENE:  Okay.  Then let's try this.

21    BY MS. PETT:

22      Q.  So do you recognize Exhibit 8?

23      A.  I recognize that the letter was sent to me,

24    and I was concerned, because it wasn't -- as far as we

25    were concerned, he never had diabetes.  He was never

```
1    told he had diabetes.  He wasn't treated for diabetes.
2    To see this, I was shocked, because it was the first
3    time that that had come up.
4    BY MS. PETT:
5        Q.  For purposes of the record, though, this is
6    the April 5, 2017 letter from Foresters to you,
7    denying the claim.  Correct?
8        A.  You're asking me?
9        Q.  Yes.
10       A.  Yes.
11       Q.  What actions did you take after you received
12   the letter, if anything?
13       A.  After I received this letter, I actually -- I
14   called my son.  My son was -- my husband left my son
15   to be the one in charge.  So, my son called the
16   lawyer, but the lawyer couldn't take care of this
17   case.  That's how we got Craig.
18       Q.  After you received the letter, did you call
19   anyone at Foresters to discuss the contents of the
20   letter?
21       A.  Yes.  I spoke to Lisa, and I said that that
22   was wrong, that it was totally wrong, that he never
23   had diabetes as far as we were concerned.  He was not
24   being treated, he was not diagnosed with diabetes.
25   So, you know, this was shocking to me.
```

Page 108

```
 1        Q.  Do you have a specific recollection of
 2   telling Lisa that your husband did not have diabetes
 3   and was never told that he had diabetes?
 4        A.  Absolutely, because I was furious when I saw
 5   the letter.
 6        Q.  Do you have any notes of that conversation?
 7        A.  Notes, no.  Once I got the lawyer, I let him
 8   take care of it.
 9        Q.  Did you put anything in writing to Foresters,
10   anything about the claim decision and telling them
11   that your husband didn't have diabetes and had never
12   been told that he had diabetes?
13            MR. GREENE:  You're talking about after
14        the claim was denied, after the receipt of
15        this letter?
16            MS. PETT:  Yes.
17            MR. GREENE:  And you're talking about
18        herself, as opposed to as through counsel?
19            MS. PETT:  That's correct.
20        A.  As myself, I do not recall sending -- I
21   recall calling them.  I recall calling Lisa.  I
22   recall -- but, after she made it a statement and I
23   received this letter, I just knew I had to do
24   something about it, because it was not true.
25   BY MS. PETT:
```

Page 109

1      Q.  Did you ask Dr. Hershman at this time, when
2  you received the letter, to write a letter to
3  Foresters and tell them that your husband did not have
4  diabetes and was never told that he had diabetes?
5      A.  I actually called his son -- his oldest
6  son -- because they know Dr. Hershman for a long time.
7  I said, "This is what they're saying."  He said, "That
8  is not true.  I know for a fact that my father was not
9  sick."  Because, when he died, he spoke to the doctor,
10  and he was fine.  The doctor was going to do the
11  analysis and things on Thursday to find out what was
12  troubling him, but he specifically told his son that
13  he wasn't sick.
14          MR. GREENE:  Digna, Digna, listen to her
15       question.  She asked if you spoke to the
16       doctor and asked the doctor to write a
17       letter.  That's what she asked you.
18          THE WITNESS:  Like I said, at that
19       moment, I don't think -- I'm not sure.  I'm
20       not sure at that moment.  I know that I spoke
21       to his son.
22          MS. PETT:  Can you scroll to the bottom
23       of the letter, Brenda?
24          MR. GREENE:  When you say, "his son,"
25       you're referring to Rigo's son?

1          THE WITNESS:  Yes.

2     BY MS. PETT:

3          Q.  Do you see that paragraph that states, "If

4     you have any medical or other information that you

5     think would show that the conclusions arrived at as

6     described above are incorrect or incomplete, we ask

7     that you provide us with all such information so we

8     may conduct a further review"?  Do you see that?

9          A.  I see that, and that's exactly why I let

10    somebody that was in better condition than me -- I was

11    trying to get a lawyer to solve this for me,

12    explaining to a lawyer that this was not so.  He was

13    completely healthy.  We answered everything.  We did

14    everything.  Like, when we got the insurance, we were

15    promised that, no matter what, if he died before, as

16    long as we answered correctly -- he wasn't sick -- he

17    didn't have diabetes.

18          I wanted somebody with knowledge to do this.

19    I was not in the condition to take care of this on my

20    own.

21          Q.  Do you know whether any of your lawyers ever

22    sent a letter to Foresters saying what you just said

23    before you filed the lawsuit?

24          A.  You would need to speak to Craig, because

25    that's my lawyer.

Page 111

1      Q.  Are you aware that, once Dr. Hershman wrote a

2   letter to Foresters telling Foresters that your

3   husband didn't have diabetes and was never told he had

4   diabetes, Foresters paid the claim?

5           MR. GREENE:  Object to the form.

6      A.  No.

7   BY MS. PETT:

8      Q.  Have you ever looked at any of Foresters'

9   records of the conversations they had with you

10  concerning the claim?

11     A.  If I ever looked at any -- I read the letters

12  they sent me.

13     Q.  Okay.  But did you look at any of the

14  documents produced in this case to determine whether

15  Foresters had documented any conversations they had

16  with you?

17     A.  No.

18     Q.  Would you be surprised if I told you there's

19  no documented conversation between you and Lisa

20  Buckland after Foresters denied the claim?

21     A.  Actually, I would be very surprised, because

22  I know I spoke to Lisa.

23     Q.  After the claim was denied?

24     A.  After the claim was denied, of course.

25     Q.  In this case, you're claiming that Foresters

```
 1    falsely and fraudulently represented through language
 2    in the policy that, in the event Mr. Vinas were to die
 3    from a non-excluded cause within the first two years
 4    following issuance of the policy, Foresters would pay
 5    benefits under the policy as long as Mr. Vinas
 6    answered the application's questions to the best of
 7    his knowledge and belief.
 8            What are you specifically claiming was
 9    falsely represented?
10        A.   That, as long as we answered all the
11    questions correctly and we said the truth -- and I
12    know that we said the truth, because she mentioned
13    that a lot -- and because it would still be paid.
14            If not -- if it wasn't going to be paid, we
15    would have never left the other insurance.  She
16    assured us that Foresters was a better company.  It
17    was more reputable.  Foresters would pay, even though
18    it would be within the first two years, which we
19    thought it would never happen.
20            Because that's why we cancelled.  We were
21    afraid, when he became 80 years old -- that was the
22    biggest thing -- when he became 80 years old, they
23    were going to sky-rise our premium.  That's how
24    healthy he was.  As far as we were concerned -- as far
25    as we could tell -- the truth -- he was so healthy
```

1    that he would not die before 80.

2           So, she made it very clear, as long as we

3    told the truth, we will have no problem.  And he was

4    very concerned about that, because he wanted to make

5    sure that it was a reputable company, that we would be

6    paid in case anything happened to him, because he lost

7    his wife in her sleep, young.

8           So, he could have died in his sleep.

9    Anything that -- you know -- and he didn't want that

10   to happen.  So, he made sure -- we spoke about this.

11   That's why I remember so clearly.  That conversation

12   was very, very clear to us.

13          Yes, cancel the other insurance because this

14   one will pay.  You're not going to have a problem.

15   It's a reputable company.  It's good.  And that's why

16   we did it.

17          Other than that, we wouldn't have taken the

18   life insurance.  We would've only taken the mortgage

19   insurance.  That's why I called Foresters.  That's why

20   we contacted Foresters.  And I would have left the

21   $100,000 life insurance.  He died at 75, and I would

22   have had the $100,000.  So, thinking he would never

23   die before 80, that's how truthful we were.

24       Q.  When you say "she," do you mean Jazmin

25   Lightbourn?

1      A.  Jazmin and Foresters, because Jazmin was

2  Foresters.  As far as we were concerned, when we

3  talked to Jazmin, we were talking to Foresters.

4      Q.  We'll get through that quickly, but just

5  answer the question.  Was there anyone, other than

6  Jazmin Lightbourn, that you contend made

7  representations to you concerning the policy?

8      A.  As far as we were concerned, Jazmin --

9      Q.  I understand that that's your position.

10          MR. GREENE:  Don't interrupt her.

11      Kristina, please don't interrupt.

12          MS. PETT:  She's not answering the

13      question.

14          MR. GREENE:  She was going to answer the

15      question.

16          THE WITNESS:  Because I called

17      Foresters -- we called Foresters.  Foresters

18      gave Jazmin the number.  When we talked to

19      Jazmin, she only said, "Foresters this,

20      Foresters that.  Foresters will pay.

21      Foresters is a better company than American

22      General."

23          When I say "Jazmin," I'm saying

24      "Foresters."  I'm sorry.

25  BY MS. PETT:

Page 115

1      Q.  I want to know if there was any other human

2  being who you contend made representations to you

3  concerning the policy other than Jazmin Lightbourn.

4      A.  Foresters sent Jazmin Lightbourn to call us,

5  so...

6      Q.  Was there any other human being that you

7  spoke to or your husband spoke to that you are

8  contending made representations to you about the

9  policy?

10         MR. GREENE:  Mrs. Vinas, just answer the

11      question.  Was there anyone other than

12      Jazmin --

13         THE WITNESS:  No.

14         MS. PETT:  Thank you.

15         MR. GREENE:  Let's take five.  Any better

16      position now, Tina?

17         MS. PETT:  I'm getting close.

18         MR. GREENE:  Fantastic.  Great.

19         (Brief recess.)

20  BY MS. PETT:

21      Q.  Other than statements that Ms. Lightbourn

22  made to Mr. Vinas or yourself, were there any other

23  statements that you're contending that were made to

24  you or Mr. Vinas that were false concerning the

25  policy?

Page 116

1           MR. GREENE:  Object to the form.

2      A.  Repeat that question.  I'm sorry.

3  BY MS. PETT:

4      Q.  Sure.  Are there any other false statements

5  that you contend were made to you or Mr. Vinas

6  concerning the policy other than the statements that

7  we've already talked about that you attribute to

8  Ms. Lightbourn?

9           MR. GREENE:  Object to the form.

10     A.  No.  She assured us that we would have gotten

11  paid.  Honestly, he was very, very concerned about it

12  so that I would be okay, and then I wasn't okay.  So,

13  that's the biggest thing.

14          MR. GREENE:  Digna, they want to know if

15      there's anything other than what you told

16      them so far.

17          THE WITNESS:  I don't think so.

18  BY MS. PETT:

19     Q.  What is the basis for your allegation that

20  Foresters never had any intention to pay Mr. Vinas's

21  insurance policy were he to die within the first two

22  years?

23          MR. GREENE:  Object to the form.

24     A.  Because Rigoberto specifically asked that we

25  will get paid -- that we will get paid -- if he died

1   before -- or after -- that we would get paid.  He

2   wanted to make sure that Foresters was reputable, that

3   everything was legal, and then we could cancel the

4   other one.  He worked so hard to say, yes, you're

5   going to get paid no matter what.  Just write the

6   truth.  Write the truth.  Just as long as you write

7   the truth.

8          He was -- I tell you -- we sat at that table,

9   and he was very -- I want to make sure -- I want to

10  make sure before cancelling the other.  He was so

11  sure.  We spoke so much about this, and that's exactly

12  what Foresters did not do.

13      Q.  What is the basis for your contention that,

14  when Foresters sold the policy to Mr. Vinas, it never

15  had any intention of paying a claim if he died within

16  the first two years?  What facts do you have to

17  support that contention?

18          MR. GREENE:  Object to the form.

19      A.  Exactly what I said.  If Foresters had

20  intentions on paying us, it would have, because we did

21  exactly what the policy requested.  We said the truth.

22  We were truthful.  We were 100 percent truthful and

23  then they didn't pay.  She said, if we said the truth,

24  you will get paid.  That's what I'm basing it on.  It

25  was the truth.  And, with the truth, we didn't get

1   paid.

2   BY MS. PETT:

3        Q.  You're saying, simply because Foresters

4   denied the claim, it never had any intention of paying

5   the claim if your husband died within the first two

6   years?

7             MR. GREENE:  Object to the form of the

8        question.  You're saying other than what I

9        discussed with her; right, Tina?

10             MS. PETT:  Yes.  I'm not asking for

11        attorney-client privilege.

12             MR. GREENE:  Well, let me -- hold on.  I

13        want to --

14             THE WITNESS:  I don't understand.

15             MR. GREENE:  Mrs. Vinas, stop for a

16        second.  I want this on the record.

17        Mrs. Vinas, I need you to step out of the

18        room -- listen to me, listen to me -- out of

19        earshot.  So, I'll call you when we're ready.

20             THE WITNESS:  I'll go to the last room

21        like I did before, but call me.

22             MR. GREENE:  Bring your phone.

23             My point is, there's obviously other

24        evidence of that that doesn't come from

25        Mrs. Vinas.  So if you're asking her what

Page 119

1        evidence is she going to provide, that's

2        fine.  But I've told her some of the stuff

3        that we've learned from the Foresters

4        witnesses.  Obviously, I don't want her

5        repeating that.

6            MS. PETT:  I understand.  I want to know

7        what evidence she has.

8            MR. GREENE:  That's fine.  Then, with

9        your permission, may I ask you to say, "Other

10       than what you've told us so far, do you have

11       anything else?"  Because, other than that,

12       you're probably going to get the whole story

13       again.  Is that okay?

14           MS. PETT:  Yes.

15           MR. GREENE:  Okay.

16           (The witness returned.)

17   BY MS. PETT:

18       Q.  I'm going to try to be very clear on this.

19   Other than what you've already told us and other than

20   anything your lawyer may have told you, do you have

21   any other information that supports your contention

22   that Foresters never intended to pay the claim if your

23   husband died within the first two years?

24           MR. GREENE:  Other than what you've

25       already testified to, Mrs. Vinas.

Page 120

1        A.   Other than what -- no.

2   BY MS. PETT:

3        Q.   Thank you.   Other than what you've already

4   told us and other than what your lawyer may have told

5   you, what is the basis of your contention that

6   Foresters never made an inquiry into Mr. Vinas's best

7   knowledge and belief?

8           MR. GREENE:   Other than what you've

9        testified already or other than what I've

10        told you.

11        A.   Nothing.

12   BY MS. PETT:

13        Q.   What is the basis for your contention, other

14   than what you've already testified to and other than

15   what your lawyer told you, that Foresters, as an

16   institution, does not investigate an insured's best

17   knowledge and belief?

18           MR. GREENE:   Again, other than what I

19        told you or what you've testified to already.

20        A.   Nothing.

21   BY MS. PETT:

22        Q.   Same for your allegation that Foresters

23   committed intentional misconduct?

24        A.   Nothing else besides what I've already said.

25        Q.   And your contention that Foresters committed

Page 121

1   gross negligence?

2        MR. GREENE:  She's asking you if the

3        answer would be the same.

4        A.  Yes.

5   BY MS. PETT:

6        Q.  In your complaint, you allege that you were

7   unable to pay monthly expenses as a result of

8   Foresters not initially paying the claim.

9        Are there any other monthly expenses that you

10  are unable to pay that we haven't talked about today?

11       A.  No.

12       Q.  And the same for debts -- are there any

13  unpaid debts that you have incurred as a result of

14  Foresters not initially paying the claim, other than

15  what we've already talked about?

16       A.  Nothing.

17       Q.  Is there any additional interest that you

18  have incurred other than what we've already talked

19  about?

20       A.  Nothing.

21       Q.  You said that you have incurred defense costs

22  in the action that Bank of America filed against you.

23       How much in attorney's fees have you had to

24  pay or do you owe as a result of that action?

25       A.  It all depends on what happens, how long it

```
                                          Page 122
 1    takes.  So, I have no idea right now.
 2              MS. PETT:  Brenda, could you pull up that
 3         stipulation?
 4              (Defendant's Exhibit 10 was marked.)
 5    BY MS. PETT:
 6         Q.  Take a look at what I marked as Exhibit 10
 7    and tell me if you have ever seen this document
 8    before.
 9              MR. GREENE:  Is there anything on page 2,
10         Tina?
11              MS. PETT:  No.  It's just one page.
12              MR. GREENE:  Okay.  Can you make it a
13         little smaller so we can see the whole thing,
14         possibly?
15              THE WITNESS:  Okay.
16    BY MS. PETT:
17         Q.  Is that your signature on the stipulation for
18    payment?
19         A.  Yes, it is.
20         Q.  It's dated October 17, 2019; is that right?
21         A.  Yes.
22         Q.  At that point, when you signed the
23    stipulation, were you represented by counsel?
24         A.  Yes.
25         Q.  Who was your counsel?
```

Page 123

1        A.   Arkin.

2        Q.   I don't want you to disclose any contents of

3   any conversation you had with your lawyer, but did

4   your lawyer review the stipulation prior to you

5   signing it?  Did he review it with you?

6        A.   Yes.

7        Q.   Is this stipulation still in effect?

8        A.   It is.  She's trying to -- she's trying to

9   file so that I can pay for the whole thing.

10        Q.   Did you make payments pursuant to this

11   stipulation?

12        A.   Yes.

13        Q.   In the stipulation, you agreed to pay a total

14   of $11,810.37; correct?

15        A.   Correct.

16        Q.   Did you make all the payments that were

17   required under the stipulation so far?

18        A.   I'm making it every month.

19        Q.   So how much are you paying currently?

20        A.   $100 a month.

21        Q.   How many more payments do you have to make?

22        A.   I've only paid a few, and I owe 11,000.  I've

23   only paid one year at $50 a month, and now I just

24   started with the $100 a month.  I owe it all.

25        Q.   And you're trying to negotiate a lump-sum

Page 124

1   payoff right now?

2        A.  Yes.

3        Q.  The lawsuit, though, has been dismissed;

4   correct?

5            MR. GREENE:  Object to the form.

6        A.  The lawyer is working on it.  I really don't

7   know what she's doing right now.

8   BY MS. PETT:

9        Q.  How are you paying her?

10       A.  How do I pay the company?

11       Q.  How are you paying your lawyer?

12       A.  I haven't paid yet.

13       Q.  Are you being charged by the hour?

14       A.  She said, when she finishes, she'll let me

15   know.

16       Q.  So you never received a bill?

17       A.  No.

18       Q.  Do you know how much she's charging you per

19   hour?

20       A.  I honestly don't.

21       Q.  What is the name of the lawyer?

22       A.  Arkin.

23       Q.  What's her full name?

24       A.  Adrian Arkin.

25       Q.  How did you find Ms. Arkin?

1      A.  I found the other lawyer that couldn't take

2    care of this, because he wasn't that type of lawyer,

3    and he recommended Ms. Arkin.

4      Q.  Sitting here today, you've not paid her any

5    money whatsoever.  Is that fair to say?

6      A.  No, not yet.

7      Q.  And you have no idea how much you owe?

8      A.  No.

9      Q.  Do you have an estimate?

10     A.  I don't know.  I don't know.

11     Q.  You're also contending, as part of your

12   damages, that you had other expenses.

13         What do you mean by other expenses, other

14   than what we've already talked about?

15     A.  I'm not sure what you mean.

16         MR. GREENE:  Are you reading from the

17         complaint?

18         MS. PETT:  Yes.  Paragraph 19.

19         THE WITNESS:  I sent the expenses that I

20         had.  I gave you all the expenses to my

21         lawyer.

22         MR. GREENE:  Tina, if I may be so bold,

23         do you want to ask her if there are any

24         expenses other than what she's told you for

25         her?

1          MS. PETT:  That's what I'm going to do.

2      I thought I already asked her that, but, yes.

3  BY MS. PETT:

4      Q.  Any other additional expenses than what you

5  already testified to?

6      A.  No.  I believe that I gave everything to my

7  lawyer and I figured that he had that.  I'm sorry.  As

8  far as all the expenses that I gave my lawyer, I don't

9  have any other --

10         MR. GREENE:  Guys, I have to step away

11      one second.  I have to take this call.  It

12      will only take a second.  I promise.

13      (Off record.)

14  BY MS. PETT:

15      Q.  Have you ever received, since your husband

16  passed away, other than Bank of America, any letters

17  from any collection agencies?

18      A.  Chase.  What they did is, they got a company,

19  that I would pay them.  They didn't send me, like, a

20  court order like Bank of America, but they did send a

21  letter that said they were giving me to another

22  company, and the company was -- it was how to work it

23  better for a year.

24         After -- when they did that, then I was able

25  to pay, so they didn't have to change.  But Chase did

Page 127

```
 1   that.
 2           And the question that you asked before -- I
 3   don't know the amount, but I'm sure I'm going to get
 4   taxes for the money that I received.  I'm pretty sure
 5   I'm going to have to pay taxes on that.
 6       Q.  Taxes on life insurance?
 7       A.  I don't know if I'm going -- I don't know.
 8   That's what I'm saying -- I don't know.  I don't know
 9   if you get taxed on that.  I don't know that.
10           MR. GREENE:  Digna, just answer her
11       question.  She asked you about other credit
12       companies.  That's all.
13           THE WITNESS:  No.
14   BY MS. PETT:
15       Q.  Was there anything that required you to pay
16   off the mortgage when you were paid your life
17   insurance benefit?
18           MR. GREENE:  Object to the form.
19       A.  It was what he said to do.  That's what that
20   money was for.
21   BY MS. PETT:
22       Q.  But you decided, when you received the money,
23   to pay a lump-sum amount of the remaining -- the
24   mortgage -- correct?
25       A.  I decided, because then I don't have to do
```

1    that $4,000 house insurance.  I can't afford $4,000 a

2    year.  As long as I have a mortgage, I have to pay

3    $4,000 for house insurance.

4         Q.  But if you chose, you could have continued to

5    pay the $200 monthly payment instead of paying a

6    lump-sum payoff of the mortgage?

7              MR. GREENE:  Object to the form.

8         A.  I wouldn't be able to afford the $4,000 a

9    year.

10   BY MS. PETT:

11        Q.  I'm just saying --

12        A.  That's kind of together, because, if I have

13   the mortgage, I pay $4,000.  So I wouldn't be able to

14   afford it paying monthly, because then I would have to

15   pay the $4,000 and that's a lot of money.

16        Q.  So you have no insurance on your home?

17        A.  No.  He never had insurance on his home.

18   Only for the mortgage.

19        Q.  All I'm trying to find out -- there's nothing

20   contractually that prevented you from keeping the

21   mortgage in place and paying it monthly.  It was a

22   choice that you made to pay it all off?

23             MR. GREENE:  Object to the form.

24        A.  If I couldn't afford it, I don't think it was

25   my choice.  I was being pushed to it.

Page 129

1      MS. PETT:  Can you pull up the next

2   exhibit?

3      (Defendant's Exhibit 9 was marked.)

4  BY MS. PETT:

5      Q.  Take a look at what is marked as Exhibit 9,

6  because I skipped around.  Take a look at what we

7  marked as Exhibit 9 and tell me if you've ever seen

8  this document before.

9      MR. GREENE:  She wants to know, have you

10   ever seen the piece of paper?

11      THE WITNESS:  I'm trying to read it to

12   see what it is.

13      MR GREENE:  Why don't you tell her what

14   it is, Ms. Pett, and then you can go from

15   there?

16  BY MS. PETT:

17      Q.  It's a civil remedy notice of insurer

18  violation.  And my first question is simple.

19      Have you ever seen this document before?

20      A.  Let me see the top.

21      Q.  That is the top.

22      A.  Oh.

23      MR. GREENE:  Tina, is it okay if I help?

24      MS. PETT:  If you can help with if she's

25   ever seen it, yeah.

1           MR. GREENE:  Mrs. Vinas, this is a

2      document that was filed, explaining the

3      insurance company's conduct by Ms. Arkin.  I

4      believe she's actually listed as your

5      attorney on here.

6           So, all Ms. Pett wants to know right now

7      is if you've ever seen this before that you

8      can recall.

9           THE WITNESS:  Could you go down a little

10     bit to make sure?  One moment, please.

11          This is when Ms. Arkin represented me;

12     right?

13          MR. GREENE:  I was trying to help things

14     along.  Obviously, that didn't work.  Just go

15     ahead and answer.

16          THE WITNESS:  She goes so fast.  I'm

17     trying to look at the whole picture before I

18     answer.

19 BY MS. PETT:

20     Q.  It's just a yes-or-no question.  Either

21 you've seen this before or you haven't.

22     A.  Okay.  But, you know, if I don't see the

23 whole picture, I won't -- you know -- anything can be

24 written on it.  I'm trying to see if I remember this.

25     Q.  Okay.  Take your time.

Page 131

```
 1        A.  One more time.  Go up.  I think I saw it,
 2   yes.  Let me say yes.
 3        Q.  I don't want you to guess.
 4        A.  I'm trying to say yes, because it looks like
 5   something that I would have had, so, yes.
 6        Q.  Okay.  You see the filing accepted date of
 7   February 5, 2020?
 8        A.  Yes, absolutely.
 9        Q.  You said you saw this document before.
10             Do you know whether you saw it before your
11   lawyer sent it to the Department of Financial
12   Services?
13        A.  I wouldn't know if she sent it before.
14        Q.  I don't want to get into attorney-client
15   conversations, but all I'm simply asking is, do you
16   know whether you had a chance to review this document
17   before your attorney sent it to the department and/or
18   Foresters?
19        A.  So you want a yes-or-no answer?
20        Q.  Yes, I do.
21        A.  I don't know when she sent it, so I would
22   have to say that I don't know.
23             MR. GREENE:  Okay.  Good.  Thank you.
24             MS. PETT:  Can you go to the page where
25        -- the third page.  Right there.  Keep it
```

Page 132

```
 1        there.
 2   BY MS. PETT:
 3        Q.  Are you familiar with the term "prediabetic?"
 4        A.  Yes.
 5        Q.  To your knowledge, was your husband ever told
 6   he was prediabetic?
 7        A.  No.
 8        Q.  Do you have a recollection of Foresters,
 9   prior to issuing the policy to Mr. Vinas, requiring
10   Mr. Vinas to provide them with medical records?
11        A.  He was not required to provide medical
12   records.
13            MR. GREENE:  Tina, we're back to the same
14        issue we had before.  If you and I have to
15        get on a call to explain how this is related
16        to fraud in the inducement, then we have to
17        do that.  This is all breach of contract
18        stuff.
19            MS. PETT:  Which is still pending because
20        of the consequential damage.
21            MR. GREENE:  All that's pending is the
22        damages aspect.  The liability aspect isn't
23        pending.  I'm the first one to acknowledge
24        that.
25            MS. PETT:  I'm not asking about
```

```
1          liability.  I'm asking about the accuracy of
2          this document and representations that were
3          made on behalf of Mrs. Vinas to Foresters and
4          other third parties.
5               MR. GREENE:  All right.  With that --
6               MS. PETT:  It goes to credibility.
7               MR. GREENE:  Well, with that, I will take
8          my chance and tell you -- I don't know how
9          much more you've got on this -- but unless
10         you're done with this at this point -- if
11         you've got a lot more, then I'm going to seek
12         a protective order and we'll let the judge
13         rule.  I don't think this has anything to do
14         with the issue of fraud in the inducement,
15         which is the only issue left other than
16         damages with respect to the breach of
17         contract claim.
18              MS. PETT:  But you don't know -- since I
19         moved to dismiss the complaint, you don't
20         know what my defenses to the allegations in
21         the counts are.  So I think I should have
22         some leeway if I can ask her questions about
23         this particular document.
24              MR. GREENE:  That's why I suggested off
25         the record, so the witness isn't listening to
```

```
 1        us, if you want to share those defenses with
 2        me, which normally would be happening before
 3        the plaintiff is deposed anyway, so it's
 4        certainly not like there's any big secret.
 5        If you want to tell me what they are, like we
 6        did earlier --
 7             MS. PETT:  A lot of them may be unclean
 8        -- I don't know what the defenses are at this
 9        point, but one of them could be unclean
10        hands.  I don't know.  I should have some
11        leeway, since we don't want to come back here
12        and I'm not going to be asking a lot of
13        questions.  I have a few questions.
14             I want to know basically why her attorney
15        made misrepresentations to the Department of
16        Financial Services.
17             MR. GREENE:  Well, I don't know.  If
18        that's what you're arguing about, why her
19        attorney did that, then I will --
20             MS. PETT:  I wouldn't know if she
21        authorized her attorney to do that, so it
22        goes to credibility.
23             MR. GREENE:  Based upon that, I will -- I
24        understand Judge Goodman's going to be
25        looking at this -- I'm going to move for a
```

Page 135

1          protective order.

2              Judge Goodman was very specific about

3          the scope of what I was permitted to ask

4          about and I think that it relates to the

5          fraud in the inducement and he was very --

6          very expressed on that issue.  I don't

7          think this has anything to do with fraud in

8          the inducement and it certainly doesn't

9          have anything to do with unclean hands

10         with respect to the fraud in the

11         inducement.

12             So, I'll seek a protective order as to

13         other questions relating to the CRN.  You can

14         certainly ask other questions as we've been

15         going on for several hours here.

16     BY MS. PETT:

17         Q.  When Mr. Vinas died, had he been a diabetic?

18             MR. GREENE:  Object to the form.

19         A.  No.  He was not diagnosed with diabetes.

20     BY MS. PETT:

21         Q.  And, when Mr. Vinas went through the

22     application process with Foresters, did Foresters

23     require him to take numerous tests?

24         A.  Only get a letter.  He wasn't required to

25     take tests.  He was to get a letter saying that he was

1   healthy, and he did.  That's all Foresters asked, one

2   letter from his doctor, and that's what he did.

3   Foresters did not question nothing else.

4        Q.  Did Foresters require Mr. Vinas to undergo

5   numerous doctor visits with Foresters' doctors?

6        A.  Absolutely not.

7        Q.  Did you almost lose your home?

8        A.  Yeah.

9        Q.  How?

10       A.  I couldn't pay the house insurance.

11       Q.  How did you almost lose it?  Did somebody

12  initiate a foreclosure against you?

13       A.  I knew, if I couldn't pay the house

14  insurance, they would cancel the mortgage.  If they

15  cancelled the mortgage -- you know -- because that's

16  one of the requirements -- I needed to pay the house

17  insurance.  So, if I don't -- if they tell me, "You

18  didn't pay your house insurance," I know what the next

19  step is.

20            So, I have to beg, I have to borrow, I have

21  to sell, and pay it before I get that letter.

22       Q.  Right.  Isn't it fair to say there's never

23  been a foreclosure action filed against you?

24       A.  I didn't allow it to get to that level.  I

25  knew what would come next.

1          MR. GREENE:  I'm pretty sure we've

2      covered this already.

3          MS. PETT:  I'm almost done.

4  BY MS. PETT:

5      Q.  Have you ever had to pay any late fees for

6  your mortgage?

7      A.  No.  I made sure I paid everything.

8      Q.  Did your interest rate ever get raised for

9  your mortgage?

10     A.  No.  I was responsible.

11     Q.  Were you charged with any late fees, other

12 than the ones we've talked about with respect to Bank

13 of America, Chase, and American Express, as a result

14 of you not initially being paid the life insurance

15 benefits?

16     A.  Yes.

17     Q.  What other late fees?

18     A.  The taxes, the taxes.  I was pretty much late

19 with the property taxes.

20     Q.  The mortgage company didn't escrow your

21 taxes?

22     A.  No, they didn't.  I paid them separate.  I

23 was pretty late with it.  That's when my children had

24 to give me the $5,000.

25     Q.  Prior to your husband passing away, when

1   would you typically pay your property taxes?

2        A.   Prior?

3        Q.   Uh-huh.

4        A.   He would pay them every year.

5        Q.   Did you ever pay them late?

6        A.   We paid from November to January.

7        Q.   Right.   Prior to him passing away, did you

8   ever pay the property taxes late?

9        A.   Yeah, I paid the property taxes late.   I did.

10        Q.   No.   Prior to Mr. Vinas --

11        A.   Oh, never, never.   He always paid on time.

12   We never had any late fees or anything.

13        Q.   I apologize if I already asked you this.

14   It's been a long day.   Had Mr. Vinas ever been a party

15   to a lawsuit?

16        A.   While I was married to him, no.

17        Q.   Did Mr. Vinas ever file for bankruptcy?

18        A.   No.

19        Q.   Just give me a second.   I think I'm just

20   about done.

21            Did Mr. Vinas ever make any attempts to

22   correct the information that Foresters obtained

23   concerning the diagnosis of diabetes when he learned

24   about it from American General?

25            MR. GREENE:   Same as before.   Other than

Page 139

1          what we've talked about the whole deposition?

2          A.  I don't understand.

3               MS. PETT:  Yeah.

4     BY MS. PETT:

5          Q.  When Mr. Vinas applied for the coverage with

6     Foresters, Foresters told you that a hit had come up

7     showing that he had diabetes.

8               And my question is, between the time that

9     that happened and the time he passed away, did he ever

10    try to correct that information with the insurance

11    bureau?

12         A.  He corrected it immediately by giving the

13    letter that they requested.  They only requested a

14    letter to correct that information.  And once we gave

15    them the letter, obviously, they gave us the

16    insurance.  Everything was fine.  Everything was great

17    and there was no other problem.  They never questioned

18    us again.

19              (Defendant's Exhibit 11 was marked.)

20    BY MS. PETT:

21         Q.  There's one more document I actually need to

22    show you.  It's the April 8, 2020, letter.  Take a

23    look at what I marked as Exhibit 11 and tell me if you

24    recognize Exhibit 11.

25         A.  Exhibit 11?

1      Q.   That's the document in front of you.

2      A.   Yes.

3      Q.   Have you seen Exhibit 11 before?

4      A.   Yes.

5      Q.   Have you seen this check prior?

6      A.   Yes.

7      Q.   Are you contending that Foresters owes you

8  any additional money under the insurance policy?

9           MR. GREENE:   Object to the form of the

10          question.   Answer as best you can.

11     A.   I am contending that they've -- had they

12  given me this money when they were supposed to, I

13  wouldn't have had all the losses I had.  I wouldn't

14  have owed Bank of America all the money I owe.  I

15  wouldn't have had American Express -- when I owned

16  $800 and I ended up owing 8,000.

17          I wouldn't have had all those expenses that I

18  had to pay had they given me this when they said they

19  would.

20  BY MS. PETT:

21     Q.   Right.  My question was, are you contending

22  there's any funds due under the contract based upon

23  the amount of insurance that was purchased?

24          MR. GREENE:   Object to the form.

25     A.   The contract was for when he died, not four

Page 141

1    years later.

2    BY MS. PETT:

3        Q.   That wasn't my question.

4        A.   That's my answer.

5        Q.   The life insurance policy for $92,000.

6        A.   It wasn't paid when he died.

7            MR. GREENE:   Whoa, whoa, stop.   What was

8        the question?

9    BY MS. PETT:

10       Q.   The life insurance face amount, was it

11   $92,000?

12       A.   It was $92,000 when he died, not four years

13   later.

14       Q.   I'm not asking you that.   I just asked you a

15   simple question.

16       A.   Okay.   It was $92,000.

17       Q.   Were you paid the face amount of the policy

18   of $92,000?

19       A.   Four years later, yes.

20       Q.   That's not the question.   Were you paid the

21   face amount of the policy of $92,000?

22           MR. GREENE:   Excuse me.   Madam Court

23       Reporter, please read back the last question

24       and last answer.

25           THE REPORTER:   Question, "Were you paid

Page 142

1       the face amount of the policy of $92,000?"

2            Answer, "Four years later, yes."

3            MR. GREENE:  Okay.  Are you still asking

4       that question, Tina?

5            MS. PETT:  No, because then she answered

6       it again without adding commentary.

7            MR. GREENE:  I don't think she answered

8       any other question.  She answered the

9       question.  I think her answer was, "Four

10      years later, yes."  So I think you've gotten

11      an answer.

12           If you're going to ask the question

13      again, I will move for a protective order.

14           MS. PETT:  Okay, fine.

15  BY MS. PETT:

16      Q.  Were you paid an additional $26,220.74 in

17  addition to the $92,000?

18      A.  Yes.

19      Q.  And that was interest; correct?

20           MR. GREENE:  Object to the form.

21      A.  Correct.

22  BY MS. PETT:

23      Q.  Sitting here today, you can't tell me a

24  dollar figure of how much additional money you're

25  seeking from Foresters?

Page 143

```
 1          MR. GREENE:  Object to the form.
 2      A.  No, but I will if I get another opportunity
 3   to figure it out, to sit down and...
 4      Q.  You know, under the rules, you're required to
 5   disclose the amount of damages that you're seeking;
 6   correct?  This is my only chance --
 7          MR. GREENE:  Wait a second.  Are you
 8       asking her what the Rules of Civil Procedure
 9       are?
10          MS. PETT:  No.  This is my only chance to
11       find out how much she's seeking.  This is the
12       deposition.  This is my only chance to talk
13       to her.  I would like an answer as to how
14       much money is being sought in this action.
15          MR. GREENE:  Which is what I told you
16       off -- not off the record -- at the end of
17       the last break or beginning of the last
18       break, that one of the things we were going
19       to be doing when this deposition was over was
20       totaling up all the numbers she gave you
21       during this deposition and hopefully be able
22       to give you a total.
23          She's given you a bunch of them.  If
24       she's being honest enough with you now to say
25       that she hasn't totaled them up, then that's
```

Page 144

1          what she's telling you.  Hopefully, by

2          Monday, you'll have that answer, which is a

3          timely response, with the exception of one

4          day, to your interrogatories and request for

5          production.

6               MS. PETT:  Right, but I won't get a

7          chance to ask her about that, so --

8               MR. GREENE:  That's not our problem with

9          your timing.

10              MS. PETT:  It is, because the Rule 26

11         disclosures require you to disclose the

12         amount of damages you're seeking.  And

13         sitting here today, after this action's been

14         pending for several years, I still don't know

15         the amount of consequential damages you're

16         seeking.

17              MR. GREENE:  And the Rule 26 disclosures

18         listed every category and listed -- listen, I

19         don't want to argue with you on the record.

20         Let me know when you're finished asking your

21         questions.

22    BY MS. PETT:

23         Q.  You can't give me a dollar figure today?

24              MR. GREENE:  Don't answer the question.

25         I'm seeking a protective order.  You've now

Page 145

1          answered that question three times.  I'm

2          seeking a protective order on that.  Go on.

3               MS. PETT:  Okay.  It doesn't count when

4          you ask my witness ten times the same

5          question.

6               All right.  I'm done.

7               MR. GREENE:  Mrs. Vinas, I only have one

8          question for you.

9               Brenda, can you please put back

10         Exhibit 9?

11                         CROSS-EXAMINATION

12    BY MR. GREENE:

13         Q.  Mrs. Vinas, counsel asked you if you reviewed

14    this document before it was sent in February of 2020.

15    You looked at it for -- the record won't reflect --

16    somewhere in the area of a minute to two minutes and

17    asked to have it scrolled down.

18              Sitting here today, do you have an absolute

19    independent recollection of looking at this piece of

20    paper, either on paper or digitally, and saying, "Yes,

21    I absolutely reviewed it"?

22         A.  No.

23         Q.  This document, as Ms. Pett indicated, makes

24    reference to Mr. Vinas and the term "prediabetic."

25              Do you remember her showing you that?

Page 146

1      A.  No.

2      Q.  Okay.  Assuming for a minute that this

3  document makes reference to Mr. Vinas and anything to

4  do with prediabetes -- suggesting that he had

5  prediabetes -- is that something that you would have

6  reviewed and approved to go out if you would have seen

7  it?

8      A.  No.

9          MS. PETT:  Objection to the form.

10         MR. GREENE:  That's all.

11                  REDIRECT EXAMINATION

12  BY MS. PETT:

13     Q.  Well, if you don't feel you had sufficient

14  time to look at this document, you're welcome to

15  review the document right now.

16     A.  Because at no time was he prediabetic.

17         MR. GREENE:  I didn't suggest she didn't

18         have sufficient time.  That wasn't my

19         question.

20         MS. PETT:  Okay.

21         MR. GREENE:  We will read if it's

22         ordered.  I'll take a copy of it if it's

23         ordered.

24         THE REPORTER:  Thank you, everyone.

25         MS. PETT:  We do want a copy.  Thank you.

Page 147

1          (The reading and signing of the

2      transcript were not waived, and these

3      proceedings concluded at 4:00 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 148

1                        CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF PALM BEACH

5

6

7              I, Lisa Gerlach, the undersigned Notary

8    Public, in and for the State of Florida, hereby

9    certify that Deponent appeared before me via Zoom and

10   was duly sworn.

11

12             WITNESS my hand and official seal this

13   16th day of October, 2020.

14

15

                        Lisa Gerlach, Court Reporter

16                      Commission #HH41912

                        Expires 9/13/2024

17

18

19

20

21

22

23

24

25

Page 149

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF PALM BEACH

5

6              I, Lisa Gerlach, Court Reporter, do hereby

7    certify that I was authorized to and did

8    stenographically report the foregoing deposition; and

9    that the transcript is a true and correct

10   transcription of the testimony given by the witness.

11             I further certify that I am not a relative,

12   employee, attorney or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorney or counsel connected with the action, nor am

15   I financially interested in the action.

16             Dated this 16th day of October, 2020.

17

18             *Lisa Gerlach*

19             Lisa Gerlach, Court Reporter

20

21   The foregoing certification of this transcript does

22   not apply to any reproduction of the same by any means

23   unless under the direct control and/or discretion of

24   the certifying reporter.

25

Page 150

```
  1                    VERITEXT LEGAL SOLUTIONS
                      One Biscayne Tower, Suite 2250
  2                     2 South Biscayne Boulevard
                          Miami, Florida 33131
  3                          (305)376-8800
  4
      October 29, 2020
  5
      Mrs. Digna Vinas
  6   c/o Craig M. Greene, Esquire
      Kramer Green Zuckerman Greene & Buchsbau
  7   4000 Hollywood Boulevard
      Suite 485
  8   Hollywood, FL 33021-6786
  9
      RE:  Vinas v. The Independent Order of Foresters
 10   DEPO OF:  Digna Vinas
      TAKEN:  October 16, 2020
 11   NUMBER OF PAGES:  151
      AVAILABLE FOR READING:   30 days
 12
      Dear Mrs. Vinas:
 13
      This letter is to advise you that the transcript of
 14   your deposition is available for reading and signing.
 15   PLEASE CALL THE ABOVE NUMBER TO MAKE AN APPOINTMENT to
      come to the Veritext office closest to you to read and
 16   sign the transcript.  Our office hours are 8:30 a.m.
      to 4:30 p.m., Monday through Friday.
 17
      In the event other arrangements are made, please send
 18   us a notarized list of any and all corrections and/or
      changes, noting page and line numbers, and the reason
 19   for such changes, so that we can furnish respective
      counsel with a copy.
 20
      If the reading and signing have not been completed
 21   prior to the above-referenced date, we shall conclude
      that you have waived the reading and signing of the
 22   deposition transcript.
 23   Your prompt attention to this matter is appreciated.
 24   Sincerely,
 25   LISA GERLACH, COURT REPORTER
```

Page 151

```
 1                        ERRATA SHEET
 2    RE:  Vinas v. The Independent Order of Foresters
      DEPO OF:  Digna Vinas
 3    TAKEN:  October 16, 2020
 4
        DO NOT WRITE ON TRANSCRIPT; ENTER ANY CHANGES HERE
 5
 6       Page    Line    Change                 Reason
 7
 8
 9
10
11
12
13
14
15
16
      Under penalties of perjury, I declare that I have read
17    the foregoing document and that the facts stated in it
      are true.
18
19    _____
      DATE                      DIGNA VINAS
20
21    Subscribed and sworn before me this _____ day of
      _____, 2020.
22
      State of Florida     )
23    County of            ) _____
                                   NOTARY PUBLIC
24
25
```

**[& - 50,000]** Page 152

**&**

**&** 2:3 150:6

**0**

**00012015-01-12**
44:16

**1**

**1** 3:12 43:25 44:1
45:5 55:8 57:10,14
59:20 66:12
**1,200** 78:7,12
**1,500** 15:4
**1,600** 14:19 15:2
**1/15/2014** 66:14
**1/16** 84:17
**1/16/15** 3:13
**1/16/17** 3:15
**1/22/15** 3:14 86:3
**1/27/17** 3:17
**10** 3:22 122:4,6
**10,000** 24:5,11
83:23
**10,400** 12:23 13:24
**100** 117:22 123:20
123:24
**100,000** 21:20 29:8
34:8 113:21,22
**103** 3:18
**105** 3:19
**108th** 5:10
**10:00** 1:12
**11** 3:23 66:16,22
94:21 139:19,23,24
139:25 140:3
**11,000** 123:22
**11,810.37** 123:14
**11th** 94:22
**12** 17:2 27:13,16
45:24 46:2,21
55:20

**12,000** 78:20
**122** 3:22
**129** 3:21
**12:11** 62:13
**12th** 57:23 96:3
**13** 81:14
**13,180** 81:9
**139** 3:23
**13th** 7:17,18
**14** 11:1 16:2,4,5,6,7
**147** 3:5
**148** 3:6
**149** 3:7
**150** 3:8
**151** 150:11
**15th** 10:13
**16** 1:12 57:10 84:22
150:10 151:3
**16th** 148:13 149:16
**17** 122:20
**18** 1:2
**19** 125:18
**1953** 6:6
**1964** 24:17
**1970** 16:23
**1971** 16:19
**1977** 16:21
**1981** 15:25 16:4,11
**1983** 10:13 15:23
15:24 16:9,10
**1:00** 62:14,16,18
**1:48** 85:1
**1:53** 85:2
**1st** 104:7

**2**

**2** 3:13 50:4,6,17
68:24 69:1 84:17
84:20 96:10 122:9
150:2
**2,500** 72:7

**2/1/17** 3:18
**20** 17:18
**20,000** 24:14 76:19
**200** 72:12 128:5
**200,000** 24:21
**2012** 27:25 29:10
38:5,18,25 39:7,20
**2013** 38:2
**2014** 67:24 68:21
**2015** 22:14 23:18
23:24 29:13 30:5,6
34:17 35:15,23
36:8,15 42:11
51:14 55:20 66:14
84:22 86:18 87:8
**2015-2016** 24:9
**2016** 22:14 23:18
23:24
**2017** 94:21 103:17
107:6
**2019** 122:20
**2020** 1:12 131:7
139:22 145:14
148:13 149:16
150:4,10 151:3,21
**210** 76:5
**21st** 103:17
**2250** 150:1
**229** 34:5
**2385** 2:9
**24100** 1:2
**26** 144:10,17
**26,220.74** 142:16
**29** 150:4
**298** 14:17
**2nd** 6:6

**3**

**3** 3:14 86:1,8 96:11
96:13,14
**3,000** 82:15,16

**3,100** 15:6
**30** 9:8 74:9 150:11
**305** 150:3
**3055** 148:15 149:18
**31** 54:3
**33021-6786** 2:5
150:8
**33131** 150:2
**33165** 5:10
**33431-7371** 2:10
**35,000** 74:10
**376-8800** 150:3

**4**

**4** 3:4,15 50:4 94:4,6
**4,000** 25:3 72:22
74:7 128:1,1,3,8,13
128:15
**4/5/17** 3:19
**4/8/20** 3:23
**40** 11:18 83:23
**40,000** 78:15
**400** 2:10
**4000** 2:4 150:7
**4155** 5:10
**42,000** 8:22 30:24
33:17
**44** 3:12
**46,000** 45:24 46:22
**485** 2:4 150:7
**4:00** 1:12 147:3
**4:30** 150:16

**5**

**5** 3:16 67:24 95:9
95:11 107:6 131:7
**5,000** 72:24 73:1
74:4 137:24
**50** 27:9 123:23
**50,000** 34:9 51:22
56:2

**[500 - answered]**                                                           Page 153

**500**   23:19,19 74:7
**561-994-4311**   2:11
**5th**   105:22

**6**

**6**   3:17 98:14 100:14
  100:15
**6,000**   76:11
**68**   3:13

**7**

**7**   3:18 55:9 56:8
  103:11,14,19
**70s**   68:9
**75**   113:21

**8**

**8**   3:19 50:4,6,17
  54:3 55:9 105:24
  106:2,4,22 139:22
**8,000**   140:16
**8,106.40.**   22:2
**8,832**   76:8
**8,832.76**   76:1
**80**   29:1 33:20,23
  34:11 37:16 112:21
  112:22 113:1,23
**800**   72:9 74:19
  140:16
**85**   3:14
**873.32**   75:25
**89**   21:24 71:1
**8:30**   150:16

**9**

**9**   3:20 53:19 54:4
  129:3,5,7 145:10
**9/13/2024**   148:16
**92,000**   141:5,11,12
  141:16,18,21 142:1
  142:17
**94**   3:15

**95**   3:16
**954-966-2112**   2:5
**98**   3:17

**a**

**a.m.**   1:12 150:16
**ability**   9:15,19
**able**   5:21 13:1 29:3
  73:12 83:22 126:24
  128:8,13 143:21
**absolute**   145:18
**absolutely**   30:8
  32:15 41:8 100:8
  102:12 104:24
  108:4 131:8 136:6
  145:21
**accepted**   131:6
**accidental**   48:7
**accommodate**   5:4
**accompany**   40:21
**account**   26:12,12
  51:11
**accounts**   26:17
**accuracy**   100:7
  133:1
**accurately**   5:21
  91:2 101:17
**acknowledge**
  132:23
**acknowledged**   4:3
**acronym**   90:1
**action**   9:3 121:22
  121:24 136:23
  143:14 149:14,15
**action's**   144:13
**actions**   107:11
**add**   73:5 80:13
  81:18
**adding**   142:6
**addition**   90:5
  142:17

**additional**   57:23,24
  58:21 121:17 126:4
  140:8 142:16,24
**address**   5:9,11 9:24
  47:10,11,19 57:2,3
**adrian**   124:24
**adults**   8:9
**advise**   150:13
**advised**   31:16
  87:18,25
**afford**   29:4 72:21
  74:8 128:1,8,14,24
**afraid**   112:21
**age**   69:15 70:16
  71:12,13 87:24
**agencies**   126:17
**agent**   28:16 56:18
**ages**   27:6,7,9
**ago**   9:11 10:4,10
  40:20
**agree**   56:17
**agreed**   123:13
**agreements**   53:20
  80:18
**ahead**   19:4,10 26:6
  46:14 82:9 90:9,11
  91:17 92:3 97:7
  100:18 130:15
**aids**   74:20,23
**alive**   26:19
**allegation**   116:19
  120:22
**allegations**   133:20
**allege**   121:6
**allergic**   77:11
**allow**   46:14 92:4
  136:24
**amazing**   19:11,14
**america**   12:18,19
  13:8 25:9 26:10,11
  84:4,5,10,14

**american**   14:5 25:9
  27:22 28:10 29:9
  32:7 33:18,22 34:3
  34:14,18 35:4 37:9
  37:11,18 38:4,13
  43:7,14 47:23
  48:25 51:24 56:3
  59:3,7,14 75:25
  76:8 84:14 114:21
  137:13 138:24
  140:15
**amount**   14:21
  73:18 79:25 81:16
  83:9 84:8 127:3,23
  140:23 141:10,17
  141:21 142:1 143:5
  144:12,15
**amounts**   81:17
**analysis**   109:11
**annuity**   48:7 49:11
  49:20
**answer**   4:18,24 5:7
  6:23 19:3,4 21:2,4
  46:17 47:7 48:11
  54:6,16 55:11,13
  55:15 57:24 61:5
  66:21 79:24 80:5
  88:15 90:23 92:4
  100:19 101:11,15
  114:5,14 115:10
  121:3 127:10
  130:15,18 131:19
  140:10 141:4,24
  142:2,9,11 143:13
  144:2,24
**answered**   60:6 62:1
  64:25 79:10 87:17
  110:13,16 112:6,10
  142:5,7,8 145:1

**answering**  67:20 114:12

**answers**  4:20 48:18 106:18

**anthony**  82:18,19

**antique**  72:11

**anybody**  103:9

**anymore**  33:12 71:1 72:6 92:22

**anyway**  61:15 97:6 134:3

**apartment**  15:15

**apologize**  138:13

**appearances**  2:1

**appeared**  148:9

**application**  3:12 36:12 37:13,18 43:21 44:16,22 45:15 47:15 48:3 48:18 49:12 51:17 51:19 52:2,8 53:18 53:25 55:19 56:9 57:22 58:22 63:2 64:12,16,23 65:3,5 65:8,12,16 79:14 79:16,20 87:6 95:5 100:7 102:11,17 105:7 135:22

**application's**  112:6

**applied**  27:17 32:6 37:8 49:11 78:13 83:6 104:25 139:5

**apply**  37:2 149:22

**applying**  79:5

**appointment**  67:24 67:25 68:18 105:9 105:11,15,17,21 150:15

**appointments**  40:22 68:12 69:4 69:11

**appreciated**  150:23

**appreciative**  81:2

**approved**  146:6

**approximate**  36:1

**approximately**  16:3 36:7

**april**  105:22 107:6 139:22

**area**  145:16

**areas**  60:17

**argue**  144:19

**arguing**  134:18

**arkin**  123:1 124:22 124:24,25 125:3 130:3,11

**arrangements**  150:17

**arrived**  110:5

**arthritis**  20:3 22:15 22:16 23:25 77:10

**asked**  41:16 46:1 48:1 51:25 57:18 60:6 64:24 79:1,11 79:13,14,22 80:8 82:5 89:8 90:19 93:11 99:7,20 109:15,16,17 116:24 126:2 127:2 127:11 136:1 138:13 141:14 145:13,17

**asking**  13:17 21:2 35:10 45:12,13 46:20 54:10 61:9 62:24 66:2 79:14 81:4 107:8 118:10 118:25 121:2 131:15 132:25 133:1 134:12 141:14 142:3 143:8 144:20

**aspect**  132:22,22

**assessment**  89:21 91:4

**assist**  67:20

**assume**  22:21 31:9

**assumes**  90:3

**assuming**  91:24 146:2

**assured**  56:23 112:16 116:10

**assuring**  56:4

**attack**  53:14 70:13

**attempts**  138:21

**attending**  39:20

**attention**  150:23

**attorney**  17:9,11 118:11 130:5 131:14,17 134:14 134:19,21 149:12 149:14

**attorney's**  121:23

**attribute**  116:7

**audible**  41:21

**august**  6:6

**authorized**  134:21 149:7

**automatically**  48:22 59:6,6

**available**  150:11,14

**avenue**  5:10

**aware**  111:1

**b**

**b**  6:15 73:23 82:22

**baby**  82:21

**back**  5:17,22 23:6 35:8 41:9 43:7 49:5 51:8 53:18 58:3,21 59:1,19 60:12 66:12 70:9,24,25 71:2,3,6 72:19 74:14,15,17,18,18

78:25 79:1 81:10 81:14 82:23 83:1 84:17 85:2 86:18 87:8 91:19 92:24 101:15,21 132:13 134:11 141:23 145:9

**background**  18:3 18:13

**bad**  24:18 71:8 72:2 73:15 82:25

**bands**  14:13

**bank**  8:17 12:18,19 13:8 14:5 25:8 26:9 26:10,11 30:16,17 51:12 84:4,5,9,14 121:22 126:16,20 137:12 140:14

**bankruptcy**  138:17

**based**  90:17 134:23 140:22

**basically**  134:14

**basing**  117:24

**basis**  87:19 88:1 116:19 117:13 120:5,13

**bates**  50:4 53:19 57:9

**battle**  26:6

**beach**  148:4 149:4

**beg**  136:20

**began**  75:8

**beginning**  75:10 79:22 92:16 143:17

**behalf**  1:17 56:20 97:16 133:3

**belief**  112:7 120:7 120:17

**believe**  15:4 24:17 24:21 28:1 30:16 64:10 65:10 88:7

94:17 96:11 99:6
   104:10 126:6 130:4
**believer** 50:14
**belonged** 57:8
**benefit** 15:1 70:17
   127:17
**benefits** 3:16 13:6
   83:25 95:8 112:5
   137:15
**best** 19:14 73:18
   112:6 120:6,16
   140:10
**better** 23:16 24:19
   48:25 71:19 73:9
   110:10 112:16
   114:21 115:15
   126:23
**beyond** 18:5 60:15
   60:19 61:9
**big** 50:14 99:15,20
   100:12 134:4
**biggest** 25:1 112:22
   116:13
**bill** 25:19 124:16
**billing** 89:22 91:4
**bills** 20:2,9 22:11
   23:25 25:6,7 71:10
   72:21 74:16 76:23
   76:23 83:7
**birth** 6:5
**biscayne** 150:1,2
**bit** 6:24 70:15 89:2
   99:25 130:10
**blessing** 77:12
**blood** 68:12 83:13
   83:14
**boca** 2:10
**bold** 125:22
**books** 17:8,25
**born** 16:18,19

**borrow** 71:16
   72:13,15,17,17,18
   72:24 81:11,13
   136:20
**borrowed** 80:17,23
**bother** 43:2
**bottom** 44:12 45:11
   106:6,8 109:22
**bought** 24:17 71:3
**boulevard** 2:4
   150:2,7
**bracelet** 71:3,23
   72:5
**bracelets** 14:13
**breach** 132:17
   133:16
**break** 5:3,5,7 40:5
   40:11 61:15,17,19
   61:20 62:12,20
   77:24 143:17,18
**breath** 7:2 73:22
**brenda** 2:14 51:6
   53:17 57:9 67:7
   68:25 84:17 94:3
   98:13 106:6 109:23
   122:2 145:9
**brief** 18:2 40:9 85:3
   115:19
**brightstar** 21:15
   28:5 34:23
**bring** 45:9 55:25
   118:22
**broker** 30:12
**brooks** 85:16,17
**brought** 24:11
   105:18
**buchsbau** 2:3
   150:6
**buckland** 98:10
   99:4 101:24 111:20

**build** 71:11
**built** 34:24
**bunch** 143:23
**bureau** 139:11
**bury** 74:11
**business** 56:25
**buy** 24:16 77:7,8

**c**

**c** 150:6
**call** 32:17,25 33:10
   35:15 46:6 50:23
   58:9,10,12 62:21
   71:8 73:20 82:21
   91:18 98:18 103:3
   107:18 115:4
   118:19,21 126:11
   132:15 150:15
**called** 29:19,25
   30:1 35:14,16
   36:19 58:4 64:10
   93:10 96:19 98:1,2
   98:19 101:9,9,10
   101:16,17 102:2
   107:14,15 109:5
   113:19 114:16,17
**calling** 65:12
   108:21,21
**calm** 70:9
**cancel** 34:14 49:1,2
   49:3 51:23 56:4
   59:7 99:10 113:13
   117:3 136:14
**cancelled** 33:18
   34:17 35:5,5,7 49:4
   59:6,10,14,16
   100:8 112:20
   136:15
**cancelling** 56:2,2
   117:10
**cancer** 23:15

**card** 25:7,8,18
   75:16 76:15 78:19
   78:23 84:2
**cards** 25:10 56:25
   75:8,8,10,12,13,14
   75:20 76:18 77:20
   77:21,23 78:1,7
   84:13
**care** 36:20 70:15
   87:23 95:4 97:17
   97:20 107:16 108:8
   110:19 125:2
**carpenter** 18:15
**carpenter's** 12:5
**carpenters** 15:3
**case** 1:2 7:3 20:15
   20:22 32:1 70:18
   107:17 111:14,25
   113:6
**cash** 22:5 34:24
**category** 144:18
**cause** 1:21 53:2
   112:3
**center** 2:9
**certainly** 134:4
   135:8,14
**certificate** 3:5,6
   7:23 18:8 100:23
   104:8,11,13 148:1
   149:1
**certification**
   149:21
**certify** 148:9 149:7
   149:11
**certifying** 149:24
**cgreene** 2:6
**chance** 43:22
   131:16 133:8 143:6
   143:10,12 144:7
**change** 14:20 20:17
   22:20 126:25 151:6

changes  150:18,19
  151:4
characterize  19:17
charge  107:15
charged  124:13
  137:11
charging  124:18
chase  14:5 25:11,12
  76:11 84:11,14
  126:18,25 137:13
chat  61:2,7
chatted  61:8
check  6:19 100:11
  105:13 140:5
checking  26:12
checks  12:25
child  73:23,23
children  8:7 27:2,4
  27:11,14 69:17
  71:14,15 72:14,16
  73:1,3,13,19 74:20
  82:16 137:23
children's  16:16
  73:5,10
choice  128:22,25
chose  128:4
christina  82:19
chronic  20:2 22:16
  23:25 77:9
chronically  77:11
city  10:22
civil  3:20 129:17
  143:8
claim  3:16 50:10
  55:21 60:16 88:24
  89:4 90:12,15
  93:18 95:3,8,23
  97:15 101:6,18,24
  102:22 107:7
  108:10,14 111:4,10
  111:20,23,24

117:15 118:4,5
  119:22 121:8,14
  133:17
claiming  111:25
  112:8
clarification  88:5
clarify  57:13
clear  68:15 75:19
  90:18 104:21 113:2
  113:12 119:18
clearly  113:11
client  84:24 89:23
  118:11 131:14
close  27:9 36:2 74:9
  83:22 115:17
closest  150:15
coaching  50:15
code  89:22,24,24
collection  126:17
come  29:22 36:5
  51:7 58:2 60:12
  69:5,14 70:4,7 84:7
  91:18 107:3 118:24
  134:11 136:25
  139:6 150:15
comfortable  91:7
coming  58:21
commentary  142:6
commented  93:7
commission  148:16
committed  120:23
  120:25
communications
  64:16
companies  23:1
  29:18 57:6 127:12
company  13:24
  20:13 21:14 22:19
  23:13 25:18 28:14
  28:24 30:10 33:9
  37:14 43:16 63:22

101:13 112:16
  113:5,15 114:21
  124:10 126:18,22
  126:22 137:20
company's  130:3
complaint  121:6
  125:17 133:19
complete  45:15
  52:1 57:18,22
  58:21 63:1 64:12
  66:21 95:24 96:1
  101:6
completed  44:24
  48:19 55:19 58:3
  59:2 60:10 95:23
  96:4,22,24 97:3,16
  150:20
completely  110:13
complications
  88:13
computer  45:8,10
  45:16
concentrate  43:1
concerned  34:1
  37:14 49:25 57:7
  64:18 70:2 79:3
  105:19 106:24,25
  107:23 112:24
  113:4 114:2,8
  116:11
concerning  47:14
  58:22 60:1 65:19
  111:10 114:7 115:3
  115:24 116:6
  138:23
conclude  150:21
concluded  147:3
conclusions  110:5
condition  80:22
  81:1 110:10,19

conduct  110:8
  130:3
conducted  38:11
confused  6:24
connected  149:14
connection  52:7
consequential
  25:24 80:10 132:20
  144:15
consider  87:20
considering  25:23
construction  11:10
  11:12,14,16
consumer  85:20
contact  29:20
  96:20
contacted  29:21
  113:20
contend  114:6
  115:2 116:5
contending  115:8
  115:23 125:11
  140:7,11,21
contention  117:13
  117:17 119:21
  120:5,13,25
contents  85:11
  106:19 107:19
  123:2
contestable  96:25
  97:8,11
continue  13:15
continued  128:4
continues  51:4
contract  56:22 90:7
  132:17 133:17
  140:22,25
contractually
  128:20
contrary  29:5

control 149:23
conversation 41:20
 41:24 51:21,23
 53:23 56:7 61:13
 63:19 65:19 93:20
 93:24 108:6 111:19
 113:11 123:3
conversations
 51:18 60:11,22
 62:25 68:20 87:7
 101:23 102:16
 111:9,15 131:15
conversed 99:14
cooke 1:2
copies 92:21
copy 42:12 92:20
 92:22 94:13 146:22
 146:25 150:19
correct 29:10 31:11
 45:6 47:24 48:11
 48:12 66:5,14
 70:18 87:17 107:7
 108:19 123:14,15
 124:4 127:24
 138:22 139:10,14
 142:19,21 143:6
 149:9
corrected 139:12
corrections 150:18
correctly 6:24 88:2
 91:10 110:16
 112:11
cost 72:5
costs 121:21
counsel 2:2,7 54:2
 54:6 108:18 122:23
 122:25 145:13
 149:12,14 150:19
count 145:3
counting 27:14
 82:16

counts 133:21
county 148:4 149:4
 151:23
couple 26:18 51:3
 59:4 61:23 62:9,10
 82:18 95:19
course 18:10 33:24
 79:11 100:10
 106:16 111:24
court 1:1,18 4:18
 4:23 5:19 126:20
 141:22 148:15
 149:6,19 150:25
cover 31:21,25
 83:16 103:23
coverage 27:23
 34:15 49:9,11,16
 49:18,20 57:6 59:3
 139:5
covered 20:15 23:3
 23:15 32:5 137:2
craig 2:3 107:17
 110:24 150:6
crazy 33:23
credibility 133:6
 134:22
credit 25:7,8,18
 71:9,11 75:10,12
 75:13,14,16 76:15
 76:18 77:20,21,23
 78:1,7,18,23 79:2,3
 84:2,13 127:11
critical 48:7
crn 135:13
cross 145:11
cry 73:11
cuba 18:14
cuban 71:5
curious 69:7
current 9:23 11:4
 14:7 15:19 24:20

currently 6:10 8:23
 10:18 13:23 48:6
 123:19
cv 1:2

d

dairy 77:11
damage 25:24
 71:15 132:20
damages 70:20
 79:23 80:10 125:12
 132:22 133:16
 143:5 144:12,15
date 6:5,17,21 7:8,9
 7:10,11,21,22 8:1
 35:25 41:22,23
 55:19 68:3 94:19
 96:6,7,8 131:6
 150:21 151:19
dated 122:20
 149:16
dates 7:6 10:14
david 8:5 15:16
 16:17,18,19 82:17
day 43:19 59:17
 101:14 138:14
 144:4 148:13
 149:16 151:21
days 59:4 150:11
deaf 74:21,21
deal 75:13 99:20
 100:12
dealing 13:11
deanna 82:19
dear 150:12
death 3:16 15:5
 16:11 25:15 31:10
 48:7 53:2 95:8
 100:23 104:8,11,13
debt 13:7 75:16
 76:15,16 77:14,16
 77:20,20,25 78:19

78:23 79:7
debts 13:25 14:1
 79:5 121:12,13
december 67:24
decided 127:22,25
decision 48:24
 102:22 108:10
declarations 53:20
declare 151:16
deep 7:2 25:22
 73:22
deeper 99:19
default 8:25
defendant 1:8,17
 2:7
defendant's 1:20
 3:11 44:1 69:1 86:1
 94:4 95:9 98:14
 103:11 105:24
 122:4 129:3 139:19
defense 89:6
 121:21
defenses 133:20
 134:1,8
delay 5:14,19
denied 101:18
 108:14 111:20,23
 111:24 118:4
denying 107:7
department 131:11
 131:17 134:15
dependent 8:11,13
depends 61:25
 121:25
depo 150:10 151:2
deponent 148:9
deposed 4:12 134:3
deposition 1:14,21
 4:16 17:7,24 91:17
 139:1 143:12,19,21
 149:8 150:14,22

describe 18:19 19:8
described 110:6
detailed 69:7
details 60:5
determine 111:14
diabetes 39:15 41:1
41:5,8,11,18 42:2,8
42:16 44:17 52:4
52:10,18,22,25
53:3,4 57:18 58:3
59:2,19 60:1,9,11
63:2,7,8,13,14,17
63:18,18,20,23
64:4,13 67:3,8
69:23 70:7,11,12
87:15 88:6,7,9,10
88:13,14,16,20
89:9,20 90:2,10,13
90:14,25 93:2,5,9
93:19,19,22 106:25
107:1,1,23,24
108:2,3,11,12
109:4,4 110:17
111:3,4 135:19
138:23 139:7
diabetic 53:7
135:17
diagnose 89:19
diagnosed 23:24
52:25 88:6,9 90:2
107:24 135:19
diagnosis 24:9
138:23
die 112:2 113:1,23
116:21
died 8:6 13:2 15:25
16:9,10,12 21:13
25:5 35:19 36:16
53:11 68:10 70:13
76:1 77:2 100:5
105:5,10,21 109:9

110:15 113:8,21
116:25 117:15
118:5 119:23
135:17 140:25
141:6,12
diet 87:18,20 88:1
different 23:1,10
34:21 50:6,17
81:11,17 83:8,10
83:12,12,23
difficulty 43:9
digitally 145:20
digna 1:4,14 3:3
4:2,11 5:16,22 6:8
6:9 7:1 18:23 20:25
20:25 62:18 73:16
88:15 89:14 106:5
109:14,14 116:14
127:10 150:5,10
151:2,19
diploma 18:4
direct 3:4 4:6 54:9
149:23
disability 12:10
48:8
disagree 80:3
discharge 56:21
disclose 123:2
143:5 144:11
disclosures 144:11
144:17
discontinued 29:7
29:8 49:9,18
discretion 149:23
discuss 46:6 63:6
79:4 85:14,24
104:2 107:19
discussed 46:12,13
61:10 65:21 66:4,5
69:5 85:14 118:9

discussing 40:24
54:23 85:11
discussion 48:23
dismiss 133:19
dismissed 13:10
124:3
district 1:1,1
doctor 24:4 39:24
40:1 41:2,5,7,10,12
52:16,17,18,21,23
63:12 64:3,11
65:24 68:2,6 70:5,8
70:10 74:22 90:10
98:9,20 109:9,10
109:16,16 136:2,5
doctor's 36:3,4
100:22
doctors 66:25
83:10,12 100:11
136:5
document 44:5,15
44:19,24 50:9 54:1
55:20 84:16,21
97:3 122:7 129:8
129:19 130:2 131:9
131:16 133:2,23
139:21 140:1
145:14,23 146:3,14
146:15 151:17
documentation
43:3,4
documented
111:15,19
documents 17:19
17:20,22,23 99:19
100:1 111:14
doing 13:12,19
20:25 50:8 61:12
62:3 69:3 76:21
78:8 124:7 143:19

dollar 142:24
144:23
dollars 26:18 72:7
doris 82:19
dr 3:14 40:12,13,22
41:25 42:6 52:15
66:24 67:24 68:17
68:21 69:4,6,11,19
86:6,20 87:8 88:18
89:8 90:24 92:10
93:4,21 98:17
103:24 104:2,3,4,8
104:22 105:11,17
109:1,6 111:1
drive 2:9
due 13:2 33:21
49:21 140:22
duly 4:3 148:10

**e**

e 6:9,9,15 47:11,14
47:17,19 57:2,3
82:4,12,13,17
earlier 21:1,10
47:22 93:20 134:6
earshot 118:19
eat 73:12,14 77:7
eating 77:8 87:23
education 18:16
educational 18:3
18:13
effect 43:18 48:2
59:3 123:7
eight 6:13 7:14
10:4 26:22 83:10
either 71:15 90:13
130:20 145:20
embarrassing 8:14
73:13,15
embarrassment
71:18

employed  10:18,20
  10:21
employee  149:12
  149:13
enclose  104:11,13
enclosed  104:8,10
  104:14
ended  76:1,7
  140:16
engage  61:12
enter  151:4
entire  84:25
envelope  92:20
  98:22
errata  3:8 151:1
escrow  137:20
especially  26:1
esquire  2:3,8 150:6
estimate  6:20 125:9
event  112:2 150:17
everybody  14:1,2
evidence  90:4
  118:24 119:1,7
exact  6:21 35:25
exactly  7:23 22:14
  41:3 42:17 47:4
  55:16 58:13 59:8
  59:17 60:4,5 68:3
  68:19 75:7 78:14
  82:23 84:7 110:9
  117:11,19,21
examination  3:2
  4:6 38:6,8 39:7
  145:11 146:11
examiner  38:18,24
  39:15 40:25 56:18
example  75:24
exception  144:3
excluded  112:3
excuse  18:22 39:11
  42:4 57:3,20

141:22
executive  2:9 56:19
exercise  87:18 88:1
exhibit  3:12,13,14
  3:15,16,17,18,19
  3:20,22,23 43:25
  44:1,16 45:5 50:7
  55:8 57:10,14
  59:20 66:12 68:24
  69:1 84:17,20 86:1
  86:8 94:3,4,6 95:9
  95:11 98:14 100:14
  100:15 103:11,14
  103:19 105:24
  106:2,4,22 122:4,6
  129:2,3,5,7 139:19
  139:23,24,25 140:3
  145:10
exhibits  3:9,11
existing  49:10,19
expect  76:24
expenses  24:23
  75:1,6 77:18,19
  83:18 121:7,9
  125:12,13,19,20,24
  126:4,8 140:17
expensive  71:4
expires  148:16
explain  99:4 102:9
  102:13 132:15
explained  28:23
  96:25 97:14
explaining  110:12
  130:2
express  14:5 25:9
  75:25 76:9 84:14
  100:22 137:13
  140:15
expressed  135:6
expressly  97:17

extra  10:24 51:22

**f**

face  21:19 141:10
  141:17,21 142:1
fact  13:2 33:21
  49:21 109:8
facts  90:3 117:16
  151:17
fair  68:16 125:5
  136:22
false  115:24 116:4
falsely  112:1,9
familiar  85:8 97:10
  132:3
family  27:14 70:12
fantastic  19:11
  51:9 115:18
far  33:25 37:13
  57:7 64:18 106:24
  107:23 112:24,24
  114:2,8 116:16
  119:10 123:17
  126:8
fast  130:16
father  109:8
february  103:17
  104:7 131:7 145:14
feel  46:17 82:25
  146:13
feeling  105:14,16
fees  121:23 137:5
  137:11,17 138:12
felt  69:15
fight  26:6 91:6
figure  61:21 142:24
  143:3 144:23
figured  24:19
  126:7
file  50:10 85:20,25
  123:9 138:17

filed  110:23 121:22
  130:2 136:23
filing  131:6
fill  36:18,20 63:9
filled  36:11 37:13
  37:17 63:15 97:18
financial  19:17
  27:10 79:15,19
  131:11 134:16
financially  8:11
  17:3 149:15
find  30:14 31:23
  57:21 58:2 64:6
  96:17 109:11
  124:25 128:19
  143:11
fine  40:8 41:7
  62:15 109:10 119:2
  119:8 139:16
  142:14
fingers  76:25
finish  4:17 5:6 9:14
  26:7 75:14
finished  6:4 19:4
  144:20
finishes  124:14
first  8:20,21 11:23
  16:9 20:19,20 24:2
  24:15 40:18 45:5
  53:8 85:23 86:12
  86:13 92:23 94:23
  95:16 100:6 105:6
  105:16 107:2 112:3
  112:18 116:21
  117:16 118:5
  119:23 129:18
  132:23
five  62:21 85:1
  115:15
fix  70:23 71:15

**[fixed - goes]**

fixed  24:14
fl  2:5,10 150:8
florida  1:1,19 5:10
  10:3,4,5,7 15:10
  38:2 148:3,8 149:3
  150:2 151:22
flying  62:4
focus  95:14 106:12
focused  103:5
follow  52:1
following  21:1
  112:4
follows  4:4
font  54:4
forbid  99:12
force  48:8
foreclosure  9:3
  136:12,23
foregoing  149:8,21
  151:17
foresters  1:7 3:13
  3:15,17,19,23 9:11
  13:3,7 14:2 20:10
  20:12,12 24:22
  27:18 28:24,24
  29:5,8,12,13,15,19
  29:22,24,24 32:25
  33:4,19,24 34:6,21
  35:14 36:19 37:1
  41:25 42:1,7,10,10
  42:13,19,20 43:16
  43:21 47:24 48:24
  51:24 52:20 55:12
  56:1,19,21,24 57:8
  57:23 58:24 59:13
  63:8,21,22 64:11
  64:17,19,20,22
  65:9,12 80:9 84:23
  87:6 92:12,19 93:7
  93:19 95:2,6 96:20
  97:19,23,24 98:2

98:24 99:4 100:6
101:2 102:19,22
103:17 104:5,23
107:6,19 108:9
109:3 110:22 111:2
111:2,4,8,15,20,25
112:4,16,17 113:19
113:20 114:1,2,3
114:17,17,17,19,20
114:20,21,24 115:4
116:20 117:2,12,14
117:19 118:3 119:3
119:22 120:6,15,22
120:25 121:8,14
131:18 132:8 133:3
135:22,22 136:1,3
136:4,5 138:22
139:6,6 140:7
142:25 150:9 151:2
forget  103:7
forgot  104:11
form  12:8 18:21,25
  19:24 28:12,17
  31:19 33:15 35:2,6
  39:3,16 42:3,24
  43:10 44:25 47:3
  48:14 49:15 53:9
  56:11 58:17 60:2
  63:3,9 64:8,24
  65:22 70:22 73:25
  80:2,11 86:22 88:8
  88:21 91:15 93:13
  95:23 96:21,24
  97:2,6,16 101:7
  102:24 104:16
  111:5 116:1,9,23
  117:18 118:7 124:5
  127:18 128:7,23
  135:18 140:9,24
  142:20 143:1 146:9

formal  18:5,16
forth  55:8 56:8
  93:14
found  63:22 125:1
foundation  92:7
four  27:5 49:8 62:5
  72:10 73:6 81:15
  140:25 141:12,19
  142:2,9
frances  16:17,22
  82:17
fraud  60:16 88:24
  89:7 90:6 132:16
  133:14 135:5,7,10
fraudulently  112:1
free  46:17
friday  1:12 150:16
friends  74:17,18
  80:17,19,21 82:11
front  50:12 53:12
  54:2 140:1
full  4:9 124:23
funds  140:22
furious  108:4
furnish  150:19
further  56:17
  61:20 110:8 149:11

**g**

g  6:15
garbage  53:11
general  27:22
  28:10 29:9 32:7
  33:18,22 34:3,14
  34:18 35:4 37:9,12
  37:18 38:4,13 43:7
  43:14 47:23 48:25
  51:24 59:3,14
  114:22 138:24
generally  18:19
gerlach  1:18 148:7
  148:15 149:6,19

150:25
getting  5:15 15:4
  29:2 43:9 52:14
  71:25 72:3 73:6
  115:17
gift  80:23
give  6:20 18:2 35:7
  41:16 52:5 56:25
  57:2 73:25 74:12
  79:12 81:1,16 82:7
  82:10,18 90:16
  94:13 99:18 137:24
  138:19 143:22
  144:23
given  33:6 79:23
  80:21 83:4 140:12
  140:18 143:23
  149:10
giving  126:21
  139:12
glad  82:5
go  7:24 19:4,10
  24:4,7 25:22 26:6
  46:5,14 52:10,14
  53:18 56:16 57:9
  65:24 68:11,12
  69:4 72:1 73:9 80:3
  80:8 82:9 83:11
  86:3 89:1 91:17
  92:2 96:14 97:7
  98:16,17 100:1,12
  100:18 104:18
  105:21 118:20
  129:14 130:9,14
  131:1,24 145:2
  146:6
god  99:11
god's  99:12
goes  130:16 133:6
  134:22

**going** 4:22,23,24
  5:16 19:25 26:1
  29:3 31:25 33:16
  33:21,25 34:10,12
  37:15,16 38:14
  40:3 43:7,20,21,23
  46:14 47:23 48:3
  49:1,2 50:13 51:2,5
  51:6,20 54:7,12
  59:11,19 60:14,15
  61:11 73:1,7 79:1
  80:7 82:14,18 84:7
  88:23,24 89:4,10
  91:8,16 92:6 95:14
  95:18 99:6,10,25
  101:10 102:3 106:9
  109:10 112:14,23
  113:14 114:14
  117:5 119:1,12,18
  126:1 127:3,5,7
  133:11 134:12,24
  134:25 135:15
  142:12 143:18
**good** 4:8 19:21,21
  20:13 21:4 23:13
  23:14 37:14 42:13
  62:3,14,16,18 68:5
  69:9,15,16 70:3,11
  71:8 74:1 78:9
  87:16 113:15
  131:23
**goodman** 1:2 135:2
**goodman's** 134:24
**gotten** 116:10
  142:10
**graduated** 18:14
**grandchildren**
  16:24 17:1,2,4
  27:13,16
**great** 20:16 27:16
  51:9 115:18 139:16

**green** 2:3 150:6
**greene** 2:3,3 5:13
  7:1 13:14 17:15
  18:21,23 19:10,24
  20:25 21:8 22:21
  25:21 26:5 28:12
  28:17 31:9,13,19
  33:15 35:2,6 36:10
  36:13 39:3,8,16
  40:3,7 42:3,24 43:1
  43:10 44:6,9,14,25
  46:5,11 47:3 48:14
  49:15,23 50:5,8,20
  50:25 51:9 53:9
  54:1,19 56:11 58:8
  58:17 60:2,14 61:6
  61:19 62:2,12,16
  62:18,20 63:3 64:8
  64:24 65:22 66:6
  67:13 70:22 73:16
  75:19,23 78:2,5
  80:2,11 81:4 82:3,5
  84:24 86:22 88:8
  88:15,21 89:10,18
  91:2,23 92:2 93:13
  94:8 95:12 96:9
  97:2,6 100:18
  102:24 104:16
  106:3,9,20 108:13
  108:17 109:14,24
  111:5 114:10,14
  115:10,15,18 116:1
  116:9,14,23 117:18
  118:7,12,15,22
  119:8,15,24 120:8
  120:18 121:2 122:9
  122:12 124:5
  125:16,22 126:10
  127:10,18 128:7,23
  129:9,13,23 130:1
  130:13 131:23

132:13,21 133:5,7
133:24 134:17,23
135:18 137:1
138:25 140:9,24
141:7,22 142:3,7
142:20 143:1,7,15
144:8,17,24 145:7
145:12 146:10,17
146:21 150:6,6
**gross** 121:1
**guess** 61:24 63:25
  70:14 131:3
**guys** 90:12 126:10

## h

**h** 82:12
**hand** 148:12
**hands** 89:7 90:5
  134:10 135:9
**handwriting** 45:11
  57:13 66:16,17,19
  95:18,20
**happen** 33:22
  55:17 59:22 99:13
  112:19 113:10
**happened** 20:15
  33:5,7 99:12,22
  101:19 113:6 139:9
**happening** 134:2
**happens** 20:22 32:2
  56:5 121:25
**happy** 50:15 61:12
**hard** 45:9 83:3
  117:4
**head** 4:21
**health** 20:16 22:17
  23:4,8,10,17,20,22
  24:1 42:14 70:2
  87:16
**healthy** 33:23
  42:21 52:22 64:4
  69:16,18 70:3

76:25 87:22 110:13
112:24,25 136:1
**hear** 4:23 18:24
  67:18 89:15 90:20
  91:22,24
**hearing** 74:20,22
  74:23,24 89:12
  93:15
**heart** 53:3,14 70:13
**heavy** 87:21
**help** 4:18 74:11
  129:23,24 130:13
**heritage** 71:5
**hershman** 3:14
  39:25 40:12,13,22
  41:25 42:6 52:15
  66:24 67:24 68:17
  68:21 69:4,6,11,19
  86:6,20 87:8 88:18
  89:8 90:24 93:4,21
  103:24 104:4
  105:11,17 109:1,6
  111:1
**hershman's** 92:10
  98:17 104:2,3,8,22
**hetherington** 2:9
**hh41912** 148:16
**high** 18:4,6,14,17
  29:3
**hire** 84:9
**history** 70:12
**hit** 139:6
**hold** 49:25 82:20
  118:12
**hollywood** 2:4,5
  150:7,8
**home** 6:1 8:23
  15:17,19,20 24:20
  30:7 63:1 69:5
  101:6 105:18
  128:16,17 136:7

[homeowners - investigation]                                                      Page 162

**homeowners** 31:17
31:20
**honest** 72:2 73:7,8
77:1 143:24
**honestly** 85:21
116:11 124:20
**hopefully** 143:21
144:1
**hour** 40:4 62:5
124:13,19
**hours** 61:23 62:6,9
62:11 135:15
150:16
**house** 24:15,16,17
25:1,2,4,4 31:4
35:24 36:5,17,18
38:10,14,18,25
44:23 45:15 52:7
52:10 53:12 72:22
72:25 73:10 74:7
96:3 97:16 128:1,3
136:10,13,16,18
**how's** 91:13
**huh** 27:8 35:1 38:1
48:10 68:1 79:8
138:3
**human** 115:1,6
**humana** 23:9,22
37:6
**humira** 24:2 74:24
77:2
**hundred** 26:18
**hurt** 103:4
**husband** 9:7 10:12
14:20 15:24 16:9
20:23 21:17 29:25
32:3 35:19,20
36:16 46:2,21 48:2
48:13,17 51:17
53:23 55:7,21
57:24 58:7 59:22

60:23 64:15 65:7
65:12,15,20,20
66:4,5,9,13,24 67:3
67:20,23 68:17,22
75:2 76:15 83:6,17
85:12,19 86:21
88:19 92:10 93:22
94:19 95:2 96:18
99:9 100:4 103:5
107:14 108:2,11
109:3 111:3 115:7
118:5 119:23
126:15 132:5
137:25
**husband's** 6:14
11:23 45:3 66:19
89:9 93:5 97:23
98:25 101:3

**i**

**idea** 61:14,24 62:5
122:1 125:7
**illness** 48:7
**imagine** 44:21 46:4
46:23,24 60:6 79:9
**immediately**
139:12
**impact** 9:14,15,18
**important** 73:17,24
85:15 103:3,5
**included** 88:18
93:5
**including** 104:3
**income** 11:4 12:2
15:5,8 45:23 46:2
46:21 47:5 48:8
**incomplete** 110:6
**incorrect** 110:6
**increase** 28:25
**incurred** 121:13,18
121:21

**independent** 1:7
145:19 150:9 151:2
**index** 3:1
**indicated** 46:3
145:23
**inducement** 132:16
133:14 135:5,8,11
**information** 13:14
58:22 64:2,6,9
110:4,7 119:21
138:22 139:10,14
**initial** 30:23
**initially** 121:8,14
137:14
**initiate** 136:12
**injection** 83:11
**injections** 24:2
**inquiry** 120:6
**inside** 72:9
**institution** 120:16
**instructing** 61:4
**instructions** 21:1
91:25
**insurance** 13:3
14:11,12 20:10,11
20:17,20,22,23,24
21:11,13,14,16
22:17 23:4,8,13,14
23:17,20,22 24:1
24:25 25:2,2,4,5
27:19,20,22 28:2,4
28:11 29:2,18,25
30:22 31:17,20,20
31:25 32:1,9,11,12
32:19 33:14,19
34:10,12,16,22
37:3,5,8 40:25
41:17 42:12 47:14
48:2,5,8,21,21,22
48:23 49:3,10,11
49:20,22 51:21,22

52:18 56:3,21 57:6
59:5,11 63:24 64:1
64:17,23 65:5,9,13
70:17,24 72:22
74:8 77:13,25
79:12 83:15,24
87:14 93:8 99:10
110:14 112:15
113:13,18,19,21
116:21 127:6,17
128:1,3,16,17
130:3 136:10,14,17
136:18 137:14
139:10,16 140:8,23
141:5,10
**insurances** 23:10
**insured** 48:6
**insured's** 120:16
**insurer** 3:20
129:17
**intended** 119:22
**intending** 29:1
**intention** 116:20
117:15 118:4
**intentional** 120:23
**intentions** 117:20
**interest** 13:5 71:21
76:3,6,7,7,11 83:2
83:3 121:17 137:8
142:19
**interested** 149:15
**interject** 25:21
**interrogatories**
144:4
**interrupt** 114:10
114:11
**investigate** 99:19
100:6 120:16
**investigation** 97:1
97:11

**involved** 9:2 30:20 32:21 37:9
**involvement** 32:23 37:11
**israel** 26:22
**issuance** 112:4
**issue** 25:24 30:14 60:21 89:18 132:14 133:14,15 135:6
**issued** 49:12 59:14 105:3
**issues** 25:18 60:16
**issuing** 132:9
**italy** 26:23
**items** 55:8 56:8

**j**

**j.c.** 75:11
**january** 36:3,7 55:20 57:23 84:22 86:18 94:21 96:3 138:6
**japan** 26:22
**jazmin** 28:22 29:14 29:15,16,21,25 33:1,11,17,19,25 34:21 35:13,14,16 35:18,23 36:5,15 42:10,10 44:23 45:8,14 46:1,20 47:13 48:1,13 51:17 52:7 53:23 55:7 63:21 64:7,10 64:15 65:4,8,16,19 66:21 67:2,11 87:4 87:7 99:9 113:24 114:1,1,3,6,8,18,19 114:23 115:3,4,12
**jazmin's** 35:11 45:2 63:1
**jewelry** 14:12,13

**jimmy** 16:17,20 82:17
**job** 10:23,25 11:21 11:22,23
**judge** 60:17 80:15 133:12 134:24 135:2
**julie** 85:16,17
**jury** 80:7

**k**

**keep** 13:17 19:25 82:14 131:25
**keeping** 128:20
**kenneth** 39:24
**kind** 63:14 98:7 128:12
**kindness** 19:13
**kitchen** 45:19
**knew** 10:16 33:10 41:6 59:11 63:13 81:1 90:9 99:21,24 108:23 136:13,25
**know** 5:2,4 7:8,11 7:22,23 8:1 10:15 11:16 13:12,18,19 13:20,23 16:7 17:10 25:17,20 27:9,18,23 28:20 30:19,19 33:11 34:23 35:16 37:15 37:15 38:5,11,20 38:24 41:18,20 42:18,23,25,25 43:8 45:14 50:11 50:18 55:2 57:5 58:14,15 59:5,8,13 59:16 60:25 67:17 67:23 68:2,6 70:2 71:12,12 72:4,11 72:23 74:3,21 75:5 75:9,9 76:10 77:9

78:14,24 79:1 80:5 80:22,25 81:4 82:11,24 84:6,7 85:13,16,19 87:7 87:10,11 89:8 90:13 95:16,17 97:13 99:7 103:9 103:10 106:6 107:25 109:6,8,20 110:21 111:22 112:12 113:9 115:1 116:14 119:6 124:7 124:15,18 125:10 125:10 127:3,7,7,8 127:8,9 129:9 130:6,22,23 131:10 131:13,16,21,22 133:8,18,20 134:8 134:10,14,17,20 136:15,18 143:4 144:14,20
**knowledge** 12:11 25:14,16 37:2 39:21 52:24 53:1 65:18 66:3 95:1 103:1 110:18 112:7 120:7,17 132:5
**knows** 73:24
**kramer** 2:3 150:6
**kramergreen.com** 2:6
**kristina** 2:8 114:11
**kristina.pett** 2:11
**kronzek** 2:14

**l**

**l** 82:22
**lab** 68:12
**lady** 7:3,4 98:1,7,8 98:19
**language** 112:1

**large** 1:19
**late** 137:5,11,17,18 137:23 138:5,8,9 138:12
**lawsuit** 12:15,16 13:10 25:15 110:23 124:3 138:15
**lawyer** 12:20 13:9 13:11,12,19 84:6,8 84:9 92:23,23 107:16,16 108:7 110:11,12,25 119:20 120:4,15 123:3,4 124:6,11 124:21 125:1,2,21 126:7,8 131:11
**lawyers** 110:21
**lay** 92:6
**lead** 80:4
**learn** 97:22,25
**learned** 98:24 119:3 138:23
**leave** 91:23
**leeway** 133:22 134:11
**left** 62:24 101:11 107:14 112:15 113:20 133:15
**legal** 117:3 150:1
**letter** 3:7,13,14,15 3:17,18,19,23 36:3 36:4 42:1,6,9,11,12 42:13,14,20,22,25 52:5,14,20,21,23 58:23 63:15 65:24 84:18,22,25 85:5 85:11,13,22 86:3,4 86:5,9,20 87:3,8,13 87:15,25 89:25,25 94:11,14,15 98:13 103:17,21,23 104:7

[letter - meaning]

Page 164

105:23 106:13,15
106:17,19,23 107:6
107:12,13,18,20
108:5,15,23 109:2
109:2,17,23 110:22
111:2 126:21
135:24,25 136:2,21
139:13,14,15,22
150:13
**letters**  111:11
126:16
**level**  136:24
**liability**  132:22
133:1
**life**  8:14 11:18
14:11 20:20,22,23
20:24 21:11,13,14
27:19,20,22 28:2,4
29:2 32:9,11 33:18
34:9,12,21 37:3,5
43:7 47:14 48:7
49:10,19 51:21,22
56:3 64:17,23 65:5
65:8,13 70:17 71:8
71:17,18,19 77:13
77:25 83:24 93:8
113:18,21 127:6,16
137:14 141:5,10
**lifestyle**  18:20 19:9
**lightbourn**  35:12
54:22 55:21 57:21
58:21 59:21 66:4
79:5 94:13,24
95:24 96:17 99:1
101:6 102:10,16
113:25 114:6 115:3
115:4,21 116:8
**liked**  68:8
**limit**  91:16
**limitations**  46:12

**limited**  46:14
**line**  46:15 51:4 54:9
54:17,18 55:2
150:18 151:6
**lines**  54:3
**lips**  5:20
**lisa**  1:18 5:17 62:13
98:10,11,24 101:2
101:9,24 102:5,15
102:22 103:3,6
107:21 108:2,21
111:19,22 148:7,15
149:6,19 150:25
**list**  32:16 33:5,8
81:19,21 150:18
**listed**  130:4 144:18
144:18
**listen**  19:3 73:17
109:14 118:18,18
144:18
**listened**  91:25
**listening**  133:25
**little**  5:14 6:24
70:15 89:1 98:5,5
99:25 122:13 130:9
**live**  9:21,23 15:13
15:22 16:1 37:20
37:22 71:19,19
**lived**  5:11 10:7,7
15:23
**living**  15:13 20:5
**llp**  2:9
**loaned**  73:19
**loans**  18:11
**log**  5:17,17,22
**long**  5:11 6:12 9:5
10:10,15,25 11:16
16:1 17:17 24:7
37:22 40:14 51:23
55:15 56:5,23 71:9
71:11 74:1 99:16

99:17 100:1,10
102:19 109:6
110:16 112:5,10
113:2 117:6 121:25
128:2 138:14
**longer**  61:10 62:10
**look**  7:1 17:19,23
43:23 50:2 78:25
79:1 80:13 84:20
92:16 94:6 95:11
100:14,18 103:13
106:1,17 111:13
122:6 129:5,6
130:17 139:23
146:14
**looked**  63:25 92:16
92:25 111:8,11
145:15
**looking**  43:2 49:24
50:3,9,17,19 61:22
62:5 66:12 97:4
98:4 134:25 145:19
**looks**  5:13 103:15
104:14 131:4
**lose**  69:19 136:7,11
**losing**  103:5
**losses**  140:13
**lost**  78:16 113:6
**lot**  20:1 21:10
25:23,25 34:7 62:9
70:23 71:7,14
74:22 75:7 78:21
83:9 112:13 128:15
133:11 134:7,12
**loud**  59:21 67:5,12
67:15,16,18
**lump**  123:25
127:23 128:6
**lunch**  61:16 62:13
62:22

**m**

**m**  2:3 150:6
**ma'am**  86:7
**madam**  141:22
**mail**  47:11,17,19
57:2,3 104:19
**mails**  47:14
**main**  51:20
**majority**  24:3
**making**  75:12
123:18
**man**  19:14
**manager**  10:24
**march**  10:13
**mark**  43:25
**marked**  44:1 69:1
84:20 86:1 94:4
95:9 98:14 103:11
103:13 105:24
106:1 122:4,6
129:3,5,7 139:19
139:23
**married**  6:12 7:14
7:15 8:3,4,5 10:11
10:16 12:1 15:16
19:18,19 20:19,20
20:21 27:11,24,25
28:3,7 37:21
138:16
**marry**  6:16
**matter**  50:13 70:21
110:15 117:5
150:23
**mcdowell**  2:9
**mean**  21:25 22:21
31:9,21 33:7 58:8
91:22 101:12
113:24 125:13,15
**meaning**  86:16
97:13

**means** 31:20
149:22
**meant** 31:23
**meat** 77:8
**medical** 20:2 22:11
38:6,8,18,24 39:7
39:15 56:18 63:9
63:10,12 76:22,23
77:4,18,19 83:7,18
88:19 89:22 90:25
91:3 93:5 97:23
98:25 101:3 103:24
110:4 132:10,11
**medication** 9:12,18
9:20 53:6 74:24
77:4 105:18,20
**medications** 83:11
105:1,4,5,7
**medicines** 24:3
**meet** 10:5 17:9,10
29:16 35:13
**meeting** 1:11 45:18
52:12 59:25
**memory** 61:11
**mentioned** 21:11
41:14 47:22 93:20
112:12
**messages** 101:11
**met** 10:8,9 11:6
21:17 101:5
**mhllp.com** 2:11
**miami** 5:10 10:21
11:14 150:2
**mib** 85:8,20 89:24
**middle** 5:5
**military** 72:16
**mind** 73:22
**mine** 45:2
**minute** 27:24 73:16
145:16 146:2

**minutes** 17:18 40:7
54:8,20 62:21 85:1
145:16
**mischaracterizing**
89:19
**misconduct** 120:23
**misrepresentations**
134:15
**missed** 14:14
**misunderstood**
16:8
**modify** 56:21
**moment** 22:13 29:7
46:8 50:21 53:5
72:1 89:15 103:4
109:19,20 130:10
**monday** 144:2
150:16
**monetary** 79:25
**money** 9:11 14:2
19:22 34:25 35:8
71:21 72:14,15,18
72:19,24 73:3,5,6
73:19 74:12 76:2
77:2,3 78:15 80:17
80:20,21 81:1,12
81:20 83:1,4,15
125:5 127:4,20,22
128:15 140:8,12,14
142:24 143:14
**month** 83:8 123:18
123:20,23,24
**monthly** 14:15 15:5
21:21 24:23 34:4,6
75:1,5 78:8,9 121:7
121:9 128:5,14,21
**months** 9:11 45:24
46:2,21 68:7
**morning** 4:8
**mortgage** 6:3,4
8:15,17,18,19,25

9:5,6,8 14:6,7,8,10
14:16 20:7,8,8,9,14
24:24 25:3 29:17
29:19 30:3,4,7,9,12
30:15,18,20,21,22
30:23,25 31:2,12
31:15,21 32:1,2,4,4
32:5,7,11,11,12,13
32:19 33:13 34:9
72:22,23 113:18
127:16,24 128:2,6
128:13,18,21
136:14,15 137:6,9
137:20
**move** 10:3 51:7
61:2 106:11 134:25
142:13
**moved** 10:4,8 15:10
16:13 38:2 133:19
**mute** 46:7 91:22

**n**

**n** 82:13,13
**name** 4:9 6:7,14
22:25 30:10 31:2,4
31:7 35:11 72:9
75:11 82:11 98:6
124:21,23
**names** 16:16 29:18
29:20 32:17,25
33:5,8 81:22,25
82:9,10
**necessarily** 87:20
**necessary** 7:25
**need** 4:23 6:20 7:8
33:12 44:6 98:8
104:1 106:12
110:24 118:17
139:21
**needed** 31:17 42:20
42:21 58:2 63:21
64:2,11 74:23

87:15 97:22,25
99:5 101:2 136:16
**needs** 106:16
**negligence** 121:1
**negotiate** 123:25
**negotiating** 12:20
12:21 13:9,20
**neither** 77:7
**net** 47:7
**never** 9:2 14:14
20:8 25:20 32:4
33:24 41:11 68:17
70:5 71:16 72:3
88:6,9,10,12,16
91:8 92:24 93:10
101:11,14,15,22
106:25,25 107:22
108:3,11 109:4
111:3 112:15,19
113:22 116:20
117:14 118:4
119:22 120:6
124:16 128:17
136:22 138:11,11
138:12 139:17
**new** 10:1,6,7,9,21
15:10,11,14 16:7
16:13 23:12 28:13
37:20,21,23 38:14
38:22
**nice** 7:2,4
**night** 73:12
**nodding** 4:21
**non** 112:3
**normally** 90:3
134:2
**notarized** 150:18
**notary** 1:18 148:7
151:23
**notes** 98:4,6 108:6
108:7

**notice**  1:20 3:20
  129:17
**notified**  95:2
**notify**  98:20,20
**noting**  150:18
**november**  138:6
**number**  12:23 22:7
  50:4 66:22 67:12
  67:14,21 80:14,15
  84:17 89:18 95:21
  102:1 114:18
  150:11,15
**numbers**  143:20
  150:18
**numerous**  135:23
  136:5
**nw**  2:9

**o**

**o**  6:15,15 82:13,22
  150:6
**oath**  3:5 4:4 148:1
**object**  18:21,25
  19:24 28:12,17
  31:19 33:15 35:2,6
  39:3,16 42:3,24
  43:10 44:25 48:14
  49:15 53:9 56:11
  58:17 60:2,14 63:3
  65:22 80:2,11 88:8
  88:21 91:11,15
  93:13 97:2,6
  102:24 104:16
  111:5 116:1,9,23
  117:18 118:7 124:5
  127:18 128:7,23
  135:18 140:9,24
  142:20 143:1
**objection**  19:2,3,10
  39:8 47:3 64:8,24
  70:22 86:22 90:3
  91:12,13,19 92:2

146:9
**obligated**  75:9
**obtain**  18:8 21:16
  28:10 29:12 30:3
**obtained**  27:23
  28:13 29:9,13 30:2
  30:18,19 31:15
  32:10 38:4 77:13
  77:15,17,25 138:22
**obtaining**  30:20,21
  30:21 33:13 37:1
  98:16
**obviously**  54:11
  90:12 118:23 119:4
  130:14 139:15
**occasion**  18:25
**occupation**  11:7
**occurred**  41:20
**october**  1:12
  122:20 148:13
  149:16 150:4,10
  151:3
**office**  10:24 86:25
  98:17 104:2,3,22
  150:15,16
**officer**  8:6 11:25
  16:12
**official**  148:12
**oh**  12:19 88:16
  129:22 138:11
**okay**  5:7,8,16 7:5
  7:20 8:3 19:5,6
  21:6,8 26:5 27:17
  29:20 30:6,23 32:6
  32:16 33:3 34:23
  35:10 38:22 39:2
  43:5 44:23 45:12
  46:9 47:7 50:5
  54:19 62:2 74:3
  75:23 77:17,22
  78:5 81:22 82:10

87:21 88:3 89:17
  106:8,20 111:13
  116:12,12 119:13
  119:15 122:12,15
  129:23 130:22,25
  131:6,23 141:16
  142:3,14 145:3
  146:2,20
**old**  29:1 33:23
  34:11 72:11 98:6
  112:21,22
**oldest**  109:5
**once**  12:2 13:6 14:9
  82:16 101:8,9
  108:7 111:1 139:14
**ones**  82:22 137:12
**open**  60:25
**opportunity**  143:2
**opposed**  108:18
**order**  1:7 5:20
  46:16 55:12 61:3
  73:9 79:12 87:14
  88:25 89:5 90:17
  91:4 126:20 133:12
  135:1,12 142:13
  144:25 145:2 150:9
  151:2
**ordered**  146:22,23
**organized**  17:8,25
**outcome**  13:20
**outside**  53:10,11
  89:11 93:14
**owe**  13:23,24 77:23
  83:7,8,18 121:24
  123:22,24 125:7
  140:14
**owed**  71:21,22
  75:25,25 80:14,25
  140:14
**owes**  140:7

**owing**  140:16
**owned**  140:15

**p**

**p**  6:9 82:22
**p.m.**  1:12 147:3
  150:16
**pablo**  82:22
**page**  3:2 44:11,12
  45:5 47:21 49:8
  50:1,3 53:19 55:9
  56:8 57:13 66:12
  67:8 96:10,13,14
  104:18 122:9,11
  131:24,25 150:18
  151:6
**pages**  150:11
**paid**  8:16,20 9:10
  13:6,8 14:1,2,5,5,6
  22:3 32:2,14 34:24
  55:12,16,22,23
  56:5,24 70:17
  71:10 74:4,16,16
  74:17,17,20 75:11
  76:8 78:8 80:23
  82:23 83:21,24
  84:2,11 90:11,15
  93:18 99:18,23,24
  100:2 102:4,19
  111:4 112:13,14
  113:6 116:11,25,25
  117:1,5,24 118:1
  123:22,23 124:12
  125:4 127:16 137:7
  137:14,22 138:6,9
  138:11 141:6,17,20
  141:25 142:16
**palm**  148:4 149:4
**paper**  59:10 64:3
  64:11 129:10
  145:20,20

papers 36:9,18,20
  45:9 98:5,22
paperwork 6:19
  64:13 98:9
paragraph 56:17
  110:3 125:18
paralegal 2:14
  43:20
part 24:4 45:15
  50:10 52:1 54:10
  93:1 125:11
particular 95:15
  133:23
parties 133:4
  149:12,13
parts 51:19
party 12:15 25:15
  138:14
pass 10:12
passed 14:8,9,21,23
  14:25 22:8 26:16
  26:24 32:13 35:21
  65:1 68:22 75:17
  75:18 76:15,17,20
  76:21 78:18,22
  83:17 94:19,24
  95:2 96:18 126:16
  139:9
passing 75:2 105:7
  137:25 138:7
patient 41:13 94:1
paula 82:15,15
pawn 72:5,6
pay 9:9 12:1,25
  13:3,4,7 14:4 18:10
  20:1,8 24:1,3,4,5
  25:19 72:19,20,24
  74:5,6,10,14,15
  75:3,4,8,9 76:4,5
  76:12 77:2,3,12
  78:15 80:9 81:14

83:2,3,21,22,25
  84:8 93:8 101:10
  101:13 112:4,17
  113:14 114:20
  116:20 117:23
  119:22 121:7,10,24
  123:9,13 124:10
  126:19,25 127:5,15
  127:23 128:2,5,13
  128:15,22 136:10
  136:13,16,18,21
  137:5 138:1,4,5,8
  140:18
paying 6:4 24:24
  24:25 25:6 70:25
  75:14 76:1,8,22
  83:1,9 117:15,20
  118:4 121:8,14
  123:19 124:9,11
  128:5,14,21
payment 3:22
  14:14,15 76:4,4
  122:18 128:5
payments 14:10
  49:10,19 75:12
  78:9 123:10,16,21
payoff 124:1 128:6
pdf 96:11
penalties 151:16
pending 48:8
  132:19,21,23
  144:14
penney 75:11
pension 11:19,24
  12:5 15:3
people 4:19 81:11
  81:15,19 82:24
  103:6
percent 117:22
perez 6:9,9 8:5

perfect 20:16 69:14
perjury 151:16
permission 119:9
permitted 135:3
person 29:21,24
  56:19 76:25 96:19
personal 79:15,19
personally 78:3
  86:23 98:18
pett 2:8 3:4 4:7
  5:25 7:2,12 13:17
  13:22 19:7,16 21:3
  21:9 22:23 23:2
  26:3,8 28:15,19
  31:11,14,22 34:2
  35:3,9 36:14 39:5
  39:10,19 40:3,6,8
  40:10 42:5 43:3,6
  43:12,25 44:2,8,10
  44:18 45:4 46:9,11
  46:19 47:6 48:16
  49:17 50:4,7,18
  51:2,5,10 53:13,17
  53:21 54:18 55:5
  56:13 57:9,11
  58:10,11,19 60:8
  61:4,17,24 62:7,17
  62:23 63:5 64:14
  65:2 66:1,8,11 67:7
  67:10,19 68:24
  69:2 73:18 74:13
  75:21 76:13 78:4
  78:11 80:6,16 81:7
  82:8 84:16,19 85:4
  86:2,24 88:11,17
  89:2,6 90:22 91:21
  92:3,6,8 93:16 94:2
  94:5,10 95:7,10,12
  95:16,22 96:12
  97:5,9 98:12,15
  100:25 103:12

104:17 105:22,25
  106:14,21 107:4
  108:16,19,25
  109:22 110:2 111:7
  114:12,25 115:14
  115:17,20 116:3,18
  118:2,10 119:6,14
  119:17 120:2,12,21
  121:5 122:2,5,11
  122:16 124:8
  125:18 126:1,3,14
  127:14,21 128:10
  129:1,4,14,16,24
  130:6,19 131:24
  132:2,19,25 133:6
  133:18 134:7,20
  135:16,20 137:3,4
  139:3,4,20 140:20
  141:2,9 142:5,14
  142:15,22 143:10
  144:6,10,22 145:3
  145:23 146:9,12,20
  146:25
pett's 2:14 19:5
  100:20
phone 32:24 33:10
  58:8,10 66:7,8,9
  98:7 102:2 118:22
phrase 91:2,10,14
  97:10
phrased 102:25
physical 70:6
physicals 68:3,4,8
  70:1
physician 39:21
  40:14,16,19
pick 58:23
picked 86:25
picking 102:1
picture 130:17,23

piece   129:10
145:19
pills   77:5
place   38:9 45:18
128:21
places   83:12,23
plaintiff   1:5 2:2
134:3
plaintiff's   3:9
plan   77:4
please   4:9 5:1,23
46:17 54:21 55:1
114:11 130:10
141:23 145:9
150:15,17
plus   83:11
pocket   24:6
point   8:14 25:22
60:15 88:22 105:3
106:5 118:23
122:22 133:10
134:9
police   8:6 11:25
16:12
policies   43:18
policy   21:22 22:5
23:4 24:23 27:18
28:5,20,21,23,23
29:7,10,12,13 32:8
34:18,19,20,23
35:4 37:1 38:5
42:19 43:8,9,14,15
43:21 47:23,24
52:8 59:15 77:14
77:25 78:13 79:6
83:7 100:4 104:25
105:3 112:2,4,5
114:7 115:3,9,25
116:6,21 117:14,21
132:9 140:8 141:5
141:17,21 142:1

policy's   21:19
portion   53:24 55:8
59:20
portions   54:23
position   56:20
114:9 115:16
possibly   122:14
power   56:20
precluded   60:17
prediabetes   146:4
146:5
prediabetic   132:3,6
145:24 146:16
premium   21:21
28:25 29:1,2,6
33:20,25 34:4,6,11
37:16 49:10,19
112:23
premiums   23:18
prepare   17:6,23
103:21
presence   44:24
96:1
present   2:13 37:17
38:17 52:12 57:22
65:15 67:4 91:20
96:21
preserve   19:2
pretty   20:6 91:7
127:4 137:1,18,23
prevented   128:20
previously   57:12
price   70:24 72:12
princess   19:12
prior   8:3 9:23
10:12 15:5,19
16:11 24:9 25:15
30:6 37:1 62:25
75:1 123:4 132:9
137:25 138:2,7,10
140:5 150:21

priority   104:19
privilege   118:11
probably   15:6 49:4
49:5 54:3 62:10
74:23 119:12
problem   7:9,21,22
10:13 87:22 97:18
97:20 113:3,14
139:17 144:8
problems   7:6
procedure   143:8
proceedings   147:3
process   32:21,23
37:9,12 38:15
54:11 63:2 65:3
97:15 101:24
102:17 135:22
procurement   90:6
produced   111:14
producer   56:18
production   144:5
programming
10:24
promise   21:3
126:12
promised   110:15
prompt   150:23
proof   20:17 63:11
63:13
property   15:11
137:19 138:1,8,9
proposed   48:6
protective   46:16
61:2 88:25 89:5
90:17 133:12 135:1
135:12 142:13
144:25 145:2
proud   69:17
proven   63:23
provide   27:10
97:22 110:7 119:1

132:10,11
provided   59:22
public   1:18 148:8
151:23
puerto   15:21,22,23
15:24 16:1,6,12
pull   43:20 50:1
51:6 68:24 84:16
94:2 95:7 98:12
105:22 122:2 129:1
purchased   24:22
42:19 100:4 140:23
purpose   87:12
purposes   84:22
103:16 107:5
pursuant   1:20
123:10
pushed   128:25
put   43:22 46:7 49:1
49:6 50:25 53:17
54:2 76:6 80:22,23
80:24 87:5,6 89:9
99:16,17 108:9
145:9

## q

question   4:17 5:1,5
5:6 9:15 13:15 19:5
19:8,25 21:5,6 39:4
43:2 47:4 48:5,9
49:8 54:7,16,21
55:1,6 58:1 60:3,12
61:5 66:16 67:17
79:9 80:3,5 88:15
88:22 90:23 92:3,5
93:11 97:21 100:20
109:15 114:5,13,15
115:11 116:2 118:8
127:2,11 129:18
130:20 136:3 139:8
140:10,21 141:3,8
141:15,20,23,25

142:4,8,9,12
144:24 145:1,5,8
146:19
**questioned** 139:17
**questioning** 46:15
51:4
**questionnaire**
52:10 57:19 58:3
59:2,19 60:1,10
63:2,16 67:3,5,9
**questionnaire.pdf.**
44:17
**questions** 6:22 21:2
43:23 46:18 48:18
55:11,13,15 57:23
57:25 59:21 60:6
62:1 67:4,12,16,21
79:13,15 87:16
99:2 106:14 112:6
112:11 133:22
134:13,13 135:13
135:14 144:21
**quick** 40:4
**quicker** 54:12
**quickly** 61:25
68:16 114:4
**quinones** 82:12
**quique** 82:2
**quote** 80:9

**r**

**r** 6:9,15,15 82:12
**rabbi** 82:19,20
**raise** 29:6 33:20,25
34:11 37:16
**raised** 137:8
**rarely** 18:24
**rate** 137:8
**raton** 2:10
**reach** 98:25
**reached** 106:6

**read** 4:22 48:17
49:16 54:8,13,18
55:1 56:12 59:21
67:4,11,15,16,17
84:25 88:2 92:13
92:15 94:8 95:13
100:19 111:11
129:11 141:23
146:21 150:15
151:16
**reading** 54:16
67:14,17 106:4
125:16 147:1
150:11,14,20,21
**ready** 82:6 98:21
118:19
**realized** 77:10
**really** 5:18 21:1,4
24:18 25:22 29:3
54:6 62:7 70:15
76:23 93:3 99:15
124:6
**reason** 12:24 20:10
33:17 56:1 61:9
65:10 90:17 150:18
151:6
**reasons** 93:14
**recall** 8:19 22:7
26:16 34:3 35:23
38:17 39:14 40:24
42:15 43:13 45:8
45:17 46:1,20
47:13,16 48:1,17
51:16,25 53:22
54:22 55:7 56:7
57:1,17 58:20,25
59:1,16,20,24,25
67:2,11 73:18
81:22 93:24 94:23
96:24 101:23
108:20,21,21,22

130:8
**receipt** 108:14
**receipts** 71:24 72:1
72:3
**receive** 11:19,24
14:18 80:25
**received** 9:10,11
11:25 14:21 86:15
107:11,13,18
108:23 109:2
124:16 126:15
127:4,22
**receiving** 12:7
14:22 85:13,22
**recess** 40:9 62:22
85:3 115:19
**recognize** 103:14
106:2,22,23 139:24
**recognizes** 95:17
**recollection** 60:21
65:11 85:10,12
103:8 108:1 132:8
145:19
**recommended**
125:3
**record** 4:10 5:24
44:14 46:10 50:24
51:1 54:1 55:4
67:13 68:16 84:22
87:5 89:13 90:18
91:4,14,20 96:9
103:16 104:15
106:3 107:5 118:16
126:13 133:25
143:16 144:19
145:15
**records** 88:19 89:9
91:1 92:10,25 93:1
93:2,6 97:23 98:16
98:25 99:5 101:3
103:24 104:1,2,9

104:10,18,19,22,22
111:9 132:10,12
**redirect** 146:11
**reduced** 49:9,18
**reference** 145:24
146:3
**referenced** 150:21
**referred** 96:10
**referring** 86:6
89:21 109:25
**reflect** 67:13 106:3
145:15
**regard** 90:7
**regarding** 47:5
48:23 51:21,23
52:3,18
**regardless** 55:1
91:9
**regular** 68:4 87:19
88:1
**related** 40:25
132:15
**relates** 88:23 89:3
90:6 135:4
**relating** 135:13
**relative** 149:11,13
**relax** 7:2
**relies** 5:20
**remaining** 89:4
127:23
**remedy** 3:20
129:17
**remember** 7:15
9:16 22:13,24,25
23:17 34:7 38:16
39:9,12,17,18 41:2
41:3,9,15,22,23
42:17 46:25 47:1,2
47:4,8 58:13 59:5,8
59:9,18 60:5 67:16
67:25 68:3 78:14

82:21,23 85:22
94:9 100:21 103:2
103:4 113:11
130:24 145:25
**remembered** 99:8
99:15
**remove** 92:18
104:21
**rent** 6:1
**rented** 15:15
**repeat** 116:2
**repeating** 119:5
**rephrase** 5:2
**replace** 47:23
**replaced** 49:9,19
**report** 149:8
**reporter** 1:18 3:6
4:18,23 5:19 62:15
141:23,25 146:24
148:15 149:1,6,19
149:24 150:25
**representations**
114:7 115:2,8
133:2
**representative**
29:15 38:13
**represented** 71:5
112:1,9 122:23
130:11
**reproduction**
149:22
**reputable** 101:12
112:17 113:5,15
117:2
**request** 85:25
144:4
**requested** 42:13
52:20,21 58:24
65:23 85:19 92:11
104:12 117:21
139:13,13

**require** 135:23
136:4 144:11
**required** 123:17
127:15 132:11
135:24 143:4
**requirements**
136:16
**requires** 42:11
**requiring** 57:24
132:9
**respect** 8:15 56:8
71:23 89:22 133:16
135:10 137:12
**respective** 150:19
**responding** 46:22
**response** 41:21
66:16 144:3
**responses** 59:22
100:7
**responsible** 17:3
74:6,6 137:10
**restroom** 40:4
**result** 121:7,13,24
137:13
**retire** 11:2 14:24
**retired** 11:8,9 12:3
**retirement** 12:7,9
**returned** 92:1
119:16
**review** 3:7 110:8
123:4,5 131:16
146:15
**reviewed** 92:9
145:13,21 146:6
**rheumatoid** 20:2
22:15,16 23:25
77:10
**rico** 15:21,22,23,24
16:1,6,12
**right** 6:22,25 7:5
13:12 20:9 25:12

31:17 32:13 34:7
34:16,17 36:9,10
36:11 40:14 49:4
49:14 50:22 53:11
53:11,12 57:15
59:9,17 62:13 75:7
80:14 87:23 92:13
118:9 122:1,20
124:1,7 130:6,12
131:25 133:5
136:22 138:7
140:21 144:6 145:6
146:15
**rigo's** 109:25
**rigoberto** 6:15 8:4
116:24
**ring** 72:10
**rings** 71:2,23 72:8
72:9
**rise** 29:3 112:23
**room** 89:14 90:20
91:23 118:18,20
**routine** 69:12,13
**ruin** 7:3
**rule** 133:13 144:10
144:17
**rules** 4:16 143:4,8
**run** 51:2
**rushmore** 8:18
30:11,14,19 31:16
31:16 32:16

| s |
| --- |

**s** 82:12,13
**salary** 20:5
**sale** 71:24
**sat** 117:8
**saved** 20:4,4
**savings** 22:10,11
24:10,12 26:12
78:16,17

**saw** 28:23 44:21
45:10 86:12,13
108:4 131:1,9,10
**saying** 13:16 29:22
32:10 35:8 42:21
47:2 53:15 55:18
60:20 61:6 64:12
77:19 101:11,14
109:7 110:22
114:23 118:3,8
127:8 128:11
135:25 145:20
**says** 45:23 48:6
53:19 56:18
**school** 18:4,6,14,17
**scope** 46:7 135:3
**screen** 43:22 44:15
53:18
**scroll** 44:7 47:21
53:19 67:7 106:7
109:22
**scrolled** 145:17
**seal** 148:12
**sealed** 92:19 98:21
**searched** 71:4
**second** 5:19 27:22
46:6 49:25 50:23
52:6,9 58:15 60:4
60:12 63:1 67:8
82:20 88:4 98:3
118:16 126:11,12
138:19 143:7
**secret** 134:4
**secretary** 18:7
56:19
**section** 95:15
**security** 11:5 12:4
12:6,7,8,9,10 13:4
14:18,21,22,23
15:1 23:23

**see** 28:22 44:3,6
  45:23 46:25 47:10
  48:5,9,22 49:23
  66:21 68:17 85:23
  93:1 107:2 110:3,8
  110:9 122:13
  129:12,20 130:22
  130:24 131:6
**seeing** 100:16
**seek** 88:24 89:4
  90:17 133:11
  135:12
**seeking** 46:15
  70:20 79:23 80:1,9
  142:25 143:5,11
  144:12,16,25 145:2
**seen** 36:15,24 44:5
  44:19,21 84:21
  85:5 86:8 94:7,11
  94:17 100:15 122:7
  129:7,10,19,25
  130:7,21 140:3,5
  146:6
**sell** 57:6 136:21
**send** 71:20,20
  97:19 98:8 100:22
  100:23 104:19
  126:19,20 150:17
**sending** 103:24
  108:20
**sent** 14:3 47:13
  50:9 86:20 92:11
  92:19 94:17 98:23
  100:24 103:15
  104:4,23 106:23
  110:22 111:12
  115:4 125:19
  131:11,13,17,21
  145:14
**sentence** 88:4

**separate** 137:22
**services** 131:12
  134:16
**set** 55:8 56:8 93:14
**seven** 5:12 67:12,14
  67:21
**shape** 69:17
**share** 50:7 134:1
**she'll** 36:19 95:4,5
  95:5 124:14
**sheet** 3:8 151:1
**shock** 102:3
**shocked** 107:2
**shocking** 107:25
**shop** 72:5,6
**shoulders** 4:22
**show** 75:24 110:5
  139:22
**showing** 139:7
  145:25
**shrugging** 4:21
**sick** 22:12,13 23:6
  53:5,8,10 76:24
  103:5 109:9,13
  110:16
**side** 27:14 50:16
**sign** 5:22 36:9 49:6
  150:16
**signature** 44:12
  96:5,10,13,15
  103:19 122:17
  148:15 149:18
**signed** 44:22 66:13
  96:4 97:18 122:22
**signing** 123:5 147:1
  150:14,20,21
**simple** 129:18
  141:15
**simply** 90:8 118:3
  131:15

**sincerely** 73:11
  150:24
**single** 6:10 54:3
  69:8
**sit** 80:12 143:3
**sitting** 45:21 51:16
  53:22 55:18 81:22
  125:4 142:23
  144:13 145:18
**situation** 19:18
  79:15,19
**six** 10:17 72:16
**skip** 51:5
**skipped** 129:6
**sky** 29:3 112:23
**sleep** 70:14 113:7,8
**small** 25:6,7 76:4
**smaller** 122:13
**smoothly** 4:15
**snap** 76:25
**social** 11:5 12:4,6,7
  12:8,9,10 13:4
  14:18,21,22,23,25
  23:23
**sold** 14:11,12,13
  21:11,13,25 34:24
  71:24 117:14
**solutions** 150:1
**solve** 110:11
**somebody** 41:4
  70:6 75:13 110:10
  110:18 136:11
**son** 16:5 72:16
  107:14,14,14,15
  109:5,6,12,21,24
  109:25
**soon** 59:11
**sorry** 7:18,19 8:2
  13:18 20:19 21:7
  22:24 27:21 31:24
  80:13 100:24 102:6

  102:6,7,14,14
  114:24 116:2 126:7
**sought** 143:14
**source** 66:3
**sources** 11:4 12:2
  15:8
**south** 150:2
**southern** 1:1
**space** 54:3
**speak** 17:17 41:12
  58:5,5 64:19,22
  65:4,7 102:21
  103:1 110:24
**speaking** 4:19
  18:19 19:4 91:11
  91:19
**specialists** 24:5
**specific** 51:18
  106:10,15 108:1
  135:2
**specifically** 93:10
  109:12 112:8
  116:24
**speculating** 42:23
**speech** 5:15
**spell** 82:3
**spend** 20:3 73:10
**spent** 22:10 72:7
**spoke** 35:18 41:10
  58:13 94:24 98:7
  98:19 101:1,7,25
  103:3,6,7,9 107:21
  109:9,15,20 111:22
  113:10 115:7,7
  117:11
**spoken** 35:20 36:21
  85:17 99:8
**stamp** 57:10
**start** 105:4
**started** 75:12 98:3
  99:6 123:24

starving 61:14
state 1:19 4:9 148:3
148:8 149:3 151:22
stated 151:17
statement 3:16
95:7 108:22
statements 115:21
115:23 116:4,6
states 1:1 49:8,12
56:16 66:14 87:25
110:3
stating 64:3 87:15
stay 44:11 73:9
stenographically
149:8
stenography 18:7
step 89:14 90:19
118:17 126:10
136:19
stipulation 3:22
122:3,17,23 123:4
123:7,11,13,17
stop 46:8 77:5
118:15 141:7
stopped 49:10,19
75:15
story 119:12
straits 80:24
strict 103:10
strong 69:16,18
student 18:11
studied 18:7
stuff 26:2 70:23
71:7,14 76:22
119:2 132:18
submitting 95:3
subscribed 151:21
successor 56:20
sue 12:18,19,22
sued 12:24

sufficient 146:13
146:18
suggest 146:17
suggested 133:24
suggesting 146:4
suite 2:4,10 150:1,7
sum 123:25 127:23
128:6
summarize 101:16
summarizing
101:17
summary 18:2
super 76:24 77:11
support 27:10
117:17
supporting 14:24
supports 119:21
supposed 140:12
sure 15:24 20:14
30:18 32:5 37:19
39:18 40:6 55:14
58:18,23,24 67:15
69:9 81:2 99:11
100:9 101:17
109:19,20 113:5,10
116:4 117:2,9,10
117:11 125:15
127:3,4 130:10
137:1,7
surely 83:19
surprised 111:18
111:21
sw 5:10
sworn 4:4 148:10
151:21

t

t 6:15 82:12
table 33:2 45:19,20
117:8
take 4:19 5:3,5,7,21
7:1 23:23 36:19

38:8 40:4 45:18
54:7,19 61:17,19
62:8 68:3,4,8 69:13
70:15 73:16,22
83:4 84:20,25 94:6
95:4,11 97:17
100:14,18 103:13
105:4 106:1 107:11
107:16 108:8
110:19 115:15
122:6 125:1 126:11
126:12 129:5,6
130:25 133:7
135:23,25 139:22
146:22
taken 1:17 12:25
97:20 113:17,18
150:10 151:3
takes 69:25 122:1
talk 50:15 60:18,24
61:20 63:16 76:17
102:15 143:12
talked 17:10 64:21
65:15 90:9,24
93:17 102:14
105:18 114:3,18
116:7 121:10,15,18
125:14 137:12
139:1
talking 40:12 55:10
55:24 60:22 66:6
75:20 77:21 78:2
89:16 90:20 97:3
98:3 108:13,17
114:3
taxed 127:9
taxes 72:24,25 74:4
74:5 127:4,5,6
137:18,18,19,21
138:1,8,9

td 51:12
teenager 68:9
telephone 65:16
tell 4:16 19:2 27:21
39:6 46:18 49:2
50:20 56:5 60:7
62:7 69:5,10,19
70:7,8 72:2 73:7,13
73:17 75:18 79:18
80:7 81:24 84:21
86:5 88:23 89:3
91:18 94:6 97:14
98:3 100:14 102:5
102:9 103:14 106:2
109:3 112:25 117:8
122:7 129:7,13
133:8 134:5 136:17
139:23 142:23
telling 39:14 42:1,7
65:20 66:5 108:2
108:10 111:2 144:1
ten 5:12 40:7 145:4
tend 70:15
term 9:6 28:20
34:18,20 85:8
132:3 145:24
terminated 43:13
terminology 53:24
test 69:13 83:13,14
tested 68:13
testified 4:4 12:13
57:12 119:25 120:9
120:14,19 126:5
testify 9:19
testimony 5:21
88:5,7 149:10
testing 60:20 61:10
tests 135:23,25
thank 36:13 115:14
120:3 131:23
146:24,25

[thanks - two]                                                                    Page 173

thanks  44:9
tharsey  82:12
thing  25:1 44:7
  49:24 55:24 62:8
  69:8 89:20 95:14
  99:18 112:22
  116:13 122:13
  123:9
things  18:1 51:3
  54:23 69:10 77:6
  83:16 87:23 95:19
  109:11 130:13
  143:18
think  7:17,17 9:7,8
  18:24 40:11 43:11
  50:12,22 57:3,12
  61:6 62:24 66:13
  68:15 77:15 79:10
  89:6,20 90:12 93:3
  103:8 106:16
  109:19 110:5
  116:17 128:24
  131:1 133:13,21
  135:4,7 138:19
  142:7,9,10
thinking  6:23 62:8
  113:22
third  131:25 133:4
thought  16:8 18:1
  33:23 59:6 62:10
  71:25 72:3 77:17
  87:21 112:19 126:2
thoughts  61:1
thousand  72:7
  74:19
three  8:8 68:7 73:6
  89:25,25 145:1
throwing  53:11
thursday  105:9,20
  109:11

tight  19:22 20:6
time  4:19 5:3,4 7:8
  7:24 10:10,20
  22:22 23:11 31:11
  32:6,24 34:13
  35:18 36:7,21
  40:14 43:15,17
  45:21 50:2 52:6,9
  55:13 58:15 60:4
  60:13 61:8 65:3
  68:21 70:25 71:9
  71:11 72:20 73:11
  74:2,4 77:18 78:13
  78:22 83:13 85:23
  86:12,13 91:6 92:4
  94:23 95:13 101:1
  101:5,7,8 103:10
  104:4 105:6,16
  107:3 109:1,6
  130:25 131:1
  138:11 139:8,9
  146:14,16,18
timeframe  66:25
timely  144:3
times  33:2 36:5
  99:24 101:10,25
  102:2 145:1,4
timing  144:9
tina  5:17 22:21
  25:21 31:10 46:5
  49:23 54:25 58:8
  60:14 62:16,20
  75:19 106:9 115:16
  118:9 122:10
  125:22 129:23
  132:13 142:4
tip  69:16 70:1
today  9:12 17:7
  47:19 51:16 53:22
  86:6 121:10 125:4
  142:23 144:13,23

145:18
told  7:18 20:12,21
  32:1 36:3 39:1,15
  40:25 41:3,4,7,11
  42:15,16 48:13
  52:17 55:14,21,22
  56:23 58:20 61:11
  63:7,8,9,17,20 66:9
  69:22 75:13 88:3
  88:10 91:23 93:21
  98:8 101:2,9 102:3
  102:10,20,20 107:1
  108:3,12 109:4,12
  111:3,18 113:3
  116:15 119:2,10,19
  119:20 120:4,4,10
  120:15,19 125:24
  132:5 139:6 143:15
tombstone  22:4
top  67:8 69:16 70:1
  70:1 76:6,7 93:1
  129:20,21
total  73:4,21
  123:13 143:22
totaled  143:25
totaling  143:20
totally  107:22
touch  104:24
tower  150:1
training  18:5
transcript  4:22
  147:2 149:9,21
  150:13,16,22 151:4
transcription
  149:10
travel  26:19,21
traveled  26:24
treated  19:12,12
  53:6 63:14,18
  88:12,16 107:1,24

treating  40:16,18
treatment  92:10
trial  12:13 80:8
tried  23:14
tries  51:6
trouble  74:22
troubling  109:12
true  70:10 108:24
  109:8 149:9 151:17
truth  55:11,15,22
  56:6,15,24 63:17
  72:3 73:7 99:17,17
  100:2,3,10,13
  102:20,20 112:11
  112:12,25 113:3
  117:6,6,7,21,23,25
  117:25
truthful  113:23
  117:22,22
truthfully  9:19
  55:13,14,16
try  5:2 106:20
  119:18 139:10
trying  31:23 33:3
  39:17 46:25 62:4,6
  76:14 82:20 106:10
  110:11 123:8,8,25
  128:19 129:11
  130:13,17,24 131:4
turned  14:12 16:6
  22:1
tv  10:24
twice  36:6 52:7
two  4:19 5:19 9:10
  15:25 16:11 24:8
  37:24,25 43:19
  56:18 76:3 92:21
  99:13,22 100:6
  112:3,18 116:21
  117:16 118:5
  119:23 145:16

[type - witness]                                                                              Page 174

type  12:6 28:21
  69:10 125:2
typed  45:5
types  23:25
typically  138:1

**u**

u  82:4,4,13
uh  27:8 35:1 38:1
  48:10 68:1 79:8
  138:3
unable  121:7,10
unclean  89:7 90:5
  134:7,9 135:9
undergo  136:4
undersigned  148:7
understand  5:1
  33:3 34:20 56:17
  58:1 62:6 76:14
  102:18 114:9
  118:14 119:6
  134:24 139:2
understanding
  46:13 87:12 100:5
understood  31:13
underwent  38:5
union  23:21
united  1:1
unpaid  121:13
updated  70:6
upset  41:3,4,5
  42:16 52:16 69:23
  69:24,25 70:5,8
use  76:2
utilize  28:16

**v**

v  150:9 151:2
value  21:19 22:5
  24:20 34:24
various  101:10,25
  102:2

vegetables  77:9
verbal  4:24 5:14
verbalize  4:20
veritext  150:1,15
video  46:8
vinas  1:4,14 3:3,18
  4:2,8,11,12 6:8,15
  6:16 10:5,15,16
  11:6 18:20 19:9
  22:8 23:3 24:12,22
  25:14,17 26:9,19
  27:17 28:3,8 29:9
  31:15,16 37:2,5,8
  37:22 38:4,22
  39:14,20 40:21,24
  42:1,7,15 43:1,8
  44:3,11,19 46:17
  46:20 47:17,22
  50:13 51:2,11,25
  52:14,24 53:22
  54:20,22 57:18
  58:6,20 60:11
  62:25 63:20 65:5
  68:11 69:3,22
  77:13,24 78:6 79:4
  84:23 85:5 86:16
  86:25 87:3 88:5
  92:9 94:8 96:15
  104:25 105:4 112:2
  112:5 115:10,22,24
  116:5 117:14
  118:15,17,25
  119:25 130:1 132:9
  132:10 133:3
  135:17,21 136:4
  138:10,14,17,21
  139:5 145:7,13,24
  146:3 150:5,9,10
  150:12 151:2,2,19
vinas's  5:14 12:2
  18:13 26:2 31:2,4

40:14 44:12 47:14
  57:14 64:23 116:20
  120:6
violation  129:18
violations  3:21
visit  63:1 73:14
visits  136:5
vs  1:6

**w**

wait  4:17 5:6 71:9
  71:11 143:7
waited  59:13
waived  147:2
  150:21
walk  30:2
want  5:3 6:23 7:25
  13:14,15 17:10
  22:13 32:3 41:15
  45:14 46:24,24
  49:23 50:11 54:15
  57:13 59:12 61:17
  73:10,14,20 74:18
  80:24 81:24 82:25
  84:24 89:12 91:15
  93:8 95:16,17
  113:9 115:1 116:14
  117:9,9 118:13,16
  119:4,6 123:2
  125:23 131:3,14,19
  134:1,5,11,14
  144:19 146:25
wanted  14:24
  19:13 20:14 23:15
  28:22 32:5,11 63:9
  63:10 67:18 69:8
  81:2 98:25 99:7,11
  100:9 110:18 113:4
  117:2
wants  7:3 106:17
  129:9 130:6

waste  91:6
watching  5:20
way  59:23 60:15
  73:1 88:23 89:3
  91:14 102:24
we've  40:3 62:3,3
  116:7 119:3 121:15
  121:18 125:14
  135:14 137:1,12
  139:1
wedding  7:7,7,9,11
  7:21 14:13
wednesday  105:10
  105:21
week  17:14 83:14
  94:25 105:5,15,17
weight  69:20
welcome  146:14
went  10:9 13:5
  16:11 26:22 30:16
  33:24 41:2,5 52:16
  52:17 53:10 55:7
  63:12 64:13 67:2
  68:2,6,17 70:5
  71:22 76:10 78:20
  83:9 86:25 89:23
  90:9,11 135:21
whatsoever  9:20
  125:5
whoa  141:7,7
widow  6:11 8:5
  16:14,15 71:17
wife  68:9 70:13
  113:7
willing  60:18
witness  3:2,7 4:3,5
  7:5 13:16,18 18:22
  19:6 21:7 22:24
  36:11 43:5 50:12
  54:2,5,8,13 62:19
  67:14 74:3 75:22

**[witness - zuckerman]**

75:24 80:4 81:6
82:4,6 89:17 90:19
90:23 91:20 92:1,4
93:15 95:20 106:4
106:8 109:18 110:1
114:16 115:13
116:17 118:14,20
119:16 122:15
125:19 127:13
129:11 130:9,16
133:25 145:4
148:12 149:10
**witness's** 60:21
89:12
**witnesses** 50:15
119:4
**wolf** 82:20
**word** 67:17 89:21
89:25 93:5
**words** 97:12
**work** 38:22 126:22
130:14
**worked** 117:4
**worker** 11:11,12,14
11:17
**working** 11:10
38:21 84:9 124:6
**worry** 18:23
**worth** 47:7 72:4
**would've** 113:18
**write** 41:25 42:6
78:24 79:2 82:21
96:6,6 109:2,16
117:5,6,6 151:4
**writing** 45:2,11
66:23 108:9
**written** 42:9 54:23
80:18 90:25 91:3
93:2 130:24
**wrong** 47:1 107:22
107:22

**wrote** 17:25 46:3
60:7 96:8 98:5
104:12 111:1

### y

**y** 82:12
**yeah** 51:15 56:15
70:19 92:22 129:25
136:8 138:9 139:3
**year** 7:15 10:9 13:1
16:18 22:20 24:6
25:3 30:3 40:20
74:7 78:25 94:1
123:23 126:23
128:2,9 138:4
**years** 5:12,12 6:13
7:14 9:8 10:4,10,17
11:1,18 15:25 16:2
16:4,6,7,11 21:17
21:18 24:8 26:22
28:9 29:1 33:23
34:11 37:24,25
40:2 73:6,6 81:15
99:13,22 100:6
112:3,18,21,22
116:22 117:16
118:6 119:23 141:1
141:12,19 142:2,10
144:14
**yonkers** 9:25 10:1
**york** 10:1,6,7,9,22
15:10,11,14 16:7
16:13 23:12 28:13
37:20,21,23 38:14
38:22
**young** 98:1,19
113:7

### z

**z** 6:9
**zoom** 1:11 2:1
148:9

**zuckerman** 2:3
150:6

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foreging transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.