UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

Case No.:  1:18-CV-24100-COOKE/
GOODMAN

DIGNA VINAS,

     Plaintiff,

vs.

THE INDEPENDENT ORDER
OF FORESTERS,

     Defendant.

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS AND ADDITIONAL FACTS IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT STATEMENT OF MATERIAL FACTS[1]

### Procurement of the Certificate

1.    Disputed.  R. Foresters provides no evidentiary support for its proposed Undisputed fact.  Further, the e-signed document itself gives no indication who completed either the form or the overflow portions (which Foresters did not provide). (Ex A, "Application with Overflow Materials," at 9-11). The evidence has established Jazmin Lightbourne, Foresters' sales agent completed at least some parts of the application. (Ex. B, October 16, 2020 Deposition of Digna Vinas ("Vinas Depo"), at 44-45; see also Ex. C, Supplemental Diabetes Questionnaire, at 2 (referring to Mr. Vinas not in first person, but as "proposed insured")).

---

[1] As Vinas has advised the Court previously, Foresters has continued to litigate the liability portions of the Breach of Contract matter despite its having admitted its breach and confessed judgment.  (D.E. 125, at 3-4) As such, a large number of facts set forth by Foresters are simply irrelevant to the remaining fraud liability issues and breach of contract causation/damages issue.  Vinas will indicate this by including an ("R") after designated irrelevant assertions.

2.      Disputed as phrased with respect to "aimed at ascertaining" and with respect to materiality.  R.  In fact, Foresters' Corporate representative ("CR") testified Mr. Vinas' medical records did not reveal a condition or issue that was material to issuance of the policy and yet, Foresters denied the claim wrongfully asserting "material information" was withheld. (Ex. D, March 4, 2020 Deposition of David Sullivan ("Sullivan Depo"), 226-231, 400-02).

3.      Undisputed. R.

4.      Undisputed with the understanding Mr. Vinas also then expressly advised Foresters that in response to misinformation (apparently from an inaccurate Medical Information Bureau data base), his doctor told him he did not have diabetes. (Ex. E, "Underwriting Materials, at 9; Ex. C, diabetes questionnaire, at 2). R.

5.      Undisputed, to the extent Foresters refers to signing the Application when it uses the word "declared."

6.      Disputed to the extent Foresters has not offered any evidence in its Motion supporting this point. R. Some of the records in Foresters file, however, suggest this occurred which then led to the information in Point 4 above.

7.      Disputed.  R. Foresters has produced no evidentiary support for its suggestions that the reason he was asked to complete a diabetes questionnaire was any MIB hit.  The word "Accordingly" implies a causal connection where none is demonstrated. Undisputed that Foresters through its sales agent Jazmin Lightbourn requested a Diabetes Questionnaire to be completed.

8.      Undisputed. R.

9.      Undisputed. R.

10.     Disputed that Mr. Vinas responded.  The sales agent appears to have completed the "additional information" section of the questionnaire.  (Ex. C, at 2 (referring to Mr. Vinas not in first person, but as "proposed insured"); Ex. B, at 44-45).

11.     Undisputed.

12.     Disputed.  R. First, Foresters provides no evidentiary quality support for its proposed Undisputed fact.  The Diabetes Questionnaire, (which is not explicitly referenced at Foresters' citation), does not contradict the MIB error, it explains it and advises that Mr. Vinas did not have diabetes.  (Ex. C, at 2).

2

13.     Disputed.   R. Foresters provides no evidentiary support for its proposed Undisputed fact. It is further disputed that the MIB hit was the reason Foresters sent any letter.  As the notes at Foresters' citation reveal, Mr. Vinas had already contacted Foresters advising that he had checked with his doctor and he did not have diabetes.

14.     Undisputed that Mr. Vinas provided a letter to Foresters through its sales agent. (Ex. B, Vinas Depo, at 42).

15.     Disputed as phrased because the second sentence is a statement of law that has no place in a statement of material facts under S.D. Fla. L.R. 56.1.  It is undisputed that Foresters approved the application after learning the fact that the MIB reference was not accurate and that Mr. Vinas' doctor advised (and provided a letter advising that) he did not have diabetes.

16.     Disputed whether the contestability clause is "consistent with Fla. Stat. § 627.255" as an issue of law that has no place in a statement of material facts under S.D. Fla. L.R. 56.1.  Undisputed that the Certificate language is accurately quoted.

17.     Disputed as phrased.  Foresters' characterization of "merger clause" is not an adequate substitute for the relevant language: "No one, including the producer who provided you with this certificate, can make a promise or representation about the entire contract other than what is described in the entire contract."  (Ex. F, Certificate, D.E. 94-1, at 10).

<u>**Plaintiff's Claim for the Death Benefits**</u>

18.     Undisputed.

19.     Disputed.  Foresters both in this document and the Motion has consistently misdescribed Jazmin Lightbourn as an "insurance broker".  Foresters provides no evidentiary support for its proposed Undisputed fact as phrased. While this may end up being a question of fact to be resolved by a jury, Foresters' own CRs as well as numerous documents from Foresters' own Production File expressly describe Ms. Lightbourn as an "agent" or "sales agent." (Ex. G, October Deposition of Doug Parrott ("Parrott Depo"), at 39-40, 92-93; Ex. H (Production File) at 18, 19, 52, 153, 154, 159 and 160). Foresters' entire sales force is composed of agents that Foresters intends customers to consider as Foresters' representatives, without reference to their employment status. (Ex. G, Parrott Depo at 92-93).  As most relevant here, Foresters fully authorizes its agents to make accurate representations about the policy terms.  (<u>Id.</u> at 40-41). Moreover, the evidence does not support the characterization

that she was a mere "broker" with no legal agency relationship to Foresters. Undisputed the claim information was initially provided to Foresters through it agent Ms. Lightbourn.

20.     Undisputed.   The letter contains additional information as well, but the information included in this was stated.

21.     Disputed.   R. First, Foresters provides no evidentiary support for its proposed Undisputed fact as phrased that the medical records were "incomplete".   This is especially curious because, despite having an unlimited medical authorization, Foresters never obtained any other set of medical records from Dr. Hershman, the individual whom they relied upon to deny this claim and attempt rescission. Further, Foresters' characterization of the records Mrs. Vinas voluntarily gave as "incomplete" implies both that Vinas was under some duty to provide medical records or an intent to provide less than complete records.  The evidence is exactly the opposite – that Mrs. Vinas sent Foresters all the records Dr. Hershman provided. (Vinas Depo, Ex. B, at 98).

22.     Disputed.  The cited material does not indicate that the underwriter reviewed and evaluated the relevant records, much less when she did so.  Moreover, the term "conflict of interest" does not describe the situation that arises when the same underwriter both issues the policy and later conducts the contestability review to determine whether an error is material for recission purposes. Avoiding such a "conflict of interest" does not signal any virtue on Foresters' part.  In fact, the allegedly "conflict free" post claim underwriter made a huge mistake in Foresters' favor when she indicated the allegedly omitted facts were material to the issuance of the policy when they in fact were not!  (Sullivan Depo., Ex. D, at 393, 400-01).

23.     Disputed.  The exact opposite is true.  The evidence is undisputed that Foresters claims department never "determined that Mr. Vinas knew and believed he had diabetic-related conditions." Lisa Buckland, the claims adjuster actually reviewing Vinas' claim, and who recommended denying it, testified she did not review Mr. Vinas' claim with an eye towards his best knowledge or belief; "it wasn't a question of what [Mr. Vinas] knew or not, it was what the diagnosis was."  (Ex. I, March 4, 2020 Deposition of Lisa Buckland ("Buckland Depo"), at p. 56, l. 9-11). She stated that she would nonetheless "do up a recission letter and send it up to management for review" without first making a "determination whether the insured knew of the condition."  (Id. at p. 20, l. 23-25). Ms. Buckland further

stated "The only evidence in [Foresters'] claim file . . . was that [Mr. Vinas] was told by his doctor that he did not have diabetes." (Id. at p. 35, l. 20-25). For all these reasons, this fact is disputed.

24.   Disputed. First, Dr. Frager's report is not admissible as competent summary judgment evidence as it is not sworn to. Fed. R. Civ. P. 56(c)(1)(A); Jones v. Menard, 559 F.2d 1282, 1286 n.5 (5th Cir. 1977). Second, Dr. Frager's opinions are inadmissible. (See generally D.E. 130 (Plaintiff's Daubert Motion)). Third, it is disputed that the report is relevant or material, because it seems to opine what would have been "reasonable" for Dr. Hershman to assume. Apart from the fact that what Dr. Hershman assumed or didn't is totally irrelevant to whether Foresters committed fraud when it sold this policy, the concept of Dr. Hershman's "reasonableness" is not an element to fraud, causation, damages or any other remaining issue in this case.

25.   Disputed that the incontestability underwriter "determined" the "accuracy of Mr. Vinas' answers". By Foresters' own admission, accuracy was to be determined by evaluating Mr. Vinas' BK&B. (Ex. G, Parrott Depo, at 85-86). As advised above it is undisputed that Foresters never looked into, much less determined Mr. Vinas' BK&B, and that the underwriter incorrectly concluded that Foresters would have declined coverage. Again, as shown above, Foresters' CR testified the policy would have been issued anyway. (Ex. D, Sullivan Depo., at 393, 400-01).

26.   Disputed as phrased. Foresters produced no evidence that the amount of premiums paid was $11,448.00. Foresters' answer is also subject to clarification for completeness. In the denial letter Foresters took the position that "Mr. Vinas had been diagnosed as having Diabetes at the time the application was taken," and that "his then-present diagnosis of Diabetes should have been disclosed at the time the application and questionnaire was completed." (Ex. J, "Denial Letter," D.E. 61-6, at 2). Foresters did not purport to have investigated or determined Mr. Vinas' best knowledge and belief. (Id.). Foresters also incorrectly claimed that "[h]ad accurate and complete information regarding Mr. Vinas' health and medical treatment been disclosed at the time the application and questionnaire was completed, the certificate would not have been issued as applied for." (Id.).

## The Action

27.     Undisputed.

28.     Undisputed.

29.     Disputed and R as to Foresters' hyperbolic and blatantly false characterization that it was "stonewalled at every turn" by "meritless" objections.  Foresters did virtually zero discovery throughout the first sixteen months of this case.  It didn't depose Dr. Hershman and did not subpoena his records until February 18, 2020.  Similarly, it was not until February 5, 2020 that Foresters sent its first set of discovery to Vinas.   It didn't depose Mrs. Vinas until literally the day of fact discovery cutoff, October 16, 2020. (Ex. B, Vinas Depo, at 1; D.E. 92, at 2).  It didn't depose Ms. Lightbourn.   Further, all of this was AFTER Foresters had supposedly done its allegedly full contestability investigation … the investigation that never bothered to investigate Mr. Vinas' BK&B.  It is obviously disputed that Vinas' objections were without legal merit. The Court never ruled on the issues because Foresters confessed judgment to Count I (Breach of Contract), rendering further discovery moot.  (D.E. 69, 71).

30.     Disputed and R as to continuing inappropriate characterizations of Mrs. Vinas' discovery objections as "meritless" and "frivolous."   Disputed that Foresters has shown that the charges in Mrs. Vinas' Civil Remedy Notice ("CRN") were "without basis;" Foresters escaped a ruling on this by confessing judgment on Count I (Breach of Contract).

31.     Undisputed R.

32.     Disputed.  Foresters suggests (by using the word "finally") that Dr. Hershman's letter provided information that Foresters didn't already have or couldn't have obtained on its own through discovery, use of medical authorization or a phone call.  This is absolutely false and is fully addressed on pages 18-19 of the Response to Foresters' motion for summary judgment, which Foresters could have obtained through the medical information release, (D.E. 127-9, at 35), and in any event was merely cumulative of the letter he submitted five years earlier when Mr. Vinas applied for the policy. (D.E. 127-4, at 2).

33.     Disputed. Foresters' characterization that interest on the death benefit was paid "to compensate Plaintiff for any damages she may have experienced between her loss and the settlement" is incorrect.  Interest compensates for the time value of money, not any other damages.  Wiand v. Lee, 753 F.3d 1194, 1205 (11th Cir. 2014).

34.     Undisputed.

35.     Disputed.  Foresters does not show that "repayment was not required as the money was gifted and not loaned," as intent to give a gift is a question of fact.  Mrs. Vinas repeatedly stated that she <u>borrowed</u> money from her friends and family.  (Vinas Depo, Ex. B at 71-72; <u>see also</u> at 81 ("They gave it to me, but I had to pay it back.").  Also, Foresters' characterization of the mortgage as not being "due" implies that she should have spent the death benefit some other way.  In fact, the very reason Mr. and Mrs. Vinas bought a Foresters' life insurance policy in connection with taking a mortgage on his house, so that the newly-taken mortgage could be paid in the event of Mr. Vinas' untimely death.  (<u>Id.</u> at 33).

36.     Disputed as phrased.  On March 16, 2020, immediately upon returning from the initial depositions of Foresters' CRs in Toronto that provided the initial evidence of Foresters' fraud, Vinas filed a Motion for Leave to File a Second Amended Complaint.  (D.E. 55).  Foresters strenuously objected, including prolonging the briefing process by seeking a sur-reply.  The Court granted the Motion, and the Second Amended Complaint was filed on August 4, 2020.  (D.E. 87 (July 16, 2020 Sur-Reply); D.E. 90 (July 23, 2020 Order Granting Leave to File)).

37.     Disputed that a Local Rule 56.1 "Statement of Material Facts" is the proper vehicle for Foresters to make supplemental argument in support of its still-pending Motion to Dismiss the Second Amended Complaint (D.E. 95), much of which merely echoes Foresters' long-denied Response (D.E. 72) and Sur-reply (D.E. 87) opposing Ms. Vinas' request for leave to file the Second Amended Complaint.  Disputed that Mrs. Vinas' request for consequential damages in the Second Amended Complaint is deficient in any way.  Disputed that the distinction between interest and fees on a cash advance as opposed to purchases are material in any way.

38.     Disputed that a Local Rule 56.1 "Statement of Material Facts" is the proper vehicle for Foresters to make supplemental argument in support of its Opposition to Ms. Vinas' Motion to Amend by Interlineation.  (D.E. 121).  Disputed that Mrs. Vinas' motion (D.E. 120) is "meritless."  Disputed as to characterization that there is "a new claim against Foresters based on agency theory" to the extent Foresters attempts to suggest its liability is derivative.  Foresters has always been alleged to be actively and completely responsible for Count III (Fraud in the Inducement). Mrs. Vinas simply alleges a second representation made

by Foresters through its sales agent; it does not suggest that Foresters is an innocent party who should nevertheless be held legally responsible for her conduct.

## ADDITIONAL FACTS

### Facts Referenced in the Response to the Motion for Summary Judgment

39.     CR David Sullivan provided testified that based upon facts <u>already in Foresters' file in 2017</u>, Mr. Vinas' best knowledge and belief ("BK&B") <u>was that he did not have diabetes and that the claim should not have been denied.</u> (Sullivan Depo, Ex. D, at p, 122 l. 25- p. 23 l. 20; p. 140 l.22-p. 144 l. 25; p. 197 l. 17-22; p. 299 l. 7-p. 300 l.3; p. 345 l. 20-23).

40.     Mr. Sullivan further testified that nothing in Mr. Vinas' medical records was material to Foresters' assumption of the risk. (Sullivan Depo, p. 400, l. 19-p. 401, l. 11). Even if Foresters had obtained the documents during the underwriting period, the underwriting guidelines directed that the certificate should issue anyway because a 73-year-old man with diabetes and peripheral sensory neuropathy was within the 100-point buffer. (<u>Id.</u> at 393 (no indication of autonomic neuropathy), 400-02, 411 (no indication of diabetic nephropathy); Ex. K, "Underwriting Guidelines", at 5, 7 (+25 points for diabetes and up to +50 for peripheral sensory neuropathy)).

41.     Before Foresters confessed judgment and paid the death benefit with interest shortly after the Sullivan deposition, Mrs. Vinas cashed in her own life insurance, and also sold jewelry (including wedding bands) to ensure that her mortgage payment was covered. (Vinas Depo, D.E. 127-14, at 14; Ex. L (List of Consequential Damages)).  The face value of her policy was $100,000; she cashed it in for $8,106.40.  (<u>Id.</u> at 21-22).

42.     Bank of America demanded payment of $11,810.37 (Ex. M, "Consequential Damages Materials," at 1) because she could not repay a short-term loan for $10,400.  (Vinas Depo, Ex. B at 12-13).

43.     Foresters understands that additional expenses arising from unpaid bills, foreclosures, and attorney fees are all natural and reasonably expected consequences of failure to pay death benefits when due.  (Sullivan Depo., Ex, D, 404-06; <u>see</u> <u>also</u> D.E. 128, at 11 (observing that the "very purpose of life insurance is to provide a sanctuary from the rigors and <u>uncertainties</u> of age, unemployment, and other disabilities that eventually incumber all flesh, and to <u>provide some assurance that those dependent on the insured will at least have bread when he is gone.</u>").

44.      Foresters does not want its customers to know that its "independent agents" are anything other than a representative of Foresters.  The "insured is not expected to distinguish between whether that person is technically employed by an intermediate agency," and "that's the way Foresters wants it."  (See Parrot Depo, Ex. G, at p. 92, l. 13 – p. 93, l. 4 )

45.      As far as Mrs. Vinas was concerned, "Jazmin was Foresters.  As far as we were concerned, when we talked to Jazmin, we were talking to Foresters. . ." (Vinas Depo, Ex. B, at p. 114 l. 1-3).  "As far as we were concerned, she belonged to Foresters.  That's it." (Id. at p. 57 l. 7-8).

46.      Ms. Lightbourn was authorized to make truthful representations, such as telling Mr. and Mrs. Vinas that "as long as they tell the truth, 100 percent the truth as they know it, that Foresters will not rescind the policy based upon a contestable claims procedure."  (Parrot Depo, Ex. G, at p. 55 l. 25-p. 56 l. 3).

47.      Foresters' entire sales force is composed of agents to whom it supplies promotional materials, applications, field underwriting guides, and other forms and materials. Id. at 39-40, 92-93).

48.      Foresters' own file materials identify Jazmin Lightbourn as an "agent" in numerous places. (Ex. H, Production File, at pp. 18,19, 52, 153, 154, 159 and 160).

49.      Mr. and Mrs. Vinas asked the sales agent about losing benefits if Mr. Vinas died during the two-year contestability period. (Vinas Depo, Ex, B, at 99). She told them that Foresters would not rescind the policy for material misrepresentation "as long as you put the truth . . . . The only thing, you might have to give more documents, or they might investigate you deeper." (Id. at p. 99 l. 16-19).

50.      Claims Adjudicator Lisa Buckland acknowledged that "The only evidence in [Foresters'] claim file . . . was that [Mr. Vinas] was told by his doctor that he did not have diabetes." (Buckland Depo, Ex. I, at p. 35 l. 20-25).

51.      Ms. Buckland did not review the claim with an eye towards Mr. Vinas' best knowledge or belief; "it wasn't a question of what [Mr. Vinas] knew or not, it was what the diagnosis was."  (Id. at p. 56 l. 9-11).

52.      It also was not part of the "normal process" to review the file for indications of an insured's best knowledge and belief.  (Id. at p. 53 l. 13-24).

53.    Ms. Buckland admitted that she usually "would do up a recission letter and send it up to management for review" anytime an application question seemed incorrect, without first making a "determination whether the insured knew of the condition." (Id. at p. 20 l. 17-25).

54.    CR Doug Parrot testified that if he were to discover that the claims department had not tried to determine Mr. Vinas's best knowledge and belief, he would "have a problem with that," because Foresters' "standard for accuracy" during the contestability claim is "the insured's best knowledge and belief, whether they are telling the truth or not." (Parrott Depo, Ex. G, at p. 85, l. 5-p. 86, l. 23).  Processing claims under different terms than the policy was sold would be selling the policy "under, let's say, false pretenses or with a representation that wasn't true … [it] would not be in line with who we are" as a company.  (Id., at p. 86, l. 2 – l. 23).

55.    At Foresters, the sales and marketing departments have no actual knowledge of how the claims and underwriting departments address the "best knowledge and belief" requirement in the Application.  (Parrott Depo, Ex. G, at 35-36, 63-64, 96).

56.    Foresters' sales department does not train sales agents on how Foresters applies the best knowledge and belief clause.  (Id. at 64-65).

57.    The last information in Foresters' files indicated that Dr. Hershman "concluded the proposed insured did not have diabetes." (Sullivan Depo, Ex. D, at p. 131 l. 20-25).

### Foresters Convinces Mr. and Mrs. Vinas to Switch

58.    Mr. Vinas mortgaged his home in 2015.  Vinas Depo, Ex. B, at 29).  The mortgage company recommended mortgage life insurance, and gave him the names of a few companies, including Foresters.  (Id. at 29, 31-32).   Mr. Vinas contacted Foresters using the information the mortgage company provided and was contacted by Jazmin Lightbourn.  (Id. at 29).

59.    Foresters intends that customers consider its sales agents to be Foresters' representatives, without reference to their employment status.  (Id. at 92-93).  Foresters authorizes its independent agents to make accurate representations about the policy terms. (Id. at 40-41).

60.     Mr. and Mrs. Vinas sat with the sales agent at their kitchen table to discuss the policy.  (Id. at 32-33).

61.     Initially, Mr. Vinas planned to purchase a supplemental mortgage life insurance policy with limits equal to the amount of the mortgage:  $42,000.  (Id. at 33).

62.     The sales agent informed them that, unlike their existing $100,000 policy, Foresters offered a product that did not raise his premiums at age 80.  (Id.; see Ex. A, at 11). The Foresters monthly premium was "a lot more" than the $229 premium that American General charged.  (Id. at 34; Ex. A, at 7 ($477)).

63.     Mr. and Mrs. Vinas came to the joint decision to switch to Foresters and cancel their existing insurance. (Vinas Depo, Ex. B, at 48 (explaining that "we got to the decision . . . that we were going to cancel" their existing insurance made the decision)).

### Foresters Issues Mr. Vinas a Policy

64.     Mr. and Mrs. Vinas sat at the kitchen table with the sales agent, who completed the application.  (Id. at 36, 44-45).

65.     To contact them, Mr. and Mrs. Vinas gave their joint email address.  (Id. at 47).

66.     Foresters' New Business + Underwriting notes indicate that the sales agent investigated and then "called in to advise PLI [Mr. Vinas] does not have diabetes."  (Ex. E, at 1).  He had "completed an exam for insurance in 2012 when the examiner advised [him] that he has diabetes." (Id.).  Mr. Vinas "went to see Dr and was advised that[sic] does not suffer from Diabetes." (Id.).  Accordingly, he "maintains no to Q 25H [sic] and 3." (Id.).

67.     The sales agent was advised to "re-ask question 24H on the application and have him complete the Diabetes Questionnaire."  (Id.).

68.     The underwriter determined that the record did not indicate diabetes. (Id. at 9).

69.     Moreover, even if Mr. Vinas had diabetes in 2010 as the MIB hit indicated, "even longer duration dm hx [i.e, an even longer history of diabetes melitus] is maybe +50" risk rating points.  (Id. at 9).

70.     The result was still "under the +100 buffer" for this product, so the policy was issued.  (Id.).

**In Addition to Not Investigating BK&B, Foresters Misapplies its Own
Underwriting Guidelines During the Contestability Review.**

71.     After Mr. Vinas' death from a heart attack on January 11, 2017, Foresters automatically contested the certificate because he died within the contestability period and his policy did not require payment of interest upon recission, merely return of premiums. (Sullivan Depo, Ex. D, at 260).

72.     Foresters' underwriting department wrote that "Had we been aware of the Applicant's history of diabetes complicated by disorders of the circulatory system and the kidneys we would have declined to issue coverage." (Ex. H, at 234).

73.     Until his deposition March 4, 2020, Mr. Sullivan had never gone through the process of rating Mr. Vinas' Application to determine whether it should have issued. (Sullivan Depo., Ex. D, at 407).  On April 3, 2020, Foresters agreed to tender the death benefit with interest and conceded Mrs. Vinas was entitled to attorney fees.  (D.E. 69).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY a true and correct copy of was filed with the Clerk of this Court via the CM/ECF filing and that a copy has been sent via electronic mail this 23rd day of December, 2020 to Kristina B. Pett, Esq. Kristina.pett@mhllp.com and Danielle Shure, Esq., Danielle.shure@mhllp.com, McDowell, Hetherington, LLP, 2101 N.W. Corporate Blvd., Suite 316, Boca Raton, FL  33431.

KRAMER, GREEN, ZUCKERMAN,
GREENE & BUCHSBAUM, P.A.
Co-Counsel for Plaintiff
4000 Hollywood Blvd., Suite 485-S
Hollywood, FL  33021
(954) 966-2112 – phone
(954) 981-1605 - fax

By:     ___/s/ Craig M. Greene___
Craig M. Greene, Esq.
Fla. Bar No. 618421
cgreene@kramergreen.com

and

Adrian Neiman Arkin, Esq.
MINTZ, TRUPPMAN, P.A.
Co-Counsel for Plaintiff
1700 Sans Souci Boulevard
North Miami, FL  33181
(305) 893-5506 – phone
adrianarkin@mintztruppman.com