UNITED STATES DISTRICT
COURT SOUTHERN DISTRICT OF
FLORIDA

MIAMI DIVISION

Case No.:  1:18-CV-24100-COOKE/
GOODMAN

DIGNA VINAS,

      Plaintiff,

vs.

THE INDEPENDENT ORDER
OF FORESTERS,

      Defendant.

_____ *I*

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Plaintiff, Digna Vinas ("Mrs. Vinas"), pursuant to Fed. R. Civ. P. 56 and S.D. Fla. L.R. 56.1, hereby files her response to the Motion for Summary Judgment (D.E. 128) filed by Defendant, the Independent Order of Foresters ("Foresters"), and incorporated Memorandum of Law:

## I.    INTRODUCTION

This case is so replete with issues of material fact that Foresters' motion for summary judgment is borderline frivolous. Foresters denied Mrs. Vinas' claim for $92,000 in life insurance benefits and only relented three years later, after its Corporate Representative ("CR") provided devastating testimony that based upon facts <u>already in Foresters' file in 2017</u>, Mr. Vinas' best knowledge and belief ("BK&B") was that he did not have diabetes and that the claim should not have been denied. (D.E. 134-4 at p. 2, l. 25-p. 123, l. 20; p. 140, l. 22-p. 144, l. 25; p. 197, l. 17-22; p. 299, l. 7-p. 300, l. 3; p. 345, l. 20-23). The CR further buried Foresters' case when he testified that nothing in Mr. Vinas' medical records was material to Foresters' assumption of the risk. (D.E. 134-4, p. 400, l. 19- p. 401, l. 11). In other words, Foresters could not defend its denial or prove either of the elements for rescission. <u>Dorton v. Jensen</u>, 676 So. 2d 437, 439 (Fla. 2d DCA 1996). The proverbial straw that broke the insurer's

back was, despite contractual and legal requirements that Foresters evaluate contestability claims by determining the insured's BK&B at the time of application, Foresters admitted it never made such a determination in Mr. Vinas' case, and, in fact, doesn't investigate an insured's BK&B <u>at all</u>. <u>That's</u> when Foresters paid the claim.[1]

Foresters now feigns surprise that following its breach, Mrs. Vinas, a fixed-income elderly widow, has suffered consequential damages from not having the life insurance benefit she and her husband planned for in the event of just this contingency. There is no "windfall recovery," as Foresters so callously charges, in awarding consequential damages to pay for what it openly admits are the all-too-foreseeable damages.

Foresters' argument that Vinas' Fraud in the Inducement Count is nothing but a bad faith case in disguise is both legally and factually unsupported. While Foresters' <u>claim</u> conduct would have likely supported a bad faith action, the Fraud in the Inducement case is not based upon its <u>claim conduct</u>. It is based upon Foresters' conduct and deceit <u>at the time of sale of the policy</u>. Foresters' <u>liability</u> on Count I is over, leaving only the issues of causation, damages, and partial entitlement to fees remains. The only <u>liability</u> issue being litigated is with respect to Count III Fraud in the Inducement.

With respect to Count III, not only does Mrs. Vinas have standing to bring a Fraud cause of action, Foresters has completely failed to satisfy its heavy burden to show the absence of questions of fact to prevail on summary judgment. This explains why, despite being the movant on this motion, Foresters fails to cite any record evidence to support its numerous claims of "lack of evidence" or "no question of fact". While not her burden, as Vinas will show, the combination of direct and circumstantial evidence is overwhelming on the issues of fraud, intent, agency, reliance, and the foreseeability of consequential damages. All of these present more than sufficient genuine issues of material fact for a jury to assess. Foresters is not entitled to summary judgment.

---

[1] Foresters' representation that Vinas provided some allegedly new information in 2020 that it didn't have before is utter bunk. This issue is addressed in detail on p. 17 *infra* with respect to additional evidence of actual fraud.

## II.   ARGUMENT AND MEMORANDUM OF LAW

### Summary Judgment Standard.

As the movant, Foresters must shoulder the burden to "'demonstrate the absence of a genuine issue of material fact.'" Balthazar Mgmt. v. Beale St. Blues Co., Inc., 17-CV-81214, 2018 WL 8221675, at *3 (S.D. Fla. Oct. 17, 2018) (quoting Shiver v. Chertoff, 549 F.3d 1342, 1343 (11th Cir. 2008)). A mere conclusory statement that the nonmovant cannot meet the burden of presenting evidence of issues of material fact at trial is insufficient. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The facts should be construed in favor of the nonmoving party, who receives the benefit of every reasonable inference. Bradley v. Franklin Collection Serv., Inc., 739 F.3d 606, 608 (11th Cir. 2014).

As regards fraud specifically, the Eleventh Circuit has recognized that summary judgments in fraud cases are usually improper, "as the issue so frequently turns on the axis of the circumstances surrounding the complete transaction, including circumstantial evidence of intent and knowledge." Glob. Quest, LLC v. Horizon Yachts, Inc., 849 F.3d 1022, 1029 (11th Cir. 2017). Indeed, the elements of fraud, "particularly including intent and knowledge" of the defendant, often cannot be proven by direct evidence. Id. at 1030.

### Foresters Is Not Entitled to Summary Judgment
### On Count I (Breach of Contract). [2]

Two years after suit had to be filed to recover benefits, and in response to devastating admissions made by its Corporate Representatives and employees during their depositions, Foresters was ultimately forced to pay Vinas' death benefit. Under Florida law, Foresters' payment was the functional equivalent of confessing judgment against it. Wollard v. Lloyd's & Cos. of Lloyd's, 439 So. 2d 217, 218 (Fla. 1983) (holding that voluntary payment of insurance proceeds after litigation begins "is, indeed, the functional equivalent of a confession of judgment or verdict in favor of the insured.")

While it is undisputed that Foresters breached the contract, and Count I's liability issue is therefore over (the presence of a contract and its breach), the issues of causation and

---

[2] Plaintiff understands so much of Foresters' Motion is irrelevant discussion of Count I liability issues that Foresters has already admitted liability for. (D.E. 128, at 4-5). Vinas is nonetheless compelled to respond. Where possible, however, Foresters' numerous improper attempts to re-argue issues either previously ruled on, fully briefed in other pending motions or irrelevant will be addressed only briefly, to minimize continued *ad nauseum* repetition.

foreseeability of consequential damages are still very much alive and being litigated. Specifically, Foresters' refusal to pay consequential damages as a result of its breach as well as challenging Vinas' entitlement to attorney's fees for continuing to litigate the issue, remain disputed. (D.E. 128, at 6). Indeed, the very motion to which this memorandum responds raises questions of law and fact regarding what damages and attorney's fees Foresters will have to pay for its admitted breach. (D.E. 128, at 6).

Foresters' position in the present Motion is not only factually and legally unsupported, it is also directly contradicted by the testimony of its own CRs!  Consider Foresters' statement that the reason it paid the death benefit was because it supposedly received new information in 2020 from Dr. Hershman explaining he did not tell Mr. Vinas that he had diabetes. This is a lie!  See p. 17 -19 *infra*. including n. 8. Foresters should not be heard in its present Motion for Summary Judgment to present an argument that so blatantly contradicts its own CR and employee's testimony.

Additionally, Foresters has admitted that its recission of Mr. Vinas' policy was improper because, contrary to its denial letter, Foresters would have issued the policy even if it had obtained Mr. Vinas' medical history first. As Foresters' CR confirmed, a diagnosis of diabetes would not disqualify Mr. Vinas from the product, which included a 100-point buffer for increased risks. At Mr. Vinas' age, diabetes was worth 50 points, and there was no evidence of complications that could get him to 100 points. (D.E. 134, at ¶ 40). Thus, even if there were errors or omissions in the application (which there were not), such hypothetical omissions were not material to the decision to ensure Mr. Vinas and could not justify recission of the policy. In the face of these admissions, Foresters somehow finds the temerity to contradict its own CR and ask the Court to summarily find that it did not breach the contract Foresters has already admitted to breaching!  The Court should reject such flagrant abuse of the Federal Rules and deny summary judgment as to Count I.

### Foresters Owes Damages That Were Foreseeable Consequences of its Admitted Breach, Preventing Count I from Becoming Moot.

Foresters suggests consequential damages are some rare species of "extra-contractual damages" that cannot be recovered unless the contract specifically permits it. (D.E. 128, at 7). This is wrong. Entitlement to consequential damages for breach of contract has been a well-established principle of contract law since <u>Hadley v. Baxendale</u>, 9 Ex. 341, 156 Eng. Rep. 145 (1854). <u>Hadley</u> has been adopted as substantive Florida law. <u>Life Investors Ins. Co. of</u>

Am. v. Johnson, 422 So. 2d 32, 34 (Fla. 4th DCA 1982). Such damages are clearly available unless limited by contract. Amoco Oil Co. v. Gomez, 125 F. Supp. 2d 492, 511 (S.D. Fla. 2000). In the present case, no such limitation exists.[3]

Contrary to Foresters' assertion, consequential damages would not provide a "double recovery." (D.E. 128, at 11). The interest Foresters paid represents the time value of the unpaid death benefits. Wiand v. Lee, 753 F.3d 1194, 1205 (11th Cir. 2014).[4]Consequential damages, on the other hand, compensate for damages that follow naturally when Mrs. Vinas, newly widowed and on a reduced fixed income, struggled to survive for three years without the $92,000 benefit she and her husband planned on … just in case. Apart from any consideration of interest, the law grants Mrs. Vinas damages that were foreseeable from Foresters' point of view. Vinas has presented affirmative evidence of her consequential damages by way of credit card statements, her own testimony and calculation. (D.E. 134, ¶¶ 41-42). Foresters CR testified that these kinds of damages are foreseeable. (Deposition of David Sullivan, D.E. 134-4, at p. 404, l. 14- p. 406, l. 12).

Consequential damages do not conflict with established principles of contract. (This issue was addressed fully in Vinas' Response to the Motion to Dismiss (D.E. 102, at 4-5, so Vinas will focus on the evidence adduced establishing the damages)). "Contemplation" does not signify parties wracking their brains to ferret out every possible type of damage that might result from a breach. The term "contemplate" is merely shorthand for foreseeability.

> … it was reasonably foreseeable that Mnemonics would cease making payments under the lease if the copiers did not operate properly and were not maintained, as required. It is not necessary to prove that the parties contemplated the precise injuries that occurred so long as the

---

[3] Plaintiff declines Foresters invitation (D.E. 128, at 7-8) to address again whether consequential damages are adequately pled. (D.E. 95 at 8-10; D.E. 102, at 5-7). There is no legal requirement to plead every item of damages with a dollar value. Further, at the Motion for Summary Judgment stage, Foresters has again failed to carry its burden and show the absence of a genuine issue of material fact on this issue.

[4] Foresters suggests that it somehow arrived at the 8% figure out of generosity. (D.E. 128, at 5). In fact, while Section 627.4615 provides for interest based on Moody's Corporate Bond Yield, it also provides that "If the method of calculating such index is substantially changed from the method of calculation in use on January 1, 1993, the rate must not be less than 8 percent." After misleading the Vinases in the sale of the policy and then wrongfully denying her claim, Foresters can hardly be heard to be altruistically giving away money. The limits of Foresters' generosity end at the limits of its potential liability.

> actual consequences could have reasonably been expected to flow from
> the breach

Mnemonics, Inc. v. Max Davis Assts, 808 So. 2d 1278, 1281 (Fla 5th DCA 2002) (Emphasis supplied); see also Bizrocket.com, Inc. v. Interland, Inc., 04-60706-CIV, 2005 WL 8168264, at *4 (S.D. Fla. Nov. 15, 2005) (also applying Hadley v. Baxendale).

The specifics of Mrs. Vinas' consequential damages are exactly what one would expect when life insurance benefits are not paid. She was forced to cash in her own life insurance to pay for her late husband's headstone. (D.E. 134-2, p. 22, l. 1-6). She sold her wedding band to pay the very mortgage that the Foresters policy was supposed to pay off. (Id., p. 14, lines. 9-14 ("I sold jewelry, his wedding bands, my bracelets. I sold my jewelry, but I never missed a payment.")). A collections action was filed when she could not make payments on a short-term loan. (Id., p. 121 l. 21- p. 123 l. 15). None of these consequences are unforeseeable. They are, as Foresters acknowledges in its own memo, the reason life insurance exists.

> [T]he "very purpose of life insurance is to provide a sanctuary from the rigors and uncertainties of age, unemployment, and other disabilities that eventually incumber all flesh, and to provide some assurance that those dependent on the insured will at least have bread when he is gone.

(D.E. 128, at 11, quoting N.Y. Life Ins. Co. v. Kincaid, 122 Fla. 283, 298 (Fla. 1935) (emphasis added)). Holding Foresters responsible for the very damages it forced Vinas to incur is not double recovery. It is justice. See Life Inv'rs Ins. Co. of Am., 422 So. 2d at 34.

Foresters' next argument, that the $43,180 Mrs. Vinas accepted from family and friends was a "gift" with no expectation of repayment (D.E. 128, at 9), is something Foresters can argue to a jury, but it is not a basis for summary judgment. It is too well settled to be disputed that whether something is intended as a gift is a question of fact not suitable for summary judgment. Guthartz v. Park Ctr. W. Corp., 07-80334-CIV, 2009 WL 278960, at *4 (S.D. Fla. Feb. 5, 2009) (citing cases); King v. Estate of King, 554 So. 2d 600, 609 (Fla. 1st DCA 1989) (citing North Shore Bank v. Shea, 148 So. 2d 60 (Fla. 2d DCA 1963)). Similarly well settled as a question of fact is whether damages proximately flowed from a breach. Tardif v. People for Ethical Treatment of Animals, 829 F. Supp. 2d 1219, 1232-34 (M.D. Fla. 2011).

Tellingly, Foresters offers no authority supporting summary judgement on this proposition. Instead, Foresters disguises its lack of authority with unrelated cases from completely different contexts, which merely restate basic principles of summary judgment

6

practice. (D.E. 129, at 9 (citing <u>Bouey</u> and <u>Solliday</u>)). There is no escaping these are consummate questions of fact for a jury.

Foresters next icily argues Vinas failed to mitigate her damages by irresponsibly paying off her mortgage and repaying loans from individuals, rather than other institutions. Even more incredible, Foresters claims that its preferential order of payment entitles it to summary judgment. It does not. Mitigation turns on reasonableness, which is a jury question. <u>Perry v. Schumacher Group of Louisiana</u>, 2:13-CV-36-FTM-29DNF, 2020 WL 6938391, at *4 (M.D. Fla. Nov. 25, 2020). This argument is yet another example that questions of fact abound on this issue, and throughout the case.

Finally, Foresters complains that it lacked notice of consequential damages because initial disclosures it claims were served on March 24, 2020, described the damages as death benefits plus interest, and attorney fees under Section 627.428. (D.E. 128, at 8). Foresters misquoted the record and is simply wrong! The disclosures referred to <u>were served on June 18, 2019</u>. (DE 61-7, at 3). Consequential damages were pled, without objection, in the Amended Compl. on September 9, 2019. (D.E. 33; <u>see</u> D.E. 31, at ¶ 2 ("Vinas seeks leave to file an Amended Complaint <u>to add a claim for consequential damages</u>") (emphasis supplied).

As for Article III's case or controversy requirement, which Foresters confusingly raises as its first ground for dismissal, a live controversy exists so long as Vinas' claim for consequential damages remains unredressed. <u>Higginbotham v. Ford Motor Credit Co.</u>, 270 Fed. Appx. 864, 868 (11th Cir. 2008) ("Claims for damages or other monetary relief automatically avoid mootness, so long as the claim remains viable.") (citation omitted). Count I is therefore not moot. The Court should deny summary judgment on Count I.

### §627.428 Attorney's Fees are Recoverable Under Both Count I and Count III[5]

First, as established above, the parties are still actively litigating the issues of causation and damages for Foresters' breach of contract.  As such, Vinas is unquestionably entitled to recover attorneys' fees for the time and expense incurred in litigating those issues. Foresters doesn't even appear to claim otherwise.  In addition, and significantly, Foresters fails to cite <u>a single case</u> supporting its claim that attorney's fees are not available for a plaintiff who successfully establishes that an insurance company fraudulently induced an insured to enter

---

[5] This issue is copied virtually verbatim from Foresters' Motion to Dismiss.  Plaintiff responded before, (D.E. 102, at 15-17) and will therefore only summarize this response.

into the contract of insurance. This is understandable as a fraudulent inducement, based upon inducing a Plaintiff into entering into a contract, <u>satisfies all the elements of §627.428</u>.

Similarly, the allegations in the present complaint satisfy every statutory element for prevailing party attorney fees. Mr. Vinas was the named insured, and Ms. Vinas is a named beneficiary under the policy. Count III (Fraud in the Inducement), while independent and separate from Count I (Breach of Contract), in that they require different elements of evidentiary proof, nevertheless features the issuance of the policy as a critical element of the claim. Without the issuance of the policy, there would have been no fraudulent inducement. The fact that Foresters induced Mr. Vinas into entering into the policy, albeit fraudulently, does not eliminate the contractual tie to the transaction. Thus, Vinas' claim arises "under a policy or contract executed by the insurer." §627.428(1), Fla. Stat.

Each of Foresters' cases are totally distinguishable from the present case for the identical reason they were distinguishable in Vinas' Response to Foresters' Motion to Dismiss (D.E. 102, at 15-17). In sum, if Vinas prevails, the "judgment or decree" in her favor will be rendered because Foresters fraudulently provided coverage to Vinas <u>under a policy or contract executed by the insurer</u>. Moreover, the claim alleged is fraud in the inducement <u>to contract</u>, which is alleged to have resulted in the creation of the policy. Vinas is entitled to attorney fees for Counts I and III under the Second Amended Complaint.

### <u>Vinas' Fraud in the Inducement Cause of Action Presents Numerous Question of Fact Making Summary Judgment Inappropriate</u>.[6]

#### A. <u>Fraud in The Inducement Is Not "Bad Faith" in Disguise.</u>

While Foresters' claim conduct certainly justified a bad faith claim, the present fraud in the inducement action is not that case. In fact, while Vinas has repeatedly tried to maintain focus on actions and representations at the time of entering into the contract, it is Foresters

---

[6] Foresters half-heartedly mentions the independent tort doctrine as a basis for granting Summary Judgment. (D.E. 127, p. 14). Defendant's self-serving unsupported interpretation of the law notwithstanding, Vinas has both pled and offered substantial evidence that fraud occurred at the time the contract is formed. (D.E. 134, ¶¶ 44-57).  These facts are in addition to, not duplicative of, the facts that led to Foresters' breach of contract.  That is all the law requires. <u>Noack v. Blue Cross and Blue Shield of Fla., Inc.</u>, 742 So. 2d 433, 434 (Fla. 1st DCA 1999); <u>see</u> also <u>John Hancock Life Ins. Co. (U.S.A.) v. Soudijn</u>, 8:15-CV-01277-T- 27AEP, 2015 WL 12859315, at *1 (M.D. Fla. Dec. 11, 2015). The Court should reject Foresters' "argument" that Vinas has inadequately presented evidence of Fraud in the Inducement.

that has continuously raised its own claim conduct as a bad faith straw man to allow it to tear it down under the guise of defeating a bad faith claim. (D.E. 95, at 9, 13 n.5; D.E. 96, at 3, 6-7, 13, 17; D.E. 128, at 1). The fraud case is not focused on claim conduct, it is based on the representations made by Foresters at the time of entering into the contract. (See pp. 11-12 infra). The Court should reject Foresters' attempt to create a bad faith straw man.

**B.  The Evidence is Undisputed that Jazmin Lightbourne Was Foresters' Agent Authorized to Make Representations on Behalf of Foresters.**

Desperate to separate itself from the compelling evidence of fraud against it, Foresters motion ignores the procedural posture of summary judgment and the evidence actually adduced during discovery, and instead focuses Vinas' alleged failure to plead the "type" of agent that Jazmin Lightbourne was. This strategy is understandable given the overwhelming evidence that Ms. Lightbourne was Foresters' self-described "sales agent" authorized to make representations on its behalf.

First, Vinas was not required to make any separate allegation of the "type" of agent Ms. Lightbourne's was in order to satisfy notice-pleading requirements." Platypus Wear, Inc. v. Clarke Modet & Co., S.L., 06-20976-CIV, 2008 WL 2557503, at *2 (S.D. Fla. June 23, 2008), adopted in relevant part, 06-20976-CIV, 2008 WL 2761300 (S.D. Fla. July 15, 2008). Further, Florida law does not allow Foresters to escape liability by conclusorily (and contrary to evidence identifying her as an "agent") characterizing Jazmin Lightbourn as a "broker". Even if there were some evidence of this, see Almerico v. RLI Ins. Co., 716 So. 2d 774, 776–77 (Fla. 1998) (observing "well settled" rule "that the insurance broker may act in the dual capacity of broker for the insured and agent of the insurer."). As explained in Vinas' Motion to Amend to Conform with the Evidence, as a result of the pending Motion to Dismiss, and so the operative complaint would be in conformance with the evidence adduced in discovery, Vinas requested leave to amend by interlineation, to add Paragraph 69(a) that expressly alleged Ms. Lightbourne was Foresters "sales agent" including the representations made by Foresters through her. (D.E. 120, at ¶ 7).

The evidence is so crystal clear on this issue, it is no wonder Foresters has been unable to point to any contrary deposition testimony, supporting affidavits or other evidence suggesting Ms. Lightbourne was not Foresters' agent. Nor was any evidence cited suggesting Ms. Lightbourn was not authorized to make the representations alleged about how Foresters'

contestability clauses work. It is incredible Foresters is even challenging this issue. Consider just a sample of the testimony from Foresters' CR Doug Parrott, on the agency issue:

Q:     When a sales representative is going to a prospective insured's home, is it fair for that sales representative to advise the insured that they are there on behalf of Foresters? Is that fair?

A:     That is correct.

Q:     From the perspective insured's position, the prospective insured is not expected to distinguish between whether that person is technically employed by an intermediate agency but only selling on behalf of Foresters or not, would that be true?

A:     I wouldn't think so. They would have knowledge that this person is representing Foresters.

Q:     And that's the way Foresters wants it, right?

A:     Correct.

(D.E. 134-7, p. 92, l. 13 – p. 93, l. 4 ) (Emphasis supplied).

Q:     … you agree with me that its necessary for the independent agent to communicate with the prospective insured about the product that they are looking to sell, does that sound reasonable?

A      That's reasonable, yes.

Q:     And you agree with me that Foresters authorizes these people to make accurate representations about Foresters products, correct?

A:     Correct.

                              …

Q:     And all of those representations are authorized by Foresters as long as they are accurate representations; correct?

A:     That is correct.

(D.E. 134-7, p. 40, l. 20 – p. 41, l. 11) (Emphasis supplied). Not coincidentally, Mrs. Vinas provided testimony completely consistent with Mr. Parrot's recognition that Ms. Lightbourn was Foresters' authorized agent.

Q:     …what are you specifically claiming was falsely represented?

A:     That as long as we answered all the questions correctly and we said the truth – and I know that we said the truth, because she mentioned that a lot – and because it would still be paid. If not – if it wasn't going to be paid, we would never have left the other insurance. … It was more reputable. Foresters would pay even though it would be within the first two years, which we thought it would never happen. …

Q:     When you say "she" do you mean Jazmin Lightbourn?

A:     Jazmin and Foresters because Jazmin was Foresters. As far as we were concerned, when we talked to Jazmin, we were talking to Foresters.

Q:     We'll get through that quickly, but just answer the question. Was there anyone, other than Jazmin Lightbourn, that you contend made representations to you concerning the policy?

A:     As far as we were concerned, Jazmin …          .        .        .

       THE WITNESS:     Because I called Foresters – we called Foresters. Foresters gave Jazmin the number. When we talked to Jazmin, she only said "Foresters this, Foresters that. Foresters will pay. Foresters is a better company than American General. When I say "Jazmin," I'm saying "Foresters".

(D.E. 134-2, p. 112, l. 8 – p. 114, l. 24 (Emphasis supplied).

       Applied to the present Fraud case, Foresters' CR expressly confirmed it would have been accurate, (and therefore authorized) for Ms. Lightbourn to tell Mr. and Mrs. Vinas "that as long as they tell the truth, 100 percent the truth as they know it, that Foresters will not rescind the policy based upon a contestable claims procedure." (Parrott Depo, at 55-56). That is **the** misrepresentation in this case. See *infra* p. 11-12) As such, it is either undisputed in favor of Vinas, or a question of fact exists, that Ms. Lightbourn was Foresters' agent authorized to make the representation that led to the fraud giving rise to the present cause of action.[7]

## C. There Are Numerous Issues of Disputed Material Fact in Evidence Precluding Summary Judgment on Claim III (Fraud in the Inducement)

---

[7] Other factors weighing in favor of Vinas' position on this issue include sales agents like Ms. Lightbourn are Foresters' only sales force; it uses no exclusive sales agents. Foresters provides the applications and other forms to gather that material, along with promotional materials for the sales agent to use. (D.E. 134-7, pp. 39-40). Indeed, Foresters' own file materials identify Jazmine Lightbourn as an "agent" in numerous places. (D.E. 134-8, at 18,19, 52, 153-54, and 159-60).

Foresters' purely conclusory and unsupported statements that there are no questions of fact with respect to the elements of fraud in the inducement are meritless and suggests Foresters did not read the same documents and was not at the same depositions as Vinas in this case. Fraudulent inducement under Florida law requires the plaintiff to plead and prove four elements: "(1) a misrepresentation of a material fact; (2) that the representer knew or should have known that the statement was false; (3) the representer's intent to induce another to rely and act upon the misrepresentation; and, (4) a resulting injury to the party acting in justifiable reliance. . . ."  See e.g., Moro-Romero v. Prudential-Bache Sec., Inc., 89-1821-CIV-DAVIS, 1991 WL 494175, at *6 (S.D. Fla. Aug. 26, 1991) (granting plaintiff's motion for summary judgment) (citing Royal Typewriter Co. v. Xerographic Supp., 719 F.2d 1092, 1103 (11th Cir. 1983); Lou Bachrodt Chev., Inc., v. Savage, 570 So. 2d 306, 308 (Fla. 4th DCA 1990)); see also Pulte Home Corp. v. Osmose Wood Pres., Inc., 60 F.3d 734, 742 (11th Cir. 1995). There is direct and circumstantial evidence establishing every element of Count III.

**1.  At the Time of Contracting, Foresters Knowingly Misrepresented a Material Fact to Mr. and Mrs. Vinas:  That as Long as Mr. Vinas Answered Application Questions to His Best Knowledge and Belief, if Mr. Vinas Were to Die During the Two-Year Contestability Period, Foresters Would Not Deny His Claim or Rescind His Policy Based Upon Misrepresentation.**

The first two elements, misrepresentation and knowledge of falsity, are easily addressed together in this case. An action for fraud may be predicated on promises of future action; if "the person promising future action does so with no intention of performing or with a positive intention not to perform … ."  See e.g., Mejia v. Jurich, 781 So. 2d 1175, 1177 (Fla. 3d DCA 2001). Foresters' misrepresentation in this case, made to Mr. and Mrs. Vinas at the time of sale of the policy was that as long as Mr. Vinas told the truth in answering his application questions, i.e., answer the questions to his best knowledge and belief, Foresters would not deny his claim or attempt to rescind his policy based upon an alleged misrepresentation. As the sales agent told Mr. and Mrs. Vinas when they sought assurances, "Say the truth. As long as you answer the questions truthfully, you will be paid." (D.E. 134-2. p.  55, l. 14-16). "The only thing, you might have to give more documents, or they might investigate you deeper." (Id. at p. 99 l. 16-19).

Significantly, as indicated above, this was an authorized and approved representation by Foresters through Jazmine Lightbourn. Supra at p. 12. Next, Plaintiff has adduced through

both direct and circumstantial evidence that this was a factually false statement. Foresters' corporate representative and employees testified that at the relevant time period, when the claim department undertook its contestable investigations, the claims department <u>did not look or otherwise investigate to determine an insured's BK&B</u>. All they looked at was to see if the insured had the diagnosis in question. Obviously, if the claims department doesn't even make an inquiry into an insureds' BK&B, it can't make a determination based upon that best knowledge and belief, a standard it hasn't even investigated.

The testimony was shocking for its disregard of the representations made to insureds both as part of the policy and as part of the sales process to convince older insureds to buy or change life insurance companies late in life.

> Q:   ...Do you make your inquiries [contestable investigations] trying to determine what the proposed insured's best knowledge and belief was at the time they filled out the application, or do you make your inquiry to determine if the insured left out, for example, a diagnosis that he may or may not have known about?

> A:   <u>I look to see if there was anything that was not disclosed on the application</u>.

> Q.   So your focus is not whether the insured knew about the thing that was not disclosed, your inquiry is to determine whether or not there was a diagnosis, or a test, or something like that that was not disclosed?

> A.   <u>I want to see if there was any medical information that was not disclosed on the application.</u>   .   .   .

> Q.   Your way doesn't tell you the actual answer [what the insured's best knowledge and belief is]; does it?

> A.   No.

> Q.   Do you rescind the policy, <u>even though you have not made a determination whether the insured knew of the condition</u>?

> A.   At that point I would do up a rescission letter and send it to management for review.

(D.E. 134-9, p. 14, l. 10 - p. 15, l. 5 p. 23, l. 7-9, p. 19, l. 23 - p. 21, l. 4) (Emphasis supplied). In short, despite its promise to the Vinases that Foresters would make its contestability

determinations based upon Mr. Vinas' BK&B, Foresters never undertook to determine what Mr. Vinas' best knowledge and belief was. The representation was false.

Foresters does not offer any evidence to contradict the element of misrepresentation. In fact, its CR acknowledged that Foresters' independent agents are authorized to make such representations. (Parrott Depo, D.E. 134 at 55-56). The same corporate officer also testified to the materiality of the representation as well as how troubled he would be to find out if it were not true. Specifically, Mr. Parrot, who had not been given Ms. Buckland's or Mr. Sullivan's deposition to read (D.E. 134-7, p. 69, l. 9-p. 70, l. 8) testified he would "have a problem" with Foresters' misrepresentation and failure to investigate Mr. Vinas' BK&B.

> Q.   If you were to find, as the head honcho of underwriting, that the folks that looked at and investigated Mr. Vinas' claim expressly did not look into what his best knowledge and belief was, in fact, said that they weren't investigating that, that all they were looking at was whether or not he had diabetes. If you were to learn that and assuming it was true, would you take any action from the underwriting perspective?
>
> A.   I would have a problem with that just as an officer of the company.
>
> Q.   And why would you have a problem with that as an officer of the company?
>
> A.   As an officer of the company I have a bigger responsibility than the area in which I am responsible for. So that in terms of the practice would not be in line with who we are.
>
> Q.   Because if that's true, and I understand everything you just said, because if what I said is true, then the policy would have been sold under, let's say, false pretenses or with a representation that wasn't true, fair? **...**
>
> A.   That's the intent or that's the goal of the contestable review to make sure that what we learned at the front end when the case was issued is indeed accurate on the back end. If it's accurate to what we knew on the front end a claim would be paid.
>
> Q.   And the standard for accuracy per Foresters own application is the insured's best knowledge and belief, whether they are telling the truth or not, right?
>
> A.   That is correct.

(D.E. 134-7, p. 85, l. 5-p. 86, l. 23.) (Emphasis supplied). Despite uncontradicted testimony from Ms. Buckland, Mr. Sullivan and Mr. Parrott, somehow, Foresters represented to this

Court "undisputed evidence shows that Foresters meaningfully considered whether Mr. Vinas' representations in the Application and Diabetes questionnaire were true to his best knowledge and belief." (D.E. 128, at 16). Really?! Where is there <u>any</u> evidence that shows Foresters undertook the BK&B inquiry it promised … much less "undisputed" evidence? Certainly, one would expect if any such evidence existed, it would have been included as powerful cross examination, or at least clarification questions, at Foresters' depositions. The Court need not search the record for such evidence … none exists. As to this element, either a question of fact is created, or the issue should be determined in favor of Vinas.

### 2. Foresters Made Its Misrepresentation to the Vinases With Knowledge of its Falsity

The next element is whether Foresters "knew" its misrepresentation was false. This presents yet additional questions of fact. Under substantive Florida law, a plaintiff can prove the falsity of a representation in one of several ways. First, fraud can be proven by showing the defendant made the representation without knowledge as to its truth or falsity. <u>Parker v. State of Florida Bd. of Regents ex rel. Florida State Univ.</u>,724 So. 2d 163, 168 (Fla. 1st DCA 1998) and cases cited therein. The second way a plaintiff can prove *scienter* is to show that Foresters made a misrepresentation in violation of its "duty to know as to the truth or falsity of the representation made." <u>Wheeler v. Baars</u>, 15 So. 584, 588 (Fla. 1894). To make a case based on this second theory, "the proof should show that the party occupied such a special situation or possessed such means of knowledge as made it his duty to know as to the truth or falsity of the representation made." <u>Parker</u>, 724 So. 2d at 168 (quoting <u>Joiner v. McCullers</u>, 28 So. 2d 823, 824 (Fla. 1947)). The third way Mrs. Vinas can prove her case is the paradigmatic fraud claim: a knowing lie, made with "actual knowledge of its falsity." <u>Id.</u>

While Vinas has evidence to support all three methods, (even though she only needs one), Foresters has failed to demonstrate the absence of a material fact with respect to <u>any</u> of these three theories, to carry its burden, much less <u>all</u> of them.

### (i) Foresters Failed to Ascertain the Truth Before Representing It Would Apply The BK&B Clause If Mr. Vinas Died During the Contestability Period.

Keeping in mind the misrepresentation in this case was that Foresters would make a contestability determination based on the insured's BK&B, the relevant question with respect to this element is whether Foresters' sales or marketing department made any inquiry as to

the truth of this representation before authorizing its sales agents to represent it to prospective insureds. In other words, did anyone from sales or marketing, ever make an inquiry of the claims department to confirm that when claims actually does its contestable claim analysis, that they do actually look to determine the insured's BK&B.

On this issue the evidence is undisputed that <u>no such inquiry was ever made</u>!! Foresters has admitted that no one in its sales or marketing department ever communicated with any representative of the claims department to confirm that the representation being made by Foresters at the time of sale (that the claims department would evaluate a contestable claim by looking at the insured's best knowledge and belief) was accurate.

> Q. Okay. To the best of your knowledge, did any of the folks in the marketing or sales department ever make any inquiry, check, confirm, or otherwise determine whether the claims department was, in fact looking to determine, looking to find out what the insureds best knowledge and belief was during contestable claims?
>
> A. Not to my direct knowledge and based on the information we received from Matt and Veronique, no.
>
> Q. So the sales department, the marketing department never confirmed that the claims department was, in fact, or wasn't, in fact, making inquiry to determine the insureds best knowledge and belief?
>
> A. No.
>
> Q. What I said is right? You had a double negative, you said no.
>
> A. I'm sorry, then reask it again.
>
> Q. Can you read the question back please.
>
> (Thereupon, the above-referred to question was read back by the court reporter.)
>
> A. They don't make those inquiries.
>
> Q. And, to your knowledge, they never did make any such inquiries at least, we will use the time period that the Court has limited us to, between 2014 and 2018, right?
>
> A. That is correct, they never did.

16

(D.E. 134-7, p. 63, l. 24-p. 64, l. 24.). Indeed, this makes perfect sense given the facts in the present case that Foresters <u>does not</u> make its contestability decision based upon the insured's best knowledge and belief. (D.E. 134, at ¶¶ 23, 25, 50-53).

In any case, this testimony presents evidence sufficient for a jury to determine Foresters made its false statement knowingly, based upon its complete failure to know or even attempt to learn the truth or falsity of its representation. Significantly again, Foresters offered no contrary testimony suggesting that its sales or marketing departments <u>do</u> inquire as to the claims department's practices so as to be certain its representations at the time of sale are accurate. It did not ask any questions of its corporate representative to clarify or otherwise amend the undisputed evidence that Foresters made representations at the time of sale that it never confirmed were accurate. Under Florida law this is both a question of fact and, if accepted by the jury, would satisfy Plaintiff's burden of establishing intent.

### (ii)  Given Foresters' Superior Knowledge and Position, Foresters Had an Obligation to Both Inquire as To How Its Claims Department Treated BK&B, But to Also Be Correct.

The second method, under Florida law, "knowledge of falsity is shown when a party occupied such a special situation or possessed such means of knowledge [of the material fact] as made it his duty to know as to the truth or falsity of the representation made." <u>See</u>, <u>e.g.</u>, <u>Parker</u>, 724 So. 2d at 168. The facts of this case establish Foresters had superior, and in fact sole knowledge of the accuracy of its representation that it would base a contestability determination on the insured's BK&B. While Vinas will offer this as one opinion of its insurance expert Scott Stein, (Ex. A., at 7 (Opinion 3))[8] it appears Foresters may be willing to stipulate to this superior knowledge, acknowledging that "it is common knowledge that a company knows more about its inner workings than a client."  (D.E. 129, at 14).

Due to this superior knowledge, it is clear Mr. and Mrs. Vinas were in a position of dependence upon Foresters for accurate information which Foresters was obligated to provide. Foresters' failure to do so establishes proof of knowledge of the false representation. <u>Hinson v. Drummond</u>, 123 So. 913 (Fla. 1929), <u>Mossler Acceptance Co. v. Perlman</u> 47 So 2d. 296 (Fla. 1950). <u>See</u> <u>also</u> <u>Capital Bank v. MVB, Inc.</u>, 644 So. 2d 515, 518 (Fla. 3d DCA

---

[8] Mr. Stein's declaration under the penalty of perjury adopting his expert report is attached as Exhibit B.

1994) (explaining that fiduciary relationships can arise when trust is reposed and accepted). Further, while the relationship is likely a question of fact, Mr. Stein is of the opinion, based upon his years of experience in this industry, that Foresters unquestionably had a fiduciary relationship with the Vinases requiring it to provide accurate information. (Ex. A, at 7-8, Opinion 4).

As discussed above, Foresters' sales arm was ignorant of how its claims department handled the best knowledge and belief clause. It didn't know, either way, whether Foresters truly investigated the insured's BK&B or not. So, not only is Foresters charged with knowledge because it failed to know the truth or falsity or its representation, it is also charged with knowledge, because it was factually wrong (see supra pg. 16-18) when it had an obligation to be right.

### (iii) Evidence Exists of Actual Intent to Misrepresent.

The third way of proving fraud is rarely seen, as in Hollywood with direct evidence of a hostile disgruntled ex-employee spilling the secrets of the insurance company. Rather, such intent is usually presented by circumstantial evidence. Glob. Quest, LLC v. Horizon Yachts, Inc., 849 F.3d 1022, 1029–30 (11th Cir. 2017) (jury to determine fraudulent intent based on "the axis of the circumstances surrounding the complete transaction".)

In the present case, however, proof that Foresters never, from the time the policy was sold, intended to pay a contestable claim, goes beyond just the indirect evidence of intent described in sections (i) and (ii) above. In addition, discovery has revealed that not only did Foresters consciously and deliberately not investigate Mr. Vinas' best knowledge and belief, **it expressly ignored** evidence in its own file at both the operational and supervisory levels, that Mr. Vinas' BK&B was that he did not have diabetes. Evidence that clearly reflected that Mr. Vinas' BK&B was that he did not have diabetes and his claim should have been paid.[9]

In fact, both the claim adjuster handling Mr. Vinas' claim and the supervisor whose approval was necessary before the rescission letter could be sent, acknowledged that not only did Foresters not subpoena Dr. Hershman's records, and not only did Foresters so much as try to call Dr. Hershman, Foresters expressly ignored a 2015 note from Dr. Hershman wherein, Mr. Vinas' doctor explains that Mr. Vinas does not have diabetes.

---

[9] This is the one area where evidence overlaps with the breach of contract claim. It is nonetheless admissible. T.D.S. Inc. v. Shelby Mut. Ins. Co. at 1528.

Under the guise of satisfying a "reasonableness test", Foresters' representation that it was supposedly unaware of Mr. Vinas' BK&B that he didn't have diabetes until Vinas' counsel provided Dr. Hershman's "doctor's note" in March of 2020 (D.E. 128, at 4-5, 8), both strains credibility, and is <u>directly refuted</u> by Foresters' own CR's testimony. In 2017 <u>Foresters knew</u> Mr. Vinas was told by his doctor that he didn't have diabetes, and that <u>was</u> his BK&B:

> Q.    And presumably there was at least some conversation so that he [Mr. Vinas] could convey what his concern [diabetes] was; fair enough?
>
> A.    One would hope.
>
> ·    ·    ·
>
> Q.    And it [notes from Forester's claim file] says: "And after doing additional testing, <u>Dr. Hershman concluded the proposed insured did not have diabetes</u>"; right?
>
> A.     That is what it says.
>
> Q.    <u>And that is the last information that Foresters had in terms of actual communication between Dr. Hershman and the insured with respect to whether he had diabetes [before denying Mr. Vinas' claim]</u>?
>
> ·    ·    ·
>
> Q.    True?
>
> A.    <u>I believe that is true</u>.

<u>Sullivan depo</u> p. 144 (Emphasis supplied). See also <u>Buckland depo</u>, p. 54, l. 18 - 24 DE 72-1. (All the evidence that showed Mr. Vinas didn't have diabetes was in Foresters' file in 2015). This additional evidence creates a question of fact sufficient for the jury to evaluate Foresters' intent to deny a contestable claim from the time it issued the policy. In sum, multiple questions of fact, based upon numerous depositions and documents preclude summary judgment on this fraud claim.

<u>**Questions of Fact Exist as to the Final Two Elements of Count III:**</u>
<u>**Detrimental Reliance and Foresters' Intent to Induce it.**</u>

The final two elements are barely, if at all, contested. Foresters states only that it "did not have the fraudulent intent to induce Mr. Vinas to purchase the Certificate." (D.E. 128, at 13). That's its entire argument! Nevertheless, the circumstances of the entire sales process as described by Mrs. Vinas provides direct evidence at best, or an inference at least, that Foresters made its misrepresentations for the purpose of selling Mr. and Mrs. Vinas an insurance policy

19

to replace his existing coverage. (D.E. 134-2, p. 31 l. 15 – p. 35 l. 8; p. 48 l. 17 – p. 49 l. 7; p. 112 l. 8 – p. 118  l.1).  Similarly, on the issue of reliance as an element of fraud, there is no question Vinas relied to her detriment on the representations made by Foresters as the evidence is undisputed that the Vinases switched to Foresters' policy and cancelled an existing life insurance policy, which was outside the two-year contestability period. (Id. at p. 29, l. 9-13). Reliance is justified where, as here, the representation was not "known to be or obviously false." Besett v. Basnett, 389 So. 2d 995, 997 (Fla. 1980) (adopting Restatement (Second) of Torts, §§ 540-41). Foresters does not shoulder its summary judgment burden on any element of Count III.  The Court should deny the motion.

### Vinas Can Raise Count III in Her Own Name as a Party to this Action.

Foresters' remaining two arguments – to the effect that any remedy against Foresters died along with Mr. Vinas – need not detain the Court long.  (D.E. 128, at 12-13).  The first argument, standing, has been presented twice before, in Foresters' opposition to filing the second amended complaint (D.E. 72, at 11) and in the pending motion to dismiss the second amended complaint.  (D.E. 95, at 12-14).  As she observed in her response, (D.E. 102, at 7-9), the Court implicitly rejected this argument when it granted Mrs. Vinas' motion to Amend to pursue Count III.   Nevertheless, Mrs. Vinas briefly reiterates that none of the cases cited by Foresters are on point.  Compared to Vinas' cases, JMIC Life Ins. Co. v. Henry, 922 So. 2d 998, 1000 (Fla. 5th DCA 2005); McBride v. Life Ins. Co. of Virginia, 190 F. Supp. 2d 1366, 1371 (M.D. Ga. 2002) that hold that "beneficiary under life insurance policy had standing to sue" for torts committed during contract formation). Finally, Foresters' rule creates a perverse incentive for an insurer to commit fraud by insulating it from any legal consequences.  If Foresters' argument is to be accepted, a beneficiary to a life insurance policy could never sue an insurer for fraud, regardless of the merits.  There is no law supporting such a proposition.  That explains why Foresters was unable to cite a single case supporting this argument.  The Court should reaffirm Mrs. Vinas' standing to pursue Count III.

The final argument, that no misrepresentations were made to induce Ms. Vinas reliance expressly ignores the direct evidence in this case.  Mrs. Vinas testified that both Mr. and Mrs. Vinas were together (both at their kitchen table) when Foresters' sales agent promised that Foresters would apply the BK&B standard of accuracy to any contestability investigation. (Vinas Depo, at 32-33).  The final decision to switch to Foresters was made

20

jointly.  Id. at 48 ("we got to the decision . . . that we were going to cancel …") (Emphasis supplied). Once again, this presents both direct and inferential evidence sufficient for a jury to consider, that Mrs. Vinas relied on Foresters' representations. Foresters' motion for summary judgment is due to be denied.

## **CONCLUSION**

This is a case for trial, not summary judgment.  Based on the foregoing argument and authority cited, the Court should deny Foresters' Motion for Summary Judgment (D.E. 128).

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY a true and correct copy of was filed with the Clerk of this Court via the CM/ECF filing and that a copy has been sent via electronic mail this 23rd day of December, 2020 to Kristina B. Pett, Esq. Kristina.pett@mhllp.com and Danielle Shure, Esq., Danielle.shure@mhllp.com, McDowell, Hetherington, LLP, 2101 N.W. Corporate Blvd., Suite 316, Boca Raton, FL  33431.

KRAMER, GREEN, ZUCKERMAN, GREENE & BUCHSBAUM, P.A.
Co-Counsel for Plaintiff
4000 Hollywood Blvd., Suite 485-S
Hollywood, FL  33021
(954) 966-2112 – phone
(954) 981-1605 - fax

By:      /s/ Craig M. Greene
Craig M. Greene, Esq.
Fla. Bar No. 618421
cgreene@kramergreen.com

and

Adrian Neiman Arkin, Esq.
MINTZ, TRUPPMAN, P.A.
Co-Counsel for Plaintiff
1700 Sans Souci Boulevard
North Miami, FL  33181
(305) 893-5506 – phone
adrianarkin@mintztruppman.com