**EXHIBIT E**

1          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
2
            CASE NO.:18-CV-24100-COOKE/GOODMAN
3

4

5    DIGNA VINAS,

6          Plaintiff,

7    vs.

8    THE INDEPENDENT ORDER OF
     FORESTERS,
9
            Defendant.
10   _____/

11         TELECONFERENCE VIDEOTAPED DEPOSITION OF

12                      DOUG PARROTT

13

14         Taken on Behalf of the Plaintiff

15

     DATE TAKEN: Tuesday, October 13, 2020
16

     TIME: 11:08 a.m. - 3:50 p.m.
17

     LOCATION: Zoom teleconference
18

19         Examination of the witness taken before:

20

                  Nancy Smith, RPR
21            Veritext Legal Solutions
          2 South Biscayne Boulevard, Suite 2250
22                 Miami, FL 33131

23

24

25

```
 1
 2                     APPEARANCES
 3
    For the Plaintiff:
 4
         CRAIG M. GREENE, ESQ. (Appearing via Zoom)
 5       KRAMER, GREEN, ZUCKERMAN, GREENE & BUCHSBAUM, P.A.
         4000 Hollywood Boulevard, Suite 485-S
 6       Hollywood, FL 33021
 7  For the Defendant:
 8       KRISTINA B. PETT, ESQ. (Appearing via Zoom)
         McDOWELL HETHERINGTON LLP
 9       2101 N.W. Corporate Boulevard, Suite 316
         Boca Raton, FL 33431
10
    Also Present:
11
         IAN COLLINS, ESQ.
12       LAUREN ALLEN
         MICHAEL KENNEDY, Videographer
13
                    I N D E X
14
    DEPOSITION OF DOUG PARROTT          PAGE NO.
15
    Direct Examination by Mr. Greene          4
16
    Certificate of Oath (Witness)           118
17
    Certificate of Reporter                 119
18
    Read and Sign Letter to Witness       120
19
    Errata Sheet (to be forwarded upon execution) 121
20
21            E X H I B I T   I N D E X
22
     Plaintiff's            Description        Page No.
23
     Exhibit 1         Notice of Deposition        27
24
25
```

1          THE VIDEOGRAPHER: We are on the record.  We

2    are today October 13, 2020. The time on the video

3    monitor is 11:08 a.m. for the videotaped deposition of

4    Doug Parrott.  Case style is Digna Vinas versus The

5    Independent Order of Foresters. At this time will

6    Counsel please state their appearances for the record.

7          MR. GREENE:  Good morning, this is Craig

8    Greene on behalf of the Plaintiff, Digna Vinas.

9          MS. PETT:  Good morning, Kristina Pett on

10   behalf of the Defendant, The Independent Order of

11   Foresters.

12          THE VIDEOGRAPHER: Will you please swear in

13   the witness.

14          THE COURT REPORTER: Will the witness please

15   say and spell your first and last name for the record.

16          THE WITNESS: Doug Parrott, D-o-u-g,

17   P-a-r-r-o-t-t.

18          THE COURT REPORTER: Will the witness now

19   please repeat the following declaration for the record.

20   I declare my testimony in this matter.

21          THE WITNESS: I declare my testimony in this

22   matter.

23          THE COURT REPORTER: Is under penalty of

24   perjury.

25          THE WITNESS: Is under penalty of perjury.

Page 4

1        THE COURT REPORTER: The witness having

2   declared that his testimony in this matter is under

3   penalty of perjury, the parties have stated their

4   agreement for the record.  You may proceed.

5                    DIRECT EXAMINATION

6        BY MR. GREENE:

7        Q.   Please give us your name and address.

8        A.   Doug Parrott, **REDACTED**

9   Kansas City, Missouri 64157.

10       Q.   Mr. Parrott, my name is Craig Greene and over

11  what I anticipate will be the next several hours I'll

12  be taking your deposition.  That means I'll be asking

13  you questions and looking to you for answers.  If at

14  any time you don't understand any of my questions

15  please let me know, I'll be glad to reask the question,

16  rephrase the question or do whatever it takes so you

17  understand the question I'm asking and you're giving me

18  an answer accordingly. I need you to answer all

19  questions out loud with a yes, a no, an I don't know or

20  some other verbal response because uh-huhs, u-hums,

21  shakes of the head, or other non-verbal responses,

22  although your intent will be probably be captured on

23  the video, it won't come across well on the formal

24  record being kept by Ms. Smith our court reporter.

25            Experience has shown that probably one of the

```
1   more difficult instructions to follow is I need you to
2   let me finish asking my question in its entirety before
3   you begin to answer.  The reason that becomes difficult
4   is that in normal conversation you know what the last
5   two or three words of my question are going to be
6   through context, just what our conversation is leading
7   to, you know what I'm asking, you will give me an
8   answer, I'll be on my way and we will never see each
9   other again.  But because we are in a formal setting
10  here of a deposition we need to have a full question
11  and a full answer.  I'm sure you've seen depo
12  transcripts before?
13       A.   Yes.
14       Q.   Okay.  So that's what we need, a full
15  question and full answer.  So in addition while it
16  doesn't look like we have a terrible delay here,
17  sometimes with these Zoom meetings you get a little bit
18  of a delay and it becomes an issue, so we will try and
19  make sure that you let me finish asking my question
20  before you begin answering.  The last point is I take
21  breaks pretty frequently, like about once an hour or
22  so.  But if my break schedule doesn't fit with your
23  break schedule or your break needs, just let me know
24  and we will take a break whenever you all need it. And
25  Madam Court Reporter, that goes for you too, we don't
```

Page 6

1   expect you to be a heroine.  If in between questions

2   you go ahead and you say, you know, I could really use

3   a break feel then feel free to ask and we will take

4   one.

5           THE COURT REPORTER: Yes.

6           MR. GREENE: Let the record reflect the court

7   reporter nodded yes.

8           BY MR. GREENE:

9       Q.   Mr. Parrott, by whom are you employed, sir?

10      A.   Independent Order of Foresters doing business

11  as Foresters Financial.

12      Q.   And what is the Independent Order of

13  Foresters?

14      A.   The Independent Order of Foresters is a life

15  insurance carrier covering business across both sides

16  of the border in Canada and the U.S., life insurance

17  business, individual life insurance business.

18      Q.   You guys are a life insurance company?

19      A.   Correct.

20      Q.   What do you do for them?

21      A.   I'm the chief underwriting officer for both

22  the U.S. and the Canadian company.

23      Q.   Is that your formal title, chief underwriting

24  officer?

25      A.   Correct, it is.

1      Q.   I'm going to ask you, if you would please, to

2   give me the benefit of your education and experience

3   throughout your career working backwards, starting with

4   where you are now and then working backwards with the

5   various positions you've held right back -- we will

6   work our way through to college, and just tell me the

7   positions you've held and I'll break you up in the

8   middle there to find out how long you have been in

9   certain positions.  Do you understand the question?

10      A.   Yes.

11      Q.   Okay.  Please.  How long -- go ahead.

12      A.   I'm sorry.

13      Q.   How long have you been chief underwriting

14   officer?

15      A.   I've been a chief underwriting officer at

16   Foresters for six and a half years.

17      Q.   And prior to that?

18      A.   I was the chief underwriting officer for

19   Americo Group in Kansas City for almost 11 years, 10

20   years and -- I'm sorry, 10 years, 9 years and 11

21   months.

22      Q.   America Group?

23      A.   Correct.  A-m-e-r-i-c-o.

24      Q.   Oh, Americo?

25      A.   Americo.

1      Q.    Okay.   And is Americo Group also a life

2    insurance company?

3      A.    They are.

4      Q.    And so same title, different company, what

5    position did you hold prior to that?

6      A.    I was an operations officer with Principal

7    Financial Group in Des Moines, Iowa.

8      Q.    Operations officer, okay, with Principal

9    Financial Group.   What is Principal Financial Group?

10     A.    A life insurance carrier, life insurance and

11   investment company.

12     Q.    And how long did you hold that position?

13     A.    About three years.

14     Q.    And what did you do before that?

15     A.    Prior to that I was with Irish Life of North

16   America in Des Moines for roughly almost 11 years

17   working in the underwriting areas and the new business

18   areas.   I was an officer vice president there.

19     Q.    So your position was officer vice president,

20   but you worked in -- was it two different areas or was

21   it two different things while you had one position, you

22   helped him with that?

23     A.    I was in the underwriting area, I led one of

24   the underwriting teams and I was responsible for the

25   underwriting practice for about nine and a half years

1   or so and then I was asked to take over new business

2   and then I took over new business for about the last

3   year and a half or so that I was there.

4        Q.   And then you went to Principal?

5        A.   Correct.

6        Q.   Okay.  And what did you do before that?

7        A.   Before that I was an underwriter with

8   National Travelers Life in Des Moines, a life insurance

9   carrier.

10       Q.   I didn't ask you because it seemed kind of

11  obvious, but I assume Irish Life of North America was a

12  life insurance company?

13       A.   I'm sorry, yes, it was.

14       Q.   I didn't ask you, it was my bad, not yours.

15  And how long were you with Underwriters National

16  Travelers?  I'm sorry, how long were you with National

17  Travelers Life?

18       A.   About two and a half years roughly, maybe

19  almost three years.

20       Q.   Okay. Two and a half to three years and you

21  were an underwriter?

22       A.   Correct.

23       Q.   And prior to that, sir?

24       A.   That goes back to the first company I worked

25  for out of college, a company called American Republic

Page 10

1   also in Des Moines and I was in underwriting.

2        Q.   For, approximately, how long?

3        A.   That was a long way back.

4        Q.   Just give me a range.

5        A.   Two to three years.

6        Q.   Okay. Great.  Where did you go to college?

7        A.   Minnesota State University in Mankato,

8   Minnesota.

9        Q.   Did you get a Bachelors, Masters, what did

10  you do?

11       A.   Bachelors degree in finance management.

12       Q.   Did you go from one position to the next in

13  all of these job transitions or were there any times

14  that you had, let's just say, more than a month or two

15  off?

16       A.   No.  One position to the next in accelerating

17  roles.

18       Q.   Understood. What do you mean when you say

19  accelerating roles?

20       A.   Every role that I took was either for a

21  promotion and responsibilities.  In the early part of

22  my career it was a promotion of salary and then as my

23  career got on it was a promotion and responsibilities.

24  I went from America to Foresters to get the

25  international experience working with Canadian company

Page 11

1    that I didn't have.

2         Q.    Basically, you're telling me that your

3    changes were all to advance yourself?

4         A.    That's correct.

5         Q.    Either financially, professionally or both?

6         A.    That's correct.

7         Q.    Okay.  Underwriting, when we use the term

8    generically, can be both underwriting to determine if a

9    particular insured is going to be accepted by the

10   company or it also involves sometimes writing the

11   policies.  Did you partake in either of those two and

12   if so please explain?

13        A.    Define what you mean by writing the policies,

14   what's that mean?

15        Q.    I worked with underwriters in the past where

16   they are actually changing the language or policy,

17   that's part of what they do.  They actually say we are

18   going to take a policy that's been approved and we are

19   going to alter it, we are going to change the terms,

20   it's part of what underwriters do.  Is that your

21   understanding as well?

22        A.    Not in the firms I have worked for.

23   Underwriting doesn't have the ability nor the authority

24   to change the terms of the contract, only the president

25   and the secretary of the company do.

Page 12

1       Q.   Then I wasn't clear with my question.  I

2   wasn't saying changing the terms of the contract of an

3   already existing contract, I was saying the company

4   decides that it's going to put out a new product, for

5   example, or they are going to change an existing

6   product.  And they ask the underwriters to please put

7   together something that they will then run by the

8   various state commissioner's offices and try and sell,

9   that's what I meant by underwriting, I didn't mean

10  change something in existence.  Would you call that

11  underwriting as well or do you call that something

12  different?

13      A.   No.  Underwriting, that's a responsibility

14  that I have as the chief underwriter so with respect to

15  underwriting it's not part of the underwriting

16  practice, it's a practice that I get involved in as the

17  head of underwriting and the person who's responsible

18  for mortality of the business that we write.  And so my

19  team and my division, unless I delegate some minor

20  things out to them, they don't get involved in that.

21  And so to your question that's not underwriting, that's

22  building product and pricing product.

23      Q.   So when you say you get involved in it, you

24  mean you, Doug Parrott, personally get involved in it?

25      A.   That's correct.

```
 1      Q.    And that's only because of the high level
 2   that you achieve?
 3      A.    That's correct.
 4      Q.    You don't delegate that to other
 5   underwriters?
 6      A.    I may delegate some research around something
 7   but I don't delegate the practice of the product
 8   involvement and the pricing involvement to others, no.
 9      Q.    You used two terms a minute ago, one of them
10   was pricing.  What was it that you used to describe the
11   development of the product or the creating a new
12   product?
13      A.    Building product.
14      Q.    Building.
15      A.    Building product and pricing a product.
16      Q.    Have you been involved in building a product
17   or pricing products for Foresters?
18      A.    Yes.
19      Q.    What products?
20      A.    On the U.S. side, term, children's whole
21   life, some of our non-med products.  Every time that we
22   have a product that is determined to be necessary to
23   build by the product group and by actuaries, I don't
24   make the decision to build a product, I only get
25   involved with the research and the underwriting advice
```

Page 14

1    to a product.  And so when those things happen then

2    that's where I get involved.

3        Q.   Understood.

4        A.   I've done the same thing on the Canadian

5    side, I've done same thing with our Canadian TPA.

6        Q.   What are your duties and responsibilities as,

7    I'm going to use the terms that you've given me, an

8    underwriting officer, sorry, chief underwriting

9    officers for Foresters?

10        A.   My responsibilities go to the underwriting

11    philosophy, it goes to the ultimate mortality results

12    that we have.

13        Q.   I'm taking these down as you say them so just

14    go a little slower for me.  Underwriting philosophy?

15        A.   Philosophy, correct.

16        Q.   What's next?

17        A.   Mortality results of the underwriting

18    practice.

19        Q.   Mortality results of underwriting practice,

20    okay.  Go ahead.

21        A.   Again, to what we've just talked about

22    building and assisting with product --

23        Q.   Okay.

24        A.   -- with the rest of our product team and our

25    pricing actuaries.

Page 15

1        Q.   Yes, sir.

2        A.   I'm the highest level of escalation there is

3   for a case question or some question of a particular

4   case that needs to be vetted out or answered.

5        Q.   Okay.

6        A.   I have all the relationships and

7   responsibilities for the underwriting practice with our

8   re-insurers.

9        Q.   Okay. Let me tell you what I got so far and

10  that way it will help you out with what you've told me.

11  I've got underwriting philosophy.  I've got mortality

12  results in the underwriting practice.  I've got

13  building products that you were the highest level of

14  escalation for individual case questions, and I've got

15  relationships and responsibilities with respect to

16  underwriting issues and re-insurers.  What else do you

17  got?

18       A.   Re-insurers, vendors.

19       Q.   Okay.  Let me ask you a question, any other

20  responsibilities that you have other than those as the

21  chief underwriting officer for Foresters?

22       A.   Hiring and firing underwriters.  The

23  personnel aspect of those that report directly to me

24  but I also am responsible for -- the underwriting

25  division reports to, the day to day tactical reports to

Page 16

1   a colleague of mine and if there's an issue with an

2   underwriter, good or bad, I am brought into the

3   conversation.

4       Q.   Understood.   Anything else?

5       A.   Representing the company in various industry

6   organizations that I'm involved in and take part in.

7       Q.   I called those last two, just because we are

8   going to go through these again, I called the one right

9   before this personnel, okay, personnel issues, is that

10  a good title for you?

11      A.   Yes.

12      Q.   Okay.

13      A.   That's acceptable.

14      Q.   The last one is industry representation, is

15  that good?

16      A.   That's correct.

17      Q.   Okay.   Anything else you can think of sitting

18  here today?

19      A.   No.

20      Q.   What are the duties and responsibilities of

21  underwriters that are under your control or your

22  leadership I should say?

23      A.   Their job is to assess the risk of individual

24  life insurance cases ultimately coming up with a

25  decision as to whether we are going to make an offer,

Page 17

1    not make an offer and if so at what price.

2        Q.    When you say make an offer, make an offer to

3    ensure the individual that's applying?

4        A.    That is correct.

5        Q.    Do underwriters have any other responsibility

6    at Foresters other than to assess the risk whether an

7    insured, a prospective insured will become an actual

8    insured?

9        A.    Yes.  For example, the three people that

10   report directly to me are my data science team.  They

11   are responsible and help me with the strategic aspect

12   of underwriting in terms of things that we use or

13   things that we look into and attempt to use or hoping

14   to use to enhance our practice.  These days data is a

15   big thing in underwriting and so I have a data science

16   team that does a lot of research around that.  We have

17   two major projects going on right now and I have got

18   two out of three of those people that are involved

19   deeply in those two products, in those two projects

20   rather.  One of my members is responsible solely for

21   all the audits that go on in underwriting and in our

22   Canadian TPA.  So that person's job is specifically to

23   the audit practice that we have in underwriting.

24       Q.    So basically you've told me about strategic

25   aspects of underwriting and data management and

1    auditing, anything else that underwriters at Foresters

2    do?

3         A.    They would get involved in projects or

4    project help from time to time as necessary either as a

5    subject matter expert or in the aspect of user testing,

6    that happens from time to time, but otherwise, no,

7    their sole responsibility is to make decisions on

8    cases.

9         Q.    I was trying to lead you into it a little

10   bit, but I'll just zone in on it here.  You know what

11   this case is about, I assume?

12        A.    I understand we are talking generally about

13   practices that we engage in our practice, yes.

14        Q.    Do you have an understanding as to what the

15   underlying case was that gave rise to where we are

16   right now with respect to the present cause of action?

17        A.    I don't have a lot of detail around it, no.

18        Q.    Okay.  Do you have an understanding that

19   originally a claim was denied and Foresters attempted

20   to rescind the policy for an alleged misrepresentation

21   of the application, do you know that?

22        A.    I understand that it was with respect to a

23   claim that was made and then ultimately was paid.

24   Again, I don't know the detail in the middle of that,

25   no.

1       Q.   So you have never heard from the day that you

2   joined Foresters right through to today, you have zero

3   understanding as to the fact that there was a claim by

4   Foresters that Mr. Vinas had misrepresented facts in

5   his application and that Foresters attempted to rescind

6   the policy, you've never heard that before?

7       A.   No, that's not true.  If I allege that I

8   apologize.  A number of months, I don't even know how

9   long ago it was, but when David Sullivan was preparing

10  for his deposition I was asked some questions regarding

11  it, so I had some general knowledge of what was

12  happening, yes.

13      Q.   Okay.  So did you assist Mr. Sullivan in the

14  preparation for his deposition?

15      A.   Only in the questions that he had of me

16  around underwriting and just general underwriting

17  practice.

18      Q.   My point I was trying to get to that got us

19  here was I do a lot of this, I assume you're obviously

20  the head honcho of underwriting, there is an

21  underwriting aspect to a denial for misrepresentation

22  in an application, is there not?

23      A.   Say that again please.

24      Q.   Sure.  I'm trying to get to the meat of it.

25      A.   Right.

1          Q.   Are you familiar with the process by which a

2     -- if you need to get something, please.

3          A.   No, I needed to turn the ringer off.

4          Q.   I'm a big believer in we all have families,

5     we all have emergencies.  If anything happens just let

6     me know we will stop, okay?

7          A.   Sure.

8          Q.   Are you familiar with the process by which

9     Foresters processes contestable claims?

10         A.   I'm familiar with that.

11         Q.   If I understand correctly without getting

12    into the minutiae, the claim department will identify a

13    potential contestable claim, will look to see if there

14    was any information omitted or wrongfully stated and

15    then has to check with underwriting to determine if it

16    would have made a difference in the original

17    application decision, is that your understanding

18    generically?

19         A.   Generically, yes, in some cases.  It doesn't

20    always -- underwriting is not always asked for an

21    opinion, but if claims makes that decision to ask for

22    an opinion, absolutely.

23         Q.   That's what I was getting at.  I'm just

24    trying to say in addition to all the things that you've

25    listed for me that underwriters do, would that be an

Page 21

```
 1   additional thing that underwriters do specifically
 2   assisting claims with respect to determining if a piece
 3   of information that was an omission was material or
 4   not?
 5        A.   Yes.  Not two underwriters -- well, in our
 6   practice it's not two underwriters, we have a specific
 7   underwriter that does that.  We have back up for that
 8   person, we have the same thing on the Canadian side, we
 9   have a back up for that person.
10        Q.   Okay.  I'm sorry, I didn't mean to interrupt
11   you, my bad.  Finish your answer.
12        A.   I was going to say there's a very narrow part
13   of our team that does that, not everybody does that.
14        Q.   Okay.  But there is an underwriter who is
15   part of the underwriting team that is assigned to
16   assist with contestable claims?
17        A.   That is correct.
18        Q.   And that's a single individual?
19        A.   A single and then that person's back up,
20   correct.
21        Q.   Does that person have any other
22   responsibilities other than assisting with contestable
23   claims?
24        A.   Yes.  The assisting with contestable claims
25   is not a full-time responsibility, so she's also
```

Page 22

1    underwriting cases when she's not assisting the claims

2    team.

3         Q.   Okay.  Tell me if you would please, we are

4    going to get into what you've done to prepare for this

5    deposition but I need to know, please, what it is that

6    you -- well, strike that.  When did you first hear

7    about the Digna Vinas case?

8         A.   Around the time that David Sullivan was

9    preparing for his deposition, this is October, I guess,

10   seems to me it was some time during this year, early

11   part of this year.

12        Q.   Okay.  And what did you do, if anything, to

13   familiarize yourself with the Digna Vinas case at that

14   time?  If you spoke with Counsel just say I spoke with

15   Counsel without telling me the content of that

16   communication, okay?

17        A.   Correct.

18        Q.   Okay.  So I assume you spoke with Counsel,

19   what else did you do?

20             MS. PETT:  Can you clarify, do you mean back

21   then or now?

22             BY MR. GREENE:

23        Q.   Yes.  Back then.

24        A.   I had no preparation.  I asked or was asked

25   questions by David Sullivan of just general

Page 23

1   underwriting practice questions that I recall.  I

2   didn't look at any documents, I didn't read anything.

3   There wasn't anything I did other than speak with David

4   and Counsel.

5       Q.   That's helpful.  So you never looked at the

6   Rigoberto Vinas file?

7       A.   No.  You mean the full file of medical

8   records and whatever else was retrieved?

9       Q.   I'll make it easier for you, let's capture it

10  in a big lump first and then whittle away the lump.

11  Have you, to this day, ever looked at any aspect of the

12  Rigoberto Vinas file?

13      A.   Just the application.

14      Q.   Okay. When did you look at the application?

15      A.   Again, back to this time of whenever David

16  Sullivan had questions for me.

17      Q.   Okay.  We are going to mess around with a

18  little bit of technology here.  I am not as good as

19  your data people I'm sure, so bear with me if I screw

20  this up, okay?

21      A.   Sure.

22      Q.   Have I shared with you -- do you see an

23  application there on your screen?

24      A.   I do.  The bottom part is kind of cut off.

25      Q.   I just made it smaller for you so you could

Page 24

1    see it here.  I'm going to scroll through this thing so

2    you can take a look at it and I will represent that

3    this is Plaintiff's Exhibit Number 5 from

4    Mr. Sullivan's deposition and I'm going to scroll

5    through this slowly so you can see it and the question

6    I'm going to ask you at the end so that you will know

7    what you're looking for is, does this look like a copy

8    of what you likely looked at back when you were

9    preparing to assist Mr. Sullivan, okay?

10        A.   Okay.

11        Q.   I'm going to scroll through it.  This is page

12   one.  You tell me if you need me to slow or stop at any

13   point.  There's page two.

14        A.   Move forward.

15        Q.   Three, four, five, six, seven, eight and then

16   there were attachments to the actual app as well which

17   are the overflow form, second page of the overflow form

18   and final page of the overflow form.

19        A.   Okay.

20        Q.   So with you having had an opportunity to look

21   at Mr. Sullivan's Exhibit Number 5, does that appear to

22   be the document that you looked at back when you were

23   helping Mr. Sullivan prepare for his depo?

24        A.   It appears to be, correct.

25        Q.   This may seem like a ridiculous and stupid

Page 25

1    question, I'm going to ask a bunch of them in this depo

2    so you will forgive me for an underwriter, but is it

3    fair to say that you are very familiar with Foresters'

4    life insurance application?

5        A.    Yes.

6        Q.    These are the applications that your team

7    looks at in making a decision whether they are going to

8    insure an insured or not; correct?

9        A.    That's correct.

10       Q.    Again, falling under the, excuse the dumb

11   question category, is this the Foresters' logo on the

12   upper right-hand corner of page one?

13       A.    That is correct.  We've since changed our

14   name, but back in this time that's correct.  We just

15   added financial to our name.

16       Q.    Okay.  How does Foresters -- let me do a

17   couple of housekeeping steps first.  While we will be

18   going through these later I just want to get through,

19   as I call them, housekeeping.  I'd like to mark, Tina,

20   did you show the witness the Notice of Taking Depo?

21           MS. PETT:  I showed to him the notice and the

22   order issued by Magistrate Goodman.

23           MR. GREENE:  Okay. Did you show him the

24   Exhibit A to the notice?  I don't want to pester him

25   with it if he hasn't seen it.

1          MS. PETT:  Exhibit A is the category?

2          MR. GREENE:  Yes, the categories that the

3    judge ordered.

4          MS. PETT: Yes, but I showed him the actual

5    order because you had changed one of the categories so

6    I wanted to make it clear what we were here for.

7          MR. GREENE:  Tell me what I changed because

8    if I did it was obviously inadvertent.

9          MS. PETT:  Right.  In category one the Judge

10   said the inquiries Foresters makes in the underwriting

11   process about the knowledge and belief of the insured.

12         MR. GREENE:  Oh, I put Rigoberto Vinas?

13         MS. PETT:  Yes.

14         MR. GREENE:  Okay.  The insured meaning more

15   generic, okay, I got it.  Obviously that wasn't meant

16   to fool anybody or do anything, okay.

17         BY MR. GREENE:

18    Q.   Let me go ahead and mark this then.  Stop

19   share. And, Mr. Parrott, you will forgive, Zoom is a

20   wonderful thing and it does work but it does take just

21   a little bit longer to get through step by step so I

22   apologize for that.

23    A.   No problem.

24    Q.   If you were up in Toronto I would slide this

25   across the table to you, I would show it to you, you

Page 27

1   would agree and then I would go into that really good

2   steak house across the street for dinner. That should

3   work now. Okay. Do you see a document that says

4   Re-notice of Video Deposition Duces Tecum?

5        A.   I do.

6        Q.   Okay.  This is what I was just talking to Ms.

7   Pett about.  I'm going to zoom through it, I'm going to

8   scroll through it very quickly here and I'll ask you if

9   you've seen this document before?

10       A.   I don't recall.  It doesn't look familiar but

11  I've read a lot of documents between in the last number

12  of weeks.

13       Q.   Understood completely. Exhibit A -- strike

14  that. First let me mark this as Plaintiff's Exhibit

15  Number 1 to this deposition.  Madam Court Reporter, if

16  I can ask you to keep track of these I would really

17  appreciate it.  If you need to stop typing for a second

18  to write something feel free to do that.

19            (Thereupon, the Notice of Taking Deposition

20  was marked as Plaintiff's Exhibit Number 1 for

21  Identification.)

22            THE COURT REPORTER: Okay.

23            BY MR. GREEN:

24       Q.   Exhibit A is a list of the areas that you've

25  been assigned to testify about with the correction that

1    Ms. Pett told me about a few minutes ago, so I'm going

2    to work through these and I'm going to ask you, are you

3    here today to testify on behalf of Foresters regarding

4    the inquiries Foresters makes in the underwriting

5    process about the knowledge and belief of the insured

6    concerning information provided in life insurance

7    applications as opposed to the straight forward

8    accuracy of the information provided?

9        A.    I am.  And let me just clarify something, as

10   you were kind of zooming through that document, the

11   document in its entirety did not ring a bell with me so

12   much.  This part of it, Exhibit A, I'm familiar with

13   these four points.

14       Q.    Okay. So you just saved me about a minute and

15   a half to two minutes. Fair to say that you are here

16   today on behalf of Foresters to testify as their

17   corporate representative on these four points with the

18   exception of number one being generically the insured

19   rather than Rigoberto Vinas?

20       A.    That is correct.

21       Q.    What have you done?  I need you to list these

22   things out for me if you would please because I'm going

23   to be taking them down, what have you done to prepare

24   for this deposition?

25       A.    Talked to Counsel, that's really it.  I mean,

```
1    other than being aware of the four points and Exhibit A
2    that we just discussed, talked to Counsel.
3         Q.   Okay.  And I understand you told me you only
4    talked to Counsel, but I have got to go through a few
5    things that it appears the answer is going to be no,
6    but bear with me while I do this because I need to ask
7    very specific questions.
8         A.   Okay.
9         Q.   Have you spoken to any of the representatives
10   in Foresters sales or marketing department in
11   preparation for your testimony here today?
12        A.   I have been made aware of information or
13   questions that were asked of Counsel and to our chief
14   distribution officer and our assistant vice president
15   over the marketing area.  I'm aware of the questions
16   that he asked them and what their responses were.
17        Q.   So if I understand correctly, rather than you
18   going and talking to these people, Counsel went and
19   talked to these people, got answers and then passed
20   that on to you?
21        A.   Correct.  It was email conversations.  Email
22   question, email response.  I saw the question, I saw
23   the response.
24        Q.   But you did not, you didn't pick up the
25   phone, or get on a zoom call, or communicate in any
```

Page 30

1    way, shape, manner or form with anyone from -- directly

2    with anyone from sales, marketing or otherwise

3    regarding your testimony here today; correct?

4        A.   I did not, no.

5        Q.   Well, then, since -- I don't usually get an

6    answer to this question, but I guess this is going to

7    be an exception, what did Counsel tell you?

8             MS. PETT:   We are got going to disclose what

9    Counsel told him.   We are going to disclose what he

10   knows about the topics through the information that has

11   been gathered for him, but we are not going to tell you

12   what Counsel told him.

13            BY MR. GREENE:

14       Q.   If I understand correctly and Mr. Parrott,

15   please, sometimes -- we haven't been going that long

16   here but sometimes I get lost, I'll admit it. I don't

17   think so here.   All of the information that you

18   received regarding sales and marketing and

19   communication that sales and marketing has came from

20   your lawyer; correct?

21       A.   The question to those two individuals came

22   from the attorney.   The question that he asked them,

23   yes, and the response is yes.

24       Q.   Let me be very specific in my question.   With

25   respect to the preparation that you have made to give

Page 31

 1    meaningful testimony here today, all of that

 2    information, other than the underwriting aspects which

 3    is in your head, came from your lawyer; correct?

 4         A.   No.  The only thing that came from the

 5    lawyer, again, was the two questions that were asked

 6    and the 15 seconds it took me to read the responses.  I

 7    mean, other than that, there was no preparation from my

 8    talking to anybody or my looking through any

 9    information or anything of that nature.

10         Q.   Okay.  Well, I need to get back to the source

11    of whatever other information you have.  You said that

12    there was information provided to you from sales or

13    marketing; correct?

14         A.   The response to the question that our Counsel

15    asked them, that's it.  Nothing more.

16         Q.   Let me get an answer to the question and then

17    I'll go ahead and I'll give you a chance because I'm

18    not going to ask you what was that information.  But

19    let me get a yes or no to the question and then we will

20    go from there.  There was information provided to you

21    from sales and marketing; correct?

22         A.   Yes.  I suppose as it was received, yes, as a

23    cc on the email, I guess the answer to the question is,

24    yes.

25         Q.   And that information was, you said you were

Page 32

1    cc'd, who sent the information?

2         A.   Our legal counsel at Foresters, Ian Collins.

3         Q.   Okay. And who was the recipient of that

4    email?

5         A.   The emails were sent to Matt Berman who's our

6    chief distribution officer which Matt has

7    responsibility over all the sales of the organization,

8    the sales division and sales team, and then the other

9    email went to Veronique Maroque, assistant vice

10   president of marketing for organization.

11        Q.   Can I have those two names again please one

12   more time please?

13        A.   Chief distribution officer is Matt Berman.

14        Q.   Hold on.  Chief distribution officer, Matt

15   Berman.

16        A.   Correct.

17        Q.   And who else?

18        A.   Veronique Maroque, Veronique is french so

19   it's V-e-, I'm going to mess this up myself,

20   V-e-r-o-n-i-q-u-e, Maroque is M-a-r-o-q-u-e, I believe.

21        Q.   I got it 100 percent without the help by the

22   way.  I have it down here, I'll show you my piece of

23   paper.  Go ahead. I'm sorry.

24        A.   She's the assistant vice president over the

25   marketing area for the company.

Page 33

1       Q.   AVP in marketing.

2       A.   Correct.

3       Q.   Okay. Now, if I understand what happened,

4  Ian, your in-house counsel, sent an email to Mr. Berman

5  and Ms. Maroque?

6       A.   Correct, separately, right.

7       Q.   Okay. Two separate emails; correct?

8       A.   Correct.  Yes.

9       Q.   Were you cc'd on those out going emails?

10      A.   Yes.

11      Q.   What did those emails say?

12      A.   Response was no.

13      Q.   No. No.

14      A.   I'm sorry.

15      Q.   What did the outgoing email say?

16      A.   Generally asked about if the sales team had

17  any knowledge, or any discussion, or knowledge,

18  knowledge and belief with respect to the claims

19  practice, the underwriting practice, I believe that was

20  the substance of the email.

21      Q.   Okay.  All right. Strike that.  Was that the

22  substance of both emails?

23      A.   Yes.  They both were identical questions

24  other than the direction, for Matt it was for sales and

25  for Veronique it was for marketing, marketing

Page 34

1    materials, that sort of thing.

2         Q.    Okay.  And if I understand correctly the

3    inquiry that was made is whether the, and then fill in

4    the blank there, sales team for one, marketing team for

5    the other, had any knowledge with respect to the claims

6    or underwriting processes, do I have that right?

7         A.    No.  The aspect of knowledge and belief with

8    respect to the claims and underwriting processes.

9         Q.    Has any knowledge with respect --

10        A.    Awareness.  Yes, awareness is maybe a better

11   word so we are not using the same word twice. Awareness

12   of knowledge and belief with respect to the claims and

13   underwriting practice.

14        Q.    So did both people write back their answers?

15        A.    They did.

16        Q.    And they cc'd you with it?

17        A.    They did.

18        Q.    And what was the answer from Mr. Berman?

19        A.    No.

20        Q.    Simple one word answer?

21        A.    Yes, sir.

22        Q.    And from Ms. Maroque?

23        A.    The answer was no.  I think she said, no, we

24   don't have any knowledge, or, no, we don't have any

25   awareness.  I forget exactly what she said but she used

1  four or five words.

2      Q.   Okay.  Do you know what -- strike that.  Can

3  you give me an estimate as to did this question from

4  Ian go out and the emails came back immediately, was it

5  a day, was it a week, you know, how long before -- I'm

6  sorry, go ahead.

7      A.   I don't recall.  It was very quick, I don't

8  know if it was right away or within -- certainly within

9  24 hours.

10     Q.   I want to see if I have an understanding of

11 the question here.  The question was whether -- we will

12 just use sales team as an example so I don't have to

13 keep saying it both ways and I understand the same

14 question was asked with regard to marketing.

15     A.   Okay.

16     Q.   Whether the sales team had awareness of the

17 best knowledge and belief clause with respect to how

18 that is handled by claims and underwriting, is that a

19 fair summary?

20     A.   That's a fair representation.

21     Q.   Okay.  And the answer from both sales and

22 marketing was that they have no idea how the claims or

23 underwriting folks deal with the best knowledge and

24 belief clause in their underwriting aspects and their

25 claims aspects; is that true?

1          A.    That's correct.

2          Q.    You have, I assume, through your years become

3    familiar with how Foresters sells its policies;

4    correct?  Meaning, when I say how, I mean the mechanism

5    of sale, do they knock door to door, do they advertise

6    on the internet, that's what I meant by how.

7          A.    Yes, I do.

8          Q.    And how is that done?

9          A.    We have many different distribution channels

10   and they are done in different ways. For example, we

11   have a BGA channel, we have an NMO channel, we have a

12   multi-level marketing channel.  Just, for example,

13   those three are very different.  Multi-level marketing

14   channel will likely work off of insurance leads and

15   those insurance leads are the source of a customer

16   base, if you will, and they will contact customers.

17   There's no door to door sales really anymore.  The

18   contact is initially through telephone, through email,

19   through digital means.  The BGA channel, for example,

20   is a little bit different because they often work

21   through existing customers, customer referrals, don't

22   generally use leads as much. There is a multi-level

23   marketing organization where they have an NMO channel,

24   but they all have a basis for gathering a customer

25   base. And so once they gather that customer then the

Page 37

```
 1   practice is to connect with that customer and whatever
 2   way is appropriate for the producer and the customer
 3   whether it's telephone, or whether it's digital means,
 4   or face-to-face conversation, whatever it takes.  They
 5   then proceed with their sales process from there.
 6        Q.   Okay.  It's about noon, I'm just going to go
 7   to the restroom, let's just take 10, say 12:10, does
 8   that work for everybody?  I don't know what your local
 9   geography is, is that good for everyone?
10        A.   That's fine.  I'm central time so I'm just an
11   hour behind you.
12        Q.   Okay.  Great.  We will take 10.
13        A.   I have a question for mechanics, do we just
14   put everybody on mute or how are we doing that?
15        Q.   Don't cut anything off, just stop your video,
16   put yourself on mute.  I would not disconnect.  We are
17   lucky to have this good connection at this time.
18        A.   Okay.
19             THE VIDEOGRAPHER: We are going off the
20   record. The time on the video monitor is 12:04 p.m.
21             (Thereupon, a brief recess was had at 12:04
22   p.m.)
23             (Thereupon, the following proceedings were
24   had at 12:16 p.m.)
25             THE VIDEOGRAPHER: We are back on the record,
```

Page 38

1    the time on the video monitor is 12:16 p.m.

2         BY MR. GREENE:

3         Q.   Mr. Parrott, before we broke for a short

4    break I was asking you about ways that Foresters

5    markets its product or sells its product to the public

6    and you were telling me that there's a number of

7    different ways.  Let me show you something here.  I

8    have got a page off of Foresters' website here, I hope

9    that you can see it, can you, or is it too small or too

10   big?  You tell me.

11        A.   No, I can see it.  You got quite a margin at

12   the top so I'm seeing where it says additional notes,

13   that's the last thing I see on this page.

14        Q.   Yes, that's all I can see too.

15        A.   Okay.

16        Q.   Okay. Let me do some identifying here for the

17   record. First of all, does this appear to you, unless I

18   am a really, really good scammer here, that this is a

19   fair and accurate copy of a legitimate Foresters'

20   website?

21        A.   Correct.  It looks to be a document that may

22   be available through our website, but, yes.

23        Q.   And does it look like, just for our record,

24   the site is www -- can you read this along with me to

25   confirm?  Are you able to?

1        A.    I can, yes, I can.  Do you want me to read

2    that?

3        Q.    I'll read it to you and just you tell me if

4    I'm accurate here.  It appears the website is

5    www.Foresters.com/EdwardNancy/the word find, a dash,

6    the word an, a-n, alpha, November, dash, the word

7    advisor, the number sign and then GREF, golf, romeo,

8    echo, fox trot, have I read that accurately?

9        A.    That's correct.

10       Q.    Does this page indicate that one of the ways

11   that Foresters markets its product or sells its product

12   is through a network of independent life insurance

13   representatives?  I'm reading that down here.

14       A.    That's correct.  Our entire company is

15   independent producers, independent advisors.  We don't

16   have a captive sales force, that is to say a sales

17   force or salaried agents paid for by the company.  The

18   captive sales force can only write business for one

19   company.  Our distribution can write business for many

20   companies, we just happen to be one of them so -- go

21   ahead.

22       Q.    And if I understand correctly, you all give

23   your applications and your promotional materials to

24   these, a group of what you call independent agents, and

25   they go out and they sell your policies. They could

Page 40

```
 1    sell other people's but they sell yours as well.
 2         A.   Correct.  Once they are contracted and
 3    appointed with us then they have access to this
 4    information.
 5         Q.   Okay.  And the applications that they give
 6    are provided by Foresters; correct?
 7         A.   Correct.
 8         Q.   I'm sorry, I didn't mean to do that.  Let's
 9    go back.  There you are. Okay. Have we now got the
10    application back on the screen, it was Exhibit 5 to
11    Mr. Sullivan's deposition?
12         A.   Yes, looks like we do.
13         Q.   Okay.  Through your experience with Foresters
14    you were telling me that -- strike that. Let's get back
15    to where we were a second ago.  Let me just get rid of
16    this.  I'm sorry, let me try it a different way.  When
17    Foresters gives the independent agents the
18    applications, and this is going to fall under the
19    stupid question category, I like to preface it so you
20    don't think I'm a moron, you agree with me that it's
21    necessary for the independent agent to communicate with
22    the prospective insured about the product that they are
23    looking to sell, does that seem reasonable?
24         A.   That's reasonable, yes.
25         Q.   And you agree with me that Foresters
```

Page 41

1    authorizes these people to make accurate

2    representations about Foresters' products, correct?

3         A.   Correct.

4         Q.   And that includes the process of going

5    through selling the product and the application

6    process, et cetera; correct?

7         A.   Correct.

8         Q.   And all of those representations are

9    authorized by Foresters as long as they are accurate

10   representations; correct?

11        A.   That is correct.

12        Q.   In fact, this is the part I was looking to

13   get to before, in looking at -- have you got Exhibit

14   Number 5 back up there?

15        A.   I do.

16        Q.   In looking at Exhibit 5 on page 8 the

17   independent agent that takes your application for

18   Foresters has to make a representation that she did

19   certain things and didn't do certain things in the

20   application itself; correct?

21        A.   That's correct.

22        Q.   Are you familiar with this, what's called

23   agent producer certification that I've kind of

24   highlighted here for you?

25        A.   I'm familiar with it.

Page 42

1      Q.   Okay.

2           MS. PETT:   Craig, I don't mean to interrupt

3      you, but this doesn't seem to fall within any of the

4      categories.

5           MR. GREENE:   I promise you this is going to

6      tie right in, I promise.   And if not, you can always

7      deal with it, but you will see where it comes in a

8      minute.

9           BY MR. GREENE:

10     Q.   The agent here, it looks like it says unless

11     specifically stated otherwise the producer report, I

12     certify each of the following and then there's A and

13     then it looks like if I've counted right through H,

14     does that sound right to you?

15     A.   Looks right.

16     Q.   Okay.   I'm going to save you and I the

17     torture of going through A through G because I'm only

18     really interested in H.   But I will tell you if you

19     feel like in order to answer this question completely

20     or fairly you need to talk about A through G I want you

21     to do so, okay?

22     A.   Okay.

23     Q.   Okay.   The agent or producer at the time of

24     submitting the application to Foresters has to certify

25     that he or she has made no misrepresentations about

Page 43

1    Foresters product applied for in the application.  They

2    further have to represent that they've made no promise

3    regarding the benefits or future performance of the

4    products applied for other than specifically written in

5    this specific product applied for in the app; is that

6    fair?  Is that true?

7           A.    That's fair, yes.

8           Q.    Would that suggest to you the exact inverse

9    which is what you told me a minute ago that the agent

10   is expected to make representations about Foresters

11   products, they just have to be true representations,

12   right?

13          A.    They have to be true and accurate

14   representations, correct.

15          Q.    Are you familiar with the portion of the

16   application that the insured has to sign where they

17   represent that the medical information they provided,

18   among other information, life, health, age, things like

19   that, is true and correct to the insured's best

20   knowledge and belief?

21          A.    Correct.  It's in disclosures above this

22   section.

23          Q.    Yes, sir, you are.  It's in the area called

24   signature section; correct?

25          A.    Correct.

1      Q.    Actually, no, I may be wrong.  Nope, it's

2    not.  I thought it was too.  Hold on.  Here we go.

3    Thank goodness for control F.  I love control F.  Okay.

4    Let's start a new question.  Right on page 7 of 8 the

5    insured makes a representation that I, as evidenced by

6    my signature in this application, declare that he's

7    reviewed the application, was asked the questions that

8    apply to him and provided answers shown in the

9    application to the questions and that the statements,

10   answers, and representations contained in the

11   application are full, complete and true to the best of

12   the insured's knowledge and belief; is that accurate?

13     A.    That's correct.

14     Q.    When an insured -- strike that.  Within these

15   policies Foresters has something called a contestable

16   period, are you familiar with that?

17     A.    I am.

18     Q.    Again, I will try and summarize it

19   generically. If you think my summary is inaccurate or

20   unfair please let me know, but I try and be objective

21   in this.  If I understand correctly the contestable

22   provision in the policy says that if the insured or the

23   owner of the policy is to pass on, die, within two

24   years of issuance of the policy then Foresters can go

25   back, look at the representations in the application

Page 45

1    and if it finds there to be what they consider to be a

2    misrepresentation that was material to their taking on

3    the risk then they reserve their right to rescind the

4    policy, is that a generic description?

5         A.   The contestability phrase or cause actually

6    gives us the right to look back to that part of your

7    description.  It gives us the opportunity to go back

8    into history and to make sure that there were no

9    misrepresentations. Further down in explanations beyond

10   the contestable period it spells out what the

11   ramifications could be of that, but, yes, generically

12   amongst that phrase or that clause and other parts of

13   the declaration that's correct.

14        Q.   During his deposition I asked Mr. Sullivan

15   whether he agreed that the key question that the claims

16   department has to determine when determining if a claim

17   should be denied during the contestable period or

18   attempted to be rescinded during the contestable period

19   is whether the insured did or did not answer an

20   application question to his or her best knowledge and

21   belief and he said, yes, that is the inquiry.  Do you

22   agree with that?

23        A.   Yes.

24        Q.   Do you understand that there is a difference

25   between the insured's best knowledge and belief and

Page 46

1    what may or may not be a factually accurate answer in

2    terms of a diagnosis or medical condition?

3              MS. PETT:  Objection to the form.

4              MR. GREENE:  If it's compound I'll break it

5    down.

6              THE WITNESS: Yes, will you rephrase that.

7              BY MR. GREENE:

8         Q.   I had an or in there so Tina's position is

9    well taken.  Do you understand that there's a

10   difference between the insured's best knowledge and

11   belief and what may be an actual fact in terms of a

12   medical diagnosis?

13        A.   Do I believe it's possible or what is the --

14   try again, please, I'm sorry.

15        Q.   You and I have been doing great so when you

16   tell me that you don't follow my question that means

17   that I got to do a better job.  Do you understand that

18   there is a difference between asking for an insured's

19   best knowledge and belief, i.e., get them to say what

20   they know, their truth, versus what they may believe

21   but may be factually inaccurate?

22        A.   Not necessarily.

23        Q.   I understand that they may be the same, but

24   there are situations -- strike that.  The critical

25   question for purposes of denying the claim, as you

1  understand it, is whether the insureds answered the

2  question to their best knowledge and belief, right?

3          A.    That's correct.

4          Q.    That is the insured has to tell the truth as

5  they know it; correct?

6          A.    That is correct.

7          Q.    Do you understand that there are situations

8  where the insured could be telling the truth as they

9  know it, but it may be factually inaccurate?

10         A.    It could be, depending on circumstances of

11 the medical history of other -- how many times they see

12 their doctors, medications, treatments, a whole factor

13 of things that may come into play.

14         Q.    Understood.  So if a -- strike that.  Are you

15 aware of any practice, protocol, best practices or

16 anything like that that Foresters either gives to its

17 agents or suggests to its agents in terms of informing

18 elderly prospective insureds about the two year

19 incontestability period or contestability period?

20         A.    I have the last part of your question, Mr.

21 Greene, but the first part, would you ask the first

22 part again?

23         Q.    Of course.  Are you aware of any practice,

24 any suggestion, any guidance, anything like that, that

25 Foresters conveys to agents or would like its

1    independent agents to engage in with respect to

2    informing elderly prospective insureds about the

3    contestable period, that is, that they better be

4    telling the truth during their application or in their

5    application because if one of them is to die or if an

6    insured is to die within two years Foresters could come

7    back and try and rescind the policy?

8           MS. PETT:  Object to the form.

9           BY MR. GREENE:

10   Q.    You can answer.

11   A.    The reference to the elderly isn't really

12   material because our agents, the independent producers

13   that we ultimately contract that are contracted through

14   NMOs and BGAs and the other organizations that we do

15   business with and go through, get information and

16   training material from the organization.  They also,

17   depending on, excuse me, depending on the organization

18   that they are contracted with in their NMO or their BGA

19   they also go through additional training with respect

20   to the practice and the products and everything that we

21   sell and the procedures surround things.

22          We don't have a guaranteed issue product.

23   There is a no contestable period in a guaranteed issue

24   product.  So every product that we have, that we sell

25   carries a guarantee or carries the contestability

Page 49

```
 1    clause. We are required by every state to include it in
 2    every single product and so that, in itself, is part of
 3    any discussion with respect to any state.
 4         Q.   My only question, my only question was
 5    whether or not Foresters had any specific language or
 6    promoted any specific language with regard to elderly
 7    patients and the contestability clause and I understand
 8    your answer is no.
 9         A.   That's correct.
10         Q.   Okay.  If I understand correctly then,
11    applying what you and I have discussed with regard to
12    the contestability clause, as long as an insured
13    answers questions to his or her best knowledge and
14    belief in the application process the claim won't be
15    denied because of a claim of contestability if the
16    insured dies in the first two years, right?
17         A.   That's not necessarily true.  Every -- I'm
18    sorry.
19         Q.   You're right, there could be other reasons,
20    so let me -- that's very fair.  Let me reask the
21    question.  With respect to denial based upon
22    inaccuracies in the application, with respect to denial
23    for contestability, are you with me so far?
24         A.   Yes.
25         Q.   Okay. If an insured, a prospective insured, I
```

1    guess, at that time, answers questions to his or her

2    best knowledge and belief the insurance company,

3    Foresters, won't rescind the policy for a

4    misrepresentation if they answer to their best

5    knowledge and belief, right?

6        A.    That's not necessarily true. The application

7    lays out the responsibilities of the customer to answer

8    those questions to the best of their knowledge and

9    belief.  We rely on that, we rely on the transparency

10   of the customer to tell us what it is that they know.

11   We also rely on a number of different data elements

12   that we secure on every customer for background,

13   underwriting background, underwriting investigation

14   information to corroborate information. From the time

15   of the underwriting aspect and at that point in time

16   when a claim is made, excuse me, at that point when a

17   claim is made it then becomes the responsibility of the

18   contestable claim review practice to make

19   determinations around belief and knowledge.  But belief

20   and knowledge is inherent in the claims process.  It's

21   inherent in the underwriting process.  We have it

22   documented in our application through the declarations

23   and what the applicant has to sign.  So with respect to

24   the underwriting aspect of things that goes to our

25   ability to make an assessment and make an offer based

Page 51

1   on that information that we have up front.

2        Q.   Are you finished?

3        A.   Yes.

4        Q.   Okay.  Can I ask the court reporter to read

5   back the question and then the first sentence of the

6   insured's answer where he says not necessarily.

7             (Thereupon, the above-referred to section was

8   read back by the court reporter.)

9             BY MR. GREENE:

10       Q.   So if I understand what you are saying, an

11  insured could 100 percent answer questions to their

12  best knowledge and belief, tell 100 percent the truth

13  as they see it and Foresters could still rescind the

14  policy under its contestability provision; correct?

15       A.   That's the responsibility of the contestable

16  claim process to determine that --

17       Q.   I understand.

18       A.   -- to the best knowledge and belief.

19       Q.   Okay. I'm asking you, assume that the

20  insured, this is part of what we have to do here, I

21  want you to assume that the insured answered questions

22  to his or her best knowledge and belief, that's a

23  given, okay, you with me so far?

24       A.   Got it.

25       Q.   If we assume that then under Foresters'

```
 1   policy that insured should be able to rest comfortably
 2   that as long as they told the truth as they know it,
 3   their best knowledge and belief, Foresters won't
 4   rescind the policy based upon misrepresentation in the
 5   application if, in fact, they did answer to their best
 6   knowledge and belief, i.e., tell the truth; is that
 7   fair?
 8        A.   Let me ask a clarifying question.  At what
 9   point in the process is this about?  Is this when they
10   are completing the application and waiting for an
11   answer from us on whether we are going to offer the
12   policy or not?
13        Q.   Oh, yes.  I'm saying assume for a moment that
14   the insured is trying to decide whether to buy your
15   policy or not, okay?
16        A.   Yep.
17        Q.   And the insured does, in fact, answer
18   questions to his or her best knowledge and belief in
19   doing so, okay, assume that's a fact.
20        A.   Okay.
21        Q.   Okay.
22        A.   Got it.
23        Q.   If, in fact, that's the case, that insured
24   should be able to rest comfortably that as long as he
25   or she answered those questions truthfully as far as
```

Page 53

```
 1    they knew that Foresters will not rescind the policy
 2    based upon a misrepresentation in God forbid the
 3    scenario that the insured were to die within the first
 4    two years; is that true?
 5         A.    The representation that they are making at
 6    the time of underwriting and we are making our decision
 7    based on that, that is the first instance of whether
 8    we're verifying knowledge and belief.  We get
 9    transparency from the customer, we make our decision.
10    They should be able to feel good about -- if they were
11    truthful about their information they should be able to
12    feel good about it.  If there is a contestable claim we
13    are going to go back and verify information.  So, for
14    example, in underwriting we don't -- if we don't have
15    any information in which to review because there's
16    nothing there we assume the customer is telling us the
17    truth.  But if in light of the contestable claim
18    process, let's just say for a moment that the customer
19    goes to the doctor every month or every three months
20    and there's things that are going on that would lead us
21    to believe that that isn't necessarily true, that the
22    fact that they are going through something.  Like a
23    cancer patient, for example, is going to chemotherapy
24    every other day then that's obviously not correct, they
25    were not truthful about their knowledge and belief.
```

Page 54

1            So at the time of underwriting that's when
2    knowledge and belief is established for the offer.  At
3    the time of contestable claim because we have the right
4    to review that information and go back and review the
5    information, that then is re-established that knowledge
6    and belief was an accurate picture at the time of
7    underwriting.  So there's two different points in time.
8    It's not just because you verified knowledge and belief
9    on the underwriting aspect because of a contestable
10   claim we have the right to go back and look at
11   information, and if it was determined that knowledge
12   and belief wasn't accurate then that's a decision
13   that's going to come into play.
14        Q.   I'm not contesting or challenging or even
15   asking a question about whether you have a right to go
16   back and look, and I'll make it clear on the record, I
17   am not asking you about that, okay?
18        A.   Yes.
19        Q.   Okay.
20        A.   Agree.
21        Q.   What I am asking you about is in your
22   hypothetical answer back to me you said assume that and
23   then you posed a hypothetical where you suggested it
24   was not the insureds best knowledge and belief and you
25   said we would then be able to rescind.  I've asked you

Page 55

1   as part of my question to assume that the insured is

2   answering to their best knowledge and belief and I

3   understand sometimes that's hard to do if you don't

4   believe it, but it's my question and I have the burden

5   of proving what I put in my hypothetical, okay?

6        A.   Yes.

7        Q.   Okay.  So, once again, if, in fact, the

8   insured is answering the question to their best

9   knowledge and belief, that insured should be able to

10  rest comfortably that if, God forbid, the insured dies

11  within the first two years that Foresters will not

12  rescind the policy based upon the incontestability or

13  the contestability clause if, in fact, it is their best

14  knowledge and belief, true?

15            MS. PETT:  Object to the form.

16            MR. GREENE:  Go on.

17            MS. PETT:  Go ahead.

18            THE WITNESS: Am I good?

19            MR. GREENE:  Yes, you're good.

20            MS. PETT: Yes.

21            THE WITNESS: Okay.  As long as they

22  understand that that gets to go under scrutiny within a

23  contestability claim period.

24            BY MR. GREENE:

25        Q.   And a representation to the insured that as

 1    long as they tell the truth, 100 percent the truth as

 2    they know it, that Foresters will not rescind the

 3    policy based upon a contestable claim procedure would

 4    be a truthful representation to the insured, right?

 5         A.   Yes.  The aspect of this, you're asking for a

 6    claims decision to be made at the time of underwriting

 7    and they have -- if they believe that they have told

 8    the truth to the best of their belief and knowledge,

 9    understanding there's a contestable claim period, then

10    they should feel good.

11         Q.   That the claim will not be contested?

12         A.   No, the claim will be contested.  If they die

13    within the first two years it will be contested.

14         Q.   Contested you mean the process?

15         A.   The process.

16         Q.   Okay.

17         A.   Correct.

18         Q.   Let me reask that question.  If they told the

19    truth the policy will not be rescinded, the claim will

20    be paid?

21         A.   That will be a decision based on the

22    contestable review.  So I can't -- no, I can't -- they

23    have to know that a contestable review is going to

24    happen and there is no claims decision made at the time

25    of underwriting whether they have been completely

1   truthful and belief, completely truthful with their

2   knowledge and belief, a contestable review will happen

3   and a decision will come of that review.

4        Q.    That's why I changed my question and I

5   changed it from a review to the decision.  Back up

6   again, okay.  If the insured is giving answers to his

7   or her best knowledge and belief, and I know you're

8   having a really hard time including that part in these

9   questions, but every one of these questions, until I

10  tell you otherwise, assumes that, okay?

11       A.    Got it.

12       Q.    Okay.  If the insured is, in fact, giving

13  answers to their best knowledge and belief then a

14  representation by the agent to the insured that says

15  something like listen, answer these questions to your

16  best knowledge and belief, and as long as you tell the

17  truth, as long as you're telling your true best

18  knowledge and belief, the claim will not be denied for

19  a misrepresentation, that would be an accurate

20  statement; correct?

21       A.    No.  Again, you're asking me to make a claims

22  decision at a time prior to a claim happening.

23  Secondly, the agent, the producer has no -- they don't

24  have any authority to make that claim.  They cannot

25  tell the applicant that a claim will be paid regardless

1    of whether they -- the claim to them would be truthful,

2    to the best of your knowledge and belief we need you to

3    make sure that these questions are accurate and these

4    answers are accurate because his only authority is to

5    say that a death within the first two years will have a

6    contestable review. To say that that death, that that

7    claim will be paid or won't be rescinded he has no

8    authority to make that claim, nor do I, nor does David

9    Sullivan, nor does the president of the company because

10   it's a result of the process.  And so, no, you can't

11   make that claim even up front.

12        Q.   Okay.

13             THE VIDEOGRAPHER: We have about five minutes

14   left to change media.

15             BY MR. GREENE:

16        Q.   Did you ever talk to David Sullivan about his

17   testimony after he was deposed?

18        A.   No, I didn't.

19        Q.   Why is it that you threw out there in that

20   answer nor does David Sullivan when telling me that no

21   one has authority to say that a claim will or won't be

22   paid?

23        A.   Because you're representing this at the time

24   of underwriting, that's the question.

25        Q.   My question was why did you include David

Page 59

1   Sullivan in that answer?

2       A.   I just included him as a party of people.  At

3   the time of underwriting no person in Foresters'

4   organization has the right to say a claim will be paid

5   until that claim is made and that claim if within the

6   first two years is investigated.

7       Q.   Is any of your experience that we went

8   through -- how many years was it?  We never did the

9   math.  How many years have you been doing this?

10      A.   I have been in the industry 35 years roughly.

11      Q.   I know it's painful to say.

12      A.   35, 36.

13      Q.   I suffer the same pain.  In your 35 years in

14  doing this in the industry is any of that in claims?

15      A.   Actually, my first company in the first year

16  I was part of claims and then they moved me to

17  underwriting, maybe a year.

18      Q.   That was about 32 years ago?

19      A.   34 actually, 1985, '86, roughly.

20      Q.   Anything since then?

21      A.   No.  Just other than any interactions that I

22  might have with claims and our person that deals with

23  contestable claims, that's everything.

24          MR. GREENE:  Okay.  Mr. Videographer, go ahead

25  and change out your tape.

Page 60

1           THE VIDEOGRAPHER: Okay. Thank you. We are off

2      the record. The time on the video monitor is 12:54 p.m.

3           (Thereupon, a brief recess was had.)

4           (Thereupon, the following proceedings were

5      had at 1:00 p.m.)

6           THE VIDEOGRAPHER: We are back on the record.

7      The time on the video monitor is 1:00 p.m. and this

8      marks the beginning of media unit number two.

9           BY MR. GREENE:

10     Q.    Mr. Parrott, I know you don't deal with

11     claims or haven't dealt with claims in 30 plus years,

12     but sitting here today can you think of any scenario,

13     any situation where assuming that an insured did answer

14     questions to their best knowledge and belief that his

15     or her claim should be rescinded for material

16     misrepresentation of the application, assuming they

17     did, assuming they did?

18     A.    So let me answer this way, if the applicant

19     completed the application to the best of their

20     knowledge and belief and our contestable claims review

21     confirmed that, then, no, the claim would not be

22     rescinded.

23     Q.    I didn't ask you that.

24     A.    Okay.

25     Q.    I asked you can you think of any factual

Page 61

1    scenario where if, in fact, the insured did answer
2    questions to their best knowledge and belief, that's
3    the conclusion, that is the answer, they did it, they
4    were answering questions to their best knowledge and
5    belief, can you think of any scenario where the claim
6    should be or the policy should be rescinded or the
7    claim denied for material misrepresentation?
8         A.   No.  Again, if that's what it was confirmed
9    then it wouldn't be rescinded.  To your factual
10   question, again, I think tell me what it is that you're
11   asking exactly.
12        Q.   You answered it, you just did.
13        A.   Okay.
14        Q.   You just answered it.
15        A.   Okay.
16        Q.   You agree with me that in determining what
17   the insured's best knowledge and belief is the claim
18   department should be trying to figure out what the
19   insured's best knowledge and belief was, right?
20        A.   It's inherent in their practice and what they
21   do in the review, yes.
22        Q.   I'll withdraw the question because you need
23   to listen to my question.  I asked you what they should
24   be doing.  So my question was, you agree with me that
25   if, in fact, their goal is to determine what the

1    insured's best knowledge and belief is that the claims

2    department should be making that inquiry; correct?

3         A.   Everything around it is built into their

4    practice of how they do things.  So inherently there's

5    no checklist, I guess, if that's what you're asking,

6    there's no checklist that happens, but in their

7    practice in what they do in reviewing contestable

8    claims that's one of the questions that they have to

9    answer to themselves, do we think this guy knew or gal

10   knew what was going on.

11        Q.   Okay.  That is -- now, you're answering that

12   from the underwriting perspective, right?

13        A.   Well, I'm sorry, I'm answering that from the

14   underwriting perspective.  I'm also answering that from

15   the times in which there may be underwriting questions

16   of a contestable claim that go beyond, that in our

17   review there may be times where David and I talk about

18   a claim and we talk about something medically that's

19   very specific --

20        Q.   Right.

21        A.   -- to somebody and would they have any idea

22   of what's going on, that kind of scenario.

23        Q.   David, you're referring to David Sullivan?

24        A.   That's correct.

25        Q.   David Sullivan is the head of claims, right?

Page 63

1        A.    That's correct.

2        Q.    Okay.  He's the one that, I guess, to use

3   your terminology, I want to be fair to you here, he

4   would be setting the claims philosophy as you set the

5   underwriting philosophy, right?

6        A.    I suppose so, yes.

7        Q.    So what the claims department should be doing

8   and shouldn't be doing is better stated by him than by

9   you; is that fair?

10       A.    Well, he's directly responsible for the

11  claims, that's absolutely correct.  In terms of what

12  goes on, again, my understanding was this deposition

13  was around generic discussion of practice and what we

14  are doing.  So in my involvement with the claims team

15  or the claims area rather as it relates to a number of

16  factors, I do have a very good understanding of how

17  they do things.

18       Q.    Okay.  I didn't ask you that.  Very simple

19  question, David is -- David Sullivan is better able to

20  testify as to what the claims department should be

21  doing than you are?

22       A.    He owns it, he runs it so I guess the answer

23  to that is, yes.

24       Q.    Okay.  To the best of your knowledge, did any

25  of the folks in the marketing or sales department ever

Page 64

1    make any inquiry, check, confirm, or otherwise

2    determine whether the claims department was, in fact,

3    looking to determine, looking to find out what the

4    insureds best knowledge and belief was during

5    contestable claims?

6         A.   Not to my direct knowledge and based on the

7    information we received from Matt and Veronique, no.

8         Q.   So the sales department, the marketing

9    department never confirmed that the claims department

10   was, in fact, or wasn't, in fact, making inquiry to

11   determine the insureds best knowledge and belief?

12        A.   No.

13        Q.   What I said is right?  You had a double

14   negative, you said no.

15        A.   I'm sorry, then reask it again.

16        Q.   Can you read the question back please.

17             (Thereupon, the above-referred to question

18   was read back by the court reporter.)

19        A.   They don't make those inquiries.

20        Q.   And, to your knowledge, they never did make

21   any such inquiries at least, we will use the time

22   period that the Court has limited us to, between 2014

23   and 2018, right?

24        A.   That is correct, they never did.

25        Q.   Based upon your investigation did -- strike

1    that.  Can you identify for us please what, if any,

2    training the claims folks go through in order to teach

3    them that they have to be determining what the insureds

4    best knowledge and belief is as compared to what the

5    actual diagnosis or fact may be relating to a medical

6    condition?

7         A.   I'm not aware of the training that they go

8    through.  I know that we will, at times, help them with

9    some underwriting training, I guess, if you will for

10   lack of a better word with respect to some things.

11   Sometimes it's specifically on a medical condition,

12   sometimes it's something else, some legislation that's

13   come across, but it's very generic.

14        Q.   You know, I asked one thing of Mr. Sullivan

15   and he answered, but it is an underwriting question and

16   I'm curious about it.  I asked him if Foresters had any

17   policies, if they issued any policies that did not have

18   a best knowledge and belief clause in the application

19   and he told me he was unaware of any such policy.  Is

20   that accurate from an underwriting perspective as well?

21        A.   I would say so.  Again, because of all the

22   information that we used to underwrite a case.

23        Q.   All I asked is if you're aware of any.

24        A.   Yes.

25        Q.   Is there any application that you guys give

Page 66

```
 1    out to all these agents or anyone else that's selling
 2    your policies that does not have a best knowledge and
 3    belief clause that you're aware of?
 4         A.   No.
 5         Q.   I'm starting to get hungry, so let's do this
 6    because it's 1:15 here. I'll move into a different area
 7    when we get back.  So Madam Court Reporter, what do you
 8    need, about 45 minutes, is that good to give your
 9    fingers a rest?
10              THE COURT REPORTER: I'm fine with whatever. I
11    will go along with the majority.
12              MR. GREENE:  Tina, you tell me.
13              MS. PETT:  I would like to do it quick
14    because I would like to get this done today.
15              MR. GREENE:  That makes two of us if I can.
16    Let's just take half an hour. Mr. Parrott, is a half
17    hour good for you?
18              THE WITNESS: Yes, that's fine.
19              MR. GREENE:  Okay. Let's make it 1:45 eastern
20    time, 12:45 central time.
21              THE WITNESS: Very good.
22              MR. GREENE:  Great.
23              THE VIDEOGRAPHER: Off the video record. The
24    time on the video monitor is 1:12 p.m.
25              (Thereupon, a lunch recess was had at 1:12
```

Page 67

1   p.m.)

2              (Thereupon, the following proceedings were

3   had at 1:48 p.m.)

4              THE VIDEOGRAPHER:  We are back on the record,

5   the time on the video monitor is 1:48 p.m.

6              BY MR. GREENE:

7      Q.   Mr. Parrott, during the application process

8   -- you good, can you hear me okay?

9      A.   Yes, you're good.  This thing just isn't

10  quite settled in there.  There we go.

11     Q.   If during the application process the agent

12  told the insured that Foresters would be determining

13  the insureds best knowledge and belief during a

14  contestable claim that would be an accurate

15  representation, right?

16     A.   If they said that, if the agent said that?

17     Q.   Yes.

18     A.   That would be accurate, yes.

19     Q.   And because you've had nothing to do with

20  investigating or looking into the claim in Ms. Vinas's

21  case you're unaware of any evidence if, in fact, that

22  was or was not done in this case; correct?

23     A.   I'm not aware of any -- ask the question

24  again, please, would you, sir.

25     Q.   Sure.  If I understand what you told me

Page 68

1  before, the only thing that you've done is looked at
2  the application in this case and you didn't remember
3  anything about the underlying merits so I'm just asking
4  you, you have knowledge, no evidence, one way or the
5  other, if, in fact, Foresters did or did not determine
6  or attempt to determine the insureds best knowledge and
7  belief in this case?
8        MS. PETT:  Object to form.
9        BY MR. GREENE:
10    Q.   Give me a yes or no and then feel free to
11  explain to your heart's content.  Do you have knowledge
12  about that?
13    A.   No, I don't.  Let me respond one thing as I
14  was having lunch and going back and thinking about what
15  we've talked about.
16    Q.   Wait.  Are you going to change an answer you
17  have given previously?
18    A.   No.
19    Q.   Does it have anything to do with this
20  question?
21    A.   Somewhat I would guess.
22    Q.   All right.  Well, how is this, if you are
23  going to go ahead and change something or make an
24  additional statement you can go ahead and you can have
25  Ms. Pett ask you about that on cross examination, okay?

Page 69

1        A.    Sure.

2        Q.    She can go ahead and solicit that from you.

3        A.    Okay.

4        Q.    During your lunch break did you speak with

5    anybody?

6        A.    We spoke on the phone with my counsel.

7        Q.    That's all I want to know, yes or no answer.

8        A.    Yes. Tina and me.

9        Q.    Okay. Did you read Mr. Sullivan's deposition

10   in this case?

11       A.    I did not, no.

12       Q.    Did anybody read any portion of it to you?

13       A.    Not to my knowledge.

14       Q.    Did anybody summarize any of his testimony to

15   you?

16       A.    No.

17       Q.    So sitting here today you have zero knowledge

18   of the substance of anything David Sullivan said during

19   his deposition, is that a fair statement, accurate?

20       A.    It's a fair statement.

21       Q.    Okay.  Did anybody -- strike that.  Did you

22   read Lisa Bucklind's deposition?

23       A.    No.

24       Q.    Did anybody read it to you?

25       A.    No.

Page 70

1      Q.    Did anybody read any portion of it or

2   summarize any of the contents to you?

3      A.    No.

4      Q.    So sitting here today it's your sworn

5   testimony that you have zero knowledge as to the

6   substance of Lisa Bucklind's testimony, is that an

7   accurate statement?

8      A.    That's correct.

9            THE COURT REPORTER: Is the last name Buckley,

10  Lisa Buckley?

11           MR. GREENE: B-u-c-k-l-i-n-d.

12           THE COURT REPORTER: Thank you.

13           BY MR. GREENE:

14     Q.    What inquiry, if any, did you make in order

15  to determine what Foresters' intent was, if any, to pay

16  claims on life insurance policies if the applicant were

17  to die during the first two years after issuance?

18     A.    What inquiry did I make?

19     Q.    Yes.

20     A.    To whom?

21     Q.    Anybody.

22     A.    Like --

23     Q.    I'll set it up better for you.  One of the

24  areas that you've been appointed here to give testimony

25  about is Foresters' intent, quote, I'm sorry, let me

```
 1    start over.  One of the areas that you've been assigned
 2    to give testimony about is Foresters' intent, assuming
 3    that one even exists, to pay claims on life insurance
 4    policies if the applicant dies during the first two
 5    years.  My question to you is what, if anything, did
 6    you do to make that determination?
 7         A.   That we indeed pay those claims, is that the
 8    question?
 9         Q.   No.
10         A.   I'm sorry, I'm just not getting your gist.
11         Q.   That's okay.  I'm reading to you a category
12    that the Judge formulated himself as to an area of
13    inquiry that you've been assigned to give testimony
14    about and that area of inquiry is Foresters' intent,
15    assuming that one even exists, to pay claims on life
16    insurance policies if the applicant dies during the
17    first two years, you with me so far?
18         A.   Got you.
19         Q.   Okay.  My first question to you is what, if
20    any, inquiry did you make, what, if any, research did
21    you do, what, if any, books did you read, what, if any,
22    emails did you look up, anything like that, in order to
23    assist you in answering that question or addressing
24    that area of testimony?
25         A.   I know, sir, from the work that I do with
```

Page 72

```
 1    Foresters, the work that I do with the contestable
 2    claims process, again, to the understanding of the
 3    person that we have involved with that, to my
 4    involvement from time to time and other areas of
 5    discussions with attorneys.
 6         Q.   I am going to let you finish, I promise.
 7    Answer my question first.  My first question is what
 8    did you do and then if it's nothing then I'll ask you,
 9    okay, what do you know from your own knowledge and then
10    you can go ahead and of course tell me. So let's get
11    the answer to my question first.  What, if anything,
12    did you do?  Did you get any email?
13         A.   Nothing.
14         Q.   Nothing.  You didn't call the salesman, you
15    didn't call up sales, you didn't call up the agencies,
16    you didn't make any inquiry on that other than that one
17    email that you told me your in-house lawyer sent to
18    sales and marketing, right?
19         A.   No. And, actually, the answer to that is I
20    did make one inquiry and the inquiry was, and this is
21    what I was trying to explain before, but I had
22    forgotten that David Sullivan, Ian and I did talk in
23    preparation for this deposition to -- for me to get
24    some understanding and hear his explanation of
25    knowledge and belief and the claims practice, so I
```

Page 73

1    apologize for not providing that earlier. So that was

2    the inquiry.

3         Q.   Okay.  So we will deal with that in a second.

4    That had nothing to do with this, but I'll come back to

5    your talking to David Sullivan in a minute.

6         A.   Sure.

7         Q.   Right now all I'm asking you is did you do

8    anything to determine Foresters' intent, assuming that

9    one even exists, to pay claims on life insurance

10   policies if the applicant dies during the first two

11   years other than what you knew in your head?

12        A.   No, I made no further effort.

13        Q.   Okay.  And did you -- strike that.  You've

14   already told me that when -- well, strike that.  Do you

15   know what Foresters' intent is to pay claims during the

16   first two years if the applicant dies during that

17   period?

18        A.   Our intent is to pay all claims that are

19   payable within the first two years.

20        Q.   And with respect to a situation where the

21   insured dies within the first two years, do I

22   understand that your testimony is it is your intent to

23   pay those claims if, in fact, the insured answered

24   questions to his or her best knowledge and belief, if

25   that's true?

Page 74

```
 1        A.    That's correct.
 2        Q.    Okay.  Now, I asked you in probably two,
 3   three, four different ways in the morning session here
 4   about David Sullivan and what you did and who you spoke
 5   with and on each one of those occasions you told me you
 6   had not spoken with David Sullivan; correct?
 7        A.    Yes.  If you asked me two, three, four times
 8   then my answer was the same each time so correct.
 9        Q.    And you remembered telling me on each one of
10   those occasions you did not speak to him; correct?
11        A.    If that's the written testimony, then
12   correct.
13        Q.    I'm asking you what you recall, don't you
14   recall giving me that testimony that you didn't speak
15   to him?
16        A.    I recall telling you that we spoke a number
17   of months ago before his deposition and then you asked
18   me who I spoke with prior to this deposition and the
19   answer for that question was our counsel. And then I
20   saw the answers to the responses, questions to and from
21   Matt Berman and Veronique and what I had failed to
22   remember at the time is that David Sullivan and I and
23   Ian had a conversation about knowledge and belief and
24   David explained the process.  So I guess in my mind I
25   was putting --
```

Page 75

1       Q.    When was this?

2       A.    Last week some time.

3       Q.    So I specifically asked you if you had a

4    conversation with David Sullivan, you told me, no, and

5    yet you did have a conversation with him last week; is

6    that accurate?

7       A.    Well, what's accurate is that I had

8    conversation with Ian Collins where David Sullivan was

9    present and so, in my mind, I placed that as a

10   conversation with counsel, with David Sullivan.  So I

11   did not have that conversation with David, just David

12   and I, Ian was involved as well.

13      Q.    Okay.  So then why is it that now after lunch

14   you're coming back and you're telling me, well, you

15   know what, I did have a conversation with David

16   Sullivan and I'll ask you about that obviously in a

17   minute, why is it that you're changing your testimony?

18          MS. PETT:  Object to the form.

19          BY MR. GREENE:

20      Q.    You can answer.

21      A.    I recalled it during lunch as I was going

22   back over the question that led up to the lunch break

23   with respect to what I perceive to be your question of

24   somebody providing the promise of paying a death claim

25   prior to a death even happening, I was going back

1   through that over my head or in my head rather and I

2   then recalled the conversation that Ian and David and I

3   had last week.

4        Q.   Okay.  You agree with me that in terms of

5   conveying David's answers to questions -- strike that,

6   let me rephrase. You agree with me that in conveying

7   Mr. Sullivan's answers to questions, his belief

8   regarding best knowledge and belief, his understanding

9   regarding best knowledge and belief that Mr. Sullivan

10  is better able to convey that to me than you are?

11       A.   I can only say that David explained the

12  process to me and I, out of my own understanding of the

13  process --

14       Q.   Answer my question, Mr. Parrott.

15            MS. PETT:  Craig, don't interrupt the

16  witness.

17            MR. GREENE:  I'm not going to have him --

18            MS. PETT:  Don't interrupt him when he is

19  speaking.

20            MR. GREENE:  Well, let's do this because then

21  we will go into not only tomorrow but the next day.  I

22  am happy to listen to Mr. Parrott's answer, but I need

23  him to answer my question then he can go on for days.

24  But I need an answer to my question first, please,

25  because all I'm going to do is just have to circle back

1   around and then ask him the same thing.  So, Madam

2   Court Reporter, can you please read the question and

3   then, Mr. Parrott, answer my question and then if you

4   need to explain because yes or no isn't full or

5   accurate, please do that, but I need an answer. Madam

6   Court Reporter, can you read back the question.

7          (Thereupon, the above-referred to question was

8   read back by the court reporter.)

9          MR. GREENE:  I'll reask it. Tell me when you

10  are back on keyboard.

11         THE COURT REPORTER: Okay. I'm back on.

12         BY MR. GREENE:

13     Q.   Okay. Do you agree with me that in terms of

14  conveying Mr. Sullivan's answers, his understanding,

15  what he meant to tell about best knowledge and belief

16  that David Sullivan is in a better position to tell me

17  what David Sullivan means than you?

18     A.   In the claims practice, yes.

19     Q.   Well, isn't David Sullivan in a better

20  position to tell me what David Sullivan means on

21  everything?

22     A.   I just answered your question.  No -- well,

23  David, we are one team in an operation of a life

24  insurance company.  We don't do things that are

25  different, we do things that are complimentary to one

1    another.  So with respect to the claims side David has

2    the best answer for you with respect to knowledge and

3    belief of the claims process.  He would probably argue

4    that I have the best knowledge and belief perspective

5    from the underwriting process.

6         Q.   Well, that's fine, but I didn't ask you that

7    question.  I'm asking you about David Sullivan's

8    answers about what he understands.  So David was in a

9    better position to tell me answers to my questions as

10   he understood them then you are eight months later,

11   right?

12        A.   Sir, it's a confusing question, but David can

13   speak to David better than I can speak to David.

14        Q.   You did understand my question and you

15   phrased it better than I did so thank you. Okay. Now, I

16   want you to tell me, as best you can recall, word for

17   word the conversation between you and David and Ian?

18        A.   Last week?

19             MS. PETT:  We are not going to tell what Ian

20   said so you can tell him what you and David discussed,

21   Ian was just there.  We are not going to disclose

22   anything like that.

23             MR. GREENE:  Let's do this, Tina, let's you

24   and I talk about this so we don't talk about it in

25   front of the witness.  Normally I would ask the witness

Page 79

```
1    to step out so we can talk about it, but let's put

2    everybody on -- let's put you and I on mute and I'll

3    call you to see if we can resolve this because this is

4    something that could get sloppy. What's your cell?

5              MS. PETT:  REDACTED -

6              MR. GREENE: Yep.

7              MS. PETT: REDACTED

8              MR. GREENE:  Yep. REDACTED You are on mute.

9    There you go. REDACTED

10             MS. PETT: REDACTED .

11             MR. GREENE:  REDACTED Okay. Everyone, I'm going

12   to go off and Tina is going to go off and we will be

13   back in a second.

14             THE VIDEOGRAPHER: We are going off the

15   record. The time on the video monitor is 2:06 p.m.

16             (Thereupon, a brief recess was had at 2:06

17   p.m.)

18             (Thereupon, the following proceedings were

19   had at 2:08 p.m.)

20             THE VIDEOGRAPHER:  We are back on the record.

21   The time on the video monitor is 2:08 p.m.

22             BY MR. GREENE:

23        Q.   Mr. Parrott, with respect to your

24   conversation with David Sullivan, which one of the four

25   areas of inquiry -- well, strike that.  Did you speak
```

Page 80

1    with him in an effort to prepare you for answering one

2    of these or all four of these areas of inquiry?

3         A.   Can I have the benefit of seeing those four

4    areas?

5         Q.   I can show them to you.  Let's see if I have

6    it on a screen, hold on a minute.

7         A.   Okay.

8         Q.   Well, first, let's ask the general question,

9    I'm sorry, I do have it, yes.  Let's ask the general

10   question, do you know if your conversation with David

11   or Mr. Sullivan was actually to prepare you for any of

12   these areas?

13        A.   Yes.

14        Q.   Okay.  Then I'm going to put it on the screen

15   for you and let's see if you can -- those are the areas

16   with the exception of number one instead of Rigoberto

17   Vinas it says the insured. Read through them all and

18   then tell me which one, if any.

19        A.   None of them actually.

20        Q.   Okay.  So then now I'll reask the question so

21   that we can get an accurate answer.  If I understand

22   correctly your conversation with Mr. Sullivan was not

23   to assist you in providing testimony with respect to

24   any of these areas of inquiry; correct?

25        A.   No, not of these that are listed 1 through

Page 81

1    4A.

2         Q.   What I said is right?

3         A.   Correct.

4              MR. GREENE: Tina, let's get back on the

5    phone.  I'm putting myself on stop video.

6              THE VIDEOGRAPHER: We are going off the

7    record, the time on the video monitor is 2:11 p.m.

8                   (Thereupon, a brief recess was had at

9    2:11 p.m.)

10             (Thereupon, the following proceedings were

11   had at 2:13 p.m.)

12             THE VIDEOGRAPHER: We are back on the record,

13   the time on the video monitor is 2:13 p.m.

14             BY MR. GREENE:

15        Q.   We are going to just set a record now.

16   Mr. Parrott, will you please tell me the substance of

17   the conversation that took place between you and Mr.

18   Sullivan and/or Mr. Ian? I'm sorry, Ian, half your name

19   got chopped, Collins.  Would you please tell me the

20   substance of that conversation.

21             MS. PETT: I'm going to object and tell him

22   not to answer that question because that question is

23   governed by the attorney-client privilege because we

24   are not disclosing any conversations between

25   Mr. Collins and Mr. Parrott.

Page 82

1        BY MR. GREENE:

2        Q.    Okay.   Now we are back to where we were 15

3    minutes ago which is do you know -- well, let's back

4    up.   You haven't made any inquiry from anybody else as

5    to Foresters' intent to play claims during the first

6    two years of the contestability period, right?

7        A.    I have not.

8        Q.    You haven't received any input from anybody

9    about that; correct?

10       A.    I have not.

11       Q.    One second.   What thought have you given, if

12   any, to Foresters' intent to pay claims on life

13   insurance policies if the applicant dies during the

14   first two years prior to the depo, have you thought

15   about it in your own mind?

16       A.    No.

17       Q.    Who is your immediate supervisor?

18       A.    Diane Fox (phonetic).

19       Q.    What's her title, I'm sorry?

20       A.    Chief operating officer.

21       Q.    And who does she report to?

22       A.    The president.

23       Q.    Are you familiar, do you know David's

24   supervisor, Mr. Sullivan?

25       A.    Same supervisor, Diane Fox.

Page 83

1      Q.   Okay. So you and he are on the same level, he

2  in terms of claims, you in terms of underwriting?

3      A.   That's correct.

4      Q.   I want you to assume for a minute that the

5  claims department when it got Mr. Vinas's claim did not

6  seek to determine what his best knowledge and belief

7  was.  I understand that you may disagree with that, I

8  understand you may have been told other things by your

9  lawyer, but for the purposes of this question I want

10  you to assume that, can you do that?

11      A.   To assume that best knowledge and belief was

12  not implemented or in play, do I understand that

13  correctly?

14      Q.   No. I'm going to tell you more specifically.

15  I want you to assume that when the claim came in to

16  Foresters' claim department that the claim folks did

17  not attempt to determine what Foresters' best knowledge

18  and belief was.

19      A.   Okay.

20      Q.   Rather they only sought to determine whether

21  or not there was or was not a diagnosis of a particular

22  condition, okay?

23      A.   Okay.

24      Q.   Do you have any knowledge, one way or the

25  other sitting here today, as to whether that was a

Page 84

```
 1   single incident of not making that inquiry or whether
 2   that was a regular course of conduct by the Foresters'
 3   claim department?
 4              MS. PETT:  Objection to the form.
 5              BY MR. GREENE:
 6       Q.   You can answer.
 7       A.   I have no knowledge, no specific knowledge
 8   other than the application review with respect to the
 9   Vinas claim. But as I understand -- as I understand the
10   practice and the process, best knowledge and belief is
11   built in, it's inherent in what they do.  It's not a
12   check box, but it's inherent in what they do.
13       Q.   You answered my question in the beginning
14   which is you have no knowledge of your own; correct?
15       A.   Correct.
16       Q.   If you on the underwriting side were to learn
17   that what I said is accurate, I understand that you
18   don't believe that to be the case, but if you were to
19   learn that what I said was accurate that, in fact, the
20   claims folks weren't interested in determining what
21   Mr. Vinas's best knowledge and belief was when he
22   filled out the application, but rather only whether or
23   not he had diabetes or not, what, if anything, would
24   you do as the head honcho of underwriting for
25   Foresters?
```

1          MS. PETT:  Object to the form.

2          THE WITNESS: Is this a specific question to

3    Vinas or as general practice?

4          BY MR. GREENE:

5     Q.    That's a great question and that's a good

6    clarification and I'm always subject to that.  So let's

7    do it one at a time.  If in this case you were to find,

8    as the head honcho of underwriting, and you know what I

9    mean by that, right, I'm not being disrespectful, you

10   are, you are the head honcho.

11    A.    Understood.

12    Q.    If you were to find, as the head honcho of

13   underwriting, that the folks that looked at and

14   investigated Mr. Vinas's claim expressly did not look

15   into what his best knowledge and belief was, in fact,

16   said that they weren't investigating that, that all

17   they were looking at was whether or not he had

18   diabetes.  If you were to learn that and assuming it

19   was true, would you take any action from the

20   underwriting perspective?

21    A.    I would have a problem with that just as an

22   officer of the company.

23          MS. PETT:  Form.

24          BY MR. GREENE:

25    Q.    And why would you have a problem with that as

Page 86

1    an officer of the company?

2         A.   As an officer of the company I have a bigger

3    responsibility than the area in which I am responsible

4    for.  So that in terms of the practice would not be in

5    line with who we are.

6         Q.   Because if that's true, and I understand

7    everything you just said, because if what I said is

8    true, then the policy would have been sold under, let's

9    say, false pretenses or with a representation that

10   wasn't true; fair?

11             MS. PETT:  Objection to the form.

12             BY MR. GREENE:

13        Q.   You can answer.

14        A.   That's the intent or that's the goal of the

15   contestable review to make sure that what we learned at

16   the front end when the case was issued is indeed

17   accurate on the back end.  If it's accurate to what we

18   knew on the front end a claim would be paid.

19        Q.   And the standard for accuracy per Foresters

20   own application is the insured's best knowledge and

21   belief, whether they are telling the truth or not,

22   right?

23        A.   That is correct.

24        Q.   The answer to my next question is self

25   evident based upon the answer to my prior, but you were

Page 87

1    correct to break it up so I'm going to expand it.  If

2    you were to find that the folks doing the claim

3    investigation were not looking into the insureds, not

4    just Mr. Vinas, the bigger package of people, best

5    knowledge and belief, but instead were looking only to

6    determine if the insured had left off a diagnosis or

7    misrepresented a diagnosis even if they didn't know

8    about it, I assume that your answer would be the same,

9    you would be troubled by that?

10               MS. PETT:  Objection to the form.

11               THE WITNESS: That's correct.  That's correct.

12               BY MR. GREENE:

13        Q.    For the same reasons?

14        A.    Correct.

15        Q.    Instead of me going through.

16        A.    Because an officer of the company, correct,

17   which is a far bigger role than just my own.

18        Q.    You will pardon me for asking this question

19   but it's just standard, how old are you, sir?

20        A.    57, I think.  Is it 2020?  57.

21        Q.    I'm only laughing because as I got closer and

22   closer to those high 50s I did literally start

23   forgetting on purpose.

24        A.    I can't do the math.

25        Q.    I started saying 57, 58, 59, they are all

1    kind of that late 50s, I am not really going to worry

2    about it.

3         A.    Right.

4         Q.    That's the only reason I was laughing with

5    you.  Okay.  As a corporate representative both sitting

6    here today as assigned one and in the role that you

7    were talking about earlier that you have a bigger role

8    than just an employee of Foresters, you would expect

9    that your sales force out there, the independent agents

10   that you refer to in your web page, would be doing

11   their best to accurately explain the terms of

12   Foresters' products; correct?

13        A.    Yes.  That's the requirement of them being

14   contracted with us.

15        Q.    And with respect to the contestability

16   provisions you would have no problem with a sales agent

17   for Foresters explaining those terms to an insured,

18   would you?

19        A.    That's correct.

20        Q.    Do you expect as a company that in the same

21   way that you rely upon the insured's representations of

22   the accuracy of their application questions that the

23   insureds are going to rely upon the explanations that

24   are given to them by your sales force?

25             MS. PETT:  Objection to the form.

1           THE WITNESS: We would expect that.  Yes, we

2     would expect that.

3           BY MR. GREENE:

4      Q.    I'm going to ask that question, the identical

5     question but differently.

6      A.    Okay.

7      Q.    Only because Ms. Pett objected to the form

8     and I'm not certain if she's right or not, but I don't

9     want to have to bring you back here again.  So would it

10    be fair to state that Foresters expects that

11    prospective insureds will rely upon the statements that

12    are made by Foresters sales force during the

13    presentation of the product?

14          MS. PETT:  Object on the same grounds.

15          MR. GREENE:  Okay.  Then obviously I didn't

16    anticipate your correct objection, sorry, Tina.

17          BY MR. GREENE:

18     Q.    Okay.  Do you have knowledge, Mr. Parrott, as

19    to other than giving the sales agents the applications

20    that have the Foresters' logo on top, what other, and

21    this is going to be a really generic question, what

22    other stuff the sales agents are given by Foresters to

23    help them in selling your product?

24     A.    They get various product guides of products.

25    Our marketing area, Veronique and her team, do a really

1    good job of putting out printed marketing materials but

2    also digital marketing help.  We have a 40-some page

3    fully underwritten, a field underwriting guide which

4    helps the producers and agents, helps them to

5    understand underwriting and perhaps what questions we

6    are looking for, bill charts, how we might handle

7    certain things, certain drugs and how we might handle

8    those particular prescription drugs on our various

9    product lines.  Again, the initial training that comes

10   out with respect to a newly contracted producer so

11   there's various and many, many opportunities for that

12   kind of information to be shared.

13        Q.   Is there anything that you are aware of in

14   any of that material that addresses what the sales

15   agent is or is not authorized to represent to the

16   insured -- well, prospective insured might be a better

17   way to put it.

18        A.   Help me understand what you mean, what they

19   are expected to represent.

20        Q.   Okay.  Is there anything in any of the sales

21   material that the sales -- strike that.  Is there

22   anything in any of the promotional or marketing

23   material that the sales force is given that says here's

24   what you're authorized to represent to an insured,

25   here's what you are not, stay away from this, we are

Page 91

```
 1   good with you talking about that.  I don't have it in
 2   front of me so I'm trying to give you a generic area of
 3   inquiry.
 4        A.   Generally the information that they receive
 5   through the marketing area and sales area is
 6   information that can be shared.  So there are no
 7   documents or lists out there that I'm aware of that
 8   says talk about this but not this.
 9        Q.   Are you aware of any documents or materials
10   that address the topic that we've been focusing on this
11   morning and this afternoon, specifically the insured
12   answering questions to his or her best knowledge and
13   belief?
14        A.   Ask the front part of that question again.
15        Q.   Sure.  Are you aware if any of this material
16   that the marketing sales team is given addresses the
17   topic that we've been focusing on this morning and this
18   afternoon specifically the insured answering questions
19   to his or her best knowledge and belief and how that
20   will be treated by Foresters?
21        A.   No.  And Veronique confirmed that they don't
22   have that information.
23        Q.   Basically, it's what's literally written
24   there in the application and the certification by the
25   producer that they haven't misrepresented anything.
```

Page 92

1     A.   That is correct.

2     Q.   Those are the only two references in any

3 written material that you're aware of, fair?

4     A.   That is correct and the marketing, the

5 applications aren't ownership of the marketing areas so

6 Veronique's question is accurate, those applications

7 are owned by the product group.

8     Q.   Have you ever sat in on a mock sales

9 presentation or had any input into that kind of thing

10 like here's how we might be able to better sell the

11 product, things of that nature?

12    A.   Yes.

13    Q.   When a sales representative is going to a

14 prospective insured's home it is fair for that sales

15 representative to advise the insured that they are

16 there on behalf of Foresters; is that fair?

17    A.   That is correct.

18    Q.   From the prospective insured's position the

19 prospective insured is not expected to distinguish

20 between whether that person is technically employed by

21 an intermediate agency but only selling on behalf of

22 Foresters or not, would that be true?

23         MS. PETT:  Objection to the form.

24         BY MR. GREENE:

25    Q.   You can answer.

Page 93

1      A.   I wouldn't think so.  They would have
2   knowledge that this person is representing Foresters.
3      Q.   And that's the way Foresters wants it, right?
4      A.   Correct.
5      Q.   Other than the generic statement that I think
6   you gave earlier that Foresters' intent with respect to
7   paying claims during the first two years of a policy is
8   to pay those claims consistent with the policy and the
9   application, do you have any further testimony
10  regarding Foresters' intent in that regard?
11     A.   No.  Again, we will pay those that are
12  payable with respect to verification of application
13  information and making sure that there are no material
14  misrepresentations.
15     Q.   That's what you, on behalf of Foresters,
16  believe is or should be Foresters' policy, correct, and
17  I don't mean policy as the insurance policy, I mean
18  your corporate policy?
19     A.   That is our corporate policy.
20     Q.   And that is the reason putting two areas of
21  inquiry here in this deposition together, why if the
22  hypothetical I gave you earlier about learning that a
23  claims person was not inquiring into an insured's best
24  knowledge and belief, if that were true, it would
25  bother you because that would be a violation of your

Page 94

1    policy?

2         A.   It would bother me as an officer of the

3    organization because that's not how we do business.

4         Q.   It would be contrary to what you hope your

5    policy should be and what you believe it is?

6         A.   That is correct.

7         Q.   Following the depositions of Ms. Bucklind and

8    Mr. Sullivan, are you aware if the claims department

9    undertook any steps to attempt to ensure that when

10   investigating contestable claims the claims department

11   is, in fact, looking to determine the insured's best

12   knowledge and belief rather than simply whether or not

13   a piece of medical evidence, or age, or something like

14   that is or is not factually accurate?

15        A.   I'm not aware.

16             MS. PETT:  I'm going to object to the scope,

17   it goes beyond the scope of this deposition.

18             BY MR. GREENE:

19        Q.   Just to put a cap on that and then I'll leave

20   it alone, you are not aware either way, whether they

21   did or they didn't?

22             MS. PETT:  Same objection.

23             THE WITNESS: Right.

24             BY MR. GREENE:

25        Q.   What I said is right?

Page 95

1           MS. PETT:  Same objection.

2           BY MR. GREENE:

3      Q.   I don't want to have the double negative.

4  What I said is right, you are not aware either way?

5  You can answer.

6      A.   Answer this or not?

7           MS. PETT:  You can say you don't know if you

8  don't know.

9           THE WITNESS: I don't know.

10          MS. PETT:  We are not here to testify on

11 behalf of the company on that issue.

12          MR. GREENE:  I got it. I understand.  I just

13 needed to put a cap on that area, Tina. Okay. We've

14 been going about an hour, let's take 10 and we are

15 looking good, Tina. I'm getting through a lot of this

16 so we are looking good.

17          MS. PETT:   Okay.

18          THE VIDEOGRAPHER: Going off the record, the

19 time on the video monitor is 2:42 p.m.

20          (Thereupon, a brief recess was had at 2:42

21 p.m.)

22          (Thereupon, the following proceedings were

23 had at had 3:00 p.m.)

24          THE VIDEOGRAPHER: We are back on the record,

25 the time on the video monitor is 3 p.m.

1         BY MR. GREENE:

2         Q.   I've looked through these four categories

3    again that you were designated to be here on and I want

4    to see if I can kind of summarize what I've learned

5    this morning.  I'm going to put them up for you so you

6    can meaningfully follow.  Is that good for you?

7         A.   Yes.

8         Q.   Okay. Great. Let's start with number four.

9    Read it to yourself and tell me when you're done.

10        A.   Okay. I'm done.

11        Q.   After, if I understand correctly, after doing

12   whatever investigation Foresters felt was appropriate

13   to prepare you for this deposition it's your testimony

14   that the folks in sales, marketing, or underwriting do

15   not know and did not engage in finding out what the

16   claims department was doing whether they were or were

17   not adhering to determining the insured's best

18   knowledge and belief during the claim; is that correct?

19        A.   That's correct.

20        Q.   With number three, I'll let you read that and

21   tell me when you're done.

22        A.   Okay.

23        Q.   If I understand, after doing the

24   investigation that you did and whatever Foresters felt

25   was appropriate in order to prepare you for today's

Page 97

1  deposition, you determined that there was no

2  communication between any of Foresters' employees

3  involved in underwriting of the policies and employees

4  in the claims department or the independent agents

5  about the practice of investigating or not

6  investigating knowledge and belief at the time of

7  claim; correct?

8       A.    I read this as not mutually exclusive, that

9  is to say this question, as I read it, says

10  communication between Foresters employees involved in

11  underwriting of life insurance policies.

12       Q.    You have to read slow reading on the record,

13  our court reporter will lose you.

14       A.    I'm sorry, let me start again.  Communication

15  between Foresters' employees involved in the

16  underwriting of life insurance policies and employees

17  in the claims department and/or independent insurance

18  agents about Foresters' practice of investigating (or

19  not investigating), at the time an application is

20  evaluated and issued, the applicant's knowledge and

21  belief about the accuracy of the information provided

22  in the application.  I can tell you that from the

23  respect of the underwriting part of it we indeed do

24  determine that.  That is to say that we rely on the

25  disclosures in the statements made in the application

Page 98

1    as well as disclosures in the signature of the

2    applicant to be a true and accurate assessment of their

3    health history.  If we have MIB information, if we have

4    prescription history, if we have some other information

5    that disputes that then we search out what the truth is

6    as far as that's concerned.  So from the underwriting,

7    excuse me, that is how it works within the underwriting

8    practice regarding this part of the question.  As far

9    as the claims department is concerned --

10         Q.   What part of the claims department?

11         A.   The first part of the first sentence because

12   the communication between Foresters' employees there's

13   nothing that ties it to me unless I'm misreading this

14   question, there's nothing that ties this to the claims

15   team because it's about at the time an application is

16   evaluated and issued, the applicant's knowledge and

17   belief about the accuracy of the information provided

18   in the application.  We don't notify claims when we are

19   underwriting an application.  We don't -- we work with

20   the insurance producer with respect to whatever the

21   decision may be, but as far as the time frame of an

22   application being evaluated and issued that is the

23   aspect of the underwriting and we indeed do apply

24   belief and knowledge.

25         Q.   I didn't suggest otherwise.

1     A.   Okay.  I mean, the answer was a one word
2  response.  I thought you were looking for a one word
3  response, with respect to underwriting it's not, the
4  answer is, no, or the answer is that we do absolutely
5  evaluate knowledge and belief.
6     Q.   Okay.  And you're talking about at the time
7  that you underwrite the claim?
8     A.   No, at the time we underwrite the application
9  because that's what the question asked.
10     Q.   My bad.  Yes. I misspoke, you're right.  It's
11  at the time that you underwrite the application.
12     A.   Correct.  And there's no other time frame,
13  obviously, when claims gets involved they are looking
14  to confirm that what was stated on the front end is
15  true on the back end.
16     Q.   I understand, but Ms. Pett and I were there
17  when the Judge dictated this so I'm going to kind of
18  focus on what I think he was allowing us to inquire
19  about.
20     A.   Okay.
21     Q.   With the understanding that you may read it
22  differently, okay?
23     A.   Okay.
24     Q.   Are you aware of any communications between
25  any of Foresters' employees that are involved in the

Page 100

1   underwriting of life insurance policies, okay, so your

2   underwriting department, okay?

3       A.   Yes.

4       Q.   And employees in the claims department or any

5   independent insurance agents, so we are talking about

6   communications between underwriting and either claims

7   or the independent agents, with me so far?

8       A.   Yes.

9       Q.   About whether or not Foresters investigates

10  or doesn't investigate the insured's best knowledge and

11  belief as provided in the application.

12      A.   It's not a one word answer, sir, and let me

13  tell you why.  If we come up with information by way of

14  them might be a prescription history, the independent

15  insurance agent is going to know about it because we

16  are going to ask for additional information and he's

17  going to say why.  And we will refer to the fact that

18  we got an MIB code or prescription history is

19  inaccurate.  So to that point the independent agent

20  will get involved if something comes up in

21  underwriting. We don't communicate with claims in any

22  way, shape or form.

23      Q.   Okay. All right. Well, except at claim time,

24  right?

25      A.   Except at claim time, that's accurate.

Page 101

1      Q.   All right. So then we can jump to the second

2  part and say the underwriting -- strike that.  We can

3  jump to the second part and say that in terms of all

4  the information you gathered that Foresters felt was

5  appropriate for you to be able to testify here today

6  you are not aware of any communications, interaction or

7  otherwise between the folks in the underwriting

8  department and the claims department with respect to

9  whether you guys, meaning Foresters, does or does not

10  investigate the insured's best knowledge and belief at

11  claim time; correct?

12      A.   That is correct.

13      Q.   With respect to the sales department that

14  there will be some communication back and forth

15  depending upon what you find in the underwriting

16  process at application time.

17      A.   Not to the sales department.

18      Q.   I'm sorry.

19      A.   It would be to the agent only by way of

20  notification that additional information is required.

21  We don't tell him what we found, that would go against

22  HIPAA and privacy laws.

23      Q.   Understood.  Anything beyond those two

24  things?

25      A.   No.

1    Q.   You and I have already talked about

2    Foresters' intent with respect to paying claims, your

3    intent as to follow the policy and the authorized

4    representations by the agent; correct?

5    A.   Correct.

6         MS. PETT:  Objection to the form.

7         BY MR. GREENE:

8    Q.   Number one, the inquiries that Foresters

9    makes into the underwriting process or any underwriting

10   process about knowledge and belief of the insured

11   concerning information provided in the life

12   applications, you've indicated that the underwriters

13   make no such inquiry; correct?

14   A.   No, I disagree.

15   Q.   All right.  Let me rephrase.  Other than what

16   you just told me about, that whole process you just

17   walked me through.

18   A.   Correct.  The process of the application and

19   the background information, et cetera, we do evaluate

20   knowledge and belief.

21   Q.   Well, hold on a minute.  The insured makes

22   representations in the application, right?

23   A.   Correct.

24   Q.   Tells you, you know, I had a bulging disc,

25   some back problems, whatever, and when you go -- and

1   certifies that the answers are to their best knowledge

2   and belief, that has to happen before you even get the

3   file; correct?

4        A.   It's -- no, the underwriter determines that.

5   If you're talking about at the time when the agent is

6   taking the application --

7        Q.   No, I'm not.

8        A.   -- I would assume.  Okay.  So, no, once the

9   case comes in the door that is all determined by the

10   underwriter.

11       Q.   You and I are -- these are called the end of

12   the day shakes.  These are the end of day, we are not

13   following each other.  Okay.  By the time the

14   underwriter gets the file to underwrite, the

15   prospective insured has already stated that the answers

16   that he or she has given are to his or her best

17   knowledge and belief, right?

18       A.   That's correct because -- that's exactly

19   correct.

20       Q.   Okay.  And then what you'll do is you'll do

21   your own investigation at the underwriting side before

22   the policy is even written and you'll decide if you

23   want to go ahead and issue the policy, right?

24       A.   That is correct.

25       Q.   Sometimes you'll find things were right,

Page 104

1    sometimes you will find things were a little wrong,

2    sometimes you will find things were very wrong?

3         A.    Correct.

4         Q.    And depending upon whether we are a little

5    wrong, very wrong or perfectly right will decide

6    whether or not Foresters is going to write the policy

7    or not?

8         A.    Right. And at what price, exactly.

9         Q.    The next time, if at all, that underwriting

10   gets involved in the process is only during the

11   contestability period, correct, after the policy is

12   issued?

13        A.    Correct, unless there's information.

14   Sometimes we receive information that comes to us by

15   way of MIB or prescription history that causes us to

16   have to open up the file and look at things but, yes,

17   generally until a claim, a contestable claim.  A

18   non-contestable claim we don't get involved in.

19        Q.    Getting back to just a few I's I need to dot

20   and T's I need to cross on some earlier testimony.  I

21   will tell you that we were advised that claims has, I

22   believe it's 3 or 4, I forget the number so I'm

23   standing uncertain as to 3 or 4 full-time employees

24   that do only contestable claims, that's their job.

25        A.    Okay.

Page 105

1      Q.   Let me stop this for a second.  Okay.  They

2   do only contestable claims.  Do you know enough about

3   the contestability process to know whether it is

4   necessary on each of those contestable claims for the

5   underwriting department to make a determination whether

6   the alleged misrepresentation was material or not?

7      A.   No.  We only get involved if claims asks us

8   to get involved and review something.  They make that

9   determination.

10      Q.   And according to you, despite the fact that

11   there are 3 or 4 full-time claims folks handling just

12   contestable claims, underwriting, who's responsible for

13   determining the materiality of the alleged

14   misrepresentation, has one person only putting in

15   part-time effort into that; is that accurate?

16           MS. PETT:  Object to the form.

17           THE WITNESS: About 60 percent of --

18           BY MR. GREENE:

19      Q.   Go ahead.

20      A.   Sixty percent of her job is that function.

21   That's the assumption, again, that there's something

22   wrong. A contestable review is just a contestable

23   review. If everything is corroborated that claim is

24   paid, sometimes in pretty quick order.

25      Q.   That's the way it's supposed to be, right?

1    A.    Uh-huh. Yes. So the relevance, again, of my

2    employee working 60 percent of her particular job

3    against 3 full-time contestable claim folks there's no

4    correlation to that in my view, again, because she

5    doesn't look at all of the contestable claims.

6         Q.    Let me ask you this, do you agree that in

7    order for a misrepresentation to be sufficient to

8    warrant rescission or denial of the claim that

9    misrepresentation must be material?

10        A.    Material, yes.

11        Q.    And materiality means that the insurance

12   company in this case, Foresters, would either not have

13   issued the policy or would have issued it for a

14   different premium; correct?

15        A.    Correct.  Yes.

16        Q.    And the only part of Foresters that can

17   determine materiality is the underwriting department,

18   correct?

19        A.    Materiality, in a large and looming way, you

20   don't need underwriting to make that determination.  So

21   let me give you an example, if the application was

22   completely clean and some person comes in and we

23   determine they had stage four cancer underwriting

24   doesn't really need to get involved.  Claims is

25   completely sufficient and well versed enough to make

Page 107

1    that decision.

2         Q.   Okay.  So you're now testifying as to a

3    claims practice, right?

4         A.   No.  I'm classifying as to the need for

5    underwriting review of a claim.

6         Q.   What I'm asking you is, do you know if using

7    your extreme example that a person said that they had

8    nothing wrong with them, they were perfectly clean

9    health, and yet for the past 10 months straight they've

10   been hooking themselves up for God forbid chemotherapy

11   every day to get rid of stage four pancreatic cancer,

12   all right?

13        A.   Yes.

14        Q.   As crazy hypo as it is, meaning hypothetical,

15   that's what we got.  Are you telling me that you can

16   tell me, sitting here today, that the claim department

17   would not refer that for a materiality review?

18        A.   Not something that extreme.  We've not seen

19   those, that kind of an extreme example.

20        Q.   I'm asking you what claims does.  Are you in

21   a better position to tell me that or is David Sullivan

22   in a better position to tell me that?

23             MS. PETT:  Objection to the form.

24             BY MR. GREENE:

25        Q.   You can answer.

Page 108

1        A.   David Sullivan's team makes the determination

2   as to whether we review that or not.  So his team would

3   be in a better position to answer that.

4        Q.   Okay.  So getting back to my original

5   question that got us here, the only -- strike that.

6   Getting back to my original question if I understand

7   correctly, you, in underwriting, will seed, give, the

8   responsibility for determining materiality to the

9   claims department if you believe that it's a clear case

10   of not providing best knowledge and belief?

11       A.   That's their responsibility, yes, I seed

12   that.

13       Q.   Do you know what percentage of the claims,

14   the contestable claims, fall into that clearly not best

15   knowledge and belief category?

16       A.   I don't know that, no.

17       Q.   Are you familiar with the policy of insurance

18   at issue in this case meaning the type of policy?

19       A.   I don't know.  No, I'm not aware of it.

20       Q.   Okay. So you don't know?

21       A.   I'm sure I looked at it when I looked at the

22   application back when, it's on there, but I just

23   forgotten what it is.

24       Q.   Would it help you to look at the app?

25       A.   If you have a question specifically about

Page 109

1   what is the product.

2        Q.   I'm not doing this because you and I are

3   having such a good time today.  Yes, I have a question

4   about it.  Hold on.

5        A.   Then it would be helpful for me to know which

6   product.

7        Q.   Okay.  Hold on.

8        A.   And actually it's the product page.  The

9   application itself does not say it's this kind of

10  product.  There's an attachment called the product page

11  that tells you what kind of a product it is.

12       Q.   Well, let's see if we have that then.  That's

13  not what I was about to bring up.

14       A.   Okay.

15       Q.   Okay. I just happen to have this here.  This

16  is production from Foresters from Counsel.  They are

17  Bate stamp production, we can identify it that way.

18  Let's see, bring you back up here.  Just so the record

19  is clear, I'm showing the witness Foresters' Bate stamp

20  production.  Tina, take a look at this if you would,

21  you'll see it's Bate stamped IOF1 through 234. I'm

22  going to scroll all the way down.

23       A.   If you go back to the --

24       Q.   I'm just identifying it, Mr. Parrott.

25       A.   Okay. I'm sorry.

Page 110

1          Q.   1 through 246 even though the PDF says

2     there's 234 pages of it.  But that's the document.

3     Now, I'm going back to page 1, does this help you?

4          A.   No.  Keep going.

5          Q.   Tell me when to stop.

6          A.   Okay.

7          Q.   There?

8          A.   No, keep going.  No, that's the application.

9          Q.   Okay.

10         A.   Stop.

11         Q.   This one or the one before?

12         A.   Try the one before.  No, keep going, I'm

13     sorry.

14         Q.   That's okay.

15         A.   Keep going.

16         Q.   This one must have it, no?

17         A.   Maybe, just a second.  It has got plan

18     numbers, I wish I were up to date on plan numbers, keep

19     going.

20         Q.   Don't worry about it.

21         A.   Stop. Okay. Keep going. Keep going. Keep

22     going.

23         Q.   It won't be there, that won't be there.  How

24     about here?

25         A.   No.  That's a claim statement.  Keep going.

Page 111

1   Keep going. Universal life contract for $92,000.

2        Q.   Okay. Are you familiar with how that product

3   is underwritten?

4        A.   Yes.

5        Q.   Okay. It's a little bit different than just

6   pure underwriting, right?

7        A.   No.  Universal life, whole life and term

8   which are three product lines, three main product lines

9   are underwritten the same.  Our final expense product

10   is underwritten differently. Actually, our accidental

11   death is done differently as well as our trial term.

12        Q.   Let me see if I can describe what we were

13   talking about.  When this product was described to us

14   earlier in the other depositions we were told that the

15   product allows for a certain number of, for lack of a

16   better term, points to be accumulated.

17        A.   Was this a non-medical product, 92,000 at

18   what age was he?  Can somebody tell me that?

19        Q.   He was 72, 70 or 72 when he applied for it.

20        A.   Okay.  So it could have been a non-medical

21   product, it's both sold and underwritten as non-medical

22   and fully underwritten.  So fully underwritten means he

23   gets exams and lab work and ABSs and other things.

24        Q.   I appreciate your willingness to help us out

25   here, but I'm not going to have you start looking into

Page 112

1    this.  Mr. Sullivan actually went into it in a lot more

2    depth and I don't want you speculating about it so I'll

3    move on to a different topic.  Let me get rid of this.

4          THE VIDEOGRAPHER: We have about five minutes

5    left to change media.

6          MR. GREENE:  Go ahead and change media

7    because I am almost done here, but that's a dangerous

8    thing for a lawyer to represent so go ahead.

9          THE VIDEOGRAPHER: We are going off the

10   record, the time on the video monitor is 3:28 p.m.

11          (Thereupon, a brief recess was had.)

12          THE VIDEOGRAPHER: We are back on the record.

13   The time on the video monitor is 2:39 p.m. This marks

14   the beginning of media unit number three.

15          BY MR. GREENE:

16   Q.    The role of the underwriter in a contestable

17   investigations we've talked about is to determine

18   materiality, right?

19   A.    If the claims team request, yes.

20   Q.    Yes.  The question that's to be answered --

21   strike that.  Through your having supervised, my guess

22   is over your years dozens of underwriters, while they

23   are given guidelines to follow and rules to follow have

24   you found that there's some level of subjectivity with

25   respect to each underwriter, that is, one underwriter

Page 113

 1    may allow or issue a policy with a high rating while

 2    another underwriter may have said, no, I don't think we

 3    want to take that one, that kind of thing?

 4          A.    That's correct.  There's a fair amount of art

 5    inside of underwriting.

 6          Q.    And the aspect of -- strike that.  The role

 7    of the underwriter at the time of claim at the claim

 8    department's request is to determine if Foresters would

 9    have, at the time of issuance, issued the policy;

10    correct?

11          A.    It stated clearly the role of the underwriter

12    is to determine if the information that's been

13    developed would have been material to the decision,

14    first of all, to issue or not to issue. Secondly, would

15    have been rated or not rated.

16          Q.    If I understand correctly, though, despite

17    the fact that there is a level as you put it of art, as

18    I put it of some subjectivity to the original

19    underwriting, only one person is given the job of

20    determining whether Foresters would have issued the

21    policy and if so under what terms at contestability

22    time; correct?

23          A.    Yes.  That person or that person's back up,

24    that's correct.

25          Q.    Is it part of your, meaning underwriting's

Page 114

1    process, to have the contestable underwriter go back

2    and have the original underwriter look at the file in

3    order to determine what that original underwriter in

4    his or her subjectivity or exercise of art would have

5    done?

6         A.    No.   That would be a conflict of interest.

7    Any question of that that would come from a contestable

8    underwriter would come back through me.

9         Q.    I am interested in this because I really

10   haven't thought of it this way, why would it be a

11   conflict of interest to ask the original underwriter

12   what he or she would have done if they had known facts

13   that Foresters is now questioning the materiality of?

14        A.    Because now you put them in a position of

15   knowing that there's a claim.   You put them in a

16   position that could lead their thinking a different way

17   knowing full well that there is a claim. So we take

18   that off the table completely. As a matter of fact, for

19   the contestable underwriter, if she comes across a

20   contestable claim that she underwrote originally then

21   she's not allowed to underwrite that on a contestable

22   basis, that then goes to her back up. That's, again, to

23   take away all conflict of interest.

24        Q.    Is there any kind of an incentive program or

25   bonus program in underwriting?

Page 115

1           MS. PETT: I'm going to object now because
2   this is beyond the scope of the notice.  I let you go a
3   little bit but we are not getting into that.
4           MR. GREENE:  Let me tell you why because I
5   think it does fall within one of the categories and
6   I'll explain why.  Give us five minutes, guys, and I
7   will -- let me talk to Tina about it.
8           THE VIDEOGRAPHER: We are going off the
9   record.  The time on the video monitor is 3:34 p.m.
10          (Thereupon, a brief recess was had at 3:34
11  p.m.)
12          (Thereupon, the following proceedings were
13  had at 3:47 p.m.)
14           THE VIDEOGRAPHER: We are back on the record.
15  The time on the video monitor is 3:47 p.m.
16          BY MR. GREENE:
17      Q.   Mr. Parrott, is there any kind of bonus
18  structure at Foresters with respect to the
19  underwriters?
20      A.   Sorry about that.  No.
21      Q.   Any bonuses are strictly what, are they
22  objective, are they merit based, how does that work?
23      A.   Merit based, corporate, expenses, sales,
24  general corporate things, individual goals.
25      Q.   Okay.  Mr. Parrott, thank you for your time.

Page 116

1    I have no other questions.

2         A.    You're welcome.

3              MS. PETT:   Thank you.   We will read.

4              MR. GREENE:   Okay. Madam Court Reporter --

5    well, first let the videographer go ahead and sign us

6    off.

7              THE VIDEOGRAPHER: We are going off the

8    record. The time on the video monitor is 3:48 p.m.

9              (Thereupon, the following proceedings were

10   had on the steno record only.)

11             MR. GREENE:   Madam Court Reporter, we will

12   order this.   I only need it digitally.   I don't need

13   paper anymore. I don't need paper.   I do want to order

14   the video synced.

15             THE VIDEOGRAPHER: Okay.

16             MR. GREENE:   So please do whatever you need

17   to do to do that and a mini is all I need right now.

18   So I don't need a full copy, just a condensed version

19   on a PDF.

20             MS. PETT:   I would like to order a copy as

21   well.   Same, etran and a mini.

22             MR. GREENE:   Thank you.

23             (Thereupon, the videotaped deposition

24   concluded at 3:50 p.m.)

25

Page 117

1

2

3                    EXCEPT FOR ANY CORRECTIONS MADE
                        ON THE ERRATA SHEET BY ME,
4                    I CERTIFY THIS IS A TRUE AND
                        ACCURATE TRANSCRIPT.
5                    FURTHER DEPONENT SAYETH NOT.
                   _____,
6                            DOUG PARROTT
7      STATE OF FLORIDA      )
                             ) SS.
8      COUNTY OF MIAMI-DADE )
9      Sworn to and subscribed before me this_____day
       of_____,20__.
10     PERSONALLY KNOWN _____OR ID._____
11

          _____
12        Notary Public in and for
          the State of Florida at Large.
13        My commission expires:
14

15

16

17

18

19

20

21

22

23

24

25

Page 118

1

2                          CERTIFICATE OF OATH

3      STATE OF FLORIDA:

                              SS.

4      COUNTY OF DADE:

5

6              I, the undersigned authority, certify that

7      DOUG PARROTT, personally appeared before me via Zoom

8      and was duly sworn.

9

10             WITNESS my Hand and Official Seal this 23rd

11     day of October 2020.

12

13                      *Nancy D. Smith*

14

                        NANCY D. SMITH, RPR

15                      Notary Public - State of Florida

                        Commission No. GG225879

16                      Expires 7-19-2022.

17

18

19

20

21

22

23

24

25

Page 119

```
1                    REPORTER'S DEPOSITION CERTIFICATE

2

   STATE OF FLORIDA:

3                         SS.

   COUNTY OF DADE:

4

5         I, NANCY D. SMITH, Registered Professional

6   Reporter and Notary Public in and for the State of

7   Florida at Large, do hereby certify that I was

8   authorized to and did stenographically report in

9   shorthand the deposition of DOUG PARROTT, a witness

10  called by the Plaintiff in the above styled cause; that

11  the reading and signing of the deposition were not

12  waived by the witness; that the foregoing pages

13  numbered from 1 to 119 inclusive, constitute a true and

14  complete record of my stenographic notes.

15        I further certify that I am not a relative,

16  employee, attorney or counsel of any of the parties,

17  nor am I a relative or employee of any of the parties'

18  attorney or counsel connected with the action, nor

19  financially interested in the action.

20        Dated this 23rd day of October 2020.

21

22        Nancy D. Smith

23

          NANCY D. SMITH

24        Registered Professional Reporter

25
```

Page 120

```
 1
                    VERITEXT LEGAL SOLUTIONS
 2               2 S. Biscayne Blvd., Suite 2250
                     Miami, Florida 33131
 3                   Phone: (800)726-7007
                     Fax:  (305)377-1100
 4
        October 23, 2020
 5
        TO:     DOUG PARROTT
 6              c/o Kristina B. Pett, Esq.
               McDowell Hetherington LLP
 7              2101 N.W. Corporate Blvd., Suite 316
               Boca Raton, FL 33431
 8
        Re:     DIGNA VINAS vs THE INDEPENDENT ORDER OF
 9              FORESTERS
        Depo of: DOUG PARROTT
10      Taken:  October 13, 2020
        Number of Pages:  119
11      Available for Reading until November 23, 2020
12      Dear DOUG PARROTT,
13          This is to advise you that the transcript of your
        deposition is completed and is available at this time
14      for your reading and signing.
            Please arrange to conclude this matter at your
15      earliest convenience.  We would suggest that you
        telephone this office and arrange an appointment
16      suitable for all concerned, or you may arrange to
        receive a copy of your transcript from any of the
17      attorneys on the case.
            However, if the reading and signing has not been
18      concluded prior to the above-referenced date, I shall
        then proceed to file the original of said transcript
19      with the party who took the deposition, without further
        notice to any parties.
20          Your prompt attention to this matter is
        appreciated.
21
                            Sincerely,
22
23                          NANCY D. SMITH, RPR
        cc:
24
25
```

Page 121

1                    ERRATA SHEET
     Re:      DIGNA VINAS v THE INDEPENDENT ORDER OF
2             FORESTERS
     Depo of: DOUG PARROTT
3    Taken:   October 13, 2020
4    DO NOT WRITE ON TRANSCRIPT ENTER ANY CHANGES HERE
5    Page #    Line #       Change           Reason
     _____l_____l_____l_____
6
     _____l_____l_____l_____
7
     _____l_____l_____l_____
8
     _____l_____l_____l_____
9
     _____l_____l_____l_____
10
     _____l_____l_____l_____
11
     _____l_____l_____l_____
12
     _____l_____l_____l_____
13
     _____l_____l_____l_____
14
     _____l_____l_____l_____
15
     _____l_____l_____l_____
16
     _____l_____l_____l_____
17
     _____l_____l_____l_____
18
     _____l_____l_____l_____
19
20   STATE OF FLORIDA)
     COUNTY OF MIAMI-DADE )
21
     Under penalties of perjury, I declare that I have read
22   my deposition transcript, and it is true and correct
     subject to any changes in form or substance entered
23   here.
24   _____        _____
     Date                    Signature
25

**&**

**&** 2:5

**1**

**1** 2:23 27:15,20
  80:25 110:1,3
  119:13
**10** 7:19,20 37:7,12
  95:14 107:9
**100** 32:21 51:11,12
  56:1
**11** 7:19,20 8:16
**118** 2:16
**119** 2:17 119:13
  120:10
**11:08** 1:16 3:3
**120** 2:18
**121** 2:19
**12685** 118:14
  119:23
**12:10** 37:7
**12:16** 37:24 38:1
**12:45** 66:20
**12:54** 60:2
**13** 1:15 3:2 120:10
  121:3
**15** 31:6 82:2
**18** 1:2
**1985** 59:19
**1:00** 60:5,7
**1:15** 66:6
**1:45** 66:19
**1:48** 67:3,5

**2**

**2** 1:21 120:2
**20** 117:9
**2014** 64:22
**2018** 64:23
**2020** 1:15 3:2 87:20
  118:11 119:20
  120:4,10,11 121:3

**2101** 2:9 120:7
**2250** 1:21 120:2
**23** 120:4,11
**234** 109:21 110:2
**23rd** 118:10 119:20
**24** 35:9
**24100** 1:2
**REDACTED** 79:10,11
**246** 110:1
**27** 2:23
**2:08** 79:19,21
**2:11** 81:7,9
**2:13** 81:11,13
**2:39** 112:13

**3**

**3** 95:25 104:22,23
  105:11 106:3
**30** 60:11
**305** 120:3
**316** 2:9 120:7
**32** 59:18
**33021** 2:6
**33131** 1:22 120:2
**33431** 2:9 120:7
**34** 59:19
**35** 59:10,12,13
**36** 59:12
**377-1100** 120:3
**3:00** 95:23
**3:28** 112:10
**3:47** 115:13,15
**3:48** 116:8
**3:50** 1:16 116:24

**4**

**4** 2:15 104:22,23
  105:11
**40** 90:2
**4000** 2:5
**45** 66:8

**485** 2:5
**4a** 81:1

**5**

**5** 24:3,21 40:10
  41:14,16
**50s** 87:22 88:1
**REDACTED** 79:5
**57** 87:20,20,25
**58** 87:25
**59** 87:25

**6**

**60** 105:17 106:2
**64157** 4:9

**7**

**7** 44:4
**7-19-2022** 118:16
**70** 111:19
**72** 111:19,19
**726-7007** 120:3

**8**

**8** 41:16 44:4
**800** 120:3
**86** 59:19
**REDACTED** 79:7,8,9
**8908** 4:8
**89th** 4:8

**9**

**9** 7:20
**92,000** 111:1,17

**a**

**a.m.** 1:16 3:3
**ability** 11:23 50:25
**able** 38:25 52:1,24
  53:10,11 54:25
  55:9 63:19 76:10
  92:10 101:5
**absolutely** 20:22
  63:11 99:4

**abss** 111:23
**accelerating** 10:16
  10:19
**acceptable** 16:13
**accepted** 11:9
**access** 40:3
**accidental** 111:10
**accumulated**
  111:16
**accuracy** 28:8
  86:19 88:22 97:21
  98:17
**accurate** 38:19
  39:4 41:1,9 43:13
  44:12 46:1 54:6,12
  57:19 58:3,4 65:20
  67:14,18 69:19
  70:7 75:6,7 77:5
  80:21 84:17,19
  86:17,17 92:6
  94:14 98:2 100:25
  105:15 117:4
**accurately** 39:8
  88:11
**achieve** 13:2
**action** 18:16 85:19
  119:18,19
**actual** 17:7 24:16
  26:4 46:11 65:5
**actuaries** 13:23
  14:25
**added** 25:15
**addition** 5:15 20:24
**additional** 21:1
  38:12 48:19 68:24
  100:16 101:20
**address** 4:7 91:10
**addresses** 90:14
  91:16
**addressing** 71:23

adhering 96:17
admit 30:16
advance 11:3
advertise 36:5
advice 13:25
advise 92:15
  120:13
advised 104:21
advisor 39:7
advisors 39:15
afternoon 91:11,18
age 43:18 94:13
  111:18
agencies 72:15
agency 92:21
agent 40:21 41:17
  41:23 42:10,23
  43:9 57:14,23
  67:11,16 88:16
  90:15 100:15,19
  101:19 102:4 103:5
agents 39:17,24
  40:17 47:17,17,25
  48:1,12 66:1 88:9
  89:19,22 90:4 97:4
  97:18 100:5,7
ago 13:9 19:9 28:1
  40:15 43:9 59:18
  74:17 82:3
agree 27:1 40:20,25
  45:22 54:20 61:16
  61:24 76:4,6 77:13
  106:6
agreed 45:15
agreement 4:4
ahead 6:2 7:11
  14:20 26:18 31:17
  32:23 35:6 39:21
  55:17 59:24 68:23
  68:24 69:2 72:10
  103:23 105:19

112:6,8 116:5
allege 19:7
alleged 18:20 105:6
  105:13
allen 2:12
allow 113:1
allowed 114:21
allowing 99:18
allows 111:15
alpha 39:6
alter 11:19
america 7:22 8:16
  9:11 10:24
american 9:25
americo 7:19,24,25
  8:1
amount 113:4
answer 4:18,18 5:3
  5:8,11,15 21:11
  29:5 30:6 31:16,23
  34:18,20,23 35:21
  42:19 45:19 46:1
  48:10 49:8 50:4,7
  51:6,11 52:5,11,17
  54:22 57:15 58:20
  59:1 60:13,18 61:1
  61:3 62:9 63:22
  68:16 69:7 72:7,11
  72:19 74:8,19
  75:20 76:14,22,23
  76:24 77:3,5 78:2
  80:21 81:22 84:6
  86:13,24,25 87:8
  92:25 95:5,6 99:1,4
  99:4 100:12 107:25
  108:3
answered 15:4 47:1
  51:21 52:25 61:12
  61:14 65:15 73:23
  77:22 84:13 112:20

answering 5:20
  55:2,8 61:4 62:11
  62:13,14 71:23
  80:1 91:12,18
answers 4:13 29:19
  34:14 44:8,10
  49:13 50:1 57:6,13
  58:4 74:20 76:5,7
  77:14 78:8,9 103:1
  103:15
anticipate 4:11
  89:16
anybody 26:16
  31:8 69:5,12,14,21
  69:24 70:1,21 82:4
  82:8
anymore 36:17
  116:13
apologize 19:8
  26:22 73:1
app 24:16 43:5
  108:24
appear 24:21 38:17
appearances 2:2
  3:6
appeared 118:7
appearing 2:4,8
appears 24:24 29:5
  39:4
applicant 50:23
  57:25 60:18 70:16
  71:4,16 73:10,16
  82:13 98:2
applicant's 97:20
  98:16
application 18:21
  19:5,22 20:17
  23:13,14,23 25:4
  40:10 41:5,17,20
  42:24 43:1,16 44:6
  44:7,9,11,25 45:20

48:4,5 49:14,22
  50:6,22 52:5,10
  60:16,19 65:18,25
  67:7,11 68:2 84:8
  84:22 86:20 88:22
  91:24 93:9,12
  97:19,22,25 98:15
  98:18,19,22 99:8
  99:11 100:11
  101:16 102:18,22
  103:6 106:21
  108:22 109:9 110:8
applications 25:6
  28:7 39:23 40:5,18
  89:19 92:5,6
  102:12
applied 43:1,4,5
  111:19
apply 44:8 98:23
applying 17:3
  49:11
appointed 40:3
  70:24
appointment
  120:15
appreciate 27:17
  111:24
appreciated 120:20
appropriate 37:2
  96:12,25 101:5
approved 11:18
approximately
  10:2
area 8:23 29:15
  32:25 43:23 63:15
  66:6 71:12,14,24
  86:3 89:25 91:2,5,5
  95:13
areas 8:17,18,20
  27:24 70:24 71:1
  72:4 79:25 80:2,4

80:12,15,24 92:5
93:20
**argue** 78:3
**arrange** 120:14,15
120:16
**art** 113:4,17 114:4
**asked** 9:1 19:10
20:20 22:24,24
29:13,16 30:22
31:5,15 33:16
35:14 44:7 45:14
54:25 60:25 61:23
65:14,16,23 74:2,7
74:17 75:3 99:9
**asking** 4:12,17 5:2
5:7,19 38:4 46:18
51:19 54:15,17,21
56:5 57:21 61:11
62:5 68:3 73:7
74:13 78:7 87:18
107:6,20
**asks** 105:7
**aspect** 15:23 17:11
18:5 19:21 23:11
34:7 50:15,24 54:9
56:5 98:23 113:6
**aspects** 17:25 31:2
35:24,25
**assess** 16:23 17:6
**assessment** 50:25
98:2
**assigned** 21:15
27:25 71:1,13 88:6
**assist** 19:13 21:16
24:9 71:23 80:23
**assistant** 29:14
32:9,24
**assisting** 14:22
21:2,22,24 22:1
**assume** 9:11 18:11
19:19 22:18 36:2

51:19,21,25 52:13
52:19 53:16 54:22
55:1 83:4,10,11,15
87:8 103:8
**assumes** 57:10
**assuming** 60:13,16
60:17 71:2,15 73:8
85:18
**assumption** 105:21
**attachment** 109:10
**attachments** 24:16
**attempt** 17:13 68:6
83:17 94:9
**attempted** 18:19
19:5 45:18
**attention** 120:20
**attorney** 30:22
81:23 119:16,18
**attorneys** 72:5
120:17
**audit** 17:23
**auditing** 18:1
**audits** 17:21
**authority** 11:23
57:24 58:4,8,21
118:6
**authorized** 41:9
90:15,24 102:3
119:8
**authorizes** 41:1
**available** 38:22
120:11,13
**avp** 33:1
**aware** 29:1,12,15
47:15,23 65:7,23
66:3 67:23 90:13
91:7,9,15 92:3 94:8
94:15,20 95:4
99:24 101:6 108:19
**awareness** 34:10
34:10,11,25 35:16

**b**

**b** 2:8,21 70:11
120:6
**bachelors** 10:9,11
**back** 7:5 9:24 10:3
21:7,9,19 22:20,23
23:15 24:8,22
25:14 31:10 34:14
35:4 37:25 40:9,10
40:14 41:14 44:25
45:6,7 48:7 51:5,8
53:13 54:4,10,16
54:22 57:5 60:6
64:16,18 66:7 67:4
68:14 73:4 75:14
75:22,25 76:25
77:6,8,10,11 79:13
79:20 81:4,12 82:2
82:3 86:17 89:9
95:24 99:15 101:14
102:25 104:19
108:4,6,22 109:18
109:23 110:3
112:12 113:23
114:1,8,22 115:14
**background** 50:12
50:13 102:19
**backwards** 7:3,4
**bad** 9:14 16:2
21:11 99:10
**base** 36:16,25
**based** 49:21 50:25
52:4 53:2,7 55:12
56:3,21 64:6,25
86:25 115:22,23
**basically** 11:2
17:24 91:23
**basis** 36:24 114:22
**bate** 109:17,19,21
**bear** 23:19 29:6

**beginning** 60:8
84:13 112:14
**behalf** 1:14 3:8,10
28:3,16 92:16,21
93:15 95:11
**belief** 26:11 28:5
33:18 34:7,12
35:17,24 43:20
44:12 45:21,25
46:11,19 47:2
49:14 50:2,5,9,19
50:19 51:12,18,22
52:3,6,18 53:8,25
54:2,6,8,12,24 55:2
55:9,14 56:8 57:1,2
57:7,13,16,18 58:2
60:14,20 61:2,5,17
61:19 62:1 64:4,11
65:4,18 66:3 67:13
68:7 72:25 73:24
74:23 76:7,8,9
77:15 78:3,4 83:6
83:11,18 84:10,21
85:15 86:21 87:5
91:13,19 93:24
94:12 96:18 97:6
97:21 98:17,24
99:5 100:11 101:10
102:10,20 103:2,17
108:10,15
**believe** 32:20 33:19
46:13,20 53:21
55:4 56:7 84:18
93:16 94:5 104:22
108:9
**believer** 20:4
**bell** 28:11
**benefit** 7:2 80:3
**benefits** 43:3
**berman** 32:5,13,15
33:4 34:18 74:21

**best** 35:17,23 43:19
44:11 45:20,25
46:10,19 47:2,15
49:13 50:2,4,8
51:12,18,22 52:3,5
52:18 54:24 55:2,8
55:13 56:8 57:7,13
57:16,17 58:2
60:14,19 61:2,4,17
61:19 62:1 63:24
64:4,11 65:4,18
66:2 67:13 68:6
73:24 76:8,9 77:15
78:2,4,16 83:6,11
83:17 84:10,21
85:15 86:20 87:4
88:11 91:12,19
93:23 94:11 96:17
100:10 101:10
103:1,16 108:10,14
**better** 34:10 46:17
48:3 63:8,19 65:10
70:23 76:10 77:16
77:19 78:9,13,15
90:16 92:10 107:21
107:22 108:3
111:16
**beyond** 45:9 62:16
94:17 101:23 115:2
**bga** 36:11,19 48:18
**bgas** 48:14
**big** 17:15 20:4
23:10 38:10
**bigger** 86:2 87:4,17
88:7
**bill** 90:6
**biscayne** 1:21
120:2
**bit** 5:17 18:10
23:18 26:21 36:20
111:5 115:3

**blank** 34:4
**blvd** 120:2,7
**boca** 2:9 120:7
**bonus** 114:25
115:17
**bonuses** 115:21
**books** 71:21
**border** 6:16
**bother** 93:25 94:2
**bottom** 23:24
**boulevard** 1:21 2:5
2:9
**box** 84:12
**break** 5:22,23,23
5:24 6:3 7:7 38:4
46:4 69:4 75:22
87:1
**breaks** 5:21
**brief** 37:21 60:3
79:16 81:8 95:20
112:11 115:10
**bring** 89:9 109:13
109:18
**broke** 38:3
**brought** 16:2
**buchsbaum** 2:5
**buckley** 70:9,10
**bucklind** 94:7
**bucklind's** 69:22
70:6
**build** 13:23,24
**building** 12:22
13:13,14,15,16
14:22 15:13
**built** 62:3 84:11
**bulging** 102:24
**bunch** 25:1
**burden** 55:4
**business** 6:10,15,17
6:17 8:17 9:1,2
12:18 39:18,19

48:15 94:3
**buy** 52:14

**c**

**c** 7:23 70:11 120:6
**call** 12:10,11 25:19
29:25 39:24 72:14
72:15,15 79:3
**called** 9:25 16:7,8
41:22 43:23 44:15
103:11 109:10
119:10
**canada** 6:16
**canadian** 6:22
10:25 14:4,5 17:22
21:8
**cancer** 53:23
106:23 107:11
**cap** 94:19 95:13
**captive** 39:16,18
**capture** 23:9
**captured** 4:22
**career** 7:3 10:22,23
**carrier** 6:15 8:10
9:9
**carries** 48:25,25
**case** 1:2 3:4 15:3,4
15:14 18:11,15
22:7,13 52:23
65:22 67:21,22
68:2,7 69:10 84:18
85:7 86:16 103:9
106:12 108:9,18
120:17
**cases** 16:24 18:8
20:19 22:1
**categories** 26:2,5
42:4 96:2 115:5
**category** 25:11
26:1,9 40:19 71:11
108:15

**cause** 18:16 45:5
119:10
**causes** 104:15
**cc** 31:23 120:23
**cc'd** 32:1 33:9
34:16
**cell** 79:4
**central** 37:10 66:20
**certain** 7:9 41:19
41:19 89:8 90:7,7
111:15
**certainly** 35:8
**certificate** 2:16,17
118:2 119:1
**certification** 41:23
91:24
**certifies** 103:1
**certify** 42:12,24
117:4 118:6 119:7
119:15
**cetera** 41:6 102:19
**challenging** 54:14
**chance** 31:17
**change** 11:19,24
12:5,10 58:14
59:25 68:16,23
112:5,6 121:5
**changed** 25:13 26:5
26:7 57:4,5
**changes** 11:3 121:4
121:22
**changing** 11:16
12:2 75:17
**channel** 36:11,11
36:12,14,19,23
**channels** 36:9
**charts** 90:6
**check** 20:15 64:1
84:12
**checklist** 62:5,6

**chemotherapy**
53:23 107:10
**chief** 6:21,23 7:13
7:15,18 12:14 14:8
15:21 29:13 32:6
32:13,14 82:20
**children's** 13:20
**chopped** 81:19
**circle** 76:25
**circumstances**
47:10
**city** 4:9 7:19
**claim** 18:19,23 19:3
20:12,13 45:16
46:25 49:14,15
50:16,17,18 51:16
53:12,17 54:3,10
55:23 56:3,9,11,12
56:19 57:18,22,24
57:25 58:1,7,8,11
58:21 59:4,5,5
60:15,21 61:5,7,17
62:16,18 67:14,20
75:24 83:5,15,16
83:16 84:3,9 85:14
86:18 87:2 96:18
97:7 99:7 100:23
100:25 101:11
104:17,17,18
105:23 106:3,8
107:5,16 110:25
113:7,7 114:15,17
114:20
**claims** 20:9,21 21:2
21:16,23,24 22:1
33:18 34:5,8,12
35:18,22,25 45:15
50:20 56:6,24
57:21 59:14,16,22
59:23 60:11,11,20
62:1,8,25 63:4,7,11

63:14,15,20 64:2,5
64:9 65:2 70:16
71:3,7,15 72:2,25
73:9,15,18,23
77:18 78:1,3 82:5
82:12 83:2,5 84:20
93:7,8,23 94:8,10
94:10 96:16 97:4
97:17 98:9,10,14
98:18 99:13 100:4
100:6,21 101:8
102:2 104:21,24
105:2,4,7,11,12
106:5,24 107:3,20
108:9,13,14 112:19
**clarification** 85:6
**clarify** 22:20 28:9
**clarifying** 52:8
**classifying** 107:4
**clause** 35:17,24
45:12 49:1,7,12
55:13 65:18 66:3
**clean** 106:22 107:8
**clear** 12:1 26:6
54:16 108:9 109:19
**clearly** 108:14
113:11
**client** 81:23
**closer** 87:21,22
**code** 100:18
**colleague** 16:1
**college** 7:6 9:25
10:6
**collins** 2:11 32:2
75:8 81:19,25
**come** 4:23 47:13
48:6 54:13 57:3
65:13 73:4 100:13
114:7,8
**comes** 42:7 90:9
100:20 103:9

104:14 106:22
114:19
**comfortably** 52:1
52:24 55:10
**coming** 16:24 75:14
**commission** 117:13
118:15
**commissioner's**
12:8
**communicate**
29:25 40:21 100:21
**communication**
22:16 30:19 97:2
97:10,14 98:12
101:14
**communications**
99:24 100:6 101:6
**companies** 39:20
**company** 6:18,22
8:2,4,11 9:12,24,25
10:25 11:10,25
12:3 16:5 32:25
39:14,17,19 50:2
58:9 59:15 77:24
85:22 86:1,2 87:16
88:20 95:11 106:12
**compared** 65:4
**complete** 44:11
119:14
**completed** 60:19
120:13
**completely** 27:13
42:19 56:25 57:1
106:22,25 114:18
**completing** 52:10
**complimentary**
77:25
**compound** 46:4
**concerned** 98:6,9
120:16

**concerning** 28:6
102:11
**conclude** 120:14
**concluded** 116:24
120:18
**conclusion** 61:3
**condensed** 116:18
**condition** 46:2 65:6
65:11 83:22
**conduct** 84:2
**confirm** 38:25 64:1
99:14
**confirmed** 60:21
61:8 64:9 91:21
**conflict** 114:6,11
114:23
**confusing** 78:12
**connect** 37:1
**connected** 119:18
**connection** 37:17
**consider** 45:1
**consistent** 93:8
**constitute** 119:13
**contact** 36:16,18
**contained** 44:10
**content** 22:15
68:11
**contents** 70:2
**contestability** 45:5
47:19 48:25 49:7
49:12,15,23 51:14
55:13,23 82:6
88:15 104:11 105:3
113:21
**contestable** 20:9,13
21:16,22,24 44:15
44:21 45:10,17,18
48:3,23 50:18
51:15 53:12,17
54:3,9 56:3,9,22,23
57:2 58:6 59:23

[contestable - decide]                                                        Page 127

60:20 62:7,16 64:5
67:14 72:1 86:15
94:10 104:17,18,24
105:2,4,12,22,22
106:3,5 108:14
112:16 114:1,7,19
114:20,21
**contested** 56:11,12
56:13,14
**contesting** 54:14
**context** 5:6
**contract** 11:24 12:2
12:3 48:13 111:1
**contracted** 40:2
48:13,18 88:14
90:10
**contrary** 94:4
**control** 16:21 44:3
44:3
**convenience**
120:15
**conversation** 5:4,6
16:3 37:4 74:23
75:4,5,8,10,11,15
76:2 78:17 79:24
80:10,22 81:17,20
**conversations**
29:21 81:24
**convey** 76:10
**conveying** 76:5,6
77:14
**conveys** 47:25
**cooke** 1:2
**copy** 24:7 38:19
116:18,20 120:16
**corner** 25:12
**corporate** 2:9
28:17 88:5 93:18
93:19 115:23,24
120:7

**correct** 6:19,25
7:23 9:5,22 11:4,6
12:25 13:3 14:15
16:16 17:4 21:17
21:20 22:17 24:24
25:8,9,13,14 28:20
29:21 30:3,20 31:3
31:13,21 32:16
33:2,6,7,8 36:1,4
38:21 39:9,14 40:2
40:6,7 41:2,3,6,7
41:10,11,20,21
43:14,19,21,24,25
44:13 45:13 47:3,5
47:6 49:9 51:14
53:24 56:17 57:20
62:2,24 63:1,11
64:24 67:22 70:8
74:1,6,8,10,12
80:24 81:3 82:9
83:3 84:14,15
86:23 87:1,11,11
87:14,16 88:12,19
89:16 92:1,4,17
93:4,16 94:6 96:18
96:19 97:7 99:12
101:11,12 102:4,5
102:13,18,23 103:3
103:18,19,24 104:3
104:11,13 106:14
106:15,18 113:4,10
113:22,24 121:22
**correction** 27:25
**corrections** 117:3
**correctly** 20:11
29:17 30:14 34:2
39:22 44:21 49:10
80:22 83:13 96:11
108:7 113:16
**correlation** 106:4

**corroborate** 50:14
**corroborated**
105:23
**counsel** 3:6 22:14
22:15,18 23:4
28:25 29:2,4,13,18
30:7,9,12 31:14
32:2 33:4 69:6
74:19 75:10 109:16
119:16,18
**counted** 42:13
**county** 117:8 118:4
119:3 121:20
**couple** 25:17
**course** 47:23 72:10
84:2
**court** 1:1 3:14,18
3:23 4:1,24 5:25
6:5,6 27:15,22 51:4
51:8 64:18,22 66:7
66:10 70:9,12 77:2
77:6,8,11 97:13
116:4,11
**covering** 6:15
**craig** 2:4 3:7 4:10
42:2 76:15
**crazy** 107:14
**creating** 13:11
**critical** 46:24
**cross** 68:25 104:20
**curious** 65:16
**customer** 36:15,21
36:24,25 37:1,2
50:7,10,12 53:9,16
53:18
**customers** 36:16,21
**cut** 23:24 37:15
**cv** 1:2

| **d** |

**d** 2:13,21 3:16
70:11 118:14 119:5
119:23 120:23
**dade** 117:8 118:4
119:3 121:20
**dangerous** 112:7
**dash** 39:5,6
**data** 17:10,14,15
17:25 23:19 50:11
**date** 1:15 110:18
120:18 121:24
**dated** 119:20
**david** 19:9 22:8,25
23:3,15 58:8,16,20
58:25 62:17,23,23
62:25 63:19,19
69:18 72:22 73:5
74:4,6,22,24 75:4,8
75:10,11,11,15
76:2,11 77:16,17
77:19,20,23 78:1,7
78:8,12,13,13,17
78:20 79:24 80:10
107:21 108:1
**david's** 76:5 82:23
**day** 15:25,25 19:1
23:11 35:5 53:24
76:21 103:12,12
107:11 117:9
118:11 119:20
**days** 17:14 76:23
**deal** 35:23 42:7
60:10 73:3
**deals** 59:22
**dealt** 60:11
**dear** 120:12
**death** 58:5,6 75:24
75:25 111:11
**decide** 52:14
103:22 104:5

**decides** 12:4
**decision** 13:24
  16:25 20:17,21
  25:7 53:6,9 54:12
  56:6,21,24 57:3,5
  57:22 98:21 107:1
  113:13
**decisions** 18:7
**declaration** 3:19
  45:13
**declarations** 50:22
**declare** 3:20,21
  44:6 121:21
**declared** 4:2
**deeply** 17:19
**defendant** 1:9 2:7
  3:10
**define** 11:13
**degree** 10:11
**delay** 5:16,18
**delegate** 12:19 13:4
  13:6,7
**denial** 19:21 49:21
  49:22 106:8
**denied** 18:19 45:17
  49:15 57:18 61:7
**denying** 46:25
**department** 20:12
  29:10 45:16 61:18
  62:2 63:7,20,25
  64:2,8,9,9 83:5,16
  84:3 94:8,10 96:16
  97:4,17 98:9,10
  100:2,4 101:8,8,13
  101:17 105:5
  106:17 107:16
  108:9
**department's**
  113:8
**depending** 47:10
  48:17,17 101:15

104:4
**depo** 5:11 24:23
  25:1,20 82:14
  120:9 121:2
**deponent** 117:5
**deposed** 58:17
**deposition** 1:11
  2:14,23 3:3 4:12
  5:10 19:10,14 22:5
  22:9 24:4 27:4,15
  27:19 28:24 40:11
  45:14 63:12 69:9
  69:19,22 72:23
  74:17,18 93:21
  94:17 96:13 97:1
  116:23 119:1,9,11
  120:13,19 121:22
**depositions** 94:7
  111:14
**depth** 112:2
**des** 8:7,16 9:8 10:1
**describe** 13:10
  111:12
**described** 111:13
**description** 2:22
  45:4,7
**designated** 96:3
**despite** 105:10
  113:16
**detail** 18:17,24
**determination** 71:6
  105:5,9 106:20
  108:1
**determinations**
  50:19
**determine** 11:8
  20:15 45:16 51:16
  61:25 64:2,3,11
  68:5,6 70:15 73:8
  83:6,17,20 87:6
  94:11 97:24 106:17

106:23 112:17
  113:8,12 114:3
**determined** 13:22
  54:11 97:1 103:9
**determines** 103:4
**determining** 21:2
  45:16 61:16 65:3
  67:12 84:20 96:17
  105:13 108:8
  113:20
**developed** 113:13
**development** 13:11
**diabetes** 84:23
  85:18
**diagnosis** 46:2,12
  65:5 83:21 87:6,7
**diane** 82:18,25
**dictated** 99:17
**die** 44:23 48:5,6
  53:3 56:12 70:17
**dies** 49:16 55:10
  71:4,16 73:10,16
  73:21 82:13
**difference** 20:16
  45:24 46:10,18
**different** 8:4,20,21
  12:12 36:9,10,13
  36:20 38:7 40:16
  50:11 54:7 66:6
  74:3 77:25 106:14
  111:5 112:3 114:16
**differently** 89:5
  99:22 111:10,11
**difficult** 5:1,3
**digital** 36:19 37:3
  90:2
**digitally** 116:12
**digna** 1:5 3:4,8
  22:7,13 120:8
  121:1

**dinner** 27:2
**direct** 2:15 4:5 64:6
**direction** 33:24
**directly** 15:23
  17:10 30:1 63:10
**disagree** 83:7
  102:14
**disc** 102:24
**disclose** 30:8,9
  78:21
**disclosing** 81:24
**disclosures** 43:21
  97:25 98:1
**disconnect** 37:16
**discussed** 29:2
  49:11 78:20
**discussion** 33:17
  49:3 63:13
**discussions** 72:5
**disputes** 98:5
**disrespectful** 85:9
**distinguish** 92:19
**distribution** 29:14
  32:6,13,14 36:9
  39:19
**district** 1:1,1
**division** 12:19
  15:25 32:8
**doctor** 53:19
**doctors** 47:12
**document** 24:22
  27:3,9 28:10,11
  38:21 110:2
**documented** 50:22
**documents** 23:2
  27:11 91:7,9
**doing** 6:10 37:14
  46:15 52:19 59:9
  59:14 61:24 63:7,8
  63:14,21 87:2
  88:10 96:11,16,23

109:2
**door** 36:5,5,17,17 103:9
**dot** 104:19
**double** 64:13 95:3
**doug** 1:12 2:14 3:4 3:16 4:8 12:24 117:6 118:7 119:9 120:5,9,12 121:2
**dozens** 112:22
**drugs** 90:7,8
**duces** 27:4
**duly** 118:8
**dumb** 25:10
**duties** 14:6 16:20

**e**

**e** 2:13,21,21 7:23 32:19,20,20,20
**earlier** 73:1 88:7 93:6,22 104:20 111:14
**earliest** 120:15
**early** 10:21 22:10
**easier** 23:9
**eastern** 66:19
**echo** 39:8
**education** 7:2
**edwardnancy** 39:5
**effort** 73:12 80:1 105:15
**eight** 24:15 78:10
**either** 10:20 11:5 11:11 18:4 47:16 94:20 95:4 100:6 106:12
**elderly** 47:18 48:2 48:11 49:6
**elements** 50:11
**email** 29:21,21,22 31:23 32:4,9 33:4 33:15,20 36:18

72:12,17
**emails** 32:5 33:7,9 33:11,22 35:4 71:22
**emergencies** 20:5
**employed** 6:9 92:20
**employee** 88:8 106:2 119:16,17
**employees** 97:2,3 97:10,15,16 98:12 99:25 100:4 104:23
**engage** 18:13 48:1 96:15
**enhance** 17:14
**ensure** 17:3 94:9
**enter** 121:4
**entered** 121:22
**entire** 39:14
**entirety** 5:2 28:11
**errata** 2:19 117:3 121:1
**escalation** 15:2,14
**esq** 2:4,8,11 120:6
**established** 54:2,5
**estimate** 35:3
**et** 41:6 102:19
**etran** 116:21
**evaluate** 99:5 102:19
**evaluated** 97:20 98:16,22
**everybody** 21:13 37:8,14 79:2
**evidence** 67:21 68:4 94:13
**evidenced** 44:5
**evident** 86:25
**exact** 43:8
**exactly** 34:25 61:11 103:18 104:8

**examination** 1:19 2:15 4:5 68:25
**example** 12:5 17:9 35:12 36:10,12,19 53:14,23 106:21 107:7,19
**exams** 111:23
**exception** 28:18 30:7 80:16
**exclusive** 97:8
**excuse** 25:10 48:17 50:16 98:7
**execution** 2:19
**exercise** 114:4
**exhibit** 2:23 24:3 24:21 25:24 26:1 27:13,14,20,24 28:12 29:1 40:10 41:13,16
**existence** 12:10
**existing** 12:3,5 36:21
**exists** 71:3,15 73:9
**expand** 87:1
**expect** 6:1 88:8,20 89:1,2
**expected** 43:10 90:19 92:19
**expects** 89:10
**expense** 111:9
**expenses** 115:23
**experience** 4:25 7:2 10:25 40:13 59:7
**expert** 18:5
**expires** 117:13 118:16
**explain** 11:12 68:11 72:21 77:4 88:11 115:6
**explained** 74:24 76:11

**explaining** 88:17
**explanation** 72:24
**explanations** 45:9 88:23
**expressly** 85:14
**extreme** 107:7,18 107:19

**f**

**f** 44:3,3
**face** 37:4,4
**fact** 19:3 41:12 46:11 52:5,17,19 52:23 53:22 55:7 55:13 57:12 61:1 61:25 64:2,10,10 65:5 67:21 68:5 73:23 84:19 85:15 94:11 100:17 105:10 113:17 114:18
**factor** 47:12
**factors** 63:16
**facts** 19:4 114:12
**factual** 60:25 61:9
**factually** 46:1,21 47:9 94:14
**failed** 74:21
**fair** 25:3 28:15 35:19,20 38:19 43:6,7 49:20 52:7 63:3,9 69:19,20 86:10 89:10 92:3 92:14,16 113:4
**fairly** 42:20
**fall** 40:18 42:3 108:14 115:5
**falling** 25:10
**false** 86:9
**familiar** 20:1,8,10 25:3 27:10 28:12 36:3 41:22,25

43:15 44:16 82:23
108:17 111:2
**familiarize**  22:13
**families**  20:4
**far**  15:9 49:23
51:23 52:25 71:17
87:17 98:6,8,21
100:7
**fax**  120:3
**feel**  6:3,3 27:18
42:19 53:10,12
56:10 68:10
**felt**  96:12,24 101:4
**field**  90:3
**figure**  61:18
**file**  23:6,7,12 103:3
103:14 104:16
114:2 120:18
**fill**  34:3
**filled**  84:22
**final**  24:18 111:9
**finance**  10:11
**financial**  6:11 8:7,9
8:9 25:15
**financially**  11:5
119:19
**find**  7:8 39:5 64:3
85:7,12 87:2
101:15 103:25
104:1,2
**finding**  96:15
**finds**  45:1
**fine**  37:10 66:10,18
78:6
**fingers**  66:9
**finish**  5:2,19 21:11
72:6
**finished**  51:2
**firing**  15:22
**firms**  11:22

**first**  3:15 9:24 22:6
23:10 25:17 27:14
38:17 47:21,21
49:16 51:5 53:3,7
55:11 56:13 58:5
59:6,15,15 70:17
71:4,17,19 72:7,7
72:11 73:10,16,19
73:21 76:24 80:8
82:5,14 93:7 98:11
98:11 113:14 116:5
**fit**  5:22
**five**  24:15 35:1
58:13 112:4 115:6
**fl**  1:22 2:6,9 120:7
**florida**  1:1 117:7
117:12 118:3,15
119:2,7 120:2
121:20
**focus**  99:18
**focusing**  91:10,17
**folks**  35:23 63:25
65:2 83:16 84:20
85:13 87:2 96:14
101:7 105:11 106:3
**follow**  5:1 46:16
96:6 102:3 112:23
112:23
**following**  3:19
37:23 42:12 60:4
67:2 79:18 81:10
94:7 95:22 103:13
115:12 116:9
**fool**  26:16
**forbid**  53:2 55:10
107:10
**force**  39:16,17,18
88:9,24 89:12
90:23
**foregoing**  119:12

**foresters**  1:8 3:5,11
6:10,11,13,14 7:16
10:24 13:17 14:9
15:21 17:6 18:1,19
19:2,4,5 20:9 25:3
25:11,16 26:10
28:3,4,16 29:10
32:2 36:3 38:4,8,19
39:11 40:6,13,17
40:25 41:2,9,18
42:24 43:1,10
44:15,24 47:16,25
48:6 49:5 50:3
51:13,25 52:3 53:1
55:11 56:2 59:3
65:16 67:12 68:5
70:15,25 71:2,14
72:1 73:8,15 82:5
82:12 83:16,17
84:2,25 86:19 88:8
88:12,17 89:10,12
89:20,22 91:20
92:16,22 93:2,3,6
93:10,15,16 96:12
96:24 97:2,10,15
97:18 98:12 99:25
100:9 101:4,9
102:2,8 104:6
106:12,16 109:16
109:19 113:8,20
114:13 115:18
120:9 121:2
**forget**  34:25 104:22
**forgetting**  87:23
**forgive**  25:2 26:19
**forgotten**  72:22
108:23
**form**  24:17,17,18
30:1 46:3 48:8
55:15 68:8 75:18
84:4 85:1,23 86:11

87:10 88:25 89:7
92:23 100:22 102:6
105:16 107:23
121:22
**formal**  4:23 5:9
6:23
**formulated**  71:12
**forth**  101:14
**forward**  24:14 28:7
**forwarded**  2:19
**found**  101:21
112:24
**four**  24:15 28:13,17
29:1 35:1 74:3,7
79:24 80:2,3 96:2,8
106:23 107:11
**fox**  39:8 82:18,25
**frame**  98:21 99:12
**free**  6:3 27:18
68:10
**french**  32:18
**frequently**  5:21
**front**  51:1 58:11
78:25 86:16,18
91:2,14 99:14
**full**  5:10,11,14,15
21:25 23:7 44:11
77:4 104:23 105:11
106:3 114:17
116:18
**fully**  90:3 111:22
111:22
**function**  105:20
**further**  43:2 45:9
73:12 93:9 117:5
119:15 120:19
**future**  43:3

**g**

**g**  3:16 42:17,20
**gal**  62:9

**gather** 36:25
**gathered** 30:11
  101:4
**gathering** 36:24
**general** 19:11,16
  22:25 80:8,9 85:3
  115:24
**generally** 18:12
  33:16 36:22 91:4
  104:17
**generic** 26:15 45:4
  63:13 65:13 89:21
  91:2 93:5
**generically** 11:8
  20:18,19 28:18
  44:19 45:11
**geography** 37:9
**getting** 20:11,23
  71:10 95:15 104:19
  108:4,6 115:3
**gg225879** 118:15
**gist** 71:10
**give** 4:7 5:7 7:2
  10:4 30:25 31:17
  35:3 39:22 40:5
  65:25 66:8 68:10
  70:24 71:2,13 91:2
  106:21 108:7 115:6
**given** 14:7 51:23
  68:17 82:11 88:24
  89:22 90:23 91:16
  103:16 112:23
  113:19
**gives** 40:17 45:6,7
  47:16
**giving** 4:17 57:6,12
  74:14 89:19
**glad** 4:15
**go** 6:2 7:11 10:6,12
  14:10,14,20 16:8
  17:21 26:18 27:1

29:4 31:17,20
32:23 35:4,6 37:6
39:20,25 40:9 44:2
44:24 45:7 48:15
48:19 53:13 54:4
54:10,15 55:16,17
55:22 59:24 62:16
65:2,7 66:11 67:10
68:23,24 69:2
72:10 76:21,23
79:9,12,12 101:21
102:25 103:23
105:19 109:23
112:6,8 114:1
115:2 116:5
**goal** 61:25 86:14
**goals** 115:24
**god** 53:2 55:10
  107:10
**goes** 5:25 9:24
  14:11 50:24 53:19
  63:12 94:17 114:22
**going** 5:5 7:1 11:9
  11:18,19,19 12:4,5
  14:7 16:8,25 17:17
  21:12 22:4 23:17
  24:1,4,6,11 25:1,7
  25:18 27:7,7 28:1,2
  28:22 29:5,18 30:6
  30:8,9,11,15 31:18
  32:19 33:9 37:6,19
  40:18 41:4 42:5,16
  42:17 52:11 53:13
  53:20,22,23 54:13
  56:23 62:10,22
  68:14,16,23 72:6
  75:21,25 76:17,25
  78:19,21 79:11,12
  79:14 80:14 81:6
  81:15,21 83:14
  87:1,15 88:1,23

89:4,21 92:13
94:16 95:14,18
96:5 99:17 100:15
100:16,17 104:6
109:22 110:3,4,8
110:12,15,19,21,21
110:22,25 111:1,25
112:9 115:1,8
116:7
**golf** 39:7
**good** 3:7,9 16:2,10
  16:15 23:18 27:1
  37:9,17 38:18
  53:10,12 55:18,19
  56:10 63:16 66:8
  66:17,21 67:8,9
  85:5 90:1 91:1
  95:15,16 96:6
  109:3
**goodman** 1:2 25:22
**goodness** 44:3
**governed** 81:23
**great** 10:6 37:12
  46:15 66:22 85:5
  96:8
**green** 2:5 27:23
**greene** 2:4,5,15 3:7
  3:8 4:6,10 6:6,8
  22:22 25:23 26:2,7
  26:12,14,17 30:13
  38:2 42:5,9 46:4,7
  47:21 48:9 51:9
  55:16,19,24 58:15
  59:24 60:9 66:12
  66:15,19,22 67:6
  68:9 70:11,13
  75:19 76:17,20
  77:9,12 78:23 79:6
  79:8,11,22 81:4,14
  82:1 84:5 85:4,24
  86:12 87:12 89:3

89:15,17 92:24
94:18,24 95:2,12
96:1 102:7 105:18
107:24 112:6,15
115:4,16 116:4,11
116:16,22
**gref** 39:7
**grounds** 89:14
**group** 7:19,22 8:1,7
  8:9,9 13:23 39:24
  92:7
**guarantee** 48:25
**guaranteed** 48:22
  48:23
**guess** 22:9 30:6
  31:23 50:1 62:5
  63:2,22 65:9 68:21
  74:24 112:21
**guidance** 47:24
**guide** 90:3
**guidelines** 112:23
**guides** 89:24
**guy** 62:9
**guys** 6:18 65:25
  101:9 115:6

**h**

**h** 2:21 42:13,18
**half** 7:16 8:25 9:3
  9:18,20 28:15
  66:16,16 81:18
**hand** 25:12 118:10
**handle** 90:6,7
**handled** 35:18
**handling** 105:11
**happen** 14:1 39:20
  56:24 57:2 103:2
  109:15
**happened** 33:3
**happening** 19:12
  57:22 75:25

happens 18:6 20:5 62:6
happy 76:22
hard 55:3 57:8
head 4:21 12:17 19:20 31:3 62:25 73:11 76:1,1 84:24 85:8,10,12
health 43:18 98:3 107:9
hear 22:6 67:8 72:24
heard 19:1,6
heart's 68:11
held 7:5,7
help 15:10 17:11 18:4 32:21 65:8 89:23 90:2,18 108:24 110:3 111:24
helped 8:22
helpful 23:5 109:5
helping 24:23
helps 90:4,4
heroine 6:1
hetherington 2:8 120:6
high 13:1 87:22 113:1
highest 15:2,13
highlighted 41:24
hipaa 101:22
hiring 15:22
history 45:8 47:11 98:3,4 100:14,18 104:15
hold 8:5,12 32:14 44:2 80:6 102:21 109:4,7
hollywood 2:5,6

home 92:14
honcho 19:20 84:24 85:8,10,12
hooking 107:10
hope 38:8 94:4
hoping 17:13
hour 5:21 37:11 66:16,17 95:14
hours 4:11 35:9
house 27:2 33:4 72:17
housekeeping 25:17,19
huh 106:1
huhs 4:20
hums 4:20
hungry 66:5
hypo 107:14
hypothetical 54:22 54:23 55:5 93:22 107:14

**i**

i.e. 46:19 52:6
ian 2:11 32:2 33:4 35:4 72:22 74:23 75:8,12 76:2 78:17 78:19,21 81:18,18
idea 35:22 62:21
identical 33:23 89:4
identification 27:21
identify 20:12 65:1 109:17
identifying 38:16 109:24
immediate 82:17
immediately 35:4
implemented 83:12
inaccuracies 49:22

inaccurate 44:19 46:21 47:9 100:19
inadvertent 26:8
incentive 114:24
incident 84:1
include 49:1 58:25
included 59:2
includes 41:4
including 57:8
inclusive 119:13
incontestability 47:19 55:12
independent 1:8 3:5,10 6:10,12,14 39:12,15,15,24 40:17,21 41:17 48:1,12 88:9 97:4 97:17 100:5,7,14 100:19 120:8 121:1
indicate 39:10
indicated 102:12
individual 6:17 15:14 16:23 17:3 21:18 115:24
individuals 30:21
industry 16:5,14 59:10,14
information 20:14 21:3 28:6,8 29:12 30:10,17 31:2,9,11 31:12,18,20,25 32:1 40:4 43:17,18 48:15 50:14,14 51:1 53:11,13,15 54:4,5,11 64:7 65:22 90:12 91:4,6 91:22 93:13 97:21 98:3,4,17 100:13 100:16 101:4,20 102:11,19 104:13 104:14 113:12

informing 47:17 48:2
inherent 50:20,21 61:20 84:11,12
inherently 62:4
initial 90:9
initially 36:18
input 82:8 92:9
inquire 99:18
inquiries 26:10 28:4 64:19,21 102:8
inquiring 93:23
inquiry 34:3 45:21 62:2 64:1,10 70:14 70:18 71:13,14,20 72:16,20,20 73:2 79:25 80:2,24 82:4 84:1 91:3 93:21 102:13
inside 113:5
instance 53:7
instructions 5:1
insurance 6:15,16 6:17,18 8:2,10,10 9:8,12 16:24 25:4 28:6 36:14,15 39:12 50:2 70:16 71:3,16 73:9 77:24 82:13 93:17 97:11 97:16,17 98:20 100:1,5,15 106:11 108:17
insure 25:8
insured 11:9 17:7,7 17:8 25:8 26:11,14 28:5,18 40:22 43:16 44:5,14,22 45:19 47:4,8 48:6 49:12,16,25,25 51:11,20,21 52:1

52:14,17,23 53:3
55:1,8,9,10,25 56:4
57:6,12,14 60:13
61:1 67:12 73:21
73:23 80:17 87:6
88:17 90:16,16,24
91:11,18 92:15,19
102:10,21 103:15
**insured's** 43:19
44:12 45:25 46:10
46:18 51:6 61:17
61:19 62:1 86:20
88:21 92:14,18
93:23 94:11 96:17
100:10 101:10
**insureds** 47:1,18
48:2 54:24 64:4,11
65:3 67:13 68:6
87:3 88:23 89:11
**insurers** 15:8,16,18
**intent** 4:22 70:15
70:25 71:2,14 73:8
73:15,18,22 82:5
82:12 86:14 93:6
93:10 102:2,3
**interaction** 101:6
**interactions** 59:21
**interest** 114:6,11
114:23
**interested** 42:18
84:20 114:9 119:19
**intermediate** 92:21
**international** 10:25
**internet** 36:6
**interrupt** 21:10
42:2 76:15,18
**inverse** 43:8
**investigate** 100:10
101:10
**investigated** 59:6
85:14

**investigates** 100:9
**investigating** 67:20
85:16 94:10 97:5,6
97:18,19
**investigation** 50:13
64:25 87:3 96:12
96:24 103:21
**investigations**
112:17
**investment** 8:11
**involved** 12:16,20
12:23,24 13:16,25
14:2 16:6 17:18
18:3 72:3 75:12
97:3,10,15 99:13
99:25 100:20
104:10,18 105:7,8
106:24
**involvement** 13:8,8
63:14 72:4
**involves** 11:10
**iof1** 109:21
**iowa** 8:7
**irish** 8:15 9:11
**issuance** 44:24
70:17 113:9
**issue** 5:18 16:1
48:22,23 95:11
103:23 108:18
113:1,14,14
**issued** 25:22 65:17
86:16 97:20 98:16
98:22 104:12
106:13,13 113:9,20
**issues** 15:16 16:9

**j**

**job** 10:13 16:23
17:22 46:17 90:1
104:24 105:20
106:2 113:19

**joined** 19:2
**judge** 26:3,9 71:12
99:17
**jump** 101:1,3

**k**

**k** 70:11
**kansas** 4:9 7:19
**keep** 27:16 35:13
110:4,8,12,15,18
110:21,21,21,25
111:1
**kennedy** 2:12
**kept** 4:24
**key** 45:15
**keyboard** 77:10
**kind** 9:10 23:24
28:10 41:23 62:22
88:1 90:12 92:9
96:4 99:17 107:19
109:9,11 113:3
114:24 115:17
**knew** 53:1 62:9,10
73:11 86:18
**knock** 36:5
**know** 4:15,19 5:4,7
5:23 6:2 18:10,21
18:24 19:8 20:6
22:5 24:6 35:2,5,8
37:8 44:20 46:20
47:5,9 50:10 52:2
56:2,23 57:7 59:11
60:10 65:8,14 69:7
71:25 72:9 73:15
75:15 80:10 82:3
82:23 85:8 87:7
95:7,8,9 96:15
100:15 102:24
105:2,3 107:6
108:13,16,19,20
109:5

**knowing** 114:15,17
**knowledge** 19:11
26:11 28:5 33:17
33:17,18 34:5,7,9
34:12,24 35:17,23
43:20 44:12 45:20
45:25 46:10,19
47:2 49:13 50:2,5,8
50:19,20 51:12,18
51:22 52:3,6,18
53:8,25 54:2,5,8,11
54:24 55:2,9,14
56:8 57:2,7,13,16
57:18 58:2 60:14
60:20 61:2,4,17,19
62:1 63:24 64:4,6
64:11,20 65:4,18
66:2 67:13 68:4,6
68:11 69:13,17
70:5 72:9,25 73:24
74:23 76:8,9 77:15
78:2,4 83:6,11,17
83:24 84:7,7,10,14
84:21 85:15 86:20
87:5 89:18 91:12
91:19 93:2,24
94:12 96:18 97:6
97:20 98:16,24
99:5 100:10 101:10
102:10,20 103:1,17
108:10,15
**known** 114:12
117:10
**knows** 30:10
**kramer** 2:5
**kristina** 2:8 3:9
120:6

**l**

**l** 70:11 121:5,5,5,6
121:6,6,7,7,7,8,8,8
121:9,9,9,10,10,10

**[l - mean]**

121:11,11,11,12,12
121:12,13,13,13,14
121:14,14,15,15,15
121:16,16,16,17,17
121:17,18,18,18
**lab**  111:23
**lack**  65:10 111:15
**language**  11:16
49:5,6
**large**  106:19
117:12 119:7
**late**  88:1
**laughing**  87:21
88:4
**lauren**  2:12
**laws**  101:22
**lawyer**  30:20 31:3
31:5 72:17 83:9
112:8
**lays**  50:7
**lead**  18:9 53:20
114:16
**leadership**  16:22
**leading**  5:6
**leads**  36:14,15,22
**learn**  84:16,19
85:18
**learned**  86:15 96:4
**learning**  93:22
**leave**  94:19
**led**  8:23 75:22
**left**  58:14 87:6
112:5
**legal**  1:21 32:2
120:1
**legislation**  65:12
**legitimate**  38:19
**letter**  2:18
**level**  13:1 15:2,13
36:12,13,22 83:1
112:24 113:17

**life**  6:14,16,17,18
8:1,10,10,15 9:8,8
9:11,12,17 13:21
16:24 25:4 28:6
39:12 43:18 70:16
71:3,15 73:9 77:23
82:12 97:11,16
100:1 102:11 111:1
111:7,7
**light**  53:17
**limited**  64:22
**line**  86:5 121:5
**lines**  90:9 111:8,8
**lisa**  69:22 70:6,10
**list**  27:24 28:21
**listed**  20:25 80:25
**listen**  57:15 61:23
76:22
**lists**  91:7
**literally**  87:22
91:23
**little**  5:17 14:14
18:9 23:18 26:21
36:20 104:1,4
111:5 115:3
**llp**  2:8 120:6
**local**  37:8
**location**  1:17
**logo**  25:11 89:20
**long**  7:8,11,13 8:12
9:15,16 10:2,3 19:9
30:15 35:5 41:9
49:12 52:2,24
55:21 56:1 57:16
57:17
**longer**  26:21
**look**  5:16 17:13
20:13 23:2,14 24:2
24:7,20 27:10
38:23 44:25 45:6
54:10,16 71:22

85:14 104:16 106:5
108:24 109:20
114:2
**looked**  23:5,11 24:8
24:22 68:1 85:13
96:2 108:21,21
**looking**  4:13 24:7
31:8 40:23 41:12
41:13,16 64:3,3
67:20 85:17 87:3,5
90:6 94:11 95:15
95:16 99:2,13
111:25
**looks**  25:7 38:21
40:12 42:10,13,15
**looming**  106:19
**lose**  97:13
**lost**  30:16
**lot**  17:16 18:17
19:19 27:11 95:15
112:1
**loud**  4:19
**love**  44:3
**lucky**  37:17
**lump**  23:10,10
**lunch**  66:25 68:14
69:4 75:13,21,22

**m**

**m**  2:4 7:23 32:20
**madam**  5:25 27:15
66:7 77:1,5 116:4
116:11
**magistrate**  25:22
**main**  111:8
**major**  17:17
**majority**  66:11
**making**  25:7 53:5,6
62:2 64:10 84:1
93:13
**management**  10:11
17:25

**mankato**  10:7
**manner**  30:1
**margin**  38:11
**mark**  25:19 26:18
27:14
**marked**  27:20
**marketing**  29:10
29:15 30:2,18,19
31:13,21 32:10,25
33:1,25,25 34:4
35:14,22 36:12,13
36:23 63:25 64:8
72:18 89:25 90:1,2
90:22 91:5,16 92:4
92:5 96:14
**markets**  38:5 39:11
**marks**  60:8 112:13
**maroque**  32:9,18
32:20 33:5 34:22
**masters**  10:9
**material**  21:3 45:2
48:12,16 60:15
61:7 90:14,21,23
91:15 92:3 93:13
105:6 106:9,10
113:13
**materiality**  105:13
106:11,17,19
107:17 108:8
112:18 114:13
**materials**  34:1
39:23 90:1 91:9
**math**  59:9 87:24
**matt**  32:5,6,13,14
33:24 64:7 74:21
**matter**  3:20,22 4:2
18:5 114:18 120:14
120:20
**mcdowell**  2:8 120:6
**mean**  10:18 11:13
11:14 12:9,24

21:10 22:20 23:7
28:25 31:7 36:4
40:8 42:2 56:14
85:9 90:18 93:17
93:17 99:1
**meaning**  26:14
36:4 101:9 107:14
108:18 113:25
**meaningful**  31:1
**meaningfully**  96:6
**means**  4:12 36:19
37:3 46:16 77:17
77:20 106:11
111:22
**meant**  12:9 26:15
36:6 77:15
**meat**  19:24
**mechanics**  37:13
**mechanism**  36:4
**med**  13:21
**media**  58:14 60:8
112:5,6,14
**medical**  23:7 43:17
46:2,12 47:11 65:5
65:11 94:13 111:17
111:20,21
**medically**  62:18
**medications**  47:12
**meetings**  5:17
**members**  17:20
**merit**  115:22,23
**merits**  68:3
**mess**  23:17 32:19
**miami**  1:22 117:8
120:2 121:20
**mib**  98:3 100:18
104:15
**michael**  2:12
**middle**  7:8 18:24
**mind**  74:24 75:9
82:15

**mine**  16:1
**mini**  116:17,21
**minnesota**  10:7,8
**minor**  12:19
**minute**  13:9 28:14
42:8 43:9 73:5
75:17 80:6 83:4
102:21
**minutes**  28:1,15
58:13 66:8 82:3
112:4 115:6
**minutiae**  20:12
**misreading**  98:13
**misrepresentation**
18:20 19:21 45:2
50:4 52:4 53:2
57:19 60:16 61:7
105:6,14 106:7,9
**misrepresentations**
42:25 45:9 93:14
**misrepresented**
19:4 87:7 91:25
**missouri**  4:9
**misspoke**  99:10
**mock**  92:8
**moines**  8:7,16 9:8
10:1
**moment**  52:13
53:18
**monitor**  3:3 37:20
38:1 60:2,7 66:24
67:5 79:15,21 81:7
81:13 95:19,25
112:10,13 115:9,15
116:8
**month**  10:14 53:19
**months**  7:21 19:8
53:19 74:17 78:10
107:9
**morning**  3:7,9 74:3
91:11,17 96:5

**moron**  40:20
**mortality**  12:18
14:11,17,19 15:11
**move**  24:14 66:6
112:3
**moved**  59:16
**multi**  36:12,13,22
**mute**  37:14,16 79:2
79:8
**mutually**  97:8

## n

**n**  2:13,21 32:20
39:6 70:11
**n.w.**  2:9 120:7
**name**  3:15 4:7,10
25:14,15 70:9
81:18
**names**  32:11
**nancy**  1:20 118:14
119:5,23 120:23
**narrow**  21:12
**national**  9:8,15,16
**nature**  31:9 92:11
**necessarily**  46:22
49:17 50:6 51:6
53:21
**necessary**  13:22
18:4 40:21 105:4
**need**  4:18 5:1,10,14
5:24 20:2 22:5
24:12 27:17 28:21
29:6 31:10 42:20
58:2 61:22 66:8
76:22,24 77:4,5
104:19,20 106:20
106:24 107:4
116:12,12,13,16,17
116:18
**needed**  20:3 95:13
**needs**  5:23 15:4

**negative**  64:14 95:3
**network**  39:12
**never**  5:8 19:1,6
23:5 59:8 64:9,20
64:24
**new**  8:17 9:1,2 12:4
13:11 44:4
**newly**  90:10
**nine**  8:25
**nmo**  36:11,23
48:18
**nmos**  48:14
**nodded**  6:7
**non**  4:21 13:21
104:18 111:17,20
111:21
**noon**  37:6
**nope**  44:1
**normal**  5:4
**normally**  78:25
**north**  8:15 9:11
**northeast**  4:8
**notary**  117:12
118:15 119:6
**notes**  38:12 119:14
**notice**  2:23 25:20
25:21,24 27:4,19
115:2 120:19
**notification**  101:20
**notify**  98:18
**november**  39:6
120:11
**number**  19:8 24:3
24:21 27:11,15,20
28:18 38:6 39:7
41:14 50:11 60:8
63:15 74:16 80:16
96:8,20 102:8
104:22 111:15
112:14 120:10

| | | | p |
|---|---|---|---|

**numbered** 119:13
**numbers** 110:18,18

**o**

**o** 3:16,17 7:23
  32:20,20 120:6
**oath** 2:16 118:2
**object** 48:8 55:15
  68:8 75:18 81:21
  85:1 89:14 94:16
  105:16 115:1
**objected** 89:7
**objection** 46:3 84:4
  86:11 87:10 88:25
  89:16 92:23 94:22
  95:1 102:6 107:23
**objective** 44:20
  115:22
**obvious** 9:11
**obviously** 19:19
  26:8,15 53:24
  75:16 89:15 99:13
**occasions** 74:5,10
**october** 1:15 3:2
  22:9 118:11 119:20
  120:4,10 121:3
**offer** 16:25 17:1,2,2
  50:25 52:11 54:2
**office** 120:15
**officer** 6:21,24 7:14
  7:15,18 8:6,8,18,19
  14:8 15:21 29:14
  32:6,13,14 82:20
  85:22 86:1,2 87:16
  94:2
**officers** 14:9
**offices** 12:8
**official** 118:10
**oh** 7:24 26:12 52:13
**okay** 5:14 7:11 8:1
  8:8 9:6,20 10:6
  11:7 14:20,23 15:5

15:9,19 16:9,12,17
18:18 19:13 20:6
21:10,14 22:3,12
22:16,18 23:14,17
23:20 24:9,10,19
25:16,23 26:14,15
26:16 27:3,6,22
28:14 29:3,8 31:10
32:3 33:3,7,21 34:2
35:2,15,21 37:6,12
37:18 38:15,16
40:5,9,13 42:1,16
42:21,22,23 44:3
49:10,25 51:4,19
51:23 52:15,19,20
52:21 54:17,19
55:5,7,21 56:16
57:6,10,12 58:12
59:24 60:1,24
61:13,15 62:11
63:2,18,24 66:19
67:8 68:25 69:3,9
69:21 71:11,19
72:9 73:3,13 74:2
75:13 76:4 77:11
77:13 78:15 79:11
80:7,14,20 82:2
83:1,19,22,23 88:5
89:6,15,18 90:20
95:13,17 96:8,10
96:22 99:1,6,20,22
99:23 100:1,2,23
103:8,13,20 104:25
105:1 107:2 108:4
108:20 109:7,14,15
109:25 110:6,9,14
110:21 111:2,5,20
115:25 116:4,15
**old** 87:19
**omission** 21:3

**omitted** 20:14
**once** 5:21 36:25
  40:2 55:7 103:8
**open** 104:16
**operating** 82:20
**operation** 77:23
**operations** 8:6,8
**opinion** 20:21,22
**opportunities**
  90:11
**opportunity** 24:20
  45:7
**opposed** 28:7
**order** 1:8 3:5,10
  6:10,12,14 25:22
  26:5 42:19 65:2
  70:14 71:22 96:25
  105:24 106:7 114:3
  116:12,13,20 120:8
  121:1
**ordered** 26:3
**organization** 32:7
  32:10 36:23 48:16
  48:17 59:4 94:3
**organizations** 16:6
  48:14
**original** 20:16
  108:4,6 113:18
  114:2,3,11 120:18
**originally** 18:19
  114:20
**outgoing** 33:15
**overflow** 24:17,17
  24:18
**owned** 92:7
**owner** 44:23
**ownership** 92:5
**owns** 63:22

**p** 3:17
**p.a.** 2:5
**p.m.** 1:16 37:20,22
  37:24 38:1 60:2,5,7
  66:24 67:1,3,5
  79:15,17,19,21
  81:7,9,11,13 95:19
  95:21,23,25 112:10
  112:13 115:9,11,13
  115:15 116:8,24
**package** 87:4
**page** 2:14,22 24:11
  24:13,17,18 25:12
  38:8,13 39:10
  41:16 44:8 88:10
  90:2 109:8,10
  110:3 121:5
**pages** 110:2 119:12
  120:10
**paid** 18:23 39:17
  56:20 57:25 58:7
  58:22 59:4 86:18
  105:24
**pain** 59:13
**painful** 59:11
**pancreatic** 107:11
**paper** 32:23 116:13
  116:13
**pardon** 87:18
**parrott** 1:12 2:14
  3:4,16 4:8,10 6:9
  12:24 26:19 30:14
  38:3 60:10 66:16
  67:7 76:14 77:3
  79:23 81:16,25
  89:18 109:24
  115:17,25 117:6
  118:7 119:9 120:5
  120:9,12 121:2

parrott's 76:22
part 10:21 11:17,20
  12:15 16:6 21:12
  21:15 22:11 23:24
  28:12 41:12 45:6
  47:20,21,22 49:2
  51:20 55:1 57:8
  59:16 91:14 97:23
  98:8,10,11 101:2,3
  105:15 106:16
  113:25
partake 11:11
particular 11:9
  15:3 83:21 90:8
  106:2
parties 4:3 119:16
  119:17 120:19
parts 45:12
party 59:2 120:19
pass 44:23
passed 29:19
patient 53:23
patients 49:7
pay 70:15 71:3,7,15
  73:9,15,18,23
  82:12 93:8,11
payable 73:19
  93:12
paying 75:24 93:7
  102:2
pdf 110:1 116:19
penalties 121:21
penalty 3:23,25 4:3
people 17:9,18
  23:19 29:18,19
  34:14 41:1 59:2
  87:4
people's 40:1
perceive 75:23
percent 32:21
  51:11,12 56:1

105:17,20 106:2
percentage 108:13
perfectly 104:5
  107:8
performance 43:3
period 44:16 45:10
  45:17,18 47:19,19
  48:3,23 55:23 56:9
  64:22 73:17 82:6
  104:11
perjury 3:24,25 4:3
  121:21
person 12:17 21:8
  21:9,21 59:3,22
  72:3 92:20 93:2,23
  105:14 106:22
  107:7 113:19,23
person's 17:22
  21:19 113:23
personally 12:24
  117:10 118:7
personnel 15:23
  16:9,9
perspective 62:12
  62:14 65:20 78:4
  85:20
pester 25:24
pett 2:8 3:9,9 22:20
  25:21 26:1,4,9,13
  27:7 28:1 30:8 42:2
  46:3 48:8 55:15,17
  55:20 66:13 68:8
  68:25 75:18 76:15
  76:18 78:19 79:5,7
  79:10 81:21 84:4
  85:1,23 86:11
  87:10 88:25 89:7
  89:14 92:23 94:16
  94:22 95:1,7,10,17
  99:16 102:6 105:16
  107:23 115:1 116:3

116:20 120:6
philosophy 14:11
  14:14,15 15:11
  63:4,5
phone 29:25 69:6
  81:5 120:3
phonetic 82:18
phrase 45:5,12
phrased 78:15
pick 29:24
picture 54:6
piece 21:2 32:22
  94:13
place 81:17
placed 75:9
plaintiff 1:6,14 2:3
  3:8 119:10
plaintiff's 2:22
  24:3 27:14,20
plan 110:17,18
play 47:13 54:13
  82:5 83:12
please 3:6,12,14,19
  4:7,15 7:1,11 11:12
  12:6 19:23 20:2
  22:3,5 28:22 30:15
  32:11,12 44:20
  46:14 64:16 65:1
  67:24 76:24 77:2,5
  81:16,19 116:16
  120:14
plus 60:11
point 5:20 19:18
  24:13 50:15,16
  52:9 100:19
points 28:13,17
  29:1 54:7 111:16
policies 11:11,13
  36:3 39:25 44:15
  65:17,17 66:2
  70:16 71:4,16

73:10 82:13 97:3
  97:11,16 100:1
policy 11:16,18
  18:20 19:6 44:22
  44:23,24 45:4 48:7
  50:3 51:14 52:1,4
  52:12,15 53:1
  55:12 56:3,19 61:6
  65:19 86:8 93:7,8
  93:16,17,17,18,19
  94:1,5 102:3
  103:22,23 104:6,11
  106:13 108:17,18
  113:1,9,21
portion 43:15
  69:12 70:1
posed 54:23
position 8:5,12,19
  8:21 10:12,16 46:8
  77:16,20 78:9
  92:18 107:21,22
  108:3 114:14,16
positions 7:5,7,9
possible 46:13
potential 20:13
practice 8:25 12:16
  12:16 13:7 14:18
  14:19 15:7,12
  17:14,23 18:13
  19:17 21:6 23:1
  33:19,19 34:13
  37:1 47:15,23
  48:20 50:18 61:20
  62:4,7 63:13 72:25
  77:18 84:10 85:3
  86:4 97:5,18 98:8
  107:3
practices 18:13
  47:15
preface 40:19

premium 106:14
preparation 19:14
22:24 29:11 30:25
31:7 72:23
prepare 22:4 24:23
28:23 80:1,11
96:13,25
preparing 19:9
22:9 24:9
prescription 90:8
98:4 100:14,18
104:15
present 2:10 18:16
75:9
presentation 89:13
92:9
president 8:18,19
11:24 29:14 32:10
32:24 58:9 82:22
pretenses 86:9
pretty 5:21 105:24
previously 68:17
price 17:1 104:8
pricing 12:22 13:8
13:10,15,17 14:25
principal 8:6,8,9
9:4
printed 90:1
prior 7:17 8:5,15
9:23 57:22 74:18
75:25 82:14 86:25
120:18
privacy 101:22
privilege 81:23
probably 4:22,25
74:2 78:3
problem 26:23
85:21,25 88:16
problems 102:25
procedure 56:3

procedures 48:21
proceed 4:4 37:5
120:18
proceedings 37:23
60:4 67:2 79:18
81:10 95:22 115:12
116:9
process 20:1,8
26:11 28:5 37:5
41:4,6 49:14 50:20
50:21 51:16 52:9
53:18 56:14,15
58:10 67:7,11 72:2
74:24 76:12,13
78:3,5 84:10
101:16 102:9,10,16
102:18 104:10
105:3 114:1
processes 20:9 34:6
34:8
producer 37:2
41:23 42:11,23
57:23 90:10 91:25
98:20
producers 39:15
48:12 90:4
product 12:4,6,22
12:22 13:7,11,12
13:13,15,15,16,22
13:23,24 14:1,22
14:24 38:5,5 39:11
39:11 40:22 41:5
43:1,5 48:22,24,24
49:2 89:13,23,24
90:9 92:7,11 109:1
109:6,8,10,10,11
111:2,8,8,9,13,15
111:17,21
production 109:16
109:17,20

products 13:17,19
13:21 15:13 17:19
41:2 43:4,11 48:20
88:12 89:24
professional 119:5
119:24
professionally 11:5
program 114:24,25
project 18:4
projects 17:17,19
18:3
promise 42:5,6
43:2 72:6 75:24
promoted 49:6
promotion 10:21
10:22,23
promotional 39:23
90:22
prompt 120:20
prospective 17:7
40:22 47:18 48:2
49:25 89:11 90:16
92:14,18,19 103:15
protocol 47:15
provided 28:6,8
31:12,20 40:6
43:17 44:8 97:21
98:17 100:11
102:11
providing 73:1
75:24 80:23 108:10
proving 55:5
provision 44:22
51:14
provisions 88:16
public 38:5 117:12
118:15 119:6
pure 111:6
purpose 87:23
purposes 46:25
83:9

put 12:4,6 26:12
37:14,16 55:5 79:1
79:2 80:14 90:17
94:19 95:13 96:5
113:17,18 114:14
114:15
putting 74:25 81:5
90:1 93:20 105:14

q

question 4:15,16,17
5:2,5,10,15,19 7:9
12:1,21 15:3,3,19
24:5 25:1,11 29:22
29:22 30:6,21,22
30:24 31:14,16,19
31:23 35:3,11,11
35:14 37:13 40:19
42:19 44:4 45:15
45:20 46:16,25
47:2,20 49:4,4,21
51:5 52:8 54:15
55:1,4,8 56:18 57:4
58:24,25 61:10,22
61:23,24 63:19
64:16,17 65:15
67:23 68:20 71:5,8
71:19,23 72:7,7,11
74:19 75:22,23
76:14,23,24 77:2,3
77:6,7,22 78:7,12
78:14 80:8,10,20
81:22,22 83:9
84:13 85:2,5 86:24
87:18 89:4,5,21
91:14 92:6 97:9
98:8,14 99:9 108:5
108:6,25 109:3
112:20 114:7
questioning 114:13
questions 4:13,14
4:19 6:1 15:14

19:10,15 22:25
23:1,16 29:7,13,15
31:5 33:23 44:7,9
49:13 50:1,8 51:11
51:21 52:18,25
57:9,9,15 58:3
60:14 61:2,4 62:8
62:15 73:24 74:20
76:5,7 78:9 88:22
90:5 91:12,18
116:1
**quick**  35:7 66:13
105:24
**quickly**  27:8
**quite**  38:11 67:10
**quote**  70:25

**r**

**r**  3:17,17 7:23
32:20,20
**ramifications**
45:11
**range**  10:4
**rated**  113:15,15
**rating**  113:1
**raton**  2:9 120:7
**read**  2:18 23:2
27:11 31:6 38:24
39:1,3,8 51:4,8
64:16,18 69:9,12
69:22,24 70:1
71:21 77:2,6,8
80:17 96:9,20 97:8
97:9,12 99:21
116:3 121:21
**reading**  39:13
71:11 97:12 119:11
120:11,14,17
**really**  6:2 27:1,16
28:25 36:17 38:18
38:18 42:18 48:11
57:8 88:1 89:21,25

106:24 114:9
**reask**  4:15 49:20
56:18 64:15 77:9
80:20
**reason**  5:3 88:4
93:20 121:5
**reasonable**  40:23
40:24
**reasons**  49:19
87:13
**recall**  23:1 27:10
35:7 74:13,14,16
78:16
**recalled**  75:21 76:2
**receive**  91:4 104:14
120:16
**received**  30:18
31:22 64:7 82:8
**recess**  37:21 60:3
66:25 79:16 81:8
95:20 112:11
115:10
**recipient**  32:3
**record**  3:1,6,15,19
4:4,24 6:6 37:20,25
38:17,23 54:16
60:2,6 66:23 67:4
79:15,20 81:7,12
81:15 95:18,24
97:12 109:18
112:10,12 115:9,14
116:8,10 119:14
**records**  23:8
**refer**  88:10 100:17
107:17
**reference**  48:11
**referenced**  120:18
**references**  92:2
**referrals**  36:21
**referred**  51:7 64:17
77:7

**referring**  62:23
**reflect**  6:6
**regard**  35:14 49:6
49:11 93:10
**regarding**  19:10
28:3 30:3,18 43:3
76:8,9 93:10 98:8
**regardless**  57:25
**registered**  119:5,24
**regular**  84:2
**relates**  63:15
**relating**  65:5
**relationships**  15:6
15:15
**relative**  119:15,17
**relevance**  106:1
**rely**  50:9,9,11
88:21,23 89:11
97:24
**remember**  68:2
74:22
**remembered**  74:9
**repeat**  3:19
**rephrase**  4:16 46:6
76:6 102:15
**report**  15:23 17:10
42:11 82:21 119:8
**reporter**  2:17 3:14
3:18,23 4:1,24 5:25
6:5,7 27:15,22 51:4
51:8 64:18 66:7,10
70:9,12 77:2,6,8,11
97:13 116:4,11
119:6,24
**reporter's**  119:1
**reports**  15:25,25
**represent**  24:2 43:2
43:17 90:15,19,24
112:8
**representation**
16:14 35:20 41:18

44:5 53:5 55:25
56:4 57:14 67:15
86:9
**representations**
41:2,8,10 43:10,11
43:14 44:10,25
88:21 102:4,22
**representative**
28:17 88:5 92:13
92:15
**representatives**
29:9 39:13
**representing**  16:5
58:23 93:2
**republic**  9:25
**request**  112:19
113:8
**required**  49:1
101:20
**requirement**  88:13
**rescind**  18:20 19:5
45:3 48:7 50:3
51:13 52:4 53:1
54:25 55:12 56:2
**rescinded**  45:18
56:19 58:7 60:15
60:22 61:6,9
**rescission**  106:8
**research**  13:6,25
17:16 71:20
**reserve**  45:3
**resolve**  79:3
**respect**  12:14 15:15
18:16,22 21:2
30:25 33:18 34:5,8
34:9,12 35:17 48:1
48:19 49:3,21,22
50:23 65:10 73:20
75:23 78:1,2 79:23
80:23 84:8 88:15
90:10 93:6,12

[respect - sentence]                                    Page 140

97:23 98:20 99:3
101:8,13 102:2
112:25 115:18
**respond** 68:13
**response** 4:20
29:22,23 30:23
31:14 33:12 99:2,3
**responses** 4:21
29:16 31:6 74:20
**responsibilities**
10:21,23 14:6,10
15:7,15,20 16:20
21:22 50:7
**responsibility**
12:13 17:5 18:7
21:25 32:7 50:17
51:15 86:3 108:8
108:11
**responsible** 8:24
12:17 15:24 17:11
17:20 63:10 86:3
105:12
**rest** 14:24 52:1,24
55:10 66:9
**restroom** 37:7
**result** 58:10
**results** 14:11,17,19
15:12
**retrieved** 23:8
**review** 50:18 53:15
54:4,4 56:22,23
57:2,3,5 58:6 60:20
61:21 62:17 84:8
86:15 105:8,22,23
107:5,17 108:2
**reviewed** 44:7
**reviewing** 62:7
**rid** 40:15 107:11
112:3
**ridiculous** 24:25

**right** 7:5 16:8
17:17 18:16 19:2
19:25 25:12 26:9
33:6,21 34:6 35:8
42:6,13,14,15
43:12 44:4 45:3,6
47:2 49:16,19 50:5
54:3,10,15 56:4
59:4 61:19 62:12
62:20,25 63:5
64:13,23 67:15
68:22 72:18 73:7
78:11 81:2 82:6
85:9 86:22 88:3
89:8 93:3 94:23,25
95:4 99:10 100:23
100:24 101:1
102:15,22 103:17
103:23,25 104:5,8
105:25 107:3,12
111:6 112:18
116:17
**rigoberto** 23:6,12
26:12 28:19 80:16
**ring** 28:11
**ringer** 20:3
**rise** 18:15
**risk** 16:23 17:6
45:3
**role** 10:20 87:17
88:6,7 112:16
113:6,11
**roles** 10:17,19
**romeo** 39:7
**roughly** 8:16 9:18
59:10,19
**rpr** 1:20 118:14
120:23
**rules** 112:23
**run** 12:7

**runs** 63:22

**s**

**s** 2:5 120:2
**salaried** 39:17
**salary** 10:22
**sale** 36:5
**sales** 29:10 30:2,18
30:19 31:12,21
32:7,8,8 33:16,24
34:4 35:12,16,21
36:17 37:5 39:16
39:16,18 63:25
64:8 72:15,18 88:9
88:16,24 89:12,19
89:22 90:14,20,21
90:23 91:5,16 92:8
92:13,14 96:14
101:13,17 115:23
**salesman** 72:14
**sat** 92:8
**save** 42:16
**saved** 28:14
**saw** 29:22,22 74:20
**sayeth** 117:5
**saying** 12:2,3 35:13
51:10 52:13 87:25
**says** 27:3 38:12
42:10 44:22 51:6
57:14 80:17 90:23
91:8 97:9 110:1
**scammer** 38:18
**scenario** 53:3 60:12
61:1,5 62:22
**schedule** 5:22,23
**science** 17:10,15
**scope** 94:16,17
115:2
**screen** 23:23 40:10
80:6,14
**screw** 23:19

**scroll** 24:1,4,11
27:8 109:22
**scrutiny** 55:22
**seal** 118:10
**search** 98:5
**second** 24:17 27:17
40:15 73:3 79:13
82:11 101:1,3
105:1 110:17
**secondly** 57:23
113:14
**seconds** 31:6
**secretary** 11:25
**section** 43:22,24
51:7
**secure** 50:12
**see** 5:8 20:13 23:22
24:1,5 27:3 35:10
38:9,11,13,14 42:7
47:11 51:13 79:3
80:5,15 96:4
109:12,18,21
111:12
**seed** 108:7,11
**seeing** 38:12 80:3
**seek** 83:6
**seen** 5:11 25:25
27:9 107:18
**self** 86:24
**sell** 12:8 39:25 40:1
40:1,23 48:21,24
92:10
**selling** 41:5 66:1
89:23 92:21
**sells** 36:3 38:5
39:11
**sent** 32:1,5 33:4
72:17
**sentence** 51:5
98:11

separate 33:7
separately 33:6
session 74:3
set 63:4 70:23
  81:15
setting 5:9 63:4
settled 67:10
seven 24:15
shakes 4:21 103:12
shape 30:1 100:22
share 26:19
shared 23:22 90:12
  91:6
sheet 2:19 117:3
  121:1
short 38:3
shorthand 119:9
show 25:20,23
  26:25 32:22 38:7
  80:5
showed 25:21 26:4
showing 109:19
shown 4:25 44:8
side 13:20 14:5
  21:8 78:1 84:16
  103:21
sides 6:15
sign 2:18 39:7
  43:16 50:23 116:5
signature 43:24
  44:6 98:1 118:14
  119:23 121:24
signing 119:11
  120:14,17
simple 34:20 63:18
simply 94:12
sincerely 120:21
single 21:18,19
  49:2 84:1
sir 6:9 9:23 15:1
  34:21 43:23 67:24

71:25 78:12 87:19
  100:12
site 38:24
sitting 16:17 60:12
  69:17 70:4 83:25
  88:5 107:16
situation 60:13
  73:20
situations 46:24
  47:7
six 7:16 24:15
sixty 105:20
slide 26:24
sloppy 79:4
slow 24:12 97:12
slower 14:14
slowly 24:5
small 38:9
smaller 23:25
smith 1:20 4:24
  118:14 119:5,23
  120:23
sold 86:8 111:21
sole 18:7
solely 17:20
solicit 69:2
solutions 1:21
  120:1
somebody 62:21
  75:24 111:18
somewhat 68:21
sorry 7:12,20 9:13
  9:16 14:8 21:10
  32:23 33:14 35:6
  40:8,16 46:14
  49:18 62:13 64:15
  70:25 71:10 80:9
  81:18 82:19 89:16
  97:14 101:18
  109:25 110:13
  115:20

sort 34:1
sought 83:20
sound 42:14
source 31:10 36:15
south 1:21
southern 1:1
speak 23:3 69:4
  74:10,14 78:13,13
  79:25
speaking 76:19
specific 21:6 29:7
  30:24 43:5 49:5,6
  62:19 84:7 85:2
specifically 17:22
  21:1 42:11 43:4
  65:11 75:3 83:14
  91:11,18 108:25
speculating 112:2
spell 3:15
spells 45:10
spoke 22:14,14,18
  69:6 74:4,16,18
spoken 29:9 74:6
ss 117:7 118:3
  119:3
stage 106:23
  107:11
stamp 109:17,19
stamped 109:21
standard 86:19
  87:19
standing 104:23
start 44:4 71:1
  87:22 96:8 97:14
  111:25
started 87:25
starting 7:3 66:5
state 3:6 10:7 12:8
  49:1,3 89:10 117:7
  117:12 118:3,15
  119:2,6 121:20

stated 4:3 20:14
  42:11 63:8 99:14
  103:15 113:11
statement 57:20
  68:24 69:19,20
  70:7 93:5 110:25
statements 44:9
  89:11 97:25
states 1:1
stay 90:25
steak 27:2
steno 116:10
stenographic
  119:14
stenographically
  119:8
step 26:21,21 79:1
steps 25:17 94:9
stop 20:6 24:12
  26:18 27:17 37:15
  81:5 105:1 110:5
  110:10,21
straight 28:7 107:9
strategic 17:11,24
street 4:8 27:2
strictly 115:21
strike 22:6 27:13
  33:21 35:2 40:14
  44:14 46:24 47:14
  64:25 69:21 73:13
  73:14 76:5 79:25
  90:21 101:2 108:5
  112:21 113:6
structure 115:18
stuff 89:22
stupid 24:25 40:19
style 3:4
styled 119:10
subject 18:5 85:6
  121:22

subjectivity 112:24
113:18 114:4
submitting 42:24
subscribed 117:9
substance 33:20,22
69:18 70:6 81:16
81:20 121:22
suffer 59:13
sufficient 106:7,25
suggest 43:8 98:25
120:15
suggested 54:23
suggestion 47:24
suggests 47:17
suitable 120:16
suite 1:21 2:5,9
120:2,7
sullivan 19:9,13
22:8,25 23:16 24:9
24:23 45:14 58:9
58:16,20 59:1
62:23,25 63:19
65:14 69:18 72:22
73:5 74:4,6,22 75:4
75:8,10,16 76:9
77:16,17,19,20
79:24 80:11,22
81:18 82:24 94:8
107:21 112:1
sullivan's 24:4,21
40:11 69:9 76:7
77:14 78:7 108:1
summarize 44:18
69:14 70:2 96:4
summary 35:19
44:19
supervised 112:21
supervisor 82:17
82:24,25
suppose 31:22 63:6

supposed 105:25
sure 5:11,19 19:24
20:7 23:19,21 45:8
58:3 67:25 69:1
73:6 86:15 91:15
93:13 108:21
surround 48:21
swear 3:12
sworn 70:4 117:9
118:8
synced 116:14

**t**

t 2:21 3:17,17
t's 104:20
table 26:25 114:18
tactical 15:25
take 5:20,24 6:3
9:1 11:18 16:6 24:2
26:20 37:7,12
66:16 85:19 95:14
109:20 113:3
114:17,23
taken 1:14,15,19
46:9 120:10 121:3
takes 4:16 37:4
41:17
talk 42:20 58:16
62:17,18 72:22
78:24,24 79:1 91:8
115:7
talked 14:21 28:25
29:2,4,19 68:15
102:1 112:17
talking 18:12 27:6
29:18 31:8 73:5
88:7 91:1 99:6
100:5 103:5 111:13
tape 59:25
teach 65:2
team 12:19 14:24
17:10,16 21:13,15

22:2 25:6 32:8
33:16 34:4,4 35:12
35:16 63:14 77:23
89:25 91:16 98:15
108:1,2 112:19
teams 8:24
technically 92:20
technology 23:18
tecum 27:4
teleconference 1:11
1:17
telephone 36:18
37:3 120:15
tell 7:6 15:9 22:3
24:12 26:7 30:7,11
38:10 39:3 42:18
46:16 47:4 50:10
51:12 52:6 56:1
57:10,16,25 61:10
66:12 72:10 77:9
77:15,16,20 78:9
78:16,19,20 80:18
81:16,19,21 83:14
96:9,21 97:22
100:13 101:21
104:21 107:16,21
107:22 110:5
111:18 115:4
telling 11:2 22:15
38:6 40:14 47:8
48:4 53:16 57:17
58:20 74:9,16
75:14 86:21 107:15
tells 102:24 109:11
term 11:7 13:20
111:7,11,16
terminology 63:3
terms 11:19,24
12:2 13:9 14:7
17:12 46:2,11
47:17 63:11 76:4

77:13 83:2,2 86:4
88:11,17 101:3
113:21
terrible 5:16
testify 27:25 28:3
28:16 63:20 95:10
101:5
testifying 107:2
testimony 3:20,21
4:2 29:11 30:3 31:1
58:17 69:14 70:5,6
70:24 71:2,13,24
73:22 74:11,14
75:17 80:23 93:9
96:13 104:20
testing 18:5
thank 44:3 60:1
70:12 78:15 115:25
116:3,22
thing 14:4,5 17:15
21:1,8 24:1 26:20
31:4 34:1 38:13
65:14 67:9 68:1,13
77:1 92:9 112:8
113:3
things 8:21 12:20
14:1 17:12,13
20:24 28:22 29:5
41:19,19 43:18
47:13 48:21 50:24
53:20 62:4 63:17
65:10 77:24,25
83:8 90:7 92:11
101:24 103:25
104:1,2,16 111:23
115:24
think 16:17 30:17
34:23 40:20 44:19
60:12,25 61:5,10
62:9 87:20 93:1,5
99:18 113:2 115:5

**thinking** 68:14 114:16
**thought** 44:2 82:11 82:14 99:2 114:10
**three** 5:5 8:13 9:19 9:20 10:5 17:9,18 24:15 36:13 53:19 74:3,7 96:20 111:8 111:8 112:14
**threw** 58:19
**tie** 42:6
**ties** 98:13,14
**time** 1:16 3:2,5 4:14 13:21 18:4,4,6 18:6 21:25 22:8,10 22:14 23:15 25:14 32:12 37:10,17,20 38:1 42:23 50:1,14 50:15 53:6 54:1,3,6 54:7 56:6,24 57:8 57:22 58:23 59:3 60:2,7 64:21 66:20 66:20,24 67:5 72:4 72:4 74:8,22 75:2 79:15,21 81:7,13 85:7 95:19,25 97:6 97:19 98:15,21 99:6,8,11,12 100:23,25 101:11 101:16 103:5,13 104:9,23 105:11,15 106:3 109:3 112:10 112:13 113:7,9,22 115:9,15,25 116:8 120:13
**times** 10:13 47:11 62:15,17 65:8 74:7
**tina** 25:19 66:12 69:8 78:23 79:12 81:4 89:16 95:13 95:15 109:20 115:7

**tina's** 46:8
**title** 6:23 8:4 16:10 82:19
**today** 3:2 16:18 19:2 28:3,16 29:11 30:3 31:1 60:12 66:14 69:17 70:4 83:25 88:6 101:5 107:16 109:3
**today's** 96:25
**told** 15:10 17:24 28:1 29:3 30:9,12 43:9 52:2 56:7,18 65:19 67:12,25 72:17 73:14 74:5 75:4 83:8 102:16 111:14
**tomorrow** 76:21
**top** 38:12 89:20
**topic** 91:10,17 112:3
**topics** 30:10
**toronto** 26:24
**torture** 42:17
**tpa** 14:5 17:22
**track** 27:16
**training** 48:16,19 65:2,7,9 90:9
**transcript** 117:4 120:13,16,18 121:4 121:22
**transcripts** 5:12
**transitions** 10:13
**transparency** 50:9 53:9
**travelers** 9:8,16,17
**treated** 91:20
**treatments** 47:12
**trial** 111:11
**trot** 39:8

**troubled** 87:9
**true** 19:7 35:25 43:6,11,13,19 44:11 49:17 50:6 53:4,21 55:14 57:17 73:25 85:19 86:6,8,10 92:22 93:24 98:2 99:15 117:4 119:13 121:22
**truth** 46:20 47:4,8 48:4 51:12 52:2,6 53:17 56:1,1,8,19 57:17 86:21 98:5
**truthful** 53:11,25 56:4 57:1,1 58:1
**truthfully** 52:25
**try** 5:18 12:8 40:16 44:18,20 46:14 48:7 110:12
**trying** 18:9 19:18 19:24 20:24 52:14 61:18 72:21 91:2
**tuesday** 1:15
**turn** 20:3
**twice** 34:11
**two** 5:5 8:20,21 9:18,20 10:5,14 11:11 13:9 16:7 17:17,18,19,19 21:5,6 24:13 28:15 30:21 31:5 32:11 33:7 44:23 47:18 48:6 49:16 53:4 54:7 55:11 56:13 58:5 59:6 60:8 66:15 70:17 71:4 71:17 73:10,16,19 73:21 74:2,7 82:6 82:14 92:2 93:7,20 101:23

**type** 108:18
**typing** 27:17

**u**

**u** 3:16 4:20 32:20 32:20 70:11
**u.s.** 6:16,22 13:20
**uh** 4:20 106:1
**ultimate** 14:11
**ultimately** 16:24 18:23 48:13
**unaware** 65:19 67:21
**uncertain** 104:23
**underlying** 18:15 68:3
**undersigned** 118:6
**understand** 4:14 4:17 7:9 18:12,22 20:11 29:3,17 30:14 33:3 34:2 35:13 39:22 44:21 45:24 46:9,17,23 47:1,7 49:7,10 51:10,17 55:3,22 67:25 73:22 78:14 80:21 83:7,8,12 84:9,9,17 86:6 90:5 90:18 95:12 96:11 96:23 99:16 108:6 113:16
**understanding** 11:21 18:14,18 19:3 20:17 35:10 56:9 63:12,16 72:2 72:24 76:8,12 77:14 99:21
**understands** 78:8
**understood** 10:18 14:3 16:4 27:13 47:14 78:10 85:11 101:23

undertook 94:9
underwrite 65:22
  99:7,8,11 103:14
  114:21
underwriter 9:7,21
  12:14 16:2 21:7,14
  25:2 103:4,10,14
  112:16,25,25 113:2
  113:7,11 114:1,2,3
  114:8,11,19
underwriters 9:15
  11:15,20 12:6 13:5
  15:22 16:21 17:5
  18:1 20:25 21:1,5,6
  102:12 112:22
  115:19
underwriting 6:21
  6:23 7:13,15,18
  8:17,23,24,25 10:1
  11:7,8,23 12:9,11
  12:13,15,15,17,21
  13:25 14:8,8,10,14
  14:17,19 15:7,11
  15:12,16,21,24
  17:12,15,21,23,25
  19:16,16,20,21
  20:15,20 21:15
  22:1 23:1 26:10
  28:4 31:2 33:19
  34:6,8,13 35:18,23
  35:24 50:13,13,15
  50:21,24 53:6,14
  54:1,7,9 56:6,25
  58:24 59:3,17
  62:12,14,15 63:5
  65:9,15,20 78:5
  83:2 84:16,24 85:8
  85:13,20 90:3,5
  96:14 97:3,11,16
  97:23 98:6,7,19,23
  99:3 100:1,2,6,21

101:2,7,15 102:9,9
  103:21 104:9 105:5
  105:12 106:17,20
  106:23 107:5 108:7
  111:6 113:5,19
  114:25
underwriting's
  113:25
underwritten 90:3
  111:3,9,10,21,22
  111:22
underwrote 114:20
unfair 44:20
unit 60:8 112:14
united 1:1
universal 111:1,7
university 10:7
upper 25:12
use 6:2 11:7 14:7
  17:12,13,14 35:12
  36:22 63:2 64:21
user 18:5
usually 30:5

**v**

v 32:19,20 121:1
various 7:5 12:8
  16:5 89:24 90:8,11
vendors 15:18
verbal 4:20,21
verification 93:12
verified 54:8
verify 53:13
verifying 53:8
veritext 1:21 120:1
veronique 32:9,18
  32:18 33:25 64:7
  74:21 89:25 91:21
veronique's 92:6
versed 106:25
version 116:18

versus 3:4 46:20
vetted 15:4
vice 8:18,19 29:14
  32:9,24
video 3:2 4:23 27:4
  37:15,20 38:1 60:2
  60:7 66:23,24 67:5
  79:15,21 81:5,7,13
  95:19,25 112:10,13
  115:9,15 116:8,14
videographer 2:12
  3:1,12 37:19,25
  58:13 59:24 60:1,6
  66:23 67:4 79:14
  79:20 81:6,12
  95:18,24 112:4,9
  112:12 115:8,14
  116:5,7,15
videotaped 1:11
  3:3 116:23
view 106:4
vinas 1:5 3:4,8 19:4
  22:7,13 23:6,12
  26:12 28:19 80:17
  84:9 85:3 87:4
  120:8 121:1
vinas's 67:20 83:5
  84:21 85:14
violation 93:25
vs 1:7 120:8

**w**

wait 68:16
waiting 52:10
waived 119:12
walked 102:17
want 25:18,24
  35:10 39:1 42:20
  51:21 63:3 69:7
  78:16 83:4,9,15
  89:9 95:3 96:3
  103:23 112:2 113:3

116:13
wanted 26:6
wants 93:3
warrant 106:8
way 5:8 7:6 10:3
  15:10 30:1 32:22
  37:2 40:16 60:18
  68:4 83:24 88:21
  90:17 93:3 94:20
  95:4 100:13,22
  101:19 104:15
  105:25 106:19
  109:17,22 114:10
  114:16
ways 35:13 36:10
  38:4,7 39:10 74:3
we've 14:21 25:13
  68:15 91:10,17
  95:13 107:18
  112:17
web 88:10
website 38:8,20,22
  39:4
week 35:5 75:2,5
  76:3 78:18
weeks 27:12
welcome 116:2
went 9:4 10:24
  29:18 32:9 59:7
  112:1
whittle 23:10
willingness 111:24
wish 110:18
withdraw 61:22
witness 1:19 2:16
  2:18 3:13,14,16,18
  3:21,25 4:1 25:20
  46:6 55:18,21
  66:18,21 76:16
  78:25,25 85:2
  87:11 89:1 94:23

[witness - zuckerman]                                                Page 145

95:9 105:17 109:19
118:10 119:9,12
**wonderful** 26:20
**word** 34:11,11,20
39:5,6,6 65:10
78:16,17 99:1,2
100:12
**words** 5:5 35:1
**work** 7:6 26:20
27:3 28:2 36:14,20
37:8 71:25 72:1
98:19 111:23
115:22
**worked** 8:20 9:24
11:15,22
**working** 7:3,4 8:17
10:25 106:2
**works** 98:7
**worry** 88:1 110:20
**write** 12:18 27:18
34:14 39:18,19
104:6 121:4
**writing** 11:10,13
**written** 43:4 74:11
91:23 92:3 103:22
**wrong** 44:1 104:1,2
104:5,5 105:22
107:8
**wrongfully** 20:14
**www** 38:24
**www.foresters.c...**
39:5

| x |
| --- |
**x** 2:13,21,21

| y |
| --- |
**year** 9:3 22:10,11
47:18 59:15,17
**years** 7:16,19,20,20
7:20 8:13,16,25
9:18,19,20 10:5

36:2 44:24 48:6
49:16 53:4 55:11
56:13 58:5 59:6,8,9
59:10,13,18 60:11
70:17 71:5,17
73:11,16,19,21
82:6,14 93:7
112:22
**yep** 52:16 79:6,8

| z |
| --- |
**zero** 19:2 69:17
70:5
**zone** 18:10
**zoom** 1:17 2:4,8
5:17 26:19 27:7
29:25 118:7
**zooming** 28:10
**zuckerman** 2:5

FLORIDA RULES OF CIVIL PROCEDURE

Rule 1.310

(e) Witness Review. If the testimony is
transcribed, the transcript shall be furnished to
the witness for examination and shall be read to or
by the witness unless the examination and reading
are waived by the witness and by the parties. Any
changes in form or substance that the witness wants
to make shall be listed in writing by the officer
with a statement of the reasons given by the
witness for making the changes. The changes shall
be attached to the transcript. It shall then be
signed by the witness unless the parties waived the
signing or the witness is ill, cannot be found, or
refuses to sign. If the transcript is not signed by
the witness within a reasonable time after it is
furnished to the witness, the officer shall sign
the transcript and state on the transcript the
waiver, illness, absence of the witness, or refusal
to sign with any reasons given therefor. The
deposition may then be used as fully as though
signed unless the court holds that the reasons
given for the refusal to sign require rejection of



the deposition wholly or partly, on motion under
rule 1.330(d)(4).




DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.