UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

Case No.:  1:18-CV-24100-COOKE/ GOODMAN

DIGNA VINAS,

      Plaintiff,

vs.

THE INDEPENDENT ORDER OF FORESTERS,

      Defendant.

_____/

## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS AND ADDITIONAL FACTS IN SUPPORT OF PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## STATEMENT OF MATERIAL FACTS[1]

### Procurement of the Certificate

1.     Disputed.  R. Foresters provides no evidentiary support for its proposed undisputed fact.  Further, the e-signed document itself gives no indication who completed either the form or the overflow portions. The evidence has established Jazmin Lightbourn, Foresters' sales agent, completed at least some parts of the application. (Ex. A, October 16, 2020 Deposition of Digna Vinas ("Vinas Depo"), at 44-45; see also Ex. B, Supplemental Diabetes Questionnaire, at 2 (referring to Mr. Vinas not in first person, but as "proposed insured")).

---

[1] As Vinas has advised the Court previously, Foresters has continued to litigate the liability portions of the Breach of Contract matter despite its having admitted its breach and confessed judgment.  (D.E. 173, at 19-22). As such, a large number of facts set forth by Foresters are simply irrelevant to the remaining fraud liability issues and breach of contract causation/damages issue.  Vinas will indicate this by including an ("R") after designated irrelevant assertions.

2.      Disputed as phrased with respect to "aimed at ascertaining" and with respect to materiality.  R. In fact, Foresters' Corporate Representative ("CR") testified Mr. Vinas' medical records did not reveal a condition or issue that was material to issuance of the policy and yet, Foresters denied the claim wrongfully asserting "material information" was withheld. (Ex. C, March 4, 2020 Deposition of David Sullivan ("Sullivan Depo"), 226-231, 400-02).

3.      Undisputed. R.

4.      Undisputed with the understanding Mr. Vinas also then expressly advised Foresters that in response to misinformation (apparently from an inaccurate Medical Information Bureau data base), his doctor told him he did not have diabetes. (Ex. D, "Underwriting Materials, at 9; Ex. C, diabetes questionnaire, at 2). R.

5.      Undisputed, to the extent Foresters refers to signing the Application when it uses the word "declared."

6.      Undisputed, to the extent Foresters refers to signing the Application when it uses the word "declared."

7.      Undisputed, to the extent Foresters refers to signing the Application when it uses the word "certified."

8.      Disputed.  R. Foresters has produced no evidentiary support for its suggestions that the reason he was asked to complete a diabetes questionnaire was any MIB hit.  The word "Accordingly" implies a causal connection where none is demonstrated. Undisputed that Foresters through its sales agent Jazmin Lightbourn requested a Diabetes Questionnaire to be completed.

9.      Undisputed. R.

10.     Disputed that Mr. Vinas responded.  The sales agent appears to have completed the "additional information" section of the questionnaire.  (Ex. B, at 2 (referring to Mr. Vinas not in first person, but as "proposed insured"); Ex. B, at 44-45.

11.     Undisputed.

12.     Disputed.  R. First, Foresters provides no evidentiary quality support for its proposed Undisputed fact.  The Diabetes Questionnaire (which is not explicitly referenced at Foresters' citation), does not contradict the MIB error, it explains it and advises that Mr. Vinas' doctor told him he did not have diabetes.  (Ex. B, at 2).

13.     Disputed.   R. Foresters provides no evidentiary support for its proposed Undisputed fact. It is further disputed that the MIB hit was the reason Foresters sent any letter.  As the notes at Foresters' citation reveal, Mr. Vinas had already contacted Foresters advising that he had checked with his doctor and he did not have diabetes.

14.     Undisputed that Mr. Vinas provided a letter to Foresters through its sales agent. (Ex. A, Vinas Depo, at 42).

15.     Disputed that the cited portion of the transcript, which reads in relevant part that "there is no claims decision made at the time of underwriting whether they have been completely truthful . . . with their knowledge and belief, a contestable review will happen and a decision will come of that review," shows that Foresters did not determine Mr. Vinas' best knowledge and belief to its own satisfaction during the initial underwriting process. Disputed as legal argument that has no place in a statement of material facts under Local Rule 56.1 to the extent Foresters suggests Section 627.404, Florida Statutes, shields it from liability here.

16.     Undisputed that Foresters approved the application after learning the fact that the MIB reference was not accurate and that Mr. Vinas' doctor advised (and provided a letter advising that) he did not have diabetes.  (Sullivan Depo, Ex. C, at p. 243 l. 21 – p. 244 l. 1; Ex. D, at 2).

17.     Disputed to the extent Foresters uses the term "owned" to disparage Vinas' standing to pursue this claim.  Undisputed that the policy designates Vinas as the beneficiary. (Ex. E, Certificate).

18.     Disputed because whether the contestability clause is "consistent with Fla. Stat. § 627.255" is an issue of law that has no place in a statement of material facts under Local Rule 56.1.  Undisputed that the Certificate language is accurately quoted.

19.     Disputed that the policy uses Foresters' characterization of "merger clause," or that Foresters' paraphrasing is an acceptable substitute for the policy language itself, i.e. that "No one, including the producer who provided you this certificate, can make a promise or representation about the entire contract other than what is described in the entire contract." (Emphasis added).

20.     Undisputed.

21.     Disputed as to unsupported speculation about what Foresters might have done.

22.     Undisputed.

3

## Plaintiff's Claim for the Death Benefit

23.     Undisputed.

24.     Undisputed.

25.     Undisputed.

26.     Undisputed that a lab report was in Dr. Hershman's medical records.  It is disputed that Dr. Hershman considered this consistent with diabetes as it is undisputed he never advised Mr. Vinas that he had diabetes.  R.

27.     Disputed to the extent "identified these conditions" is meant to imply Dr. Hershman diagnosed Mr. Vinas with diabetes. R.

28.     Disputed.  The cited material does not indicate that claims adjudicator Lisa Buckland reviewed and evaluated the relevant records for evidence of Mr. Vinas' best knowledge and belief before recommending recission.  The exact opposite is true.  The evidence is undisputed that Foresters' claims department never "determined that Mr. Vinas knew he was being followed for diabetes and secondary complications." Ms. Buckland testified she did not review Mr. Vinas' claim with an eye towards his best knowledge or belief; "it wasn't a question of what [Mr. Vinas] knew or not, it was what the diagnosis was." (Ex. F, March 4, 2020 Deposition of Lisa Buckland ("Buckland Depo"), at p. 56 lines 9-11). She stated that she would nonetheless "do up a recission letter and send it up to management for review" without first making a "determination whether the insured knew of the condition." (Id. at p. 20 lines 23-25). Ms. Buckland further stated "The only evidence in [Foresters'] claim file . . . was that [Mr. Vinas] was told by his doctor that he did not have diabetes." (Id. at p. 35 lines 20-25)  For all these reasons, this fact is disputed.

29.     Disputed that the incontestability underwriter "determined" whether Mr. Vinas "accurately answer[ed]" anything. By Foresters' own admission, accuracy was to be determined by evaluating Mr. Vinas' BK&B.  (Ex. G, October 13, 2020 Deposition of Doug Parrott ("Parrott Depo"), at 85-86).  As advised above it is undisputed that Foresters never looked into, much less determined Mr. Vinas' BK&B, and that the underwriter incorrectly concluded that Foresters would have declined coverage.  Foresters' CR testified the policy would have been issued anyway.  (Ex. C, Sullivan Depo., at 393, 400-01).

30.     Disputed as phrased.  Foresters produced no evidence that the amount of premiums paid was $11,448.00. Foresters' answer is also subject to clarification for

completeness.   In the denial letter Foresters took the position that "Mr. Vinas had been diagnosed as having Diabetes at the time the application was taken," and that "his then-present diagnosis of Diabetes should have been disclosed at the time the application and questionnaire was completed." (Ex. H, "Denial Letter," at 2).  Foresters did not purport to have investigated or determined Mr. Vinas' best knowledge and belief. (Id.).  Foresters also incorrectly claimed that "[h]ad accurate and complete information regarding Mr. Vinas' health and medical treatment been disclosed at the time the application and questionnaire was completed, the certificate would not have been issued as applied for." (Id.).

31.   Undisputed.  Foresters unequivocally denied Vinas' claim. (Ex. H, Denial letter, D.E. 158-6). Mrs. Vinas filed suit to recover the benefits.  Foresters ultimately paid the claim and confessed judgment three years after denying Vinas' claim.

## The Action

32.   Undisputed.

33.   Undisputed.

34.   Disputed and R as to Foresters' hyperbolic and blatantly false characterization that it was "stonewalled at every turn" by "meritless" objections.  Foresters did zero discovery throughout the first sixteen months of this case.  It didn't depose Dr. Hershman, and did not subpoena his records until February 18, 2020.  Similarly, it was not until February 5, 2020 that Foresters sent its first set of discovery to Vinas.   It didn't depose Mrs. Vinas until literally the day of fact discovery cutoff, October 16, 2020. (Ex. A, Vinas Depo, at 1; D.E. 92, at 2). It didn't depose Ms. Lightbourn.  Further, all of this was AFTER Foresters had supposedly done its allegedly full contestability investigation … the investigation that never bothered to investigate Mr. Vinas' BK&B.  It is obviously disputed that Vinas' objections were without legal merit. The Court never ruled on the issues because Foresters confessed judgment to Count I (Breach of Contract), rendering further discovery moot.  (D.E. 69, 71).

35.   Disputed and R as to continuing inappropriate characterizations of Mrs. Vinas' discovery objections as "meritless" and "frivolous."  Disputed that Foresters has shown that the charges in Mrs. Vinas' Civil Remedy Notice ("CRN") were "without basis;" Foresters escaped a ruling on this by confessing judgment on Count I (Breach of Contract).

36.   Disputed.  Foresters suggests that Dr. Hershman's letter provided information that Foresters didn't already have or couldn't have obtained on its own through discovery, by

using the medical release authorizations, or from a simple phone call! This is absolutely false and is fully addressed in the Response to Foresters' motion for summary judgment (D.E. 173, at 5), which explains Foresters could have obtained through the medical information releases, (Ex. C, Sullivan Depo, at p. 38 lines 4-17) and in any event was merely cumulative of the letter he submitted five years earlier when Mr. Vinas applied for the policy. (D.E. 127-4, at 2) (Ex. I, 2015 Hershman letter). Disputed that Dr. Hershman's medical records indicate that Mr. Vinas "had diabetes and secondary complications." Disputed that the text of Dr. Hershman's 2020 letter indicates that he thought his medical records show that he "diagnose[d] Mr. Vinas with diabetes or any complications of diabetes," or that he ever told Mr. Vinas he had diabetes. (D.E. 155-16; Ex. J (2020 Hershman Letter)).

37.     Disputed. Foresters' characterization that interest on the death benefit was paid "to compensate Plaintiff for any damages she may have experienced between her loss and the settlement" is incorrect. Interest compensates for the time value of money, not any other damages. Wiand v. Lee, 753 F.3d 1194, 1205 (11th Cir. 2014). R.

38.     Undisputed. R.

39.     Undisputed, but irrelevant because Vinas brings no bad faith claim. R.

40.     Disputed. On March 16, 2020, immediately upon returning from the initial depositions of Foresters' CRs in Toronto that provided the initial evidence of Foresters' fraud, Vinas filed a Motion for Leave to File a Second Amended Complaint raising Count III (Fraud in the Inducement). (D.E. 55). Count III does not raise or include any claim for bad faith. Foresters strenuously opposed the amendment, including prolonging the briefing process by seeking a sur-reply after mistakenly invoking a products liability doctrine, the economic tort rule. The Court granted the Motion, and the Second Amended Complaint was filed on August 4, 2020. (D.E. 87 (July 16, 2020 Sur-Reply); D.E. 90 (July 23, 2020 Order Granting Leave to File)).

41.     Disputed that a statement of material fact is an appropriate vehicle to re-argue Foresters' motion to dismiss. Disputed that the operative complaint is a shotgun pleading. Disputed that there is any vicarious liability count against Foresters, who is not alleged to be merely technically liable with no fault of its own. On these facts, Lightbourn was authorized to make accurate representations about the Foresters' products she sold.

## ADDITIONAL FACTS

Plaintiff again, must point out the overwhelming majority of the facts cited by Foresters are <u>completely irrelevant</u> to the issues to be determined in this fraud in the inducement action (separate and apart from being inaccurate and misleading).  Plaintiff, however, cannot stop Foresters from submitting these irrelevant facts to the Court.  As such, Plaintiff is compelled to submit the following (mostly irrelevant) facts that either correct the record or present a complete picture of the irrelevant issue.

1.      Foresters' entire sales force is composed of nonemployee sales agents to whom it supplies promotional materials, applications, field underwriting guides, and other forms and materials.  (Parrott Depo, Ex. G, at 39-40, 92-93).

2.      Foresters does not want its customers to know that its "independent agents" are anything other than a representative of Foresters.  The "insured is not expected to distinguish between whether that person is technically employed by an intermediate agency," and "that's the way Foresters wants it."  (See Parrot Depo, Ex. G, at p. 92, l. 13 – p. 93, l. 4 )

3. The late Rigoberto Vinas (Mr. Vinas) mortgaged his home in 2015.  (Ex. A, Vinas Depo at 29).  The mortgage company recommended mortgage life insurance, and gave him the names of a few companies, including Foresters.  (<u>Id.</u> at 29, 31-32).   Mr. Vinas contacted Foresters.

4.      Sales agent Jazmin Lightbourn contacted the Vinases in response to their inquiry.  (Ex. A, Vinas Depo, at p. 35, lines 13-15; p. 115, lines 1-5).

5.      As far as Mrs. Vinas was concerned, "Jazmin was Foresters.  As far as we were concerned, when we talked to Jazmin, we were talking to Foresters. . ." (Vinas Depo, Ex. A, at p. 114 l. 1-3).  "As far as we were concerned, she belonged to Foresters.  That's it." (<u>Id.</u> at p. 57 l. 7-8).

6.      Foresters' own file materials identify Jazmin Lightbourn as an "agent" in numerous places. (Ex. K, Production File, at pp. 18,19, 52, 153, 154, 159 and 160).

7.      Ms. Lightbourn was authorized to make truthful representations, such as telling Mr. and Mrs. Vinas when they asked what would happen if he died within two years that "as long as they tell the truth, 100 percent the truth as they know it, that Foresters will not rescind the policy based upon a contestable claims procedure."  (Parrot Depo, Ex. G, at p. 55 l. 25-p. 56 l. 3).

8.      Initially, the Vinases planned to purchase a supplemental mortgage life insurance policy with limits equal to the amount of the mortgage: $42,000. (Ex. A, Vinas Depo, at 33).

9.      The sales agent informed them that, unlike their existing $100,000 policy, Foresters offered a product that did not raise his premiums at age 80. (Id.; see Ex. L, "Application", at 11). The Foresters' monthly premium was "a lot more" than the $229 premium that American General charged. (Id. at 34; Ex. L, at 7 ($477)).

10.     Mr. and Mrs. Vinas asked the sales agent about losing benefits if Mr. Vinas died during the two-year contestability period. (Vinas Depo, Ex. A, at 99). She told them that Foresters would not rescind the policy for a misrepresentation "as long as you put the truth . . . . The only thing, you might have to give more documents, or they might investigate you deeper." (Id. at p. 99 l. 16-19).

11.     At Foresters, the sales and marketing departments have no actual knowledge of how the claims and underwriting departments address the "best knowledge and belief" requirement in the Application. (Parrott Depo, Ex. G, at 35-36, 63-64, 96).

12.     Foresters' sales department does not train sales agents on how Foresters applies the best knowledge and belief clause. (Id. at 64-65).

13.     Mr. and Mrs. Vinas came to the joint decision to switch to Foresters and cancel their existing insurance. (Vinas Depo, Ex. A, at 48 (explaining that "we got to the decision . . . that we were going to cancel" their existing insurance)).

14.     Foresters' New Business + Underwriting notes indicate that after the MIB hit, the sales agent investigated and then "called in to advise PLI [Mr. Vinas] does not have diabetes." (Ex. D, at 1). He had "completed an exam for insurance in 2012 when the examiner advised [him] that he has diabetes." (Id.). Mr. Vinas "went to see Dr and was advised that[sic] does not suffer from Diabetes." (Id.). Accordingly, he "maintains no to Q 25H [sic] and 3." (Id.).

15.     The sales agent was advised to "re-ask question 24H on the application and have him complete the Diabetes Questionnaire." (Id.).

16.     Mr. Vinas obtained a note from his doctor Kenneth Hershman dated January 22, 2015, advising that Mr. Vinas was "in good health and [was]s not taking any medication

8

Case 1:18-cv-24100-MGC   Document 172   Entered on FLSD Docket 02/19/2021   Page 9 of 12


for diabetes or on a diabetic diet" and also explained that he'd been Mr. Vinas' doctor for fifteen years.  (Ex. I).

17.    The letter was provided to the sales agent, who faxed the letter to the underwriting department on January 22, 2015.  (Ex. I, at 1).

18.    Foresters issued Mr. Vinas a policy with full knowledge of Dr. Hershman's letter that Foresters interpreted as indicating Mr. Vinas did not have diabetes.  (Ex. I; Sullivan Depo, Ex. C, at 236).

19.    The underwriter determined that the record indicated Mr. Vinas did not have diabetes. (Ex. D, at 2; see also Sullivan Depo, Ex. C, at p. 243 l. 21 – p. 244 l. 1).

20.    Moreover, even if Mr. Vinas had diabetes in 2010 as the MIB hit indicated, "even longer duration dm hx [i.e, an even longer history of diabetes melitus] is maybe +50" risk rating points.  (Id.).

21.    The result was still "under the +100 buffer" for this product, so the policy was issued.  (Id.).[2]

22.    After Mr. Vinas's death from a heart attack on January 11, 2017, the sales agent sent the claim forms to the claims department.  (Ex. M, January 16, 2017 letter to Jazmin Lightbourn, at 1). The forms included an "Authorization for disclosure of medical and health-related information."  (Id. at 3).

23.    Foresters automatically contested the certificate because he died within the contestability period and his policy did not require payment of interest upon recission, merely return of premiums.  (Sullivan Depo, Ex. C, at 260).

24.    Claims Adjudicator Lisa Buckland acknowledged that "The only evidence in [Foresters'] claim file . . . was that [Mr. Vinas] was told by his doctor that he did not have diabetes." (Buckland Depo, Ex. F, at p. 35 l. 20-25).

25.    Ms. Buckland did not review the claim with an eye towards Mr. Vinas' best knowledge or belief; "it wasn't a question of what [Mr. Vinas] knew or not, it was what the diagnosis was."  (Id. at p. 56 l. 9-11).

26.    It also was not part of the "normal process" to review the file for indications of an insured's best knowledge and belief.  (Id. at p. 53 l. 13-24).

---

[2] Vinas will seek to file under seal a copy of the underwriting guidelines Foresters uses for diabetes and diabetic conditions.

27.     Similarly, calling a doctor to determine the insured's best knowledge and belief would not be a normal part of Foresters' investigation process.  (Sullivan Depo, Ex. C, at 290).

28.     CR Doug Parrot testified that if he were to discover that the claims department had not tried to determine Mr. Vinas' best knowledge and belief, he would "have a problem with that," because Foresters' "standard for accuracy" during the contestability claim is "the insured's best knowledge and belief, whether they are telling the truth or not."  (Parrott Depo, Ex. G, at p. 85, l. 5-p. 86, l. 23).  Processing claims under different terms than the policy was sold would be selling the policy "under, let's say, false pretenses or with a representation that wasn't true … [it] would not be in line with who we are" as a company.  (Id., at p. 86, l. 2 – l. 23).

29.     Ms. Buckland admitted that she usually "would do up a recission letter and send it up to management for review" anytime an application question seemed incorrect, without first making a "determination whether the insured knew of the condition."  (Buckland Depo, Ex. F, at p. 20 l. 17-25).

30.     It was Ms. Buckland's job to forward all relevant information to the underwriting department during the contestability review, so that underwriting could determine whether any error was material, i.e. whether the policy would nevertheless have issued.  (Id. at 38-39).

31.     Nevertheless, when she wrote her summary for review by the underwriting department, she did not mention that the file contained Dr. Hershman's letter and Mr. Vinas' two statements regarding the reason for the false MIB hit.  (Id.; see also Ex. N, "Underwriting Opinion," at 2).

32.     Instead, she merely noted portions of Mr. Vinas' records both before and after the Application included an "assessment" of diabetes based on the use of International Classification of Diseases ("ICD") billing codes.  (Buckland Depo., Ex. F, D.E. 79-1, at 24-26, 42-43; Ex. N, at 1-2).

33.     CR David Sullivan testified that based upon facts already in Foresters' file in 2017, Mr. Vinas' best knowledge and belief ("BK&B") was that he did not have diabetes and that the claim should not have been denied. (Sullivan Depo, Ex. C, at p, 122 l. 25- p. 23 l. 20; p. 140 l.22-p. 144 l. 25; p. 197 l. 17-22; p. 299 l. 7-p. 300 l.3; p. 345 l. 20-23).

34.     Foresters' underwriting department wrote that "Had we been aware of the Applicant's history of diabetes complicated by disorders of the circulatory system and the kidneys we would have declined to issue coverage."  (Ex. N, at 2).

35.     Mr. Sullivan further testified that nothing in Mr. Vinas' medical records was material to Foresters' assumption of the risk. (Sullivan Depo, Ex. C, p. 400, l. 19-p. 401, l. 11). Even if Foresters had obtained the documents during the underwriting period, the underwriting guidelines directed that the certificate should issue anyway because a 73-year-old man with diabetes and peripheral sensory neuropathy was within the 100-point buffer. (Id. at 393 (no indication of autonomic neuropathy), 400-02, 41).

36.     Until his deposition March 4, 2020, Mr. Sullivan had never gone through the process of rating Mr. Vinas' Application to determine whether it should have issued. (Sullivan Depo., Ex. C, D.E. 79-2, at 407).  On April 3, 2020, Foresters agreed to tender the death benefit with interest and conceded Ms. Vinas was entitled to attorney fees.  (D.E. 69).

37.     Before Foresters confessed judgment and paid the death benefit with interest shortly after the Sullivan deposition, Mrs. Vinas cashed in her own life insurance, and also sold jewelry (including wedding bands) to ensure that her mortgage payment was covered. (Vinas Depo, Ex. A, D.E. 127-14, at 14; Ex. O, "Amended List of Consequential Damages")). The face value of her policy was $100,000; she cashed it in for $8,106.40.  (Id. at 21-22).

38.     Bank of America demanded payment of $11,810.37 (Ex. P, "Consequential Damages Materials," at 1) because she could not repay a short-term loan for $10,400.  (Vinas Depo, Ex. A at 12-13).

39.     Foresters understands that additional expenses arising from unpaid bills, foreclosures, and attorney fees are all natural and reasonably expected consequences of not having life insurance benefits available after a spouse's death.  (Sullivan Depo., Ex, C, 404-06).

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY a true and correct copy of was filed with the Clerk of this Court via the CM/ECF filing and that a copy has been sent via electronic mail this 19th day of February to Kristina B. Pett, Esq. Kristina.pett@mhllp.com and Danielle Shure, Esq.,

Danielle.shure@mhllp.com, McDowell, Hetherington, LLP, 2101 N.W. Corporate Blvd., Suite 316, Boca Raton, FL  33431.

KRAMER, GREEN, ZUCKERMAN,
GREENE & BUCHSBAUM, P.A.
Co-Counsel for Plaintiff
4000 Hollywood Blvd., Suite 485-S
Hollywood, FL  33021
(954) 966-2112 – phone
(954) 981-1605 - fax

By:      /s/ Craig M. Greene
         Craig M. Greene, Esq.
         Fla. Bar No. 618421
         cgreene@kramergreen.com

         and


         Adrian Neiman Arkin, Esq.
         MINTZ, TRUPPMAN, P.A.
         Co-Counsel for Plaintiff
         1700 Sans Souci Boulevard
         North Miami, FL  33181
         (305) 893-5506 – phone
         adrianarkin@mintztruppman.com